IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
In re:                                  :     Chapter 11
                                        :
FILENE'S BASEMENT, LLC, et al.,         :     Case No. 11-13511 (___)
                                        :
            Debtors.[1]                 :     Joint Administration Pending
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF GARY BINKOSKI, INTERIM CHIEF FINANCIAL OFFICER OF SYMS CORP. IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Gary Binkoski, being duly sworn, deposes and says:

1.      I am a Senior Director of Alvarez & Marsal Holdings, LLC ("A&M").
A&M is a financial advisory services firm with numerous offices throughout the country. I have
held the position of Senior Director with A&M since 2009.

2.      I earned a Bachelor of Business Administration from Loyola University in
1984 and a Masters of Business Administration from Northwestern University in 1995.
Throughout the course of my career, I have served as Chief Financial Officer for a variety of
specialty retailers in various industries such as apparel, consumer electronics, home and storage
solutions, and office products. I have more than 27 years of experience in financial roles for
nationally known corporations such as General Foods, Marshall Field's, Office Depot and The
Limited Too. In my current position at A&M, I am responsible for organizational restructuring
for retail, restaurant and consumer-based companies, which includes providing interim

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Filene's Basement, LLC (8277), Syms Corp. (5228), Syms Clothing, Inc. (3869), and Syms Advertising Inc. (5234). The Debtors' address is One Syms Way, Secaucus, New Jersey 07094.

management, financial and organizational restructuring initiatives, as well as strategic planning engagements.

3. In March 2011, A&M was engaged to provide financial advisory services to Syms Corp. ("<u>Syms</u>"), a publicly-held corporation organized under the laws of the state of New Jersey and the parent of the other debtors and debtors in possession in the above captioned chapter 11 cases, (collectively, the "<u>Debtors</u>"), including Filene's Basement, LLC ("<u>Filene's Basement</u>"), a limited liability company organized under the laws of the state of Delaware. I was a part of the engagement team in March, and as a result, I have developed a great deal of institutional knowledge regarding the Debtors' operations, finance and systems since the commencement of A&M's engagement. I am over the age of 18, competent to testify, and authorized to submit this Declaration in support of the Debtors' chapter 11 petitions and the first day pleadings described herein (the "<u>First Day Pleadings</u>").

4. I became the Interim Chief Financial Officer of Syms in July 2011. In that capacity, I have become familiar with the Debtors' day-to-day operations, business affairs, and books and records. I have also reviewed the First Day Pleadings and am familiar with the facts alleged and the relief requested therein. Certain of the disclosures herein relate to matters within the knowledge of employees of the Debtors and are based on information provided by them. I otherwise have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities as Interim Chief Financial Officer, and if called as a witness, would testify competently thereto.

5. This Declaration is divided into two parts. Part I of this Declaration provides background information about the Debtors, their business operations, and the

circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the Debtors' First Day Pleadings.

**PART I**

**BACKGROUND**

**A.      Chapter 11 Filings**

6.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 100-1532 (as amended, the "<u>Bankruptcy Code</u>"). The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

**B.      The Debtors' Businesses and Recent Performance**

7.      The Debtors collectively own and operate forty-six (46) "off-price" retail stores under the "Syms" and "Filene's Basement" names.

8.      On June 18, 2009, Filene's Basement (then known as SYL, LLC) acquired certain real property leases, inventory, equipment and other assets of Filene's Basement Inc., a retail clothing chain, pursuant to an auction conducted under section 363 of the Bankruptcy Code. As a result, utilizing the services of approximately 1555 employees, Filene's Basement owns and operates a chain of twenty-one (21) Filene's Basement stores. The Filene's Basement stores are situated throughout the Northeast, Middle Atlantic, Midwest and Southeast regions of the United States, in properties that are leased by Filene's Basement. Filene's Basement also leases and operates a 457,000 square foot distribution facility in Auburn, Massachusetts. The Filene's Basement stores offer a broad range of first quality, in-season merchandise bearing nationally recognized designer or brand-name labels for men, women and children. The Filene's Basement stores are known for their tagline, "Where Bargains Were Born,"[TM] which is illustrative of the

store brand's long-standing position as an original off-price retailer. The Filene's Basement stores are also known for their "Running of the Brides" events, which focus on bridal gowns and apparel and are unique to Filene's Basement.

9. Syms was founded in 1958 and has approximately 910 employees. Syms owns and operates a chain of twenty-five (25) "off-price" retail stores that operate under the "Syms" name.[2] The Syms stores are situated throughout the Northeast, Middle Atlantic, Midwest, Southwest and Southeast regions of the United States. Fifteen (10) of the Syms stores operate in properties that are owned by Syms, while ten (10) of the Syms stores operate in properties that Syms leases. The Syms stores offer a broad range of first quality, in-season merchandise, bearing nationally recognized designer or brand-name labels for men, women and children at prices substantially lower than those generally found in department and specialty stores. In addition, several stores also carry a selection of fine jewelry. Syms stores have as their tagline "An Educated Consumer Is Our Best Customer,"[TM] one of the best known and longest lasting taglines in retail. Furthermore, Syms owns a facility in Secaucus, New Jersey, that houses the Debtors' corporate offices and that also contains warehouse, distribution, and store space.

10. The retail apparel business is highly competitive, and the Debtors' businesses account for only a small fraction of the total market for men's, women's and children's apparel. The Syms and Filene's Basement stores compete with discount stores, specialty apparel stores, department stores, manufacturer-owned factory outlet stores and other retail outlets. Many of the stores with which Syms and Filene's Basement compete are units of large national

---

[2] Five (5) of these are co-branded Syms/Filene's Basement stores that are owned and operated by Syms. These co-branded stores combine the strengths of both the Syms and the Filene's Basement brands.

or regional chains.  In particular, retailers having substantially greater resources than the Debtors have entered or have indicated their intention to enter the "off-price" apparel business, and the "off-price" apparel business itself has become increasingly competitive, especially with respect to the increased use by manufacturers of their own factory outlets and the use of on-line sites by other retailers.  At various times of the year, department store chains and specialty shops offer brand-name merchandise at substantial markdowns which further intensifies the competitive nature of the industry.

