IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :     Chapter 11
                                          :
FILENE'S BASEMENT, LLC, et al.,           :     Case No. 11-13511 (____)
                                          :
                        Debtors.[1]       :     Joint Administration Pending
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363,
507(a), 1107(a) AND 1108 AND FED. R. BANKR. P. 6003, AUTHORIZING
DEBTORS, <u>INTER ALIA</u>, TO PAY PREPETITION WAGES, COMPENSATION
AND EMPLOYEE BENEFITS**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "<u>Debtors</u>") hereby move (the "<u>Motion</u>") this Court for entry of an order, pursuant to sections

105, 363, 507(a), 1107(a) and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>")

and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy</u>

<u>Rules</u>"), authorizing, but not directing, the Debtors to pay prepetition wages, salaries and

employee and retiree benefits and granting related relief as further described herein.  In support

of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Gary

Binkoski in Support of Chapter 11 Petitions and First Day Pleadings (the "<u>First Day</u>

<u>Declaration</u>"), filed with the Court concurrently herewith.  In further support of the Motion, the

Debtors, by and through their undersigned counsel, respectfully represent as follows:

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Filene's Basement, LLC (8277), Syms Corp. (5228), Syms Clothing, Inc. (3869), and Syms Advertising Inc. (5234). The Debtors' address is One Syms Way, Secaucus, New Jersey 07094.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 507(a), 1107(a) and 1108.  Such relief is warranted pursuant to Bankruptcy Rule 6003.

## BACKGROUND

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and fully incorporated herein by reference.

## RELIEF REQUESTED

4.      The Debtors filed these chapter 11 cases in order to achieve an orderly wind-down by, among other things, conducting going-out-of-business sales at their various retail stores.  Preserving and motivating the Debtors' workforce and maintaining employee morale during this difficult process is critical to maximizing the value of the Debtors' assets for the benefit of their estates, creditors, stakeholders, and other parties in interest.  The Debtors also seek to minimize the unique personal hardship the Debtors' employees will suffer if their employee-related obligations are not paid when due.

5.     Accordingly, by this Motion, the Debtors request that the Court enter an order, under Bankruptcy Code sections 105(a), 363(b), 507(a), 1107(a) and 1108:[2] authorizing, but not directing, the Debtors to: (a) pay and/or perform, as applicable, prepetition obligations to current employees, retirees and independent contractors (collectively, the "Employees"), including accrued prepetition wages, salaries and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Claims"); (b) honor and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' vacation, sick time and holiday time policies, workers' compensation, employee and retiree benefit plans and programs, the most significant of which are described below (and to pay all fees and costs in connection therewith, including contributions to various union funded programs on behalf of the Debtors' Employees), except as otherwise set forth herein (collectively, the "Employee Benefit Obligations"); (c) reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (d) pay all related prepetition withholdings, payroll-related taxes and union dues associated with the Employee Claims and the Employee Benefit Obligations (the "Employer Taxes"); and (e) pay all administrative fees and employer contributions to Employee pension funds ( the "Pension Obligations" and, together with the Employee Claims, the Employee Benefit Obligations, the Employee Expense Obligations and the Employer Taxes collectively, the "Prepetition Employee Obligations").

6.     The Debtors also request an order (i) authorizing and directing the Debtors' banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on

---

[2]     As further described herein, certain of the relief requested in this Motion also relates to employee compensation, benefits and programs subject to the provisions of Bankruptcy Code sections 1113 and 1114, governing collective bargaining agreements and retiree benefits, respectively.

account of any of the Prepetition Employee Obligations; (ii) prohibiting the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations; (iii) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected; and (iv) authorizing, but not directing, the Debtors to continue their ordinary course employee and retiree compensation, benefits and related programs described in this Motion during the postpetition liquidation and wind-down process.

## BASIS FOR RELIEF

**A.      Wages, Salaries and Commissions**

7.      The Debtors employ approximately 2,465 Employees in their stores, distribution centers and corporate offices, of which approximately 1,404 work on a part time basis.  The Debtors are parties to four collective bargaining agreements ("<u>CBA</u>") governing their unionized hourly Employees (the "<u>Union Employees</u>").  Filene's Basement, LLC ("<u>Filene's Basement</u>") is a party to one (1) CBA with Local 1102 of the Retail Wholesale Department Store Workers Union ("<u>RWDSU</u>").  Local 1102 of the RWDSU represents approximately 1,131 hourly employees at the Filene's Basement store locations and distribution centers (the "<u>FB 1102 Employees</u>").

8.      Syms Corp. ("<u>Syms</u>") is a party to three (3) CBAs, one (1) CBA with each of Local 1102 of the RWDSU (representing the "<u>Syms 1102 Employees</u>"), Local 108 of the RWDSU (representing the "<u>Syms 108 Employees</u>") and Local 400 of the United Food and Commercial Workers Union ("<u>UFCW</u>", representing the "<u>Syms 400 Employees</u>").  Collectively, Local 1102 and 108 of the RWDSU and Local 400 of the UFCW represent approximately 696 hourly employees at the Syms store locations and a distribution center in Secaucus, New Jersey.

Syms utilizes the services of one (1) independent contractor who provides a variety of marketing and consulting services to the Debtors.

9.  In addition to the Union Employees, the Debtors have approximately 638 non-union Employees (the "Non-Union Employees") who generally work in store-level management positions in the Debtors' stores, work as district managers, regional loss prevention managers or human resources managers, or work in the Debtors' corporate offices.[3]  Filene's Basement employs approximately 424 Non-Union Employees, including 23 in the Debtors' corporate offices.  Syms employs approximately 214 Non-Union Employees, including 93 in the Debtors' corporate offices.  Approximately 87% of all employees are hourly wage earners (collectively, the "Hourly Employees") and the remaining 13% are salaried personnel (collectively, the "Salaried Employees").

