IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
In re:                                      :       Chapter 11
                                            :
FILENE'S BASEMENT, LLC, et al.,             :       Case No. 11-13511 (KJC)
                                            :
                Debtors.[1]                 :       Joint Administration Pending
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDERS PURSUANT TO
BANKRUPTCY CODE SECTIONS 105(a), 363(b), 364(e), 365(a) AND 554(a),
BANKRUPTCY RULES 2002, 6003, 6004, 9006(c), AND 9014 AND LOCAL RULES 2002-
1 AND 9006-1 (A) SCHEDULING A HEARING AND APPROVING THE FORM AND
MANNER OF NOTICE OF THE MOTION AND HEARING THEREON AND (B)(I)
APPROVING THE DEBTORS' ENTRY INTO AGENCY AGREEMENT, (II)
AUTHORIZING THE DEBTORS TO SELL CERTAIN ASSETS THROUGH STORE
CLOSING SALES, (III) AUTHORIZING THE DEBTORS TO ABANDON UNSOLD
PROPERTY, (IV) WAIVING COMPLIANCE WITH CONTRACTUAL STORE
CLOSING SALE RESTRICTIONS AND EXEMPTING THE DEBTORS FROM STATE
WAGE PAY REQUIREMENTS AND LAWS RESTRICTING STORE CLOSING SALES,
(V) AUTHORIZING THE DEBTORS' ASSUMPTION OF OCTOBER AGENCY
AGREEMENT AND (VI) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") hereby move this Court (the "Motion"), on an emergency basis, for entry of (A) an order,

pursuant to section 105 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9006(c)

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and

9006-1(e) of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for

the District of Delaware (the "Local Rules") scheduling a hearing on the merits of the Motion on

November 10, 2011 and approving the form and manner of the notice of the Motion and (B) an order

pursuant to Bankruptcy Code sections 105(a), 363(b), 364(e), 365(a) and 554(a) and Bankruptcy

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Filene's
    Basement, LLC (8277), Syms Corp. (5228), Syms Clothing, Inc. (3869), and Syms Advertising Inc. (5234).
    The Debtors' address is One Syms Way, Secaucus, New Jersey 07094.

Rules 2002, 6003, 6004, 6006 and 9014 (i) authorizing the Debtors to enter into Second Agency

Agreement made as of November 2, 2011 (the "Agency Agreement") with a joint venture of Gordon

Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (together, the "Agent"), a copy

of which is attached hereto as Exhibit A; (ii) authorizing the Agent to sell certain assets, consisting

of merchandise (the "Merchandise") and owned furniture, fixtures and equipment ("FF&E") at the

Debtors' respective stores (the "Stores") through store closing sales (the "Sale"), free and clear of all

liens, claims and encumbrances; (iii) authorizing the Debtors to abandon unsold Merchandise and

Owned FF&E after conclusion of the Sale; (iv) waiving compliance with any provisions in the

Debtors' agreements restricting store closing sales (the "Contractual Restrictions"), and exempting

the Debtors from any applicable state and local rules, statutes or ordinances restricting store closing

sales (the "Applicable Law Restrictions") and from state wage pay requirements ("Wage Pay Laws");

(v) authorizing the assumption of the October 12 Agency Agreement, attached hereto as Exhibit D,

between the Debtors and Gordon Brothers Retail Partners LLC (the "October Agency Agreement");

and (vi) granting related relief.

In support of the Motion, the Debtors, by and through their undersigned counsel,

respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtors seek (i) immediate entry of an order approving the

form, manner and shortened notice of the Motion and hearing thereon, and (ii) an order to be

entered after a hearing on the Motion that authorizes the Debtors to conduct store closing sales at

all their stores, and to wind down their operations with the assistance of a professional liquidator

pursuant to the terms of the Agency Agreement.  The Debtors arrived at the decision to shut

down their retail operations very reluctantly.  As described further below, however, a liquidation

of the Debtors' entire retail operations not only is the best solution for maximizing stakeholder recovery, it is the only realistic course.

2.     The Debtors' troubles can be traced, in part, to their inability to achieve hoped-for synergies following the acquisition of the Filene's Basement business by Debtor Filene's Basement, LLC, a wholly-owned subsidiary of Debtor Syms Corp. That acquisition occurred in June of 2009, and was effectuated when Filene's Basement, Inc. (an entity that is unrelated to the Debtors) commenced chapter 11 proceedings in this Court and sold certain real property leases, inventory, equipment and other assets to Debtor Filene's Basement, LLC (then known as SYL, LLC) pursuant to section 363 of the Bankruptcy Code. Unfortunately, the hoped-for synergies between the Syms and Filene's Basement businesses did not materialize following the 2009 acquisition and the Debtors have sustained ongoing and significant losses. The Debtors have also experienced financial and liquidity issues caused by the highly unfavorable economic climate affecting retailers in general, which has been exacerbated by intense competition from other retailers and discount stores

3.     Indeed, the Debtors have negative earnings before interest, taxes, depreciation and amortization. Their cash flow also is negative. The Debtors have been funding their losses through the periodic sale of portions of unencumbered real estate portfolio. Despite exhaustive efforts to turn around their businesses, the Debtors have been unable to develop a viable, long-term merchandising strategy and business plan that will return the Debtors to profitability. Accordingly, the Debtors determined that they could not reorganize on a stand-alone basis, and that they needed to stop further depleting real estate assets to fund operating losses. The Debtors therefore determined to cease operations, liquidate their merchandise pursuant to a chain-wide store closing process, and dispose of real estate over time for the benefit of their stakeholders.

4. This decision came only after the Debtors devoted five months trying to find better alternatives. In March 2011, the Debtors retained Rothschild, Inc. ("Rothschild") as their investment banker, and Alvarez & Marsal ("A&M") as their financial advisor, to assist them in developing strategic alternatives and attempting to turn around their operations. The Debtors made their efforts public, and contacted almost one hundred potential financial buyers, strategic buyers, and liquidators about a possible going-concern transaction or capital infusion.