11.     As of September, 2011, the Debtors owned assets aggregating approximately $236 million on a book value basis.  Of this amount, approximately $2.5 million was comprised of cash and cash equivalents, $97.7 million was comprised of real estate inventories, $65.8 million was comprised of merchandise inventory, and $70 million was comprised of other assets.  The Debtors had aggregate liabilities of approximately $94 million.

**C.     The Debtors' Corporate and Capital Structure.**

12.     A corporate organization chart depicting the ownership structure of the Debtors is attached hereto as Exhibit A.

13.     Syms, the parent company of each of the other Debtors, is a publicly-held New Jersey corporation.  Prior to the Petition Date, Syms' common stock was listed on NASDAQ under the symbol "SYMS."  As of the Petition Date, approximately 14.5 million shares of Syms' common stock were outstanding.

14.     The remaining Debtors are: (a) Filene's Basement, a Delaware limited liability company of which Syms is the sole member; (b) Syms Advertising Inc., a Delaware corporation and a direct subsidiary of Syms; and (c) Syms Clothing, Inc., a New York corporation and a direct subsidiary of Syms.

15.     Syms and Filene's Basement are parties to a secured $75 million revolving credit facility (the "Prepetition Revolver") pursuant to that certain Credit Agreement (as amended, the "Prepetition Credit Agreement") dated as of August 27, 2009 with Bank of America, N.A. as Administrative and Collateral Agent (the "Prepetition Lender").  The Prepetition Credit Agreement is scheduled to mature on August 27, 2012.  Obligations under the Prepetition Credit Agreement are secured by liens on the Debtors' inventory and other personal property and two parcels of Syms' real property located in Paramus, New Jersey and Secaucus, New Jersey.  As of the Petition Date, there was approximately $31.3 million outstanding under the Prepetition Revolver, which includes amounts outstanding under sub-limits for letters of credit which, when utilized, reduce availability under the facility.  The letters of credit are used primarily to provide liquidity to the Debtors for payment to their factors and for insurance premiums.  As of the Petition Date, the Debtors had outstanding letters of credit under the Prepetition Credit Facility of approximately $11.1 million.

16.     Although the Debtors have sought to remain current with their suppliers, given their performance over the past twelve months and most recently, the Debtors' trade vendors and factors have restricted trade credit over the last several months.  In addition, several of the factors have required additional security in the form of stand-by letters of credit.  While the factors had previously extended credit beyond the level of security provided, this practice has now ceased completely.  Further, the Debtors' trade vendors have become increasingly uncomfortable with the level of uncertainty regarding the Debtors' future, fueled by the Debtors' recent operational performance, press regarding the Debtors, and rumors within the industry.  Accordingly, the Debtors' working capital has been severely restricted, as has the Debtors'

receipt of merchandise. These impacts on working capital have been exacerbated by declining revenues, thereby reducing available liquidity.

**D.      Events Leading to the Filing of the Chapter 11 Cases.**

17.      The Debtors have filed these chapter 11 cases because they have concluded they are unable to reorganize on a stand-alone basis. Therefore, they have determined that the best way to maximize value for the benefit of all interested parties – including creditors and stockholders – is a prompt and orderly wind-down of their retail businesses that will capitalize on the upcoming holiday shopping season, followed by a separate process to maximize the value of Syms' owned real estate. As more fully discussed below, this conclusion was reached following a lengthy process in which the Debtors considered and explored all reasonable strategic alternatives.

18.      Notwithstanding their best efforts, the Debtors have experienced significant operational losses during the last two years. For the fiscal year ended February 26, 2011, the loss before income taxes as reported in their Form 10-K was $51.7 million. For the 26 weeks ended August 27, 2011, the Debtors had losses of $16.7 million as reported in the Company's Form 10-Q.

19.      The Debtors' economic condition is attributable to numerous factors. The prolonged deterioration in economic conditions during the past few years has led to an erosion of consumer confidence, disposable income, and consumer spending. As a result, consumer purchases of discretionary items, including merchandise sold in the Syms and Filene's Basement stores, has declined. Furthermore, as noted above, the retail apparel business is highly competitive and has become increasingly so. The Syms and Filene's Basement stores compete with discount stores, specialty apparel stores, department stores, manufacturer-owned factory outlet stores and other retail outlets, many of which are units of large national or regional chains

that have substantially greater resources than the Debtors. The Debtors' businesses have, therefore, faced increased competition for declining consumer purchases.

20. Additionally, the Debtors have not realized the anticipated synergies between the Syms and Filene's Basement businesses. When the Filene's Basement assets were acquired, it was with the expectation that significant synergies and cost savings could be generated, to the benefit of both the Syms and Filene's Basement businesses. However, these benefits did not materialize to the degree expected because developing synergies and cost savings between the Syms and Filene's Basement businesses proved more difficult than had been anticipated. As a result, and given the conditions discussed above, both the Syms and Filene's Basement businesses sustained ongoing and significant losses.

21. In the months leading up to the Petition Date, the Debtors' financial position has further suffered as a result of recent tightening of credit lines from their factors, which was reflected in reduced payment terms. This in turn forced the Debtors to pay down over-advances that were provided in prior months and resulted in reduced merchandise receipts.

22. The Debtors undertook numerous initiatives to improve their performance and maximize value. In March 2011, the Debtors retained A&M to assist in developing and implementing performance enhancing initiatives. Since its retention, A&M has been significantly involved with all aspects of the Syms and Filene's Basement businesses, providing interim chief financial officer and chief performance officer services,[3] and working with the Debtors' management to implement various initiatives, including rigorous inventory planning and allocation practices; eliminating non-performing categories in the Syms and Filene's

---

[3] Jeffrey Feinberg has served as Chief Performance Officer in connection with A&M's engagement by the Debtors since March 2011.