10.  The average monthly payroll for the Debtors' Employees in the typical non-Christmas season is approximately $4.82 million, including payroll taxes.  All of the Debtors' payroll functions are administered internally, except payroll check printing and imaging, and the payment of payroll taxes to the relevant government agencies, which are outsourced to Ceridian Corporation.  All of the Debtors' Employees are paid every other Thursday.  The Debtors' payroll obligations are five (5) days in arrears on each pay date.[4]  As of the Petition Date, the Debtors estimate that approximately $1.67 million, including payroll taxes, exists in accrued but unpaid payroll for Employees.  Approximately $878,000 of that amount represents Filene's

---

[3]  This number also includes temporary and seasonal employees and Filene's Basement Employees who work fewer than twelve (12) hours per week and are therefore, ineligible for union membership.  Approximately six (6) of the Non-Union Employees work for the Debtors pursuant to individual employment agreements (four (4) are employed by Filene's Basement and two (2) by Syms).  The Debtors do not, by this Motion, seek to assume any individual employment agreement under Bankruptcy Code section 365(a).  By this Motion the Debtors do not seek to pay any such Employee, or any other Employee, in excess of the $11,725 cap of Bankruptcy Code sections 507(a)(4) and 507(a)(5).

[4]  On Thursday, October 27, 2011, the Debtors' Employees were paid for the period ending October 22, 2011.

Basement payroll obligations and approximately $789,000 of that amount represents Syms' payroll obligations.

11.      The Debtors only seek authority to pay Employees up to the $11,725 priority cap set forth in Bankruptcy Code sections 507(a)(4) and 507(a)(5).  Pursuant to this Motion, the Debtors seek to pay the outstanding amounts owed as of the Petition Date for accrued and unpaid wages, salaries and commissions, including amounts that the Debtors are required by law to withhold from Employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes, as well as union dues.

**B.      Other Compensation:  Vacation, Personal, Holiday, Sick, Severance and Business Expenses**

12.      The Debtors offer their Employees other forms of compensation, including vacation time, overtime pay, paid holidays, other earned time off, severance and reimbursement of certain business expenses.  These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees during the liquidations and wind-down of the Debtors' retail locations.

13.      **Vacation, Personal, Holiday and Sick Time**.  Certain of the Debtors' Employees are eligible to receive paid vacation time, personal time, holiday time and sick time.  The precise amount of paid vacation time, personal time, holiday time and sick time depends on whether the Employee is full or part-time and whether the Employee is a Union Employee, in which case the appropriate CBA applies.  The Debtors' have uniform vacation time, personal time, holiday time and sick time policies for their Non-Union Employees.

14.      Vacation time is based on an Employee's length of service (the "Vacation Time").  Full-time FB 1102 Employees accrue one (1) week of Vacation Time after six (6) months of employment and an additional one (1) week after a year of employment.  Full-time FB 1102

Employees accrue two (2) weeks of annual Vacation Time until their fifth year of employment, after which they accrue three (3) weeks of annual Vacation Time. Full-time FB 1102 Employees accrue Vacation Time pro rata over the applicable time period starting on the first of the calendar year.

15.     Full-time Syms 1102 Employees receive Vacation Time according to the same schedule as FB 1102 Employees, except full-time Syms 1102 Employees who have reached their twelfth year of employment are eligible for four (4) weeks of annual Vacation Time. Syms 1102 Employees are credited with their available Vacation Time as of June 1.

16.     Full-time Syms 108 Employees receive Vacation Time at the same rate as Syms 1102 Employees. Full-time Syms 108 Employees are credited with all available Vacation Time as of the first of the calendar year.

17.     Full-time Syms 400 Employees receive two (2) weeks of annual Vacation Time after their first year of employment, three (3) weeks of annual Vacation Time after their fifth year of employment and four (4) weeks of annual Vacation Time after their twelfth year of employment.

18.     The Debtors' full-time Non-Union Employees receive one (1) week of annual Vacation Time after six (6) months of employment, two (2) weeks of annual Vacation Time after one (1) year of employment and three (3) weeks of annual Vacation Time after five (5) years of employment. Non-Union Employees are credited with all available Vacation Time at the beginning of the applicable time period.

19. The Debtors' vacation policies do not permit the carryover or cash-out of Vacation Time from year to year.[5]

20. At any point in time, Vacation Time is accruing or being used by Employees, making it difficult to quantify the cost of accrued Vacation Time as of the Petition Date. However, prior to the Petition Date, approximately 1,555 Filene's Basement Employees had accrued approximately $152,800 of Vacation Time, and approximately 910 Syms Employees had accrued approximately $229,350 of Vacation Time.

21. In addition, the Debtors provide their full-time Employees several personal days per year ("Personal Time"). FB 1102 Employees receive two (2) personal days per year. Syms 1102 Employees receive one (1) personal day during their first year of employment and two (2) personal days annually thereafter.[6] Syms 108 Employees receive two (2) personal days per year.[7] Syms 400 Employees receive three (3) personal days per year.[8] Non-Union Employees receive two (2) personal days per year.

22. At any point in time, Employees are earning and taking Personal Time, making it difficult to quantify the cost of accrued Personal Time as of the Petition Date. However, prior to the Petition Date, approximately 1,555 Filene's Basement Employees accrued approximately $69,500 of Personal Time, and approximately 910 Syms Employees accrued approximately

---

[5] The Debtors' corporate policies, and certain policies governed by applicable CBAs, generally allow for the payout of accrued Vacation Time upon termination. The Debtors believe, however, that the large majority of any such additional accrued Vacation Time claims will result in general unsecured claims against the Debtors' estates. The Debtors do not seek authority by this Motion to pay these additional obligations.