5. Despite countless hours of effort by the Debtors and their teams at Rothschild and A&M, the Debtors did not receive a single, going-concern proposal. Meanwhile, losses mounted, vendors and factors restricted trade terms, and shipments of new merchandise fell to a trickle. The Debtors therefore approached the major players in the liquidation industry and solicited their bids to serve as agent to liquidate the Debtors' stores. The process was very competitive, and culminated in the Debtors' receipt of four bids from a total of five nationally-known liquidators.

6. As the end of October approached without a viable out-of-court or going concern alternative, and as the all-critical holiday selling season approached, the Debtors determined that they had no realistic choice but to accept the highest and best liquidation bid so that they could begin conducting store closing sales in time to take advantage of the single, largest selling day of the year, so-called "Black Friday," the day immediately after Thanksgiving.

7. The Debtors believe that the estimated proceeds from the disposition of their merchandise during the holiday season, followed by controlled dispositions of Syms Corp.'s real estate portfolio, should be sufficient to afford a dividend to Syms Corp.'s shareholders. In anticipation of the commencement of these cases, the Debtors conferred with their secured lender, Bank of America, N.A. (the "Prepetition Lender") in connection with the terms of the Agency Agreement. The Debtors also reached out to counsel to the National Association of Attorneys

General to initiate a dialogue that would ensure a smooth, store closing process. This Motion represents the culmination of those efforts.

## JURISDICTION

8.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The legal predicates for the relief requested herein are Bankruptcy Code sections 105, 363, 364, 365 and 554. Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6003, 6004, 9006, 9014 and Local Rules 2002-1 and 9006-1.

## RELIEF REQUESTED

9.     By this emergency Motion, the Debtors seek immediate entry of an order pursuant to section 105 of the Bankruptcy Code, Bankruptcy Rule 9006(c) and Local Rules 2002-1 and 9006-1(e), in substantially the form annexed hereto as Exhibit B, scheduling a hearing on the merits of the Motion for November 10, 2011, and approving the form and manner of the shortened notice with respect to the Motion and the emergency hearing thereon.

10.     The Motion also seeks entry of an order on the merits of the GOB Motion after an expedited hearing pursuant to sections 105(a), 363(b), 364(e), 365(a) and 554(a) of the Bankruptcy Code (i) authorizing the Debtors to enter into the Agency Agreement; (ii) authorizing the Debtors to sell the Merchandise and FF&E at the Stores through the Sale free and clear of all liens, claims and encumbrances; (iii) authorizing the Debtors to abandon unsold Merchandise or Owned FF&E at the Stores following conclusion of the Sale; (iv) waiving compliance with Contractual Restrictions and exempting the Debtors from Applicable Laws and Wage Pay Laws; (v) authorizing the Debtors to assume the October Agency Agreement; and (vi) granting related relief, in substantially the form annexed hereto as Exhibit C.

## BACKGROUND

11.    On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.  Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

12.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the Declaration of Gary Binkoski in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration") filed contemporaneously herewith.  Additional information regarding the Debtors' solicitation efforts that resulted in the Agent's bid is contained in the First Day Declaration, as well as the need for immediate relief is contained in the  Declaration of Bernard Douton of Rothschild (the "Douton Declaration"), and the Declaration of Steve Lipman of Rothschild (the "Lipman Declaration"), both submitted in support of this Motion and also filed contemporaneously herewith.  Information regarding the need to schedule a hearing and grant relief on shortened notice as contemplated by Bankruptcy Rule 6003 is also contained in the Declaration of Benjamin L. Nortman (the "Nortman Declaration"), submitted in support of this Motion and filed contemporaneously herewith.

## BASIS FOR RELIEF

### A.    The Solicitation Process

13.    Earlier this year, the Debtors recognized the need to engage an investment banker to assist them in addressing issues related to their mounting business losses.  The Debtors therefore retained Rothschild in March 2011 to assist them in developing and pursuing one or

more strategic alternatives. Douton Declaration ¶ 5; Lipman Declaration ¶ 5. The Debtors' decision to retain Rothschild arose from the Debtors' significant operating losses, increased competition in the retail sector in which the Debtors operate, and poor economic conditions that have negatively affected retailers in general. Douton Declaration ¶ 5. Indeed, the Debtors have experienced negative operating income for at least the last two years, with the Debtors funding their cash shortfalls through periodic dispositions of unencumbered real estate. Id.

14.     After retaining Rothschild and with Rothschild's assistance, the Debtors undertook a comprehensive process lasting several months to identify and evaluate strategic alternatives, including a possible sale of the Debtors (the "Strategic Alternatives Process"). First Day Declaration ¶ 24; Douton Declaration ¶ 6; Lipman Declaration ¶ 6. On May 26, 2011, the Debtors issued a press release indicating that the Board of Directors had initiated the Strategic Alternatives Process and that Rothschild had been retained to assist in this process. First Day Declaration ¶ 24; Douton Declaration ¶6; Lipman Declaration ¶ 7.

15.     As part of the Strategic Alternatives Process, the Debtors, through Rothschild, contacted strategic, financial, and real estate buyers, as well as liquidators, to gauge their interest in pursuing a transaction with the Debtors. First Day Declaration ¶ 25; Douton Declaration ¶ 7; Lipman Declaration ¶ 8. The Debtors, through Rothschild, ultimately contacted a total of 85 potential transaction parties. A total of 48 such parties thereafter executed confidentiality agreements and engaged in further diligence of the Debtors. Lipman Declaration ¶ 8. Included within the categories of potential strategic and financial buyers were potential buyers who considered a variety of strategic alternatives, including an acquisition of the Debtors or a liquidation of the Debtors. First Day Declaration ¶ 25; Lipman Declaration ¶ 8.