Basement stores and increasing performing categories; and meeting with the Debtors' Prepetition Lender and factors in an effort to establish better credit lines.

23. The Debtors have also initiated closings of underperforming stores. In the past fiscal year, the Debtors closed two underperforming Syms stores and one underperforming Filene's Basement store. Moreover, prior to the Petition Date, the Debtors began the process of winding down and liquidating an additional five (5) underperforming Filene's Basement stores (the "5 Prepetition Closing Stores"). To that end, the Debtors entered into an agency agreement with Gordon Brothers Retail Partners, LLC ("GBRP") dated October 12, 2011 (the "October Agency Agreement"), whereby GBRP serves as the Debtors' agent to liquidate the 5 Prepetition Closing Stores. The 5 Prepetition Closing Stores are subject to leases which expire in December 2011.

24. Notwithstanding the initiatives described above, and despite the best efforts of all involved, the Debtors' businesses continued to deteriorate. The Debtors suffered significant ongoing operational losses throughout 2011, and projected that such losses would continue for the foreseeable future. In addition, as described above, the Debtors' factors and trade vendors tightened credit terms and, as a result, the Debtors projected that, absent additional financing or measures to monetize certain assets, their liquidity would run out as early as mid-November 2011 and, at the latest, in January 2012.

25. Thus, in addition to the initiatives described above, the Debtors undertook a comprehensive process lasting several months to identify and evaluate strategic alternatives, including a possible sale of the Debtors (the "Strategic Alternatives Process"). On May 26, 2011, Syms issued a press release indicating that its board of directors had initiated the Strategic Alternatives Process and that Rothschild Inc. ("Rothschild") had been retained to assist in this

process. The Debtors also retained Cushman & Wakefield to work with Rotshchild and to assist in evaluating options with respect to Syms' owned real estate.

26. As part of the Strategic Alternatives Process, the Debtors, through Rothschild, were in contact with strategic, financial, and real estate buyers, as well as liquidators, to gauge their interest in pursuing a transaction with the Debtors. Specifically, the Debtors, through Rothschild, spoke with potential strategic buyers, potential financial buyers, potential real estate buyers, and nationally known liquidators, many of whom executed confidentiality agreements and engaged in further diligence of the Debtors. Included within the categories of potential strategic and financial buyers were potential buyers who would consider buying the Debtors for an upfront cash fee.

27. The Strategic Alternatives Process lasted several months. Throughout that process, the Debtors (through Rothschild) indicated that they were receptive to various acquisition alternatives, including but not limited to an acquisition of the Debtors in their entireties (*i.e.*, the Syms and Filene's Basement retail operations and the Syms owned real estate), an acquisition of some or all of the retail operations, or an investment in the Debtors. The Debtors did not receive any viable bids from any of the potential strategic and financial buyers as a result of the Strategic Alternatives Process.

28. Given the Debtors' liquidity position, the ongoing losses and deterioration of the Syms and Filene's Basement retail operations, the inability to reorganize on a stand-alone basis, and the lack of a viable alternative transaction, the Debtors began to consider maximizing value through an orderly wind-down of their businesses. In determining to pursue a liquidation of their businesses, the Debtors considered the results of Rothschild's efforts to develop one or more going-concern alternatives as described in the Lipman Declaration, on the one hand, and

Rothschild's efforts to develop a liquidation alternative as described herein, on the other hand. The latter included not only an analysis of the proposals from the liquidators and the estimated proceeds from store closing sales and sales of furniture, fixture and equipment, as well as intellectual property assets, as described below, but also estimated proceeds from liquidation of Syms' owned real estate portfolio and the possibility of mitigating real estate lease rejection claims.

29.  The Debtors further determined that the wind-down of the Syms and Filene's Basement retail businesses should occur promptly to capitalize on the upcoming holiday shopping season (the busiest season for retailers).  Indeed, the Debtors determined, based upon the advice of their advisors, that delaying the wind-down of the Syms and Filene's Basement retail businesses until after the holiday season would result in significant decreases in their recoveries on inventory (at least 10% to 20%).

30.  The Debtors' Board of Directors met regularly throughout the Strategic Alternative Process and were kept apprised of the status of proposals and options available to the Debtors.  I was present at all these meetings.  Ultimately, at a meeting of the Syms' Board of Directors held on October 31, 2011, Rothschild provided a presentation that summarized the terms of each of the four proposals received on October 28, 2011.  The board also heard a presentation regarding the status of Rothschild's efforts to develop other strategic alternatives that would have not contemplated chapter 11.  At a telephonic conference convened on November 1, 2011, the Board of Directors determined that the liquidation bids received to date represented a better recovery to stakeholders than any further efforts to reorganize on a stand-alone basis, given the absence of any bids to acquire the Debtors' businesses.  Notably, the Chief Executive Officer and majority shareholder of Syms was present at all of the Board meetings and

supported the Board's determination that an orderly liquidation represented the best option to maximize recoveries for all stakeholders. Indeed, the Debtors believe that there will be stockholder recoveries at the conclusion of their wind-down efforts. Therefore, with the approval of the Board of Directors, the Debtors commenced these cases with the intention of seeking approval to enter into an agency agreement on an emergency basis.

**E.       Objectives of the Chapter 11 Cases**

31.      The Debtors commenced these chapter 11 cases to first effectuate a prompt and orderly liquidation of the Syms and Filene's Basement retail businesses and then a separate process to maximize the value of Syms' owned real estate. After having considered the various alternatives (including as described above), the Debtors believe that these chapter 11 cases constitute the best means to maximize value for the benefit of creditors, stockholders, and all other interested parties.