[6] Syms 1102 Employees hired before 7/15/1994 receive three (3) personal days annually.

[7] Syms 108 Employees hired before 6/1/2000 receive five (5) personal days annually.

[8] Syms 400 Employees hired before 8/10/1994 receive four (4) personal days annually.

$93,000 of Personal Time.  Employees are paid for accrued but unused Personal Time upon termination of their employment.

23.     Holiday time is provided to full-time and part-time Employees, who have been employed more than thirty (30) days (the "Holiday Time").  At any point in time, Holiday Time is accruing, making it difficult to quantify the cost of accrued Holiday Time as of the Petition Date.  However, prior to the Petition Date, no Filene's Basement Employees had accrued any Holiday Time, and approximately 910 Syms Employees accrued approximately $15,030 of Holiday Time.  Employees are paid for accrued but unused Holiday Time upon termination of their employment.

24.     The Debtors provide their Employees with Sick time ("Sick Time").  Full-time FB 1102 Employees are entitled to five (5) annuals sick days and part-time FB 1102 Employees are entitled to two (2) annual sick days.  Full-time Syms 1102 Employees are entitled to six (6) annual sick days and part-time Syms 1102 Employees are entitled to a pro-rated six (6) sick days.  Full-time Syms 108 Employees are entitled to six (6) annual sick days and part-time Syms 108 Employees are entitled to a pro-rated six (6) days.[9]  Full-time Syms 400 Employees are entitled to six (6) sick days per year and part-time Syms 400 Employees to a pro-rated six (6) days per year.  Non-Union Employees are entitled to six (6) sick days per year.  Employees are not paid for accrued but unused Sick Time upon termination of their employment.[10]

---

[9]     Syms 108 Employees accrue Sick Time at the rate of one (1) day every two (2) months during the first year of employment.

[10]    Syms 1102 Employees hired before 7/15/1994, Syms 108 Employees hired before 5/30/1996 and Syms 400 Employees hired before 8/10/1994 are all paid out for unused sick days.  At any point in time, the foregoing Syms' Employees are using Sick Time, making it difficult to quantify the value of accrued Sick Time as of the Petition Date.  However, prior to the Petition Date, the foregoing Syms' Employees accrued approximately $33,125 of Sick Time.

25.     By this Motion, the Debtors seek authority to honor all prepetition liabilities to their Employees, except as otherwise indicated herein, with respect to the Debtors' vacation, holiday and sick time-off policies.  The Debtors anticipate that their Employees will utilize any accrued Vacation Time, Personal Time, Holiday Time or Sick Time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.  Use of Employee Vacation Time, Personal Time, Holiday Time or Sick Time remains subject to ordinary course restrictions.

26.     **Current Prepetition Severance Obligations.**  The Debtors maintain in the ordinary course of their businesses certain severance programs that are available to their Employees under certain circumstances upon termination (the "Severance Obligations").  By the Motion, the Debtors seek authority to pay outstanding prepetition Severance Obligations, in an amount not to exceed the per-employee priority wage and benefits cap set forth in Bankruptcy Code sections 507(a)(4) and 507(a)(5), and in an aggregate amount of less than $18,000.[11]

27.     **Expense Reimbursement**.  The Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies and miscellaneous business expenses (collectively, the "Reimbursable Expenses").  Most Employees who are reimbursed for their expenses are store managers, district managers, corporate employees, area loss prevention managers and regional human resources managers who incur business expenses as part of their jobs.  Reimbursable Expenses are reimbursed through the

---

[11]     Significant additional Severance Obligations are likely to arise upon the termination of Employees following the liquidation process and the wind-down of the Debtors' estates.  The Debtors believe, however, that the large majority of any such additional accrued Severance Obligation claims will result in general unsecured claims against the Debtors' estates.  The Debtors do not seek authority by this Motion to pay these additional Severance Obligations.

Debtors' payroll system, and are processed as they are received with each bi-weekly payroll. As of the Petition Date, the Debtors estimate that their accrued and unpaid obligations for Reimbursable Expenses are approximately $36,487.

28.     Certain of the Debtors' Employees travel extensively by car and truck in the performance of their job duties. The Debtors provide such Employees a vehicle allowance that is included in their bi-weekly payroll check. On a monthly basis, Filene's Basement provides approximately $2,950 in vehicle allowances to Employees and Syms provides approximately $7,142 in vehicle allowances. Together, these vehicle allowances (the "Vehicle Expenses") cost the Debtors' approximately $10,092 each month. The Debtors estimate that approximately $973 of Filene's Basement Vehicle Expenses and $2,355 of Syms' Vehicle Expenses are accrued and unpaid as of the Petition Date.

29.     By this Motion, the Debtors seek authority to pay all Reimbursable Expenses and Vehicle Expenses accrued and outstanding as of the Petition Date.

**C.     Employee Benefit Plans**

30.     **Medical Plans**. The Debtors provide their full-time Non-Union Employees and full-time FB 1102 Employees with medical benefits pursuant to five (5) different self-funded preferred provider medical plans (collectively, the "Medical Plans") through UMR United Healthcare ("UMR"), offering varying levels of coverage. The Medical Plans offer medical benefits. In addition, the Debtors offer their Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Medical Plans. The flexible spending benefits are administered by Comprehensive Benefits. 336 Employees have elected individual coverage under the Medical Plans, 108 Employees have elected to cover themselves and one additional person under the Medical Plans, and 94 Employees have elected family coverage under the Medical Plans.

31.     The Medical Plans are funded through Employee contributions by participating Employees and by the Debtors.  The cost of the Medical Plans is borne primarily by the Debtors, but Employees contribute to the Medical Plans through payroll deductions.[12]  Employee contributions are deducted from bi-weekly paychecks to pay for that month's coverage.  Payments made pursuant to the Medical Plans include trust fund payments (i.e., employee contributions) and premium payments.