16.     Throughout that process, the Debtors indicated that they were receptive to various acquisition alternatives, including, but not limited to, an acquisition of the Debtors in their entireties (*i.e.*, the Syms and Filene's Basement retail operations and the Syms owned real estate), an acquisition of some or all of the retail operations, or an investment in the Debtors. First Day Declaration ¶ 26; Lipman Declaration ¶ 9. However, despite extensive efforts, the Debtors received <u>no</u> viable proposals that would have allowed the Debtors to continue as a going concern. Douton Declaration ¶ 7; Lipman Declaration ¶ 10. Given their massive operating losses, the Debtors have also determined that they are unable to reorganize on a stand-alone basis. First Day Declaration ¶ 28; Lipman Declaration ¶ 10.

17.     In fact, as a result of the Strategic Alternatives Process, the Debtors received bids that <u>only</u> contemplated the liquidation of the Debtors' entire store chains. First Day Declaration ¶ 26; Douton Declaration ¶ 7; Lipman Declaration ¶10. The Debtors solicited and received bids from a total of five liquidation firms, including the Agent, to serve as the Debtors' agent in a liquidation of the Syms and Filene's Basement retail businesses. First Day Declaration ¶ 26; Douton Declaration ¶ 8. The Debtors did not receive any viable bids from potential strategic and financial buyers. First Day Declaration ¶ 26.

18.     Based on these results, a liquidation of the Debtors' retail assets through chapter 11 presents the best – indeed the <u>only</u> – way of maximizing value for all stakeholders. First Day Declaration ¶ 28; Douton Declaration ¶ 9; Lipman Declaration ¶ 11. The Debtors determined that a Sale conducted by one or more experienced and reputable liquidator(s) would achieve the maximum values for the Merchandise and Owned FF&E located in the Stores and would minimize administrative expenses. First Day Declaration ¶ 30; Douton Declaration ¶ 11; Lipman Declaration ¶ 11. Indeed, given the breadth of the Sale, it would be impossible for the

Debtors to self-administer the Sale without outside liquidator assistance. Douton Declaration ¶ 11; Lipman Declaration ¶ 11.

19. The Debtors move by way of emergency motion to set a hearing date on shortened notice and eventually obtain Court approval after such hearing to enter into the Agency Agreement because every day that passes leading up to the critical holiday shopping season represents potential lost revenue from the store closing sales. In particular, the Debtors and their advisors believe that it is critical for the relief requested herein to be granted on an expedited basis, and that the failure to receive such expedited relief will result in immediate and irreparable harm, for the following reasons:

- First, a delay of the November 11, 2011 Sale Commencement Date could force the sale to continue into January, which has lower volume shopping days. In addition to the prospect of lower recoveries from sales during January, the Debtors could be burdened with additional leasehold administrative expenses for the entire month of January and potentially 2011 tax bills that come in during January 2012. Nortman Declaration ¶ 11.

- Second, the upcoming holiday shopping season, including the critical "Black Friday" post-Thanksgiving shopping weekend, provides a unique window of opportunity for the Debtors to maximize values from the store closings when retail customers are most likely to shop. Douton Declaration ¶ 22. However, Agent requires advance time to prepare appropriate signage and reserve prominent advertising space in order to get ready for the Black Friday weekend. First Day Declaration ¶ 74. Failure to obtain the relief requested on an expedited basis could leave the Agent with insufficient time to undertake these preparations, thereby leading to a less successful Sale and diminished recoveries.

- Third, the Agent requires lead time to order inventory to augment the Debtors' existing inventory under the Agency Agreement. First Day Declaration ¶ 74; Douton Declaration ¶ 24; Nortman Declaration ¶¶ 8-9 The Agent has advised the Debtors that if the order approving the Agency Agreement is not entered as soon as possible, it would severely restrict the Agent's ability to obtain the augmentation goods and distribute them to the Debtors' stores in a timely manner to capture the "Black Friday" shopping opportunity. Nortman Declaration ¶ 9; Douton Declaration ¶ 24. The Agent has predicated its purchase of augment inventory on entry of a court order approving the Agency Agreement. Douton Declaration ¶ 24. Augment inventory is critical to the Debtors' ability to maximize the value of these estates, as the Debtors will receive a portion of the net proceeds of any such inventory under the Agency Agreement, after deduction of certain customary fees and expenses. Nortman

Declaration ¶ 8. For this additional reason, the failure to obtain the expedited relief requested by this Motion would result in irreparable harm in the form of diminished recoveries from the Sale.

- <u>Fourth</u>, at this point, the Debtors have no unencumbered cash under their credit facility with their Prepetition Lender. First Day Declaration ¶ 11. As a consequence of that and significantly tightened credit terms from trade vendors and factors, the Debtors are unable to place orders on new inventory for next season. First Day Declaration ¶ 77. Indeed, the Debtors' inventory levels have slowly been shrinking for several weeks as word of the Debtors' financial condition has spread and their vendors and factors restricted terms. Douton Declaration ¶ 22. Given these constraints, expedited relief of the kind requested is critical to allow the Debtors to pursue a Sale that will maximize value, and the Debtors (and their estates) would be irreparably harmed if such relief were not granted on an expedited basis.

- <u>Fifth</u>, the guaranteed amount that the Agent is willing to pay to conduct the Sales will likely decrease as the Debtors continue to operate on a non-GOB basis. This is because the Debtors have not been replenishing inventory due to their tightened credit lines, and the Agent's guaranteed amount will likely decrease if the inventory levels fall below the threshold provided in the Agency Agreement. Nortman Declaration ¶ 7.

20.     The Debtors have been unable to develop a viable business strategy for reversing their downward spiral. Douton Declaration ¶ 25. They pursued out-of-court alternatives as long as they responsibly could before finally determining that none of them was viable, and that they needed to commence store closing sales immediately to take advantage of the holiday season. Douton Declaration ¶ 25.