# PART II

## FIRST DAY MOTIONS AND ORDERS

32.     In furtherance of these objectives, the Debtors expect to file a number of first day motions (the "<u>First Day Motions</u>") and proposed orders, each as listed on the attached <u>Exhibit B</u>, and respectfully request that the Court consider entering the proposed orders granting such First Day Motions.  I have reviewed each of the First Day Motions and Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving an orderly wind-down of the Debtors' businesses.

## A.     Administrative Pleadings.

33.     The Debtors have filed three "administrative" motions that seek to have (a) the bankruptcy cases jointly administered, (b) Kurtzman Carson Consultants, LLC ("<u>KCC</u>") retained as claims and noticing agent and (c) the time to file schedules and statements extended, as noted in items 1, 2 and 3 on <u>Exhibit B</u> hereto.

34.     The Debtors are requesting that the chapter 11 case of each of the Debtors be jointly administered.  As set forth above, Filene's Basement, formerly SYL, LLC, and SYL Inc., is a wholly-owned subsidiary of Syms and an affiliate of Syms Clothing, Inc. and Syms Advertising Inc., which are also each wholly-owned subsidiaries of Syms; therefore, the Debtors are all affiliated entities.  I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings,

thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

35.     The Debtors also seek authority to retain KCC as claims, noticing and solicitation agent in these bankruptcy cases.  I understand that a claims and noticing agent is required by the rules of this Court.  Moreover, such relief is prudent in light of the thousands of creditors and potential creditors and parties in interest to whom certain notices will be sent. Accordingly, I believe that the most effective and efficient manner by which to give notice and provide solicitation services in these cases is to engage an independent third party.

36.     The Debtors are requesting that the Court extend the time by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs to thirty (30) days after the current deadline. It is my understanding that the Local Bankruptcy Rules automatically extended the Debtors' deadline thirty (30) days because the Debtors filed a creditor matrix containing more than two hundred (200) creditors. Thus, the Debtors are requesting the Court to extend the deadline to file schedules and statements to sixty (60) days after the Petition Date.

**B.     Motions to Continue Certain Banking and Business Practices (Item 4).**

37.     The Debtors have filed a motion to continue using their prepetition cash management system and bank accounts, subject to certain modifications.  In that regard, I understand that on a prepetition basis, the Debtors maintained fifty-six (56) bank accounts out of which they managed cash receipts and disbursements, and that post-petition they will maintain those accounts in addition to two (2) new deposit/disbursement accounts, to be set up post-petition, that will be used to receive proceeds from and fund obligations relating to the going-out-of-business process for each of Syms and Filene's Basement (the "Bank Accounts").  I believe that all of the Bank Accounts are and will be in a financially stable banking institution,

fully insured by FDIC insurance (up to an applicable limit per Debtor), and comprise an established cash management system that the Debtors need to maintain, subject to the post-petition modifications, in order to ensure smooth collections and disbursements as they wind down their respective businesses.

38.     In understand that the prepetition cash management procedures utilized by the Debtors constitute ordinary, usual and essential business practices, and with the post-petition modifications, remain appropriate in connection with the Debtors' store closing sales. The Debtors' cash management system is highly automated. This allows the Debtors to manage centrally all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. I believe that the Debtors will continue to maintain detailed records reflecting all transfers of funds. As noted above, the Debtors' cash management system will be modified post-petition by the use of two (2) new deposit/disbursement accounts to receive proceeds from the going-out-of-business process and facilitate post-petition disbursements by the debtors in possession.

39.     If the Debtors were not permitted to continue to use their banking and business practices, as contemplated by their First Day Motion for approval of same, including their use of numerous business forms (including, without limitation, letterhead, purchase orders, invoices, contracts and checks) would, I believe, cause enormous disruption and could impair the Debtors' efforts to accomplish an orderly wind-down. Moreover, such actions would be expensive, unnecessary and burdensome to the Debtors' estates and would not confer any benefit upon those dealing with the Debtors. Consequently, I believe that maintenance of the existing cash management system, subject to the post-petition modifications, and other banking and

business practices as requested in certain of the First Day Motions during these chapter 11 cases is in the best interests of all creditors and other parties in interest.

**C.      Waiver of Investment and Deposit Requirements (Item 5).**

40.      The Debtors have filed a motion seeking a waiver of investment and deposit requirements under Bankruptcy Code section 345.  All of the Debtors' Bank Accounts are with Bank of America, N.A., a stable banking institution with FDIC insurance (up to an applicable limit per Debtor).  The Debtors do not maintain any investment accounts.

41.      I believe that the Debtors' deposit practices substantially conform with Bankruptcy Code section 345, and that all money deposits are safe and prudent and yield, under the circumstances, the maximum reasonable net return on such money.  Nonetheless, out of an abundance of caution, to the extent that such deposits do not conform with the approved practices identified in Bankruptcy Code section 345, the Debtors seek to have such requirements waived so as to allow Bank of America, N.A. to accept and hold the Debtors' funds consistent with prepetition practices.

**D.      Payment of Employee and Payroll Obligations and Certain Taxes (Item 6).**

42.      The Debtors have also filed a motion to continue certain prepetition wages, compensation and employee benefits.  The Debtors' workforce is comprised of full- and part-time salaried and hourly employees.  The Debtors employ in the aggregate approximately 2,465 Employees in their stores, distribution centers and headquarters, of which approximately 1,118 work on a part time basis.  The Debtors are parties to four collective bargaining agreements (each, a "CBA") governing their unionized hourly Employees.  Filene's Basement has a CBA with Local 1102 of the Retail Wholesale Department Store Workers Union ("RWDSU"), which represents approximately 1,131 hourly employees at the Filene's Basement store locations and distribution centers.  Syms has CBAs with Local 1102 of the RWDSU, Local 108 of the

RWDSU and Local 400 of the United Food and Commercial Workers Union ("UFCW"). Collectively, Local 1102 and 108 of the RWDSU and Local 400 of the UFCW represent approximately 696 hourly employees at the Syms store locations and its distribution center in Secaucus, New Jersey.