32.     UMR invoices the Debtors for actual claims, administrative costs and surcharges on a weekly basis.  Once a month, the weekly invoice includes stop loss premiums and prescription costs.  The Medical Plans cost the Debtors approximately $40,000 - $100,000 each week, though this amount can fluctuate based upon the number and amount of claims submitted for any given period.  This amount includes both trust fund payments and premium payments.  As of the Petition Date, the Debtors' were aware of unpaid costs under the Medical Plans of approximately $86,804, though there may exist claims submitted and not yet reported to the Debtors.  By this Motion, the Debtors request authority to make payments and remittances related to the prepetition Medical Plan expenses in the ordinary course of business.

33.     **Dental Plan**.  The Debtors also offer their Employees dental benefits (the "Dental Plan") through UMR Managed Dental Network.  Full-time Non-Union Employees and FB 1102 Employees are eligible to receive benefits under the Dental Plan.  Approximately 299 Employees have elected individual coverage, 98 Employees have elected to cover themselves and an additional person, and 89 Employees have elected family coverage.  The Dental Plan is funded through contributions by participating Employees and by the Debtors.  The cost of the Dental

---

[12]     The Debtors provide certain former Employees COBRA health coverage through UMR.  The former Employees largely pay the costs of their COBRA health insurance, but the Debtors pay some administration fees to UMR.  UMR sends the Debtors consolidated invoices for all of its services (including the Dental Plan described below).  The fees for former Employee COBRA coverage are rolled into the sums presented above.

Plan is borne by the Debtors and by Employees. Employee contributions are deducted from bi-weekly paychecks to pay for that month's coverage. Payments made pursuant to the Dental Plan include trust fund payments and premium payments. The Debtors' Dental Plan payments are rolled into, and included in, the estimated UMR Medical Plan expenses provided immediately above. By this Motion, the Debtors request authority to make payments and remittances related to the prepetition Dental Plan expenses in the ordinary course of business.

34. **Union Health Funds**. The CBAs provide that Syms make contributions to certain union health funds on behalf of Union Employees (the "Union Health Funds").[13] The amount that Syms contributes to the respective Union Health Funds depends on the applicable CBA. Syms pays the trustees of Local 1102 of the RWDSU $466.00 a month for each full-time Syms 1102 Employee and $75.00 a month for each part-time Syms 1102 Employee, for an average monthly cost of approximately $129,750.[14] Syms pays the trustees of Local 108 of the RWDSU $540.00 a month for each full-time Syms 108 Employee and $382.00 for each part-time Syms 108 Employee, for an average monthly cost of approximately $48,050.[15] Under the CBA with Local 400 of the UFCW, Syms participates in the Washington Wholesalers Health and Welfare Fund ("UFCW Health Fund"). Under the CBA with Local 400 of the UFCW and the Agreement and Declaration of Trust of the UFCW Health Fund, Syms agreed to pay the full cost

---

[13] The CBA that applies to FB 1102 Employees does not provide for a Union Health Fund. Full-time FB 1102 Employees are eligible for coverage under the Medical Plans and the Dental Plan.

[14] Only Syms 1102 Employees who have completed 90 days of employment are eligible to have Syms make contributions to the Local 1102 RWDSU Union Health Fund on their behalf. The Debtors make contributions to the Local 1102 RWDSU Union Health Fund only on behalf of part-time Employees who work sixteen to twenty nine hours per week, incapacitated part-time Employees, and full-time employees who work 30 hours or more per week.

[15] Only Syms 108 Employees who have completed 30 days of employment are eligible to have the Debtors make contributions to the Local 108 RWDSU Union Health Fund on their behalf. Full-time Employees work 35 hours or more per week and part-time Employees work fewer than 35 hours per week.

of health and welfare benefits, and related expenses submitted by the trustees of the UFCW

Health Fund on behalf of active and retired Syms 400 Employees who are eligible for benefits.[16]

On a monthly basis, Syms paid, on average, approximately $41,800 per month to the trustees of

the UFCW Health Fund.[17]  On a monthly basis Syms incurs an average of approximately

$219,600 on account of the Union Health Funds.  The Debtors estimate that approximately

$72,396 in unpaid contributions to the Union Health Funds are accrued and unpaid as of the

Petition Date.  By this Motion, the Debtors seek authority to continue to remit all prepetition

amounts owed to the Union Health Funds in the ordinary course of business.

35.     **Life, Short-Term Disability and Long-Term Disability Insurance**.  The

Debtors' Employees also have the option to purchase, and in some cases the Debtors provide for

Employees, life, accidental death and dismemberment, supplemental life, short-term disability,

long-term disability and supplemental long-term disability insurance (collectively, the "Life

Insurance Plans") pursuant to policies issued by Reliance Standard Life Insurance Company

("Reliance").  The Life Insurance Plans are offered to FB 1102 Employees and Non-Union

Employees of Syms.

36.     The Debtors pay premiums for all full-time FB 1102 Employees and Non-Union

Employees of Syms to receive basic term life insurance ("Basic Life Insurance") at a rate of at

least one (1) times such Employee's annual earnings.  Certain Non-Union Employees of Syms at

the controller, district, store manager, director, regional human resources and buyer level are

eligible for Basic Life Insurance at a rate of one-and-a-half (1.5) times annual earnings, and Non-

---

[16]     Syms pays claims for full-time Syms 400 Employees after six months of employment and part-time Syms 400 Employees after nine months of employment.  Syms 400 retirees are also covered.  Full-time Employees work at least 40 hours per week and part-time Employees are those who work fewer than 40 hours per week.

[17]     This sum represents health, dental, life insurance, and administrative fees.