**B.     Approval Of The Agency Agreement**

21.     The Debtors respectfully request approval of the Agency Agreement with the Agent. Although the Debtors respectfully refer the Court to the Agency Agreement in its entirety, certain of the material terms are set forth below:[2]

- <u>Assets</u>. All Merchandise at the Stores as of the Sale Commencement Date <u>plus</u> Merchandise located in the warehouse/distribution centers and merchandise which is in transit or on order as of the Sale Commencement Date. In addition, the Agent may

---

[2]     Capitalized terms used in this summary shall have the meanings ascribed to them in the Agency Agreement. This summary of the Agency Agreement is for summary purposes only and is qualified in its entirety by the terms and provision of the Agency agreement.

augment the Merchandise with goods of like kind and quality (the "<u>Additional Agent Merchandise</u>"), the sale of which is included as "Proceeds" under the Agency Agreement.

- <u>Guaranteed Amount</u>. As a guaranty of the Agent's performance under the Agency Agreement, the Agent will guarantee the Debtors' receipt of a certain percentage of the Cost Value of the Merchandise included in the sale (the "<u>Guaranty Percentage</u>"), subject to certain inventory level and cost factor adjustments. The Agent has agreed to a Guaranty Percentage of 90% of the aggregate Cost Value of Merchandise.

- <u>Recovery Amount</u>. To the extent that the proceeds realized from the sale of Merchandise exceed (i) the Guaranteed Amount and (ii) the expenses of the sale (discussed *infra*) (collectively, (the "<u>Sharing Amounts</u>"), the remaining proceeds will be allocated <u>first</u> to pay the Agent's Fee and <u>next</u> to be shared between the Debtors and the Agent.

- <u>Sale of FF&E</u>. The Agent will sell the FF&E located at the Stores, the Distribution Centers and the Debtors' corporate offices, but only to the extent designated by the Agent, in exchange for providing the Agent a fee, calculated as a percentage of the net proceeds from such sales. The Agent has agreed to a FF&E Guarantee of $2 million, 50% of which will be paid on the Payment Date.

- <u>Payment Timing</u>. On the second business day following entry of an Order approving the Sale, the Agent will wire to the Debtors an amount certain as payment of a portion of the Guaranteed Amount (the "<u>Initial Guaranty Payment</u>"). The Agent has agreed to pay 80% of the Guaranteed Amount as the Initial Guaranty Payment. The Agent will pay the remaining Guaranteed Amount and all other amounts due to the Debtors, pursuant to the timing in the Agency Agreement, as and when the parties reconcile the Guaranteed Amount.

- <u>Expenses of Sale</u>. From the Sale Commencement Date through and including the Sale Termination Date, the Agent will be unconditionally responsible for all Expenses enumerated in Section 4.1 of the Agency Agreement (including, without limitation, Payroll, benefits for Retained Employees, Agent's on-site supervision related costs, signs and banners, promotional costs, Sale supplies, telephone, postage/overnight or delivery/courier charges, credit card and bank fees, costs related to moving, transferring or consolidating merchandise between Stores, insurance costs, security and building alarm costs, cost of capital and letter of credit fees, and any Retention Bonuses for Retained Employees and an agreed percentage of the costs of the physical inventory taking), incurred in conducting the Sale during the Sale Term, which Expenses may be funded and paid from Proceeds of the Sale to the extent available, or directly by the Agent. Agent shall also be responsible for Occupancy Expenses including rent, utilities, trash and snow removal, and cleaning expenses, limited on a per Store and per diem basis in amounts not to exceed those set forth in Exhibit 4.1(c) of the Agency Agreement. Benefits paid to Retained Employees shall not exceed 22% of the base payroll for each Retained Employee.

- Employees. The Agent shall have the right to use the Debtors' store-level employees during the Sale Term and will reimburse the Debtors for actual payroll, and Employee Benefits up to an agreed upon cap based upon a percentage of the base payroll for each Retained Employee. The Agent may also elect to pay, as an expense, a retention bonus to certain retained employees. The employees will remain the Debtors' employees at all times.

- Cost Value / Inventory Taking. The Cost Value of Merchandise is the cost of such item as reflected on the Debtors' books and records in the ordinary course of business consistent with historical practices. The Debtors and Agent shall split the fees and expenses associated with employing a mutually agreed upon national inventory taking service for the taking of physical inventory of the Cost Value and Retail Value of the Merchandise in the Stores and warehouse/distribution centers.

- Sale Term. The Agent has the right to conduct the Store Closing Sales commencing the day after entry of the Order approving the Sale. The Agent has conditioned its agreement, however, on entry of such Order by November 10, 2011. The Sale may continue until January 31, 2012; provided, however, that under certain circumstances, the Agent may terminate the sales at certain Stores prior to such date.

- Sale Guidelines. The Sale shall be conducted in accordance with the Sale Guidelines attached to the Agency Agreement as Exhibit 8.1. The Agent shall be authorized to advertise and promote the sales as a "store closing," "going out of business," or "sale on everything," or similar themed sale.

- Merchandise Returns/Gift Cards/Other Programs. Sales of all items of Merchandise sold during the Sale Term shall be a "final sale", however the Agent will accept returns of Merchandise sold prior to the Sale Commencement Date provided that such return is accompanied by the original Store register receipt and is otherwise in compliance with Debtors' 30 day return policy in effect as of the date such item was purchased. During the Sale Term, the Agent will accept the Debtors' gift cards, and Merchandise credits issued by the Debtors prior to the Sale Commencement Date, but solely to the extent that the Court authorizes the Debtors to honor such items in connection with the Debtors' customer programs motion, filed concurrently herewith. The Debtors shall reimburse the Agent for such amounts during the weekly sale reconciliation.