43.     The Debtors have approximately 638 non-union Employees (the "Non-Union Employees") who generally work in management positions in the Debtors' stores or are area managers, regional loss prevention or human resources managers or work in the Debtors' corporate office.[4]  Approximately 87% of all employees are hourly wage earners and the remaining 13% are salaried personnel.

44.     It is my understanding that the motion seeks authorization to pay prepetition wages, salaries, bonuses, reimbursements, and other compensation, to continue the maintenance of employee benefit programs in the ordinary course of business, and directing all banks to honor prepetition checks for payment of prepetition employee obligations.  I believe that without payment of these employee obligations, the Debtors' businesses and operations will be detrimentally impacted through the reduction in employee morale and the potential loss of key employees during the wind-down process.

45.     To my knowledge, there are presently only two (2) employees who are owed in excess of $11,725 for prepetition wages or salaries.  Thus, I believe that the overwhelming majority of all of the Debtors' employees may have a priority claim with respect to all of their accrued but unpaid prepetition wages or salaries, a claim which I am told is granted priority over other claims pursuant to the Bankruptcy Code.  It is my understanding that the

---

[4]     Approximately eight (8) of the Non-Union Employees work for the Debtors pursuant to individual employment agreements.

motion does not seek authority to pay any employee over $11,725 for prepetition wages or benefits. It is also my understanding that as of the Petition Date, the Debtors had approximately $1.67 million in unpaid payroll obligations, and that approximately $878,000 of that sum represents Filene's Basement payroll obligations and approximately $789,000 of that sum represents Syms' payroll obligations.

46.     The Debtors offer a number of different reimbursement programs, medical, life and disability insurance, savings and retirement plans and other employee benefits, all as more fully set forth in the motion. I believe the Debtors must continue to pay all such outstanding amounts owed as of the date of this Declaration for the items addressed herein and in the motion, including amounts that the Debtors are required by law to withhold from employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes. I believe that if such payments are not made, employees will terminate their employment with the Debtors at a time when the need for a well-motivated workforce is most critical, and cause significant disruption to operations.

**E.     Utilities (Item 7).**

47.     The Debtors have filed a motion seeking (i) approval of the Debtors' proposed form of adequate assurance of postpetition payment to the utility companies; (ii) to establish procedures for resolving any objections by the utility companies relating to the proposed adequate assurance; and (iii) to prohibit the utility companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors solely on the basis of the commencement of these cases, a debt that is owed by the Debtors for services rendered prior to the petition date, or on account of any perceived inadequacy of the Debtors' proposed adequate assurance. In connection with the operation of their businesses, the Debtors receive electricity,

gas, water, telephone services and other similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies").

48.     The services provided by the Utility Companies are crucial to the Debtors. If the Utility Services were interrupted, even for a brief period, the Debtors' operations could be severely disrupted, and such disruption could jeopardize the Debtors' ability to conduct going-out-of-business sales, particularly during the crucial upcoming holiday sales season.

49.     I believe that the procedures that the Debtors have proposed for the Utility Companies adequately protect such Utility Companies' rights that I understand are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services.

**F.      Reclamation (Item 8).**

50.     The Debtors have filed a motion to establish standard, comprehensive and uniform procedures for addressing and managing demands made by suppliers and vendors for reclamation of materials, supplies, goods, products and related items delivered prior to the Petition Date.  In addition, the Debtors have requested that the court (a) allow the debtors to return goods for credit against a vendor's prepetition claim and (b) confirm that the automatic stay is applicable and that parties cannot, without first getting relief from the automatic stay, reclaim goods or interfere with the delivery of goods.

51.     I believe that during this critical time, the Debtors must dedicate substantial attention and resources to the wind-down process, and without the relief requested in the reclamation motion, the Debtors would be required to expend substantial time and limited resources (a) establishing their right to retain the goods; (b) contesting or litigating reclamation demands; and/or (c) enforcing their rights with respect to goods in transit.  Accordingly, I believe

that the proposed procedures and other relief requested in the reclamation motion is in the best interests of the Debtors, their estates, their creditors, their stakeholders and all parties in interest.

**G.    Motions for Payment of Other Critical Business Expenditures.**

52.    The Debtors have also filed a number of motions seeking authority to make critical business expenditures.

<u>Sales, Use and Other Trust Fund Obligations (Item 9)</u>

53.    The Debtors seek authority to pay certain sales, use and other similar "trust fund" taxes (collectively, the "<u>Taxes</u>") owing to certain federal, state and local governmental units in the approximate amount of $1.65 million.

54.    It is my understanding that as of the Petition Date, the Debtors were current in the payment of assessed and undisputed Taxes. I believe the continued payment of the Taxes on their normal due dates will ultimately preserve the value of the Debtors' estates and prevent any disruption caused by nonpayment that could be a detriment to all parties in interest.

<u>Customer Practices  (Item 10)</u>

55.    The Debtors have filed a motion (i) to honor prepetition obligations owed to customers on account of gift cards, gift certificates, certain returns, refunds and exchanges and (ii) to continue certain promotional programs (together, the "<u>Customer Programs</u>") and (iii) to continue to receive, process and honor credit card transactions (the "<u>Credit Card Processing</u>") and pay any fees related thereto.

56.    The Debtors operate two promotional programs: the Filene's Basement Fan Club and Syms' Educated Consumer program.   In addition, the Debtors have historically issued gift cards and paper gift certificates.  I understand that as of October 1, 2011, the Debtors estimate that approximately $2.5 million in Filene's Basement gift cards and $1.2 million in Syms' gift cards had been issued but not yet redeemed.  I also understand that the Debtors

estimate that the gift card obligations that are likely to be redeemed amount to a liability of approximately $1.1 million for Filene's Basement and $719,000 for Syms because, in the Debtors' experience, gift cards that have aged for over two (2) years are unlikely to be redeemed and Filene's Basement holds a reserve of approximately $1.15 million for unredeemed gift cards. I also understand that the Debtors estimate that the approximate amount of outstanding obligations with respect to gift certificates is approximately $0 for Filene's Basement and $2.9 million for Syms. My understanding is that Syms does not expect many of these gift certificate obligations to be redeemed because the gift certificates are all older than 90 days, and such certificates historically have low redemption rates.