Union Employees of Syms at the chairman, president and vice-president level are eligible for such coverage at two (2) times annual earnings. All the foregoing categories of Employees are capped at a maximum of $500,000 of Basic Life Insurance coverage.

37.     The Debtors pay for all full-time Non-Union Employees to receive short term disability coverage ("Short Term Disability") through Reliance.[18] The Short Term Disability plan paid for by the Debtors pays 50% of an eligible Employee's weekly salary, up to a maximum of $170 a week for up to 26 weeks. Employees may elect to pay, through payroll deductions, for voluntary Short Term Disability, which provides up to 60% of weekly earnings not to exceed $1,750. The voluntary Short Term Disability plan has an elimination period of seven days of continuous illness and benefit payments that may last up to six (6) months.

38.     The Debtors pay for all full-time FB 1102 Employees and Non-Union Employees of Syms to receive long term disability coverage ("Long Term Disability") through Reliance. Such coverage is 60% of the Employee's monthly earnings up to a maximum of $7,500. Additionally, the Debtors pay for Non-Union Employees of Syms at the chairman, president and vice-president level to receive Long Term Disability coverage at 60% of monthly salary up to maximum of $12,000.

39.     The Life Insurance Plans are paid primarily through employer contributions. Syms pays approximately $2,893 per month to Reliance, and Filene's Basement pays approximately $4,602 per month to Reliance, on account of the Life Insurance Plans, including employee contributions. By this Motion, the Debtors seek authority to pay any prepetition amounts due on account of the Life Insurance Plans.

---

[18]     All full-time Non-Union Employees who have completed a month of service and work outside New Jersey are eligible. New Jersey Employees are covered under a state disability plan.

**D.** **Savings and Retirement Plans**

40. The Debtors offer certain Employees a savings and retirement plan through which they can accumulate savings for their future. Specifically, eligible Employees each year may contribute pre-tax compensation, consistent with IRS regulations, for investment in a 401(k) plan (the "401(k) Plan") managed by Principal Financial. The Debtors do not provide any matching contributions to Employee 401(k) Plans.

41. On average, Filene's Basement withholds approximately $35,000 every other week for Employees participating in the 401(k) Plan and Syms withholds approximately $27,000 every other week.[19] By this Motion, the Debtors seek authority to remit all amounts that are related to the 401(k) Plan and that arose prior to the Petition Date in the ordinary course of the Debtors' business including any administration fees owed to Principal Financial in connection with the 401(k) Plan, and to continue the 401(k) Plan in the ordinary course.

**E.** **Pension Funds**

42. Syms participates in four pension funds ("Pension Funds"). Syms administered a single-employer defined benefit pension fund for the benefit of certain Employees of Syms (the "Syms Pension Fund").[20] The Syms Pension Fund was frozen as of December 31, 2006, and the Debtors do not have any current monthly funding obligations with respect to the Syms Pension Fund. Syms handles routine administration of the Syms Pension Fund in house. This year Syms paid approximately $9,075 to CEP Consultants, Inc. for annual administrative and advisor services and $4,125 for FASB calculations.

---

[19] These sums represent both 401(k) savings and Employee 401(k) loan repayment.

[20] Generally, Syms Non-Union, non-security Employees were eligible.

43.     Under certain of the CBAs, Syms participates in multi-employer pension funds for the benefit of certain Union Employees (the Multi-Employer Funds"). Syms contributes $64 a month for eligible[21] full-time Syms 1102 Employees and $46 a month for eligible part-time Syms 1002 Employees to a multi-employer plan administered by the trustees of Local 1102 of the RWDSU, for an average monthly payment of approximately $29,335. Syms contributes $100 a month for eligible full-time Syms 108 Employees and $50 a month for eligible part-time Syms 108 Employees to a multi-employer plan administered by the trustees of Local 108 of the RWDSU, for an average monthly payment of approximately $3,400. Syms contributes $.60 for each hour worked by eligible Syms 400 Employees to a multi-employer plan administered by the trustees of Local 400 of the UFCW, for an average monthly payment of approximately $4,137.

44.     As of the Petition Date, the Debtors estimate that approximately $12,156 exists in accrued but unpaid employer contributions to the Multi-Employer Funds. By this Motion, the Debtors seek authority to remit all administrative and actuarial costs that arose prior to the Petition Date in the ordinary course on account of the Syms Pension Fund and the Multi-Employer Funds and to pay any employer contribution liability that arose to the Multi-Employer Funds prior to the Petition Date.

### F.     Workers' Compensation

45.     The Debtors provide workers' compensation benefits to all Employees. These benefits are covered primarily under the Debtors' workers' compensation insurance program[22]

---

[21]     The eligibility criteria for each Multi-Employer Plan is defined in the applicable CBA.

[22]     Additionally, simultaneously herewith the Debtors have filed a motion seeking authority to maintain the insurance policies in connection with workers' compensation pursuant to the Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors To (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, (II) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Policies and (III) Continue to Honor Insurance Premium Financing Obligations.

administered jointly by the Debtors and their insurance carrier, Liberty Mutual Insurance Company ("Liberty Mutual").[23]  The Debtors paid Liberty Mutual $371,326 for workers' compensation insurance for the plan year ending November 14, 2011.

46.     As of October 18, 2011, approximately 137 workers' compensation claims were pending against Syms, and Syms had reserved approximately $1.82 million for potential liability.[24]  As of October 18, 2011, approximately 7 workers' compensation claims were pending against Filene's Basement, and Filene's Basement had reserved approximately $194,837 for potential liability.

47.     Additionally, Filene's Basement participates in the state workers' compensation program in the state of Ohio (the "State Workers' Compensation Program").  In Ohio, Filene's Basement pays the Bureau of Workers' Compensation (the "BWC") a premium based upon the total amount of payroll dollars paid to workers employed in that state.  Filene's Basement employs approximately 170 workers in Ohio and paid the BWC approximately $9,400 for the period from 1/1/2011 to 6/30/2011.