- Letter of Credit / Security Interests. To secure its obligations under the Agency Agreement, the Agent will post a letter of credit for the benefit of the Prepetition Lender and the Debtors. The Agent will be granted, upon issuance of the Letter of Credit and effective as of the Payment Date, a valid and perfected first priority security interest in and lien upon (i) the Merchandise, (ii) Additional Agent Merchandise, (iii) all Proceeds, (iv) the commission regarding the sale of Owned FF&E, and (v) any Sharing Amount, up to the amount of Agent's percentage share, to secure all obligations of Debtors to Agent. Until the Debtors receive payment of the Guaranteed Amount, and the issuance of the Letter of Credit to secure payment of Expenses due to Debtors under the Agency Agreement, such security interest shall

remain junior and subordinate in all respects to the liens, security interests and claims of the Prepetition Lender, but solely to the extent and amount of the unpaid portion of the Guaranteed Amount and Expenses. Upon entry of the Approval Order, and payment of the Initial Guaranty Payment, and the issuance of the Letter of Credit, the security interest granted to the Agent will be deemed properly perfected without the necessity of filing financing statements or other documentation.

22. The Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their business judgment. Accordingly, the Debtors respectfully request that this Court authorize the Debtors to enter into the Agency Agreement.

### C. Scheduling Of Hearing On The Merits

23. Pursuant to Bankruptcy Rule 6003, certain of the relief requested in the Motion may only be granted within twenty-one days of the Petition Date if such relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Furthermore, in accordance with Local Rule 9006-1, the Debtors would generally be required to provide twenty-one (21) days' notice, provided service is by overnight delivery, of the Motion to the parties in interest specified in Local Rule 2002-1(b). See Del. Bankr. L.R. 2002-1(b), 9006-1(c)(i); Fed. R. Bankr. P. 2002(a)(2). However, Local Rule 9006-1(e) provides that the Court may shorten the notice period upon a motion that sets forth the exigencies that justify the shortened notice. See Del. Bankr. L.R. 9006-1(e); see also Fed. R. Bankr. P. 9006(c)(1) (permitting court to shorten notice "for cause shown").

24. For the reasons set forth above, the Debtors believe that they will suffer immediate and irreparable harm if the relief requested by this Motion is not considered and granted on an expedited basis and that cause exists to shorten the customary notice period. Among other reasons necessitating an expedited hearing on the merits of the Motion are the following, which are absolutely essential to the Debtors' ability to achieve and maximize value

for their estates, creditors and stakeholders: the upcoming holiday shopping season, including the critical "Black Friday" post-Thanksgiving shopping weekend, provides a unique window of opportunity for the Debtors to maximize values from the store closings when retail customers are most likely to shop; to the extent the Debtors delay in commencing their Sale, the value they will receive under the Agency Agreement will decrease; the Agent requires lead time to order Additional Agent Merchandise to augment the Debtor's existing inventory under the Agency Agreement; and the Debtors have no unencumbered cash under their credit facility with their Prepetition Lender, leaving them with no other options or ability to preserve (let alone maximize) value.

25.     Accordingly, the Debtors respectfully request that the hearing on this matter be scheduled for hearing on November 10, 2011, at 10:00 am (Eastern), with all parties wishing to object to the Motion being required to do so, in writing, by November 8, 2011, at 4:00 p.m. (Eastern).

**D.     Notice Of Hearing On The Merits**

26.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the Sale, including (i) the terms and conditions of the Sale; (ii) the date, time, and place of the hearing, and (iii) the deadline for filing any objections to the relief requested herein (the "Sale Notice").  See Fed. R. Bankr. P. 2002 (a), (c).  The Debtors respectfully submit that the form of the Sale Notice, attached hereto as Exhibit E complies with applicable rules. Copies of the Sale Notice have been and will be served on: (i) the Office of the United States Trustee; (ii) counsel to the Prepetition Lender; (iii) all parties who are known to assert a security interest, lien, or claim in any of the Merchandise; (iv) all the Debtors' landlords; (v) all applicable federal, state, and local taxing authorities; (vi) all applicable county and state consumer protection agencies; (vii) all applicable state attorneys general; (viii) all other government agencies required to

receive notice under the Bankruptcy Rules; and (ix) the parties included on the Debtors' lists of twenty (20) largest unsecured creditors.  The Debtors submit that no other or further notice need be provided.

## APPLICABLE AUTHORITY

### A. Authority To Enter Into Agency Agreement

27.     Under § 363(b)(1), a debtor in possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1); In re Ames Dep't Stores, Inc. (Ames I), 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that going out-of-business sales are governed by § 363(b)).  To obtain court approval to use property under section 363(b) of the Bankruptcy Code for a sale or lease of property outside of the ordinary course of business, the Debtors must demonstrate their sound business judgment. In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991).  See also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)).

28.     Disposition of a debtor's inventory by a liquidator acting as a debtor's agent pursuant to store closing and liquidation procedures like those proposed herein is an accepted method for the sale of assets in chapter 11 cases involving retail debtors.  See, e.g., In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011) (authorizing debtors' entry into agency agreement to conduct full-scale liquidation of stores); In re Borders Grp., Inc., No. 11-10614  (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (authorizing debtors' entry into agency agreement to conduct store closing sales on first day);  In re Goody's LLC, No. 09-10124 (Bankr. D. Del. Jan. 21, 2009) (authorizing debtors' assumption of prepetition agency agreement and to conduct full-scale liquidation through store closing sales at the outset of the case); In re Circuit City

Stores, Inc., No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); In re Whitehall Jewelers

Holdings, Inc., No. 08-11261 (KG) (Bankr D. Del. Aug. 8, 2008) (authorizing debtors' entry into

an agency agreement to conduct store closing sales); In re Goody's Family Clothing, Inc., No.

08-11133 (CSS) (Bankr D. Del. June 13, 2008) (same); In re Linens Holding Co., No. 08-10832

(CSS) (Bankr. D. Del. May 30, 2008) (same); In re Sharper Image Corp., No. 08-10322 (KG)

(Bankr. D. Del. May 30, 2008) (authorizing debtor's entry into an agency agreement to conduct

store closing sales).[3]

29.     As described above and in the First Day Declaration, the Lipman Declaration, the

Douton Declaration, and the Nortman Declaration, sound business reasons exist to justify entry

into the Agency Agreement and prompt commencement of the Sale.  Based upon the results of

their exhaustive analysis of the Debtors' ongoing and future business prospects, the Debtors'

management and team of financial advisors concluded that conducting the Sale on an immediate

basis and in accordance with the procedures set forth in the Agency Agreement is the best

method to maximize recoveries to the estates.  In light of the Debtors' pre-filing solicitation of

offers, as well as the competitive bidding process that Rothschild conducted among the nation's

top liquidators to enter into the Agency Agreement, approval of the Agency Agreement with the

winning bidder is the best alternative to any other form of liquidation. Therefore, the Debtors

submit that entry into the Agency Agreement is a reasonable exercise of their business judgment.