57.     The Debtors' customers occasionally seek to return merchandise purchased at the Debtors' retail stores. I understand that the Debtors intend to allow customers to continue to return merchandise purchased prior to the Petition Date, within thirty (30) days of the purchase and with an original receipt, in exchange for a refund. In my opinion, it is difficult to estimate the aggregate amount of requests the Debtors might receive for refunds for merchandise prior to the Petition Date. The Debtors, however, do have return reserves, as of October 1, 2011, of approximately $667,000 for Filene's Basement and approximately $335,000 for Syms.

58.     Finally, the Debtors are parties to agreements with Visa, MasterCard, American Express, Discover and First Merchant Data Services for the authorization, processing and settlement of credit card transactions. Syms is also a party to a private label credit card agreement with GE Money Bank. It is my understanding that approximately seventy-five (75) to eighty-five (85) percent of all transactions in the Debtors' stores are credit card transactions. I understand that as of the Petition Date, Filene's Basement may owe approximately $500,000 in fees relating to credit card processing and Syms may owe approximately $300,000 in such fees.

59.     The success of the Debtors' wind-down efforts will be dependent upon many things, including the loyalty and continued patronage of customers.  In my view, continuation of the Customer Programs is essential to maintaining goodwill and strong relationships with existing customers during the critical holiday season.  Furthermore, given the large percentage of credit card transactions in the Debtors' stores, I believe that the Debtors' ability to honor and process credit card transactions is essential to the Debtors' wind-down efforts.  Accordingly, I believe that continuing the Customer Programs and maintaining Credit Card Processing is in the best interests of the Debtors, their estates, creditors, stakeholders and other parties in interest.

### Shipping and Delivery Charges (Item 11)

60.     In the normal course of their businesses, the Debtors incur certain fees and charges to third party shippers, haulers, common carriers and other transporters (collectively, the "Shippers").  As of the date of this Declaration, I believe that the Debtors will be liable to their Shippers for transport of the Debtors' merchandise among the Debtors' vendors, distribution centers and stores.  Based upon my knowledge of the average monthly shipping costs incurred by the Debtors prepetition,  I believe that the Debtors should be authorized to pay any prepetition shipping charges in an amount not to exceed $700,000 in order to avoid the detrimental consequences that may occur if these Shippers are not paid.

61.     If these claims are not paid, many of the Debtors' Shippers may refuse to perform additional services for the Debtors, requiring the Debtors to replace such Shippers at considerable cost to the Debtors and their estates.  I further believe that because of the Debtors' delivery system, if the Shippers refused to ship or transport goods, the Debtors may risk having inadequate in-store inventory.  I believe that such an outcome could be potentially devastating to the Debtors' wind-down efforts.  Finally, I understand that any delays in payment of shipping

charges with respect to goods that are in the possession of the Shippers as of the Petition Date will likely result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such parties. Thus, I believe that the Debtors will have no alternative but to pay shipping charges in full in order to effect the release of any liens securing payment of such charges.

Insurance Premiums (Item 12)

62. The Debtors maintain various insurance policies, including policies for coverage for, among other things, workers' compensation liability, employment practices liability, automobile liability, marine liability, commercial property liability, directors and officers liability, fiduciary liability, internet liability, and commercial umbrella and excess liability claims (the "Insurance Policies"). I believe that maintenance of insurance coverage under the Insurance Policies is essential to the operation of the Debtors' businesses and I am told that it is required under the United States Trustee for the District of Delaware Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees for Chapter 11 Cases (Jan. 26, 2009) (the "Operating Guidelines"), the laws of the various states in which the Debtors operate, and the Debtors' various agreements.

63. The Debtors seek to continue to maintain their existing Insurance Policies, and to renew, revise, extend, supplement, change or enter into new insurance coverage as needed in their business judgment. I believe that payment of any Insurance Policy premiums, if any, relating to prepetition insurance coverage is necessary to continued coverage under such policies. For the policy period 2010-2011, the total annual premiums under the Insurance Policies is approximately $2,527,173. Furthermore, it is my opinion that authorizing the Debtors, in their

business judgment, to renew, revise, extend, supplement, change or enter into new insurance coverage as needed is prudent and necessary.

64.     The Debtors have financed the payment of certain premiums for their commercial property liability and marine liability policies (the "Financed Policies") through a Premium Finance Agreement dated June 14, 2011 (the "Premium Financing Agreement").  The terms of the Premium Financing Agreement provide that the Debtors pay an initial down payment, followed by monthly installments, to Flatiron Capital ("Flatiron") in exchange for Flatiron's agreement to pay the full annual insurance premiums for the Financed Policies, in advance, to the Insurance Carrier that provides the Financed Policies.

65.     The Debtors seek authority to continue to make payments under the Premium Financing Agreement.  Under the terms of the Premium Financing Agreement, Flatiron may cancel the Financed Policies for non-payment and may accelerate and declare due and payable the entire unpaid premiums upon the Debtors' failure to pay the monthly Premium Financing Obligations.  Even if Flatiron did not immediately cancel the insurance coverage upon the Debtors' default, Flatiron holds a security interest in any unearned premiums or other sums payable under the Financed Policies (collectively, the "Unearned Premiums").  The Debtors' failure to make required monthly payment under the Premium Financing Agreement would result in a depletion of the Unearned Premiums, thereby reducing Flatiron's equity cushion, which could entitle Flatiron to relief from the automatic stay.  I believe it is in the best interests of the Debtors, their estates, their creditors and other parties in interest for the Debtors to continue to make payments under the Premium Financing Agreement.