48.     Failure to maintain this workers' compensation insurance and to continue participation in the State Workers' Compensation Programs could result in administrative or legal proceedings against the Debtors and their officers and directors.

49.     The average cost incurred by the Debtors on a monthly basis in connection with the workers' compensation program or participation in the State Workers' Compensation

---

[23]  Syms' former workers' compensation carrier was Chartis/AIG ("Chartis/AIG").  Chartis/AIG is still involved in the administration of claims against Syms pending prior to the switch to Liberty Mutual.  The Filene's Basement workers' compensation claims are under coverage provided by Liberty Mutual.

[24]  116 of these claims are under insurance coverage provided by Liberty Mutual and 21 are under insurance coverage provided by Chartis/AIG.

Programs is approximately $101,893.[25]  By this Motion, the Debtors seek authority to continue

paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all

amounts related to their workers' compensation programs and the State Workers' Compensation

Programs that arose prior to the Petition Date as they become due in the ordinary course of the

Debtors' business.[26]

## G.    Other Benefits

50.      The Debtors offer certain benefit programs to various groups of Employees,

including, but not limited to, store discounts and promotional contests.  The Debtors believe that

these programs maintain Employee morale and help retain the Debtors' workforce.  The Debtors

offer full-time Employees a discount of 25% on merchandise in the Debtors' stores and part-time

Employees a discount of 15%.  The approximate cost of Employee discounts from October 3,

2010 through October 1, 2011 was $1,434,000.  The Debtors also offer promotional and

incentive programs to Employees, but the cost of such programs are not possible to calculate as

the cost of such programs are based solely on Employee performance.  The Debtors assert that

failing to honor such programs would have an adverse affect on the Debtors' Employees.  By this

Motion, the Debtors request authority to continue such programs in their sole discretion and

make payments pursuant to such programs in the ordinary course.

## H.    Social Security, Income Taxes, Union Dues and Other Withholding

51.      The Debtors routinely withhold from Employee paychecks amounts that the

Debtors are required to transmit to third parties.  Examples of such withholding include Social

---

[25]   This amount includes the Debtors' deductible payments for workers' compensation claims.  On a going forward basis, this sum would accommodate anticipated future workers' compensation claims, and the costs associated with administration of such claims.

[26]   The Debtors' believe that they are currently paid up to date on workers' compensation, and that their policy will be up for renewal shortly.

Security, FICA, federal and state income taxes, garnishments, union dues, charitable donations, health care payments and certain voluntary payroll deductions.[27] The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore are not property of the Debtors' bankruptcy estates. Thus, the Debtors believe that they have authority to direct such funds to the appropriate parties in the ordinary course of business. Out of an abundance of caution, the Debtors request authority to direct such trust funds to the appropriate parties.

## I.     Direction to Banks

52.     The Debtors also seek an order authorizing and directing the Debtors' banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any of the Prepetition Employee Obligations, and prohibiting the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations. The Debtors also seek an order authorizing them to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

---

[27]     The Debtors offer Employees the opportunity to obtain Metro Cards for public transportation through the TransitChek program ("TransitChek"). Approximately eighteen (18) of the Debtors' Employees have elected TransitChek payroll withholding. The Debtors' pay approximately $1,900 a month to TransitCheck. With the exception of a $5.50 participation fee per employee paid for by the Debtors, that entire sum represents Employee contributions. The Debtors request Court approval to pay any prepetition TransitCheck participation fees and to continue to pay the TransitChek participation fee in the ordinary course.

The Debtors also offer Employees the ability to obtain optional insurance from Aflac through payroll withholding. Seven (7) Employees have elected to participate and the Debtors pay approximately $243 a month to Aflac. Employees pay the full cost of this program through Employee contributions.

**J.      Postpetition Continuation of Ordinary Course Employee Programs**

53.      Finally, the Debtors seek an order authorizing, but not obligating, the Debtors to continue their ordinary course employee and retiree compensation, benefits and related programs described in this Motion during the postpetition liquidation and wind-down process.  Though such programs likely constitute ordinary course of business expenses authorized under the Bankruptcy Code and applicable law, the Debtors nevertheless seek a "comfort order" authorizing the continuation of such programs to the extent that the going-out-of-business liquidation and wind-down process might be considered outside the realm of the Debtors' ordinary course of business.

## APPLICABLE AUTHORITY

54.      As a result of the commencement of these chapter 11 cases and in the absence of an order of the Court providing otherwise, the Debtors will be prohibited from paying or otherwise satisfying their Prepetition Employee Obligations, and the checks, wire transfers and direct deposit transfers issued in respect of the Prepetition Employee Obligations will be dishonored.  Failing to honor these obligations would have devastating consequences on the Debtors' going-out-of-business process and the orderly wind-down necessary to maximize the value of the Debtors' estates.

55.      Accordingly, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code and the "necessity of payment" doctrine, the Debtors seek authority to: (i) pay their outstanding Prepetition Employee Obligations; and (ii) continue certain of their practices, programs and policies in effect as of the Petition Date with respect to the Prepetition Employee Obligations, including allowing Employees to use vacation time accrued, but unused, as of the Petition Date to the extent permitted by the Debtors' existing policies.  The Debtors further request that the Court authorize and direct the bank(s) at which the Debtors maintain the account(s) from which

the Debtors' payroll obligations are disbursed, to honor and pay all prepetition and postpetition checks issued to or to be issued and fund transfers requested or to be requested, by the Debtors in respect of the Prepetition Employee Obligations. The Debtors also seek authority to issue new postpetition checks or fund transfer requests with respect to such prepetition obligations that may have been dishonored. The relief requested herein is essential and necessary to the Debtors' continued operations in chapter 11 and to an effective and orderly wind-down of the Debtors' business.