30.     Specifically, allowing the Agent to sell the Merchandise in the manner described

herein will enable the Debtors to maximize returns in a short time frame.  In addition, it is

generally more cost-effective for a store closing agent, with its substantial experience, to conduct

---

[3]     For the benefit of the Court and other parties, the Debtors have filed a Compendium of the docketed orders cited
herein.

these sales, rather than a debtor. Finally, the Agency Agreement will provide the Debtors with a guaranteed return for the Merchandise, which will satisfy the claims of their Prepetition Lender while allowing for even more potential recovery on sales of Additional Agent Merchandise through the sharing in full formula contained therein. This arrangement will minimize the Debtors' risk, while motivating the Agent to maximize proceeds from the Sale. Thus, the Debtors submit that there is more than sufficient business justification for the Debtors to enter intothe Agency Agreement.

31. The Agency Agreement was negotiated at arm's-length and in good faith after other qualified parties and their qualifications and proposals were considered. See Douton Declaration ¶ 13. Therefore, based on the facts submitted in support of this Motion, this Court should find that the Agent has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code. See generally, Martin v. Coated Sales, Inc., (In re Coated Sales, Inc.), No. 89 Civ. 3704 (KMW), 1990 WL 212899, at *2 (S.D.N.Y. Dec. 13, 1990) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion . . . or an attempt to take grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assoc., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)).

32. The Agent's extension of credit under, and the other financial accommodations of Agent set forth in the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of this Court's authorization to consummate the transactions contemplated by the Agency Agreement should not affect the validity of such transactions, unless such authorization and consummation are properly stayed pending appeal.

33.     Finally, the terms of the Agency Agreement affecting the Debtors' Prepetition Lender have been agreed to by the Prepetition Lender.  Upon payment of the Guaranteed Amount, and the issuance of the Letter of Credit to secure payment of Expenses due to the Debtors under the Agency Agreement, the Agent shall be entitled to sell all Merchandise and Owned FF&E free and clear of all liens, claims, or encumbrances thereon.  The Debtors' Prepetition Lender has further agreed that, upon payment of the Initial Guaranty Payment and delivery of the Letter of Credit, any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds shall attach only to the Guaranteed Amount and any other amounts to be received by the Debtors under the Agency Agreement.  The Debtors respectfully request authority to utilize the Initial Guaranty Payment to satisfy the claims of the Prepetition Lender without the need for further order of this Court.

34.     Based on the foregoing, the Debtors have determined that entering into the Agency Agreement with the Agent is in their best interests and the best interests of the Debtors' stakeholders.  Accordingly, the Debtors respectfully request authorization to enter into the Agency Agreement pursuant to its terms.

**B.      Assets Should Be Sold Free And**
**Clear Of Liens, Claims And Encumbrances**

35.     The Debtors request approval to sell assets subject to the Agency Agreement on a final "as is" basis, free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is a *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); <u>see also</u> <u>Citicorp Homeowners Servs., Inc. v. Elliot</u> (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

36.     As noted above, the Debtors' Prepetition Lender has indicated its assent to the Sale and, particularly, to the sale of the Merchandise and Owned FF&E free and clear of its liens, claims and encumbrances, with all such obligations to attach to the proceeds of the Sale with the same validity and priority that such liens, claims, encumbrances, or interests had against the assets.

37.     With respect to any other party asserting a lien, claim, or encumbrance against the Merchandise or the Owned FF&E, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f). In connection with the sale of the assets pursuant to the terms and conditions of the Agency Agreement, the Debtors propose that any liens, claims, and encumbrances be transferred to and attach to the amounts payable to the Debtors under the Agency Agreement, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto.

38.     Accordingly, the Debtors submit that, to the extent applicable, the Court should authorize the Debtors to sell the Merchandise and Owned FF&E free and clear of any liens, claims, encumbrances, or other interests that may exist, with any of the same to be transferred and attached to the net proceeds of the sale, with the same validity and priority that such liens, claims, encumbrances, or interests had against the assets.

### C. The Sale Does Not Require Appointment
### Of A Consumer Privacy Ombudsman

39.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or

lease personally identifiable information unless such sale or lease is consistent with its policies or

upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy

Code.  Pursuant to the Agency Agreement, the Agent will *not* be purchasing the Debtors'

customer lists containing any personally identifiable information regarding the Debtors'

customers.  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

### D. Authority To Abandon Unsold Property
### Following Store Closing Sales

40.     Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, a

debtor, "may abandon any property of the estate that is burdensome to the estate or that is of

inconsequential value and benefit to the estate."  11 U.S.C. § 554 (a).  See Hanover Ins. Co. v.

Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (a trustee "may abandon his claim to any

asset, including a cause of action, he deems less valuable than the cost of asserting that claim");

In re Grossinger's Assocs., 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995).  Under the Agency

Agreement, any Merchandise remaining at the Stores following the Sale can be sold by the

Agent, with the proceeds thereof treated as Proceeds if the Agent is unable to sell or dispose of

any such assets following the Sale, it would be costly and burdensome to the estate to retain them.

Thus, to the extent that the Agent does not sell any Merchandise or Owned FF&E, the Debtors

request that they be authorized upon the conclusion of the Sale to abandon same without

incurring liability to any person or entity.

41.     In the event of such abandonment, the Debtors request that the applicable landlord

be authorized to dispose of such property without any liability to any individual or entity that

may claim an interest in such abandoned property, and that such abandonment be without

prejudice to any landlord's right to assert any claims based on such abandonment and without prejudice to the Debtors or other party-in-interest to object thereto.