66.     I also believe that it is in the best interests of the Debtors, their estates, their creditors and other parties in interest for the Debtors to continue their business relationship

with their insurance consultants and brokers, City Underwriting Agency, Inc. and Willis of New York, Inc. (the "Insurance Consultants"), and to continue to pay the Insurance Consultants' fees and/or commissions.  It is my belief that the employment of the Insurance Consultants has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner, and to realize considerable savings in the procurement of such Insurance Policies.  I believe that it is in the best interests of the Debtors to continue their business relationship with the Insurance Consultants.

**H.     Approval of Access to Cash Collateral (Item 13)**

67.     The Debtors have also sought authority to use cash collateral.  For the reasons set forth below, I believe that the Court's approval of this motion is absolutely critical.

68.     Substantially all of the Debtors' cash constitutes cash collateral (the "Cash Collateral") of the Prepetition Lender under the Prepetition Credit Agreement.  Specifically, under the terms of the Prepetition Credit Agreement, both the Filene's Basement and the Syms store accounts are swept daily and deposited into an account (the "Cash Collateral Account") held by the Debtors' prepetition lender, as collateral for obligations arising under the Prepetition Credit Agreement.  The Debtors, therefore, have limited access to immediately available funds.

69.     Without immediate authority to use the Cash Collateral, it is my understanding that the Debtors will have no cash to sustain their businesses and will be forced to immediately cease operating as a going concern, to the detriment of all stakeholders.

70.     Accordingly, I believe the Debtors have an immediate need to use Cash Collateral in order to permit, among other things, the orderly continuation of the operation of their businesses and the completion of the restructuring process.  The Debtors' access to Cash Collateral is necessary in order to ensure that the Debtors have sufficient working capital and liquidity to operate their businesses and thus preserve and maintain the going concern value of

the Debtors' estates, which, in turn, is integral to maximizing recoveries for the Debtors' stakeholders.

## I.   Motion to Enter into November Agency Agreement, Commence Store Closing Sales, Assume October Agency Agreement and Related Relief (Item 14)

71.     As discussed above, prior to the Petition Date, the Debtors undertook efforts to explore strategic alternatives while maintaining the option to pursue an orderly wind-down of their retail businesses.  As a result of the Debtors' efforts over five (5) months to solicit bids on a transaction, the only viable bids received were proposals to conduct a liquidation of the Debtors' retail stores through an immediate store closing process that would capture the benefits of the upcoming holiday shopping season in the face of the Debtors' projected loss of liquidity by as early as December 2011.

72.     Therefore, as set forth in greater detail in the Debtors' Emergency Motion for Entry of Orders (A) Scheduling a Hearing and Approving the Form and Manner of the Notice of the Motion and Hearing Thereon, (B)(I) Approving the Debtors' Entry into Agency Agreement, (II) Authorizing the Debtors to Sell Certain Merchandise Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance with Contractual Store Closing Sale Restrictions and Exempting the Debtors from Certain State Wage Pay Requirements and Laws Restricting Store Closing Sales, (V) Authorizing the Debtors' Assumption of October Agency Agreement, and (VI) Granting Related Relief (the "GOB Motion"), the Debtors seek an expedited hearing and approval of notice procedures with respect to the GOB Motion for November 10, 2011 and, as set forth in the GOB Motion, authority to enter into the Agency Agreement with the Agent, pursuant to which the Agent would liquidate the Debtors' remaining inventory and certain other assets therein (the "Store Closing Sales").

Pursuant to the terms of the Agency Agreement, the Agent would commence the Store Closing Sales immediately upon entry of the order authorizing the Debtors to sell their assets.

73.     I believe and have been advised that time is of the essence with respect to the Debtors' need to obtain Court authority to begin the process of the Store Closing Sales as quickly and efficiently as possible.  Moreover, in order to avoid any unnecessary administrative expenses, including those expenses for rent and related costs in connection with the closing locations, I believe that it is essential that the Debtors be authorized to enter into the Agency Agreement for several reasons.

74.     With respect to the timing on the hearing for the GOB Motion, I am advised and understand that the Agent requires adequate lead time and requires the certainty of a court order authorizing the Debtors' entry into the Agency Agreement before the Agent can commence preparations for the Sales.  In particular, I am advised and understand that the Agent will require lead time in order to, among other things, prepare adequate signage for the stores, reserve advertising space in connection with the all-important "Black Friday" holiday shopping weekend, and order its augment inventory in sufficient time for it to arrive to be sold in the Debtors' stores.  The Agent's ability to place orders for augment inventory is especially critical to the Debtors' bottom line.  Under the terms of the Agency Agreement, the Debtors proceeds from the sale of the augment inventory are shared on a 60/40 basis between the Debtors and the Agent, after deduction of certain fees and expenses. Thus, to the extent that the Agent does not have sufficient lead time to place orders and receive augment inventory and stock such inventory in the stores during the peak sale period, the Debtors lose the ability to realize revenue from the sale of that inventory.  Moreover, I understand that the upcoming holiday shopping season, including the critical "Black Friday" post-Thanksgiving shopping weekend, provides a unique window of

opportunity for the Debtors to maximize values from the store closings when retail customers are most likely to shop.

75.     Second, I am advised that to the extent the Debtors delay in commencing the Store Closing Sales, the value they anticipate receiving under the Agency Agreement will decrease.  In particular, the guaranteed amount that the Agent is willing to pay to conduct the Store Closing Sales will decrease if the sales cannot commence by November 10, 2011.

76.     Third, I am advised that the Agent requires lead time to order inventory to augment the Debtor's existing inventory under the Agency Agreement.  In fact, the Agent has advised the Debtors that if the order approving the Agency Agreement is not entered as soon as possible, it would severely restrict the Agent's ability to obtain the augmentation goods and distribute them to the Debtors' stores in a timely manner to capture the "Black Friday" shopping opportunity.