56. The payment of the Prepetition Employee Obligations is justified under section 105(a) of the Bankruptcy Code and the well-established "necessity of payment doctrine." The Debtors do not seek authority to pay any Employee in excess of the $11,725 cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

57. Under the "necessity of payment doctrine" and section 105(a) of the Bankruptcy Code, courts have consistently permitted immediate payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate of the benefit of all creditors, specifically including payment of prepetition employee claims. See, e.g., Miltenberger v. Logansport, C. &S.W. Ry. Co., 106 U.S. 286, 312 (1882) (stating that payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of . . . [crucial] business relations"); Gregg v. Metro Trust Co., 197 U.S. 183, 187 (1905) (stating that "the payment of the employees of the [rail]road is more certain to be necessary in order to keep it running than the payment of any other class of previously incurred debts"); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989) (finding that payment of prepetition wages, salaries, reimbursable business expenses and health benefits to active employees of debtor airline authorized); In re Chateaugay Corp., 80 B.R. 279, 286-89 (S.D.N.Y. 1987), appeal

dismissed, 838 F.2d 59 (2d Cir. 1988) (approving lower court order authorizing debtor, prior to plan stage of case, to pay prepetition wages, salaries, expenses and benefits); In re Gulf Air, Inc., 112 B.R. 152, 153-54 (Bankr. W.D. La. 1989) (permitting payment of prepetition wages, benefits and expenses as necessary to maintain going concern values and to assist reorganization efforts).

58.     The Debtors' ability to maximize value depends, in large part, upon the retention and motivation of the Employees whose efforts will be critical to successful liquidation sales at the Debtors' stores.  Employees will be required to commit much of their time and energy to the Debtors' going-out-of-business efforts.  Any disruption from Employee resignations or lack of morale, particularly during the beginning of the important holiday selling season, could have devastating effects on the Debtors' wind-down efforts.  Most of the Debtors' employees (and their families) are dependent upon the wages, salaries, reimbursements and other benefits they receive from the Debtors.

59.     If amounts owed are not received, insurance reimbursements are not made, or other benefits delayed, the employees may suffer extensive personal hardship and in some cases will be unable to meet their "basic living" needs, causing harm to them and their families and potentially making it difficult or impossible for them to continue working for the Debtors.  The Debtors believe that in order to avoid Employee resignations and to maintain Employee morale, it is critical that they be authorized to pay each of their Employees all compensation amounts that have been earned under the Debtors' prepetition contractual obligations or practices, subject to the limitations described herein.

60.     Moreover, the Debtors estimate that substantially all of the amounts they seek to pay herein are entitled to priority under sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

Section 507(a)(4) of the Bankruptcy Code grants priority to employee claims for "wages, salaries, or commissions, including vacation, severance and sick leave play" earned within 180 days before the filing of the applicable petition up to $11,725 per employee. 11 U.S.C. § 507(a)(4). Similarly, section 507(a)(5) of the Bankruptcy Code provides the claims for contributions to certain employee benefit plans are also afforded priority treatment to the extent of the number of employees covered by each plan multiplied by $11,725, less any amounts paid pursuant to section 507(a)(4) of the Bankruptcy Code. 11 U.S.C. § 507(a)(5). Because of the number of Employees working for the Debtors, and because some amounts are unknown pending submission of claims, the Debtors do not know the exact amount due each Employee for the prepetition period. However, an overwhelming majority of the Debtors' Employees are owed amounts under the $11,725 cap of sections 507(a)(4) and 507(a)(5). The Debtors know of only two management Employees owed sums that exceed the $11,725 cap of sections 507(a)(4) and 507(a)(5). By this Motion, Debtors seek only authority to pay up to $11,725 to Employees and do not seek authority to exceed that cap.

61.     Thus, granting the relief sought herein would affect only the timing, and not the amount of payment of the Prepetition Employee Obligations to the extent they constitute priority claims.

62.     A portion of the Prepetition Employee Obligations constitutes funds held in trust for payment to third parties. The payment of the employee contribution component of the Employer Taxes, 401(k) Plan, union dues or payment of garnished wages will not prejudice the Debtors' estates because such withholdings are held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates under Bankruptcy Code section 541. See Begier v. IRS, 496 U.S. 53 (1990). Moreover, payments which are critical to the retention

and morale of the Debtors' workforce actually add value to the estates because an unplanned reduction in Employee retention or productivity could have disastrous effects on recoveries to creditors and stakeholders.

63.     The relief requested herein is commonly granted in this District, including in cases involving the wind-down of a debtor.  See, e.g., In re Goody's LLC, Case No. 09-10124 (CSS) (Bankr. D. Del. Jan. 15, 2009); In re Am. Home Mort. Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 7, 2007); In re Earthshell Corp., Case No. 07-10086 (Bankr. D. Del. Jan. 24, 2007) (KG); In re Sea Containers, Ltd., Case No. 06-11156 (KJC) (Bankr. D. Del. Oct 17, 2006); In re Foamex Int'l, Case No. 05-12685 (PJW) (Bankr. D. Del. Sept. 20, 2005); In re Pharm. Formulations, Inc., Case No. 05-11910 (MFW) (Bankr. D. Del. July 12, 2005); In re Ultimate Elecs., Inc., Case No 05-10104 (PJW) (Bankr. D. Del. Jan. 13, 2005).[28]

64.     For all the reasons previously set forth herein, the Debtors submit that payment of the Prepetition Employee Obligations and the continuation of the specified related employment policies are necessary to the success of the Debtors' orderly wind-down and should be authorized by this Court.

65.     As a precaution, the proposed Order provides that the relief granted therein shall not constitute or be deemed an assumption of any of the employment and service agreements to which the Debtors are a party or any of the Debtors' employee benefit policies, plans, programs, practices and procedures under Bankruptcy Code section 365.