42.     Notwithstanding the foregoing, the Debtors and the Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

### E.     Waiver Of Contractual Restrictions And Exemption From Wage Pay Laws And Laws Restricting Store Closing Sales

43.     The Debtors respectfully request waiver of certain contractual or applicable law restrictions that could otherwise inhibit the Debtors' ability to maximize recoveries through the Sale, and which are customarily waived in sales such as these.

### (i)     Waiver of Contractual Restrictions

44.     Certain stores subject to the Sale are located on properties that are leased by the Debtors.  In certain cases, the contemplated Sale may be inconsistent with certain provisions of such leases, subleases, or other documents with respect to any such leased premises, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions.

45.     The Debtors request that the Court override or invalidate any Contractual Restrictions that may impair the Debtors' ability to close stores and conduct the Sale.  Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts despite provisions of recorded documents or agreements purporting to forbid such sales.  See  In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding restrictive lease provision unenforceable against debtor that sought to

conduct going-out-of-business sale "because it conflicts with the Debtor's fiduciary duty to maximize estate assets"); Ames I, 136 B.R. at 359 (finding that "to enforce the anti-[going out-of-business] sale clause of the [l]ease would contravene overriding federal policy requiring Debtor[s] to maximize estate assets by imposing additional constraints never envisioned by Congress"); see also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-going-out-of-business sales clause in lease unenforceable).

46.     Other such restrictive provisions in contracts have been deemed unenforceable in other chapter 11 liquidation cases as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. See In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011) (waiving contractual restrictions); In re Blockbuster Inc., No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) (same); In re Finlay Enters., Inc., No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) (same); In re Goody's LLC, No. 09-10124 (same) (Bankr. D. Del. Jan. 15, 2009); In re KB Toys Inc., No. 08-13269 (KJC) (Bankr. D. Del. Dec. 18, 2008) (same); In re Steve & Barry's Manhattan LLC, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) (same); In re Whitehall Jewelers Holdings, Inc., No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (same); In re Goody's Family Clothing, Inc., No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same).

**(ii)     Exemption From Applicable Law Restrictions**

47.     Certain states in which the Stores are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local laws, statutes, rules, regulations, and ordinances related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Sale, or consumer fraud laws, with the exception of

deceptive advertising laws (the "Liquidation Sale Laws").  Typical statutes and regulations

provide that if a liquidation or bankruptcy sale is court authorized, however, then a company

need not comply with these Liquidation Sale Laws.

48.     The Debtors request that the Court authorize the Debtors to conduct the Sale

without the necessity of, and the delay associated with, complying with the Liquidation Sale

Laws.  Because the Debtors and their assets are subject to this Court's jurisdiction, see 28 U.S.C.

§ 1334, this Court will be able to supervise the Sale.  The Sale is a legitimate method by which

the Debtors can maximize the return from the sale of the Merchandise for the benefit of their

estates, their creditors and their stakeholders.  Moreover, creditors and the public interest are

adequately protected by the jurisdiction and supervision of this Court.

49.     Even if a state or local law does not expressly except bankruptcy sales from its

ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal

bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution.  To

hold otherwise would severely impair the relief otherwise available under section 363 of the

Bankruptcy Code.  In concert with this premise, bankruptcy courts have consistently recognized

that federal bankruptcy law preempts state and local laws that contravene the underlying policies

of the Bankruptcy Code.  See, e.g., Aloe v. Shenango Inc. (In re Shenango Grp., Inc.), 186 B.R.

623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and

legal obligations pursuant to the bankruptcy code . . . . [A] state statute . . . . cannot place burdens

on them where the result would contradict the priorities established by the federal bankruptcy

code."), aff'd sub nom Belcufine v. Aloe, 112 F. 3d 633 (3d Cir. 1997).

50.     While the Debtors recognize that preemption of state law is not always

appropriate, as when the protection of public health and safety is involved, see Baker & Drake,

Inc. v. Public Service Commission of Nevada (In re Baker & Drake, Inc.), 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption of public safety measure), it is appropriate when, as here, the implicated state laws concern economic regulation. Id. at 1353 (finding that "federal bankruptcy preemption is more likely. . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"). See also In re Anchor Blue Retail Grp., No. 09-11770 (PJW) (Bankr. D. Del. June 18, 2009) (authorizing store closing sale conducted in accordance with sale guidelines).

51. Here, section 363 of the Bankruptcy Code, which requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Sale Laws, because full compliance with the Liquidation Sale Laws could constrain the Debtors' ability to marshal and maximize assets for the benefit of creditors. The relief requested herein is commonly granted in this District and other jurisdictions. See, e.g., In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011) (exempting store closing sales from applicable law restrictions); In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (same); In re Blockbuster Inc., No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) (same); In re Finlay Enters., Inc., No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) (same); In re Goody's LLC, No. 09-10124 (Bankr. D. Del. Jan. 15, 2009) (same); In re Steve & Barry's Manhattan LLC, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) (same); In re Whitehall Jewelers Holdings, Inc., No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (same); In re Goody's Family Clothing, Inc., No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens Holding Co., No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008).

52.     Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Sale. The Debtors only request that this Court authorize the Debtors to conduct the Sale without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the Sale as store closings or similar type sales, or transferring merchandise from the distribution centers to the Stores. The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

53.     The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Sale, or the advertising and promotion (including through the posting of signs) of Sale, in the manner set forth in the proposed Order.

**F.     Exemption From State Wage Pay Laws**

54.     Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee's accrued salary substantially contemporaneously with his or her termination. In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. The relief contemplated by this Motion involves 39 retail stores operated by the Debtors and thus the Sale will result in a substantial numbers of employees being terminated during or immediately upon conclusion of the Sale. The Debtors' payroll systems may not be able to process the payroll information associated with these employees in a manner that will be compliant with these state laws and regulations.