77.     Fourth, at this point, the Debtors have no unencumbered cash under their credit facility with their Prepetition Lender.  As a consequence of that and significantly tightened credit terms from trade vendors and factors, the Debtors are unable to place orders on new inventory for next season, which means that their stores are subject to rapidly dwindling inventory mix, resulting in less value overall for their remaining merchandise.

78.     Consequently, I believe that the Debtors' inability to schedule a prompt hearing on the GOB Motion and obtain court authority to enter into the Agency Agreement would in all likelihood cause unnecessary delay and lost opportunity costs that would in turn disrupt the Debtors' efforts to accomplish an orderly wind-down.

79.     Finally, I am advised and understand that certain related relief sought in the GOB Motion to permit the Debtors to abandon unsold property, consisting of furniture,

fixtures and equipment and obviate any contractual or state or local laws that could inhibit the Store Closing Sales is necessary and customarily granted in chapter 11 cases where debtors effectuate large-scale closing sales such as the ones contemplated by the GOB Motion.

80. The Debtors also seek authority to assume the October Agency Agreement and continue the Store Closing Sales with respect to the 5 Prepetition Closing Stores.[5] The liquidation of the 5 Prepetition Closing Stores was ongoing as of the Petition Date and the Debtors are seeking Court authority to assume the October Agency Agreement as part of the GOB Motion.

81. Pursuant to the terms of the October Agency Agreement, the Agent commenced the liquidation process with respect to the 5 Prepetition Closing Stores on October 13, 2011. Importantly, the Agent has already remitted the Guaranteed Payment (as defined in the October Agency Agreement) to the Debtors pursuant to the terms of the October Agency Agreement and the Debtors have used the proceeds to pay down their outstanding obligations under the Credit Facility. In addition, as a result of the liquidation in process at the 5 Prepetition Closing Stores, the Agent has become familiar with the Debtors' merchandise mix, operations and customer base. Because the Agent has already been overseeing the 5 Prepetition Closing Stores' liquidation, it best knows how to maximize the value to be obtained by the Debtors during the remainder of such sales in those stores.

---

[5] The Debtors, with the assistance of A&M, negotiated the terms of the October Agency Agreement with GBRP, together with the input and consent of the Debtors' Prepetition Lender. Because of A&M's role in negotiating the October Agency Agreement and in order to maintain a fully impartial and robust bidding process, A&M did not participate in the strategic alternatives process set forth above. Rather, the process was entirely managed and controlled by Rothschild and its employees, with minimal support by A&M in response to Rothschild's discrete requests for analysis that would not impact the impartial nature of the process.

I swear under penalty of perjury that the foregoing is true and correct.

Dated:      November 2, 2011


SYMS CORP.
(for itself and on behalf of each of its affiliated debtors as debtors and debtors in possession)


By:      */s/ Gary Binkoski*
           Name:  Gary Binkoski
           Title:   Interim Chief Financial Officer

**<u>EXHIBIT A</u>**

**Corporate Organizational Chart**

# Syms Corp. Organizational Chart



## EXHIBIT B

## List of First Day Motions

1)     Debtors' Motion for Order Directing Joint Administration of Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Del. Bankr. L.R. 1015-1 and Waiving Requirements of Fed. R. Bankr. P. 2002(n)

2)     Debtors' Application for Order Pursuant to 28 U.S.C. § 156(c), Fed. R. Bankr. P. 2002 and Del. Bankr. L.R. 2002-1(f) Authorizing Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Notice, Claims and Solicitation Agent Nunc Pro Tunc to the Petition Date

3)     Debtors' Motion for Order Pursuant to Fed. R. Bankr. P. 1007(c) and Del. Bankr. L.R. 1007-1(b) Extending Time for Debtors to File Schedules and Statements

4)     Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363, Fed. R. Bankr. P. 6003 and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Maintenance of Existing Bank Accounts, (II) Authorizing Continued Use of Existing Business Forms and (III) Authorizing Continued Use of Existing Cash Management System with Certain Modifications

5)     Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105 and 345 and Del. Bankr. L.R. 2015-2(b) Waiving Investment and Deposit Requirements

6)     Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363, 507(a), 1107(a) and 1108 and Fed. R. Bankr. P. 6003, Authorizing Debtors, Inter Alia, to Pay Prepetition Wages, Compensation and Employee Benefits

7)     Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service

8)     Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 362, and 546 (I) Establishing Procedures for Addressing Reclamation Demands, (II) Authorizing Debtors to Return Goods Pursuant to 11 U.S.C. § 546(h) and (III) Prohibiting Parties from Interfering with the Delivery of Goods

9)     Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(8) and 541 and Fed. R. Bankr. P. 6003 Authorizing the Debtors to Pay Certain Prepetition Sales, Use and Other Such Trust Fund Taxes and Related Obligations

10)     Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363, 507(a)(7), 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Continuation of Certain Customer Practices

11)     Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b), 506, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Certain Prepetition Shipping and Delivery Charges

12)     Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, (II) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Policies and (III) Continue to Honor Insurance Premium Financing Obligations

13)     Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363 and 507(b), Fed. R. Bankr. P. 2002, 4001(b) and 9014, and Del. Bankr. L.R. 4001-2 (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief

14)     Debtors' Emergency Motion for Entry of Orders (A) Scheduling a Hearing and Approving the Form and Manner of Notice of the Motion and Hearing Thereon and (B)(I) Approving the Debtors' Entry into Agency Agreement, (II) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance with Contractual Store Closing Sale Restrictions and Exempting the Debtors from State Wage Pay Requirements and Laws Restricting Store Closing Sales, (V) Authorizing the Debtors' Assumption of October Agency Agreement and (VI) Granting Related Relief

844879-New York Server 3A - MSW