---

[28]   Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders, however, are available on request.

## SATISFACTION OF BANKRUPTCY RULE 6003

66.     Pursuant to Bankruptcy Rule 6003, the Court may grant a request of a debtor to pay all or part of a prepetition claim in the first 21 days of a case only if that relief is necessary to avoid immediate and irreparable harm.  No court within the Third Circuit has interpreted the "immediate and irreparable harm" language in the context of Bankruptcy Rule 6003 in any reported decision.  However, the Third Circuit Court of Appeals has interpreted the same language in the context of preliminary injunctions.  In that context, irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 F. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)).  Further, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle Cnty., 40 F.3d 645, 653-55 (3d Cir. 1994).  To the extent that the requirements of Bankruptcy Rule 6003 are applicable to the relief requested in the Motion, the Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm as defined by the Third Circuit Court of Appeals.

67.     Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for granting the relief requested herein.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

68.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the

Debtors seek in this Motion is necessary for the Debtors to conduct an orderly, value-maximizing liquidation and wind-down process and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

69.     Notice of this Motion will be given to: (i) the United States Trustee for the District of Delaware; (ii) counsel to the agent for the prepetition lenders; (iii) the parties included on the Debtors' lists of twenty (20) largest unsecured creditors; and (iv) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).

70.     No previous request for the relief sought herein has been made to this Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

# CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:        Wilmington, Delaware
              November 2, 2011


        /s/ *Mark S. Chehi*
        Mark S. Chehi (I.D. No. 2855)
        Skadden, Arps, Slate, Meagher & Flom LLP
        One Rodney Square
        P.O. Box 636
        Wilmington, Delaware 19899-0636
        (302) 651-3000
        (302) 651-3001

        - and -

        Jay M. Goffman
        Mark M. McDermott
        David M. Turetsky
        Skadden, Arps, Slate, Meagher & Flom LLP
        Four Times Square
        New York, New York 10036-6522
        (212) 735-3000
        (212) 735-2000

        Proposed Counsel for Debtors and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
        :
In re:         :    Chapter 11
        :
FILENE'S BASEMENT, LLC, <u>et</u> <u>al</u>.,    :    Case No. 11-13511 (___)
        :
Debtors.[1]    :    Joint Administration Pending
        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x  **Related Docket No._____**

**ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, 507(a), 1107(a) AND 1108 AND FED. R. BANKR. P. 6003, AUTHORIZING DEBTORS, <u>INTER</u> <u>ALIA</u>, TO PAY PREPETITION WAGES, COMPENSATION, AND EMPLOYEE BENEFITS**

Upon consideration of the motion (the "<u>Motion</u>")[2] of the above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for an order, under sections 363, 507(a)(4) and 507(a)(5), 1107(a) and 1108 and Bankruptcy Rule 6003, (a) authorizing, but not directing, the Debtors, <u>inter</u> <u>alia</u>, to pay prepetition wages, salaries and employee benefits; (b) authorizing, but not directing, the Debtors to continue the maintenance of all employee benefit programs in the ordinary course; and upon the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED that:**

1.      The Motion is GRANTED as set forth herein.

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Filene's Basement, LLC (8277), Syms Corp. (5228), Syms Clothing, Inc. (3869), and Syms Advertising Inc. (5234).  The Debtors' address is One Syms Way, Secaucus, New Jersey 07094.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2. Subject to the limitations contained in sections 507(a)(4) and (a)(5) of the Bankruptcy Code, the Debtors are authorized, but not directed, to pay and/or honor (including to any third parties that provide or aid in the monitoring, processing or administration of the Prepetition Employee Obligations), in their sole discretion, the Prepetition Employee Obligations as and when such obligations are due, upon entry of this order.

3. The Debtors are authorized, but not directed, in their sole discretion, to honor and continue their expense reimbursement and Employee Benefit Obligations that were in effect as of the Petition Date, including but not limited to Vacation Time, Personal Time, Holiday Time, Sick Time, Severance Obligations, Medical Plans, Dental Plan, Union Health Funds, Life Insurance Plans, 401(k) Plan, Pension Funds, Reimbursable Expenses, Vehicle Expenses and workers' compensation and State Workers' Compensation Programs; provided, however, that such relief shall not constitute or be deemed an assumption or an authorization to assume any of such Employee Benefit Obligations, including, policies, plans, programs, practices, and procedures, under section 365(a) of the Bankruptcy Code.

4. The Debtors' banks shall be and hereby are authorized and directed to receive, process, honor and pay all prepetition and postpetition checks and fund transfers on account of the Prepetition Employee Obligations that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments. The Debtors' banks are prohibited from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations. The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or

rejected.

5.    The Debtors may pay any and all withholding, including social security, FICA, federal and state income taxes, garnishments, union dues, health care payments, retirement fund withholding and other types of withholding, whether these relate to the period prior to the date of the Debtors' chapter 11 filings or subsequent thereto.

6.    Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this order.

7.    Nothing in the Motion or this order or the relief granted (including any actions taken or payments made by the Debtors pursuant to the relief) shall (a) be construed as a request for authority to assume any executory contract under 11 U.S.C. § 365; (b) waive, affect or impair any of the Debtors' rights, claims or defenses, including, but not limited to, those arising from section 365 of the Bankruptcy Code, other applicable law and any agreement; (c) grant third-party beneficiary status or bestow any additional rights on any third party; or (d) be otherwise enforceable by any third party.

8.    Authorizations given to the Debtors in this order empower but do not direct the Debtors to effectuate the payments specified herein.

9.    The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

10.   Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

11.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this order.

Dated:  Wilmington, Delaware
            _____, 2011


_____
UNITED STATES BANKRUPTCY JUDGE