55.     To be clear, the Debtors intend to pay accrued salary to their terminated employees as expeditiously as possible and under normal payment procedures, subject to this Court's approval.  However, the requirements imposed by these state laws and regulations may well be unworkable in these circumstances.  If the Debtors are required to comply to the letter with these state laws and regulations, their efforts to wind down their operations and stem unnecessary payroll costs could be hampered tremendously.  Indeed, if forced to comply, the Debtors could face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of a Sale while payroll is prepared or (b) staging terminations to the detriment of the Debtors' estates.  Both of these choices will provide no benefit to the Debtors' estates and will only increase the administrative costs of conducting the Sale.

56.     Accordingly, the Debtors respectfully submit that in this instance, Wage Pay Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtors should be granted relief from their requirements.  See In re Linens Holding Co., No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (final order waiving debtors' compliance with "fast pay" laws and regulations in connection with approval of store closing sales).

**ASSUMPTION OF OCTOBER AGENCY AGREEMENT WITH GBRP**

57.     Section 365(a) of the Bankruptcy Code provides that a debtor may assume executory contracts. 11 U.S.C. § 365(a).  The decision to assume or reject is governed by the business judgment rule. In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating that a debtor's decision to reject an executory contract is governed by the business judgment standard).  See generally Nat'l Labor Relations Bd. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts to authorize the rejection of an executory contract is that of "business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (stating that

section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

58.     As set forth in greater detail in the First Day Declaration, the Debtors entered into the October Agency Agreement with Gordon Brothers Retail Partners, LLC ("GBRP") prior to the Petition Date to obtain GBRP's services with respect to store closing sales at five (5) Filene's Basement retail store locations.[4]  The October Agency Agreement is structured in a substantially similar manner as the Agency Agreement and contains similar terms and conditions with respect to the five Filene's Basement stores. In particular, the pertinent terms of the October Agency Agreement are as follows:

- Payment of a 39% Guaranty Percentage[5] of the Retail Value of the Merchandise;

- A sharing of Proceeds from the sale of Additional Agent Merchandise;

- Payment of 70% of the Guaranty Percentage to be made within one business day of the Sale Commencement Date;

- Agent is responsible for Expenses of the Sale, including, without limitation, payroll, limited occupancy-related expenses, advertising and mailings, Supplies, Agent's on-site supervision of the Store and Agent's cost of Additional Agent Merchandise.

59.     Pursuant to the terms of the October Agency Agreement, the Debtors remit payment to GBRP on a daily basis based on a receipt/disbursement reconciliation process.  As of the date hereof, the Debtors were current on these reconciliation payments.  As part of the relief

---

[4]     In connection with the October Agency Agreement, the Debtors also entered into a Consignment Agreement and Security Agreement, which form an integral part of the October Agency Agreement.  Consequently, the Debtors seek authority to assume all aspects of the October Agency Agreement, including the Consignment Agreement and the Security Agreement.

[5]     Capitalized terms not defined herein have the meaning ascribed to them in the October Agency Agreement.

requested in assuming the October Agency Agreement, the Debtors request authority to continue to perform under the agreement including making such daily reconciliation payments as necessary.

60.     The Store Sales under the October Agency Agreement commenced on October 13, 2011. Moreover, the Debtors have already received the Guaranteed Payment under the October Agency Agreement and have remitted proceeds to their Prepetition Lender to pay down their obligations under the Credit Facility.

61.     The Debtors would suffer immediate and irreparable harm if they were unable to assume the October Agency Agreement on an expedited basis. As a consequence of the significant expenditures already made under the October Agency Agreement, including the purchase of Additional Agent Merchandise and the remittance of Proceeds to the Prepetition Lender from the Guaranty Payment, failure by the Debtors to continue performing pursuant to the October Agency Agreement at this point would require a complete unwinding of the transaction with a little or no corresponding benefit to the estates. This in turn would lead to unnecessary delay and expense that would in turn severely disrupt the Debtors' efforts to accomplish an orderly wind-down and result in significant costs to the Debtors and their estates. Among other things, the Debtors and their advisors would be compelled to devote valuable time and effort, at considerable expense to the Debtors and their estates, to locating new agents to conduct closing sales at these five stores. Locating alternate agents willing to conduct the store closing sales at the locations and provide equivalent value would be extremely difficult because the five stores are scheduled to close in December when the leases expire. Additionally, the Debtors have already canvassed the market to obtain bids from other major inventory liquidation firms and have since declined those bids in favor of the Agent's bid.

62.     Accordingly, the Debtors, in their business judgment, have concluded that assuming the October Agency Agreement is in the best interest of the Debtors and their estates, especially where doing so will not require the Debtors to pay any cure obligations.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

63.     Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted in the "relief is necessary to avoid immediate and irreparable harm . . .: Fed. R. Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the Third Circuit has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. See Norfolk S. Ry. Co. v. City of Pittsburgh, 235 F. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)).  Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF STAY UNDER BANKRUPTCY RULES 6004(H) AND 6006(D)

64.     Pursuant to Bankruptcy Rule 6004(h), unless a court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order. Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Fed. R. Bankr. P. 6004(h) advisory committee's note.

65. In order to maximize value from the Sale, the Debtors request that any order approving the Motion be effective immediately by providing that the 14-day stay under Bankruptcy Rules 6004(h) is waived. As discussed above and set forth in the Douton Declaration, the Agent requires the ability to commence the Sale right away and no later than November 11, 2011. Moreover, the Debtors face severe prejudice each day that the Stores continue to operate, as those stores are unprofitable, drain liquidity, and are being quickly depleted of inventory which will not be replenished.

66. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: Wilmington, Delaware
      November 2, 2011

/s/ Mark S. Chehi
Mark S. Chehi (I.D. No. 2855)
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000
(302) 651-3001

- and -

Jay M. Goffman
Mark M. McDermott
David M. Turetsky
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000
(212) 735-2000

Proposed Counsel for Debtors and Debtors in Possession