# EXHIBIT A

<u>**SECOND AGENCY AGREEMENT**</u>

This Second Agency Agreement ("<u>Agreement</u>") is made as of November 2, 2011, among (i) Syms Corp ("<u>Syms</u>") and Filene's Basement, LLC ("<u>Filene's</u>" and, together with Syms, either "<u>Merchant</u>" or "<u>Merchants</u>"), jointly and severally; and (ii) a joint venture of Gordon Brothers Retail Partners, LLC ("<u>GBRP</u>") and Hilco Merchant Resources, LLC ("<u>Hilco</u>" and, together with GBRP, "<u>Agent</u>"), jointly and severally.

Section 1.  <u>Recitals</u>.

WHEREAS, the Merchants operate retail stores and desire that the Agent act as the Merchants' exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchants' thirty-nine (39) retail store locations identified on <u>Exhibit 1</u> attached hereto (each individually a "<u>Store</u>," and collectively the "<u>Stores</u>") by means of a "going out of business", "store closing", "sale on everything" or similar sale (as further described below, the "<u>Sale</u>"); and (b) disposing of the FF&E in the Stores.

WHEREAS, commencing on or after October 13, 2011, Filene's commenced store closing sales at the retail locations identified on Exhibit 2 hereto (the "<u>Prior Stores</u>") pursuant to that certain Agency Agreement dated October 12, 2011 among GBRP and Filene's (the "<u>Existing Agreement</u>").

WHEREAS, Merchants intend to file chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (such cases, the "<u>Bankruptcy Case</u>" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "<u>Bankruptcy Court</u>") and to file a motion for entry of an order authorizing Merchants to enter into this Agreement and authorizing Merchants to conduct the Sale in accordance with the terms of this Agreement (the "<u>Approval Order</u>").

WHEREAS, Merchants intend to request, in connection with the Approval Order, that the Existing Agreement be assumed pursuant to Section 365 of the Bankruptcy Code, pursuant to which GBRP would be authorized to continue the store closing sales at the Prior Stores under the terms of the Existing Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and the Merchants hereby agree as follows:

Section 2.  <u>Appointment of Agent/Approval Order</u>.

(a)  Effective as of the date hereof, and subject to entry of the Approval Order, Merchants hereby appoint the Agent, and the Agent hereby agrees to serve, as the Merchants' exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

(b)  The Approval Order shall provide, in a form reasonably satisfactory to the Merchants and Agent, *inter alia,* that (i) this Agreement is in the best interest of Merchants, Merchants' estates, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchants and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon payment of the Initial Guaranty Payments (as defined below) and delivery of the Letters of Credit (as defined below), Agent shall be entitled to sell all Merchandise and

FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or FF&E or the Proceeds (as defined below) thereof attaching only to the Guaranteed Amounts and other amounts to be received by Merchants under this Agreement; (v) Agent shall have the right to use the Stores (as defined below) and all related Store services, furniture, fixtures, equipment and other assets of Merchants as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchants, is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale as a "store closing", or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, and e-mail lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchants and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against the Merchants other than as expressly provided for in this Agreement; (xii) subject to Agent having satisfied its payment obligations hereunder, any amounts owed by Merchants to Agent under this Agreement shall be granted the status of superpriority claims in Merchants' Bankruptcy Case pursuant to section 364(c) of Title 11, United States Code, 11 U.S.C. §§ 101-1330 (the "<u>Bankruptcy Code</u>") but junior to the superpriority claims of the Lenders; (xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16 hereof (without the necessity of filing financing statements to perfect the security interests); (xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted; (xv) the Bankruptcy Court finds that the Merchants' decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchants' sound business judgment consistent with their fiduciary duties and is in the best interests of the Merchants, their estates, their creditors, and other parties in interest; (xvi) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between the Merchants and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvii) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amounts under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code; (xviii) this Agreement is approved pursuant to Bankruptcy Code section 363; (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code section 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the liens or priority authorized or created under this Agreement or the Approval Order; and (xx) Merchants' assumption pursuant to Section 365 of the Bankruptcy Code of this Agreement and, unless the assumption of the Existing Agreement has been approved previously by the Bankruptcy Court, the Existing Agreement is approved.

(c)     Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "going out of business", "store closing," "sale on everything" or similar-themed sale, and the

Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.  Consideration to Merchant and Agent.

3.1     Payments to Merchant.

(a)     Subject to Merchant's compliance in all material respects with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive ninety percent (90.0%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Agent shall pay to Merchant the Guaranteed Amount and the Sharing Amount due to Merchant (if any) in the manner and at the times specified in Section 3.3. The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant; (B) the aggregate Cost Value of the Merchandise subject to Gross Rings; and (C) any other adjustments to Cost Value as expressly contemplated by this Agreement.

(b)     The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being sixty-five million dollars ($65,000,000) (the "Merchandise Threshold"). To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

(c)     The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Value of the Merchandise included in the Sale, such percentage being 48.2% (the "Cost Factor Threshold"). To the extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Value of the Merchandise included in the Sale is a percentage other than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

(d)     The adjustments set forth in Sections 3.1(b) and 3.1(c) of this Agreement, if applicable, shall operate independently and cumulatively.

3.2     Compensation to Agent, Sharing:

(a)     After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amounts and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to five percent (5.0%) of the sum of: ((i) the Cost Value of the Merchandise; plus (ii) the Agent's cost without lift of the Additional Agent Merchandise)

("Agent's Fee"); and THEREAFTER: sixty percent (60%) to Merchant and forty percent (40%) to Agent ("Sharing Amounts").

(b)     To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), Agent shall use commercially reasonable efforts to dispose of all of such Remaining Merchandise by means of bulk sale/wholesale or otherwise, and the proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3     Proceeds; Time of Payments; Control of Proceeds.

(a)     For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue (e.g., related to goods sold through jewelry, fragrance and shoe license departments) received in the Store, in each case during the Sale Term and exclusive of Sales Taxes; and (b) the total amount (in dollars) of all sales of Additional Agent Merchandise made under this Agreement during the Sale Term and exclusive of Sales Taxes; and (c) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term; and (d) any and all proceeds received by Agent from the disposition of Remaining Merchandise.  For purposes of the avoidance of doubt: (1) proceeds from the sale of FF&E shall not be deemed "Proceeds"; and (2) the personnel used during the Sale Term in connection with the shoe license department shall be Retained Employees for purposes of calculating Expenses (as otherwise provided for/limited by the terms of this Agreement);  whereas the personnel used during the Sale Term in connection with the fragrance and jewelry license departments shall not be Retained Employees for purposes of calculating Expenses (and all costs and expenses of such fragrance and jewelry personnel shall be borne solely by Merchant).

(b)     On the second business day following the entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount equal to eighty percent (80%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course) (the "Initial Guaranty Payment") by wire transfer to an account designated in writing by Merchant ("Merchant Account").  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to the Merchant Account on the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent and Merchant (the "Final Inventory Report"); provided, however, that Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking and cause the Final Inventory Report to be issued on or before the tenth (10) day following the Sale Commencement Date (with the date of completion of such reconciliation and issuance of such Final Inventory Report to be referred to as the "Inventory Reconciliation Date").  In the event that the Initial Guaranty Payment (plus any other amounts paid by Agent on account of the Guaranteed Amount) exceeds the Guaranteed Amount, the Merchant shall pay to the Agent such excess (the "Adjustment Amount") within two business days after the Inventory Reconciliation Date.  To the extent that the Agent is owed the Adjustment Amount, and Merchant for any reason fails to timely pay to Agent the Adjustment Amount due, then to the extent that Bank of America, N.A. ("Lender") receives, or has received, any funds on account of the Guaranteed Amount from Merchant or Agent, then the Lender shall, within two business days written demand by Agent, disgorge and remit the Adjustment Amount to Agent.  To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation under Section 8.7.  To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to Merchant as part of the Final Reconciliation.

(c)     All Proceeds shall be controlled by Agent in the manner provided for below.

(i)     Agent may establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts") and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts.  The Agency Accounts shall be dedicated solely to the deposit of Proceeds and the distribution of amounts payable hereunder.  Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.  Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and existing bank accounts for credit card Proceeds relating solely to the Sale.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures.  Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

(iii)   Subject to the terms of the Approval Order, prior to the date Agent establishes the Agency Accounts, all Proceeds (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds (including credit card Proceeds), and the disbursement of amounts payable by Agent hereunder (the "Designated Deposit Accounts").  Subject to the Approval Order, the Designated Deposit Accounts shall be cash collateral accounts, with all cash, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds hereunder, and Merchant hereby grants to Agent a security interest in each Designated Deposit Account.  The terms of the Approval Order shall provide that each account shall be subject to an agreement between and among the Agent, the Merchant and the subject bank,  providing for, among other things, that such bank will comply with instructions originated by the secured party directing the disposition of funds in such account without further consent of the Merchant (a "Control Agreement").  The terms of the Approval Order shall provide for, *inter alia,* the acknowledgement of the Agent's security interest in Proceeds deposited in such account, and for turnover of any such Proceeds by Lender to Agent.  If, notwithstanding the provisions of this Section, Merchant receives or otherwise has dominion over or control of any Proceeds, Merchant shall hold such Proceeds in trust for Agent and shall not commingle Proceeds with any of Merchant's other funds or deposit such Proceeds in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)    On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales) deposited into the Designated Deposit Accounts for the prior day; provided however that Merchant need not begin this remittance process until the fifth day following the Sale Commencement Date and

may remit on a five day lag basis throughout the Sale Term (and the 5 day period following the conclusion of the Sale Term). Agent shall have ten (10) business days after the date of each such payment by Merchant to notify Merchant and Lender of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall. For the avoidance of doubt, Merchant shall remit to Agent Proceeds from credit card sales no later than one (1) business day after actually received.

        (d)      Either party may offset amounts held by them for application pursuant to the terms of this Agreement.

        (e)      In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis.

        3.4      <u>Security</u>. In order to secure Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the Payment Date, Agent shall furnish Lender, as Merchant's designee, an irrevocable standby Letter of Credit naming Lender and Merchant as co-beneficiaries (each, a "<u>Beneficiary</u>") in the aggregate original face amount equal to the sum of: (a) twenty percent (20%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of <u>Exhibit 3.4</u> hereof (the "<u>Letter of Credit</u>"). The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date. Upon Lender's receipt of payment in full of its claims against the Merchant, Lender shall promptly deliver the Letter of Credit to Merchant and take all steps necessary to remove itself as a named co-beneficiary thereunder. Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Beneficiaries shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days. If the Beneficiaries fail to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then the Beneficiaries shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant. In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, the Beneficiaries may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute. Lender, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount made to the time of each such request (and Merchant and Lender shall cooperate with respect to each such request); <u>provided however</u>, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three weeks of Expenses.

Section 4.  <u>Expenses of the Sale</u>.

        4.1      <u>Expenses</u>. Agent shall be responsible for all "Expenses" pursuant to the terms of this Agreement, which expenses shall be paid by Agent in accordance with Section 4.2 below and/or otherwise in accordance with this Agreement. As used herein, "<u>Expenses</u>" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term, <u>limited</u> to the following:

        (a)      all payroll with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term (including hours

worked during the Inventory Taking) as well as payroll for any of Merchant's former employees or temporary labor engaged for the Sale;

(b)     any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Benefits) for Retained Employees used in the Sale, in an amount not to exceed 22% of the base payroll for each Retained Employee in the Stores (the "Benefits Cap") during the Sale Term;

(c)     the limited occupancy-related expenses categorized on Exhibit 4.1(c), but in all cases limited on a per Store and per diem basis not to exceed the respective categories and amounts shown on Exhibit 4.1(c) (and for purposes of the avoidance of doubt, Exhibit 4.1(c) may (to the extent expressly provided on Exhibit 4.1(c)) include a percentage amount allocable for percentage rent payable with respect to sales made in the respective Store during the Sale Term);

(d)     Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)     advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)     credit card fees, bank card fees, chargebacks and discounts with respect to Merchandise sold in the Sale;

(g)     bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)     costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(i)     all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)     Store cash theft and other store cash shortfalls in the registers;

(k)     Agent's on-site supervision of the Store, including any and all fees, wages, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and incidental out-of-pocket and commercially reasonable travel expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale), provided, however that the supervision costs shall not exceed a budget that is mutually agreed upon by Merchant and the Agent;

(l)     postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)     fifty percent (50%) of the fees and expenses of the Inventory Taking Service.

(n)     Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(o)     Agent's reasonable out-of-pocket costs and expenses including but not limited to, reasonable legal fees and expenses incurred in connection with the review of data, preparation, negotiation and execution of this Agreement and any ancillary documents, and in connection with the Sale (provided however that no more than $100,000 of legal fees and expenses incurred in connection

with the review of data, preparation, negotiation and execution of this Agreement and any ancillary documents shall be deemed an "Expense" hereunder);

(p)     the actual cost of goods of the Additional Agent Merchandise actually sold during the Sale Term or pursuant to Section 3.2(b) above (including without limitation Agent's actual freight costs associated with the Additional Agent Merchandise);

(q)     The actual cost to Agent of insuring the Additional Agent Merchandise pursuant to Section 8.10 below;

(r)     Third party payroll processing expenses associated with the Sale;

(s)     The actual costs of all security (to the extent customarily provided in the Stores) including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance;

(t)     delivery and freight costs associated with the transfers of Merchandise (including without limitation On-Order/In-Transit Merchandise) (1) between and among the Stores; and (2) from the Distribution Centers to the Stores during the Sale Term, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise (provided, however, the Agent shall not transfer Merchandise between and among Stores until the Inventory Taking at the transferring and receiving Stores has been completed); and

(u)     trash and snow removal.

There will be no double payment of Expenses to the extent that an expense appears or is contained in more than one Expense category above; and the lowest cap shall apply if a cap appears or is contained in more than one Expense category above for which an expense appears or is contained in more than one Expense category above.

As used herein, the following terms have the following respective meanings:

(i)     "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting.

(ii)     "Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to the Sale Commencement Date: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, termination or severance pay, and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)     "Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, housekeeping and cleaning expenses, and rental for furniture, fixtures and equipment, and any and all other occupancy and occupancy-related expenses associated with the Sale and/or the Store.

(iv)     "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to Merchant.

(v)     Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or distribution centers, and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid by solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order (provided however that in no event shall Agent be responsible for any such other costs, expenses, or liabilities).

## 4.2     Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

## 4.3     Distribution Center Expenses

Agent shall be responsible for allocating and designating the shipment of Merchandise, including Agent's Additional Merchandise, from the Merchant's distribution centers to the Stores. Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation to the Stores of the On-Order/In-Transit Merchandise.  Agent shall be responsible for the delivery and freight costs associated with transferring all On-Order/In-Transit Merchandise from the distribution centers to the Stores prior to the Sale Termination Date.  Notwithstanding the foregoing, the actual costs and expenses, including without limitation use and occupancy expenses, payroll expenses, and all other costs of the operations of the Distribution Centers, transfer and delivery related to the processing, transfer and consolidation of Merchandise in the Distribution Center (the "Distribution Center Expenses") shall remain the obligation of the Merchant, except as provided for in section 4.1(t).

Section 5.  Gross Rings; Merchandise.

## 5.1     Inventory Taking.

(a)     Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU Cost Value and Retail Value physical inventory of the Merchandise located in the Stores and in Merchant's warehouse/distribution centers in Auburn, MA, Secaucus, NJ and Landover, MD,  (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Stores, and with respect to Merchandise located in Merchant's warehouse/distribution centers prior to Merchandise being transferred to the Stores, in each case as soon as practicable (but absent extraordinary circumstances no later than 20 days following the Sale Commencement Date) (the date of the Inventory Taking at each Store and at each of Merchant's warehouse/distribution centers being the "Inventory Date" for each such Store/warehouse/distribution center).  Merchandise that is in-transit as of the Inventory Date shall be subject to a supplemental Inventory Taking at the distribution center where such in-transit Merchandise is delivered prior to shipment to the Stores.   Merchant and Agent shall jointly employ RGIS or other mutually agreed upon national inventory taking service (the "Inventory Taking Service") to

conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions").  As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service plus one hundred percent (100%) of the payroll and related benefits for Retained Employees utilized in the conduct of the Inventory Taking.  Merchant shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service.  Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant, Lender, and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking, the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store.  Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking; or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store.  Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs and Cost Value and Retail Value, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Cost Value and Retail Value of the Merchandise).  Each Store will be closed during the Inventory taking; provided however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business.  The Inventory Taking, including, but not limited to the Final Inventory Report, shall be reconciled by Merchant and Agent as soon as practicable following the Inventory Taking.

(b)     At each Store, for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store.  Register receipts shall show for each item sold the Cost Value for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101.5% of the aggregate Cost Value of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2     Merchandise Subject to This Agreement.

(a)     For purposes of this Agreement, "Merchandise" shall mean all new, finished, first-quality saleable goods in the ordinary course of business (i) located at the Stores as of the Sale Commencement Date (including Defective Merchandise and Merchandise subject to Gross Rings), (ii) located at Merchant's warehouse/distribution centers in Auburn, MA, Secaucus, NJ and Landover, MD ("Distribution Center Merchandise"), and (iii) which are, as of the Sale Commencement Date, in-transit or on order (the "On-Order/In-Transit Merchandise").   "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Merchant Consignment Goods; or (5) Additional Agent Merchandise; or (6) furnishings, trade fixtures, equipment and/or improvements to real property which are located in the Stores ("FF&E"); provided that Agent shall be permitted to sell FF&E as set forth in Section 7 below.

(b)     As used in this Agreement, the following terms have the respective meanings set forth below:

"Base Retail Value" shall mean with respect to each item of Merchandise the lowest ticketed, marked, shelf, Merchandise File, or SKU/PLU file price for such item since October 15, 2011. For purposes of calculating Base Retail Value, if an item of Merchandise has more than one ticketed, marked, shelf, Merchandise File, or SKU/PLU file price, or if multiple items of the same SKU have different ticketed, marked, shelf, Merchandise File, or SKU/PLU file prices, the lowest ticketed, marked, shelf, Merchandise File, or SKU/PLU file price shall prevail for all such items of Merchandise in the same Store ("Per Store Lowest Price") unless it is reasonably determined by Merchant and Agent that the applicable Per Store Lowest Price was variantly priced because it was damaged or marked as "as is", in which case the next higher Per Store Lowest Price shall control. For purposes of the avoidance of doubt, temporary point of sale discounts shall not be taken into account in determining the Base Retail Value of an item of Merchandise.

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods. Examples of Defective Merchandise include but are not limited to goods which are damaged, defective, scratched, soiled, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, parts, items typically sold as a set which are incomplete or gift with purchase items.

"Excluded Defective Merchandise" means any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Cost Value. Excluded Defective Merchandise shall be identified as such during the Inventory Taking.

"Merchandise File" shall mean the files named "Skuinv-2011-10-01.xlsx" and sent by Merchant to GBRP on October 11, 2011.

5.3     Valuation.

(a)     For purposes of this Agreement:

(i)     "Cost Value" shall mean with respect to each item of Merchandise the cost of such item as reflected on the Merchant's books and records maintained in the ordinary course of business consistent with historical practices.

(ii)     "Retail Value" shall mean with respect to each item of Merchandise the Base Retail Value.

(b)     Notwithstanding the provisions of Section 5.3(a):

(i)     with respect to each item of Defective Merchandise, the parties shall mutually agree upon the "Cost Value" (and if Agent and Merchant are unable to mutually agree on the Cost Value of any one or more items of Defective Merchandise, such items shall be deemed "Excluded Defective Merchandise"); and\

(ii)     with respect to any item of Distribution Center Merchandise and/or On-Order/In-Transit Merchandise that arrives at a Store on or after the fourteenth (14th) day following the Sale Commencement Date, the "Cost Value" shall be determined by multiplying what otherwise would

have been the "Cost Value" of such item by the inverse of the then prevailing Sale discount for such item (or substantially identical item).

5.4     Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant Consignment Goods" at prices mutually agreed upon by Agent and Merchant.  The Agent shall retain 20% of the sale price for all sales of Merchant Consignment Goods, and Merchant shall receive 80% of the receipts in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell merchandise not included as Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable.  Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1     Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the date that the Bankruptcy Court enters the Approval Order (the "Sale Commencement Date").  Agent shall complete the Sale at each Store no later than January 31, 2012 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis at upon not less than five (5) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided however, that a Vacate Notice shall not be effective until the fifteenth (15th) day of the calendar month in which it is given, if it is given prior to the tenth (10th) calendar day of any month, it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses for each Store, including each Store subject to a Vacate Notice, shall continue until the later of (i) the applicable Vacate Date for such Store or (ii) the fifteenth (15th) day of the calendar month in which the Vacate Date for such Store occurs.

6.2     Vacating the Store.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the Vacate Date.

Section 7.  FF&E.

Agent shall sell all furniture, fixtures, and equipment located at the Stores, Merchant's warehouse/distribution centers in Auburn, MA, Secaucus, NJ and Landover, MD, and at Merchant's home office (the "FF&E").  Agent shall pay Merchant (in addition to all other amounts contemplated by this Agreement), two million dollars ($2,000,000) ("FF&E Guarantee"); and Agent shall have the exclusive right to retain all proceeds from the sale of FF&E (and the Approval Order shall expressly provide for Agent's sole rights in and to such proceeds).  For purposes of the avoidance of doubt, "Proceeds" shall not include the proceeds from the sale of FF&E.  Agent shall pay Merchant fifty percent (50%) of the FF&E Guarantee on the Payment Date, with the balance due (after giving effect to any adjustments contemplated below) on the date of the Final Reconciliation.  To the extent Agent does not have the right to sell all FF&E (whether because Merchant does not own any items, Merchant does not have the licensing rights to sell such items, landlords make ownership claims on any such items thereby

delaying sales, or otherwise), or to the extent the composition of the FF&E is not substantially similar to the listing of furniture, fixtures and equipment reflected on the information formally provided by Merchant to Agent as part of the due diligence review leading up to this transaction (including the Merchant's fixed asset register files), then Merchant and Agent shall mutually agree upon an equitable reduction to the amount of the FF&E Guarantee.  For purposes of the avoidance of doubt, Agent acknowledges that the FF&E shall not include leased copiers or rolling stock even if such assets were reflected on Merchant's formally provided information/fixed asset register files).  Agent shall be responsible for the payment of all expenses incurred in connection with the sale of the FF&E.  At the conclusion of the Sale Term, Agent may abandon, in place, any unsold FF&E, and any other furniture, fixtures, and equipment located at the Stores, Merchant's warehouse/distribution centers in Auburn, MA, Secaucus, NJ and Landover, MD, and at Merchant's home office.

Section 8.  Conduct of the Sale.

8.1  Rights of Agent.  Except as may be further permitted in the Approval Order, Agent shall be permitted to conduct the Sale as a "going out of business", "store closing", "sale on everything" or similar themed sale throughout the Sale Term.  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "Sale Guidelines").  In addition to any other rights granted to Agent hereunder in conducting the Sale the Agent, in the exercise of its reasonable discretion shall have the right:

(a)  to establish Sale prices and Store hours;

(b)  except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(c)  (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process payroll, perform MIS, reconcile cash and inventories, process and report data, and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d)  to establish and implement advertising, signage and promotion programs consistent with the "going out of business", "store closing", "sale on everything" or similar theme including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers (provided however that Agent shall be obligated to comply with (and indemnify Merchant in the event of its failure to comply with) applicable state and local health and safety laws in connection with Agent's use of exterior banners and signwalkers);

(e)  to transfer Merchandise between and among the Stores as an Expense; provided, however, the Agent shall not transfer Merchandise between and among Stores until the Inventory Taking at the transferring and receiving Stores has been completed; and

(f)     subject to the provisions of Section 8.10 below, to include Additional Agent Merchandise in the Sale.

8.2     <u>Terms of Sales to Customers; Final/As Is Sales.</u>  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.   Agent shall accept and honor coupons during the Sale Term, including but not limited to Merchant's Membership Program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term (and Merchant shall reimburse Agent therefor in accordance with the provisions of Section 8.6 below).  The Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

8.3     <u>Sales Taxes</u>.

(a)     During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     <u>Supplies</u>.  Agent shall have the right to use, without charge, all existing supplies located at the Stores including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "<u>Supplies</u>").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor.

8.5     Returns of Merchandise.  Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect as of the date such item was purchased.  For the avoidance of doubt, Merchant's return policy in effect as of the date hereof is full return of purchase price within 30 days if accompanied by a valid receipt.  If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its otherwise "Cost Value," multiplied by the inverse of the then prevailing Sale discount.  The aggregate Cost Value of the Merchandise shall be increased by the adjusted Cost Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5).  In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during the weekly sale reconciliation provided for in Section 8.7.  Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of Merchandise, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6     Gift Certificates; Membership Program.

(a)     During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar Merchandise credits issued by Merchant (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the weekly sale reconciliation provided for in Section 8.7.  Agent shall not sell any Gift Certificates.

(b)     During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons and/or Merchants' employee discount terms ("Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects the applicable Merchant Discounts, then Merchant shall reimburse Agent for the differential between the discount received under the Membership Program and the then-prevailing Sale discounts being offered by Agent.

(c)     Merchant shall reimburse Agent in cash for the value of any discounts afforded customers in connection with the use during the Sale of Merchant's coupons and/or Merchant's other Membership program benefits ("Membership Program").   During the Sale Term, customers may elect to take advantage of Merchant's Membership Program benefits or the then-prevailing Sale discounts, but not both on a cumulative basis.

8.7     Sale Reconciliation.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, and Sharing Amounts, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.

8.8    Force Majeure.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.9    Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10    Additional Agent Merchandise.

(a)    Set forth on Exhibit 8.10(a) is Agent's preliminary Additional Agent Merchandise purchasing plan, which Merchant has approved and which is subject to modification by Agent, in the exercise of Agent's reasonable discretion, from time to time from and after the date hereof.  Subject to compliance with applicable law, Agent shall, at Agent's sole cost and expense, supplement the Merchandise in the Stores with goods of like kind and quality as is customarily sold in the Stores (the "Additional Agent Merchandise").  Sales of Additional Agent Merchandise shall be run through Merchant's cash register systems; provided however Agent shall mark the Additional Agent Merchandise using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Agent Merchandise from the sale of Merchandise.  Merchant and Agent agree that the transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  At all times and for all purposes (other than for purposes of Merchant's Sharing Amounts as contemplated by Section 3.2(a)), the Additional Agent Merchandise and their proceeds shall be the exclusive property of Agent, and no other person or entity (including without limitation Merchant, Lender, or any third person claiming a security interest in Merchant's property) shall have any claim against any of the Additional Agent Merchandise or their proceeds.   The Additional Agent Merchandise shall at all times remain subject to the exclusive control of Agent, and Agent shall, as an Expense of the Sale, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard thereto with Agent's insurers.

(b)    In addition to all other compensation due to Agent under this Agreement, Merchant shall pay Agent an "Agent's Supplemental Additional Merchandise Fee" equal to three percent (3.0%) of the actual cost of goods of the Additional Agent Merchandise sold pursuant to this Agreement (including without limitation Agent's actual freight costs associated with the Additional Agent Merchandise).  Agent covenants to Merchant that Agent shall not add any "lift" to its cost of goods of the Additional Agent Merchandise. Merchant shall pay Agent the Agent's Supplemental Additional Merchandise Fee in connection with each Weekly Sale Reconciliation with respect to purchases of Additional Agent Merchandise sold by Agent during each then prior week (or at such other mutually agreed upon time in the case of Additional Agent Merchandise sold pursuant to Section 3.2(b) above).

8.11    Collective Bargaining Agreements.  Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements; provided however that Agent shall use commercially reasonable efforts (so long as Agent does not have to incur any incremental expenses or liabilities and so long as such compliance does not unreasonably interfere with the Sale or Agent's strategies conducting the Sale) to cooperate with Merchant in connection with Merchant's compliance with its collective bargaining agreements to the extent such compliance is required under the Bankruptcy Code.

Section 9.  Employee Matters.

9.1    Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations, and Merchant's applicable collective bargaining agreements.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments, to any Store employees prior to the Sale Termination Date.  Merchant shall not transfer any Retained Employee during the Sale Term without Agent's prior consent.

9.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto, provided, however, that, in the event that Agent determines to cease using an employee "for cause" (which shall consist of dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided further, however, that Agent shall immediately notify Merchant of the basis for such "cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall rest solely with Merchant).

9.3    Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4    Employee Retention Bonuses.  Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to

which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion. The amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.  <u>Conditions Precedent and Subsequent</u>.

(a)  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(i)  All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)  Lender has executed this Agreement (with all Exhibits attached hereto).

(iii)  The Bankruptcy Court shall have entered the Approval Order, and shall have approved/assumed the Existing Agreement, by November 10, 2011 or such later date as mutually agreed upon by the Merchant and the Agent (the "<u>Approval Order Deadline</u>").

(b)  The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(i)  All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)  Lender has executed this Agreement (with all Exhibits attached hereto), subject to the Approval Order.

Section 11.  <u>Representations, Warranties and Covenants</u>.

11.1  <u>Merchant's Representations, Warranties and Covenants</u>. Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)  Merchant (i) is a corporation (in the case of Syms) or a limited liability company (in the case of Filene's) duly organized, validly existing and in good standing under the laws of the State of its incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)  Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its

obligations thereunder. Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder. Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

(c)     Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and FF&E to be included in the Sale, free and clear of all liens, claims and encumbrances of any nature (other than the lien of the Agent hereunder and the lien of the Lender). Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the FF&E and its proceeds).

(d)     Merchant has maintained its pricing files (including without limitation the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale markdowns, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant has, and shall continue to, ticket or mark all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory. Since October 15, 2011, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale from the Merchandise prior to the Sale Commencement Date, and has not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     Since October 15, 2011, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; provided however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the date hereof.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores. Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for the conduct of the Sale at the Store. Except as otherwise restricted by the Bankruptcy Code or as provided

herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(i)     Subject to approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Since October 15, 2011, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)     Since October 15, 2011, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; and (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores. For purposes of the avoidance of doubt, Agent acknowledges that Merchant has not, since October 15, 2011, replenished the Stores in the ordinary course of business.

(l)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores.

(m)     Each of Merchant's collective bargaining agreements affecting any of its employees who will be providing services in connection with this Agreement are identified on Exhibit 11.1(m).  Merchant has provided representatives of Agent with access to (and the opportunity to copy) all such agreements, and all amendments, modifications, and supplements thereto.

(n)     The composition of the Merchandise shall be substantially similar to the mix information contained in the Merchandise File.  As of November 1, 2011, there shall be no more than $6,500,000 of Merchandise (at Cost Value) at the Merchant's warehouse/distribution centers in Auburn, MA, Secaucus, NJ and Landover, MD.  As of November 1, 2011, there shall be no more than $3,500,000 of Merchandise (at Cost Value) in-transit.  Unless otherwise expressly requested by Agent in writing, Merchant shall cancel all goods which, as of the date Merchant files the Bankruptcy Case, are on-order but not yet in-transit.

(o)     Approximately sixty-three percent (63%) of the Merchandise in the Stores as of the Sale Commencement Date shall be in the Filene's stores as of the Sale Commencement Date; and approximately thirty-seven percent (37%) of the Merchandise in the Stores as of the Sale Commencement Date shall be in the Syms stores as of the Sale Commencement Date.

(p)     To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

11.2    <u>Agent's Representations, Warranties and Covenants</u>.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Each member of Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent, and each member of Agent, has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent or any member of Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchants' leases and other agreements, except as provided for in the Sale Guidelines and Approval Order.

(e)     Absent prior consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)     To the best of Agent's knowledge, all Additional Agent Merchandise is in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Merchandise shall be of like kind and quality as is customarily sold in the Stores.

Section 12.  <u>Insurance</u>.

12.1    <u>Merchant's Liability Insurance</u>.  Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, products liability, comprehensive public liability,

auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies. Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term. In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.

12.2    Merchant's Casualty Insurance.  Merchant will provide throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof. From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured (as its interest may appear). In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, plus any self-insurance amounts and the amount of any deductible or self-insured retention paid by Merchant, shall constitute Proceeds hereunder. Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured (as its interest may appear), in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3    Agent's Insurance.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as additional insureds with respect to such policies. Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as additional insureds, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors). Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    Worker's Compensation Insurance.  Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.  Indemnification.

13.1    Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with

any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); and (vi) the gross negligence (including omissions) or willful misconduct of Merchant, or its officers, directors, employees, agents or representatives.

       13.2    <u>Agent Indemnification</u>. Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; (iv) any consumer warranty or products liability claims relating to Additional Agent Merchandise; (v) as set forth in section 8.3 above; and (vi) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

    Section 14.  <u>Defaults</u>. The following shall constitute "<u>Events of Default</u>" hereunder:

       (a)    The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof;

       (b)    Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party; or

       (c)    The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

    Section 15.  <u>Miscellaneous</u>.

       15.1    <u>Notices</u>. All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

       If to the Agent:       GORDON BROTHERS RETAIL PARTNERS, LLC
                                101 Huntington Avenue, 10th Floor

Boston, MA  02199
Attention: Michael Chartock
Tel: (617) 210-7116
Fax: (617) 531-7906
Email: mchartock@gordonbrothers.com

and to:

HILCO MERCHANT RESOURCES, LLC
5 Revere Drive
Northbrook, IL  60062
Attention: Ian Fredericks
Tel: (847) 418-2075
Fax: (847) 897-0859
Email: ifredericks@hilcotrading.com

With a copy to:

Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, Massachusetts 02110
Attention:  James F. Wallack, Esq.

and

Ashby & Geddes, P.A.
500 Delaware Avenue
Wilmington, DE  19899
Attention: William P. Bowden, Esq.
Tel: (302) 654-1888 extension 254
Fax:
Email: wbowden@ashby-geddes.com

If to the Merchant:               SYMS CORP
                                  FILENE'S BASEMENT, LLC
                                  1 Syms Way
                                  Secaucus, NJ  07094
                                  Attention: Laura Brandt
                                  Tel: (201) 902-9600
                                  Fax:  (201) 902-9270
                                  Email: laurabrandt@syms.com

                                  With a copy to:
                                  SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                                  LLP
                                  Four Times Square
                                  Attention:  Mark McDermott and Suzanne Lovett
                                  New York, New York 10036

Tel: (212) 735-3000
Fax: (212) 735-
Email: mark.mcdermott@skadden.com
Email: Suzanne.lovett@skadden.com

If to the Lender:      Bank of America, N.A.
100 Federal Street, 9th Floor
Boston, MA 02110
Attention: Betsy A. Ratto
Tel: 617-434-4113
Fax: 617-434-4339
Email: betsy.ratto@baml.com

15.2       <u>Governing Law/Exclusive Jurisdiction</u>.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

15.3       <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4       <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

15.5       <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6       <u>Intentionally Omitted</u>.

15.7       <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; <u>provided</u>, <u>however</u>, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

15.8       <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a

facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

15.9     <u>Section Headings</u>. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.10     <u>Wiring of Funds</u>. All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; <u>provided</u>, <u>however</u>, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

15.11     <u>Currency</u>. All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

Section 16.     <u>Agent's Security Interest</u>. Effective upon payment by Agent of the Initial Guaranty Payment and issuance of the Letter of Credit, Merchant hereby grants to Agent a security interest in and lien upon (i) the Merchandise (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, Credit Card Proceeds); (iv) the commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) the commission regarding the sale or other disposition of FF&E under Section 7 hereof; and (vi) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount under Section 3.2(a) hereof, and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing, including, without limitation, any proceeds in the form of Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (all of which are collectively referred to herein as the "<u>Agent Collateral</u>") to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, and payment of the Initial Guaranty Payment, and issuance of the Letter of Credit, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(a)     The Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, <u>provided however</u>, that, until the Merchant receives payment of the Guaranteed Amount, and issuance of the Letter of Credit to secure payment of Expenses due to Merchant hereunder, the security interest granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests of Lender in the Agent Collateral (other than the Additional Agent Merchandise in which Lender has no security interest or other lien) but solely to the extent and amount of the unpaid portion of the Guaranteed Amount and Expenses, and upon payment of the Guaranteed Amount and issuance of the Letter of Credit, any security interest or lien of the Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent. Merchant shall cooperate with Agent with respect to all filings and other actions to the extent reasonably requested by Agent to ensure that Agent properly perfects the security interests and liens granted hereunder.

(b)    Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(c)    In the event of a Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)    As used herein, the following terms have the following respective meanings:

"Accounts" shall mean "accounts" within the meaning of Section 9-102(a)(2) of the Code and, to the extent not otherwise included therein, all Accounts, Contract Rights and accounts receivable; any other obligations or indebtedness owed to the Merchant; all rights of Merchant to receive any payments in money or kind; all guarantees of Accounts and security therefor; all cash or non-cash proceeds of all of the foregoing; all of the right, title and interest of Merchant in and with respect to the goods, services or other property which gave rise to or which secure any of the accounts and insurance policies and proceeds relating thereto, and all of the rights of the Merchant as an unpaid seller of goods or services, including, without limitation the rights of stoppage in transit, replevin, reclamation and resale and all of the foregoing, whether now existing or hereafter created or acquired.

"Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of New York.

"Contract" or "Contracts" shall mean all contracts, agreements, insurance policies, and other undertakings of any nature whatsoever pursuant to which the Merchant has entered into a sale or agreement to sell or provide goods or services now or in the future.

"Contract Rights", to the extent not included in the definition of Accounts in Section 2.1, shall mean all rights to payment or performance under a Contract not yet earned by performance and not evidenced by an instrument or chattel paper.

"Credit Card Proceeds" shall mean the Merchant's Accounts or Payment Intangibles arising from sales of Merchandise, Additional Agent Merchandise or FF&E paid for by customers using credit cards.

"Deposit Accounts" shall mean "deposit accounts" within the meaning of Section 9-102(a)(29) of the Code, including, without limitation, any Designated Deposit Accounts (as defined in this Agreement), any other deposit account holding Proceeds.

"General Intangibles" shall mean "general intangibles" within the meaning of Section 9-102(a)(42) of the Code to the extent they arise from the sale of goods or services or are used in connection with the production of the Merchandise and/or the Additional Goods, Payment Intangibles, and all choses in action, insurance proceeds, goodwill, patents, copyrights, trademarks, tradenames, customer lists, formulae, trade secrets, licenses, designs, computer software, research and literary rights now owned or hereafter acquired.

"Payment Intangible" shall have the meaning set forth in section 9-102(a)(61) of the Code.

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**Gordon Brothers Retail Partners, LLC**
**Hilco Merchant Resources, LLC**

By:   _s/ Richard Edwards_
For the Joint Venture
Print Name and Title: Principal and ManagingDirector

**Syms Corp**

By:
Print Name and Title:

**Filene's Basement, LLC**
By: Syms Corp, its sole member

By:
Print Name and Title:

**Agreed and Accepted as to Sections**
**3.3, 8.3, 8.8, 8.10, and 16:**
**Bank of America, N.A.**

By: _____
Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 2 – List of Prior Stores
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 8.1 – Sale Guidelines
Exhibit 8.10(a) – Agent's Preliminary Additional Agent Merchandise Purchasing Plan.
Exhibit 11.1(m) – Identification of Collective Bargaining Agreements.

# Syms/Filene's Basement

### Exhibit 1
### Store List

| Store No. | Store | Address | City | State | Zip Code | Telephone No. | Total Sq Ft | Retail Sq Ft | Concept |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Secaucus, NJ | OneSyms Way | Secaucus | NJ | 07094 | 201-902-0300 | 0 | 29,000 | Syms |
| 3 | West Palm Beach, FL | 4400 Forest Hill Blvd | West Palm Beach | FL | 33406 | 561-641-9000 | 112,000 | 36,000 | Syms |
| 9 | Woodbridge, NJ | 555 King Georges Rd | Woodbridge | NJ | 07095 | 732-826-4400 | 36,500 | 32,000 | Syms |
| 10 | Falls Chrch 7 Corners VA | 1000 E. Broad St | Falls Church | VA | 22042 | 703-241-8500 | 47,300 | 39,000 | Syms |
| 15 | King of Prussia, PA | 1340 Swedesford Rd | Berwyn | PA | 19312 | 610-644-2000 | 69,000 | 41,000 | Syms |
| 17 | Miami, FL | 4615 NW 77th Avenue | Miami | FL | 33166 | 305-477-4417 | 53,000 | 45,000 | Syms |
| 18 | Rockville, MD | 1900 Chapman Avenue | Rockville | MD | 20852 | 301-984-3335 | 71,000 | 61,000 | Syms |
| 20 | Southfield (Detroit), MI | 21700 Telegraph Road | Southfield | MI | 48034 | 248-350-2525 | 60,000 | 46,000 | Syms |
| 22 | Atlanta, GA | 5775 Jimmy Carter Boulevard | Norcross | GA | 30071 | 770-368-0200 | 69,000 | 41,000 | Syms |
| 27 | Houston, TX | 10770 Westheimer | Houston | TX | 77042 | 713-952-6700 | 42,000 | 34,000 | Syms |
| 28 | Tampa, FL | 3251 Hillsborough Avenue | Tampa | FL | 33614 | 813-876-6655 | 77,000 | 38,000 | Syms |
| 44 | Marietta, GA | 1803 Roswell Road | Marietta | GA | 30062 | 770-321-3400 | 77,000 | 39,000 | Syms |
| 45 | Trinity, NY | 42 Trinity Place | New York | NY | 10007 | 212-797-1199 | 57,000 | 40,000 | Syms |
| 48 | Kendall, FL | 13899 SW 88th Street | Miami | FL | 33186 | 305-408-6200 | 40,000 | 32,000 | Syms |
| 64 | Addison, IL | 280 West North Avenue | Addison | IL | 60101 | 630-620-6445 | 68,000 | 47,000 | Syms |
| 70 | Cherry Hill, NJ | 1865 E. Marlton Pike | Cherry Hill | NJ | 08003 | 856-424-0884 | 150,000 | 55,000 | Syms |
| 79 | Buffalo, NY | 8075 Sheridan Drive | Williamsville | NY | 14221 | 716-633-4333 | 102,000 | 39,000 | Syms |
| 195 | Ft. Lauderdale, FL | 5300 Powerline | Ft. Lauderdale | FL | 33309 | 954-772-0775 | 55,000 | 44,000 | Syms |
| 330 | Bergen/Paramus, NJ | 330 Route 17 North | Paramus | NJ | 07652 | 201-791-7422 | 77,000 | 56,000 | Syms |
| 36 | Fairfield, CT | 652 Commerce Drive | Fairfield | CT | 06825 | 203-330-6700 | 43,000 | 32,000 | Syms |
| 37 | Hartford, CT | 267 Berlin Turnpike | Hartford | CT | 06037 | 860-829-6400 | 38,000 | 31,000 | Syms |
| 39 | Westchester, NY | 295 Tarrytown Road | Elmsford | NY | 10523 | 914-592-2447 | 143,000 | 50,000 | Syms |
| 250 | Westbury, NY | 695 Merrick Avenue | Westbury | NY | 11590 | 516-683-0018 | 92,000 | 72,000 | Syms |
| 560 | Norwood, MA | 560 Boston Providence Highway | Norwood | MA | 02062 | 781-769-8200 | 43,100 | 36,000 | Syms |
| 410 | Connecticut Ave | 1133 Connecticut Ave | Washington | DC | 20036 | 202-872-8430 | 38,000 | 26,800 | Filene's Basement |
| 413 | Mazza Gallerie | 5300 Wisconsin Ave | Washington | DC | 20015 | 202-966-0208 | 44,800 | 29,500 | Filene's Basement |
| 426 | Newton | 215-227 Needham St | Newton Upper Fa | MA | 02464 | 617-332-1295 | 28,300 | 18,700 | Filene's Basement |
| 436 | Harvard Park Warrenville | Harvard Park Shopping Ctr | Beechwood | OH | 44122 | 216-593-0009 | 38,000 | 26,000 | Filene's Basement |
| 440 | Manhasset | 1400 Northern Blvd | Manhasset | NY | 11030 | 516-365-6224 | 48,000 | 35,200 | Filene's Basement |
| 443 | Fresh Meadows Flushing | 187-04 Horace Harding | Fresh Meadows | NY | 11365 | 718-479-7711 | 28,700 | 18,500 | Filene's Basement |
| 447 | Union Square | 4 Union Square South | New York | NY | 01003 | 212-358-0169 | 90,000 | 57,400 | Filene's Basement |
| 452 | Back Bay Boston | 497 Boylston St | Boston | MA | 02116 | 617-424-5520 | 38,400 | 25,500 | Filene's Basement |
| 471 | Atlanta Lenox | 3535 Peachtree RD | Atlanta | GA | 30326 | 404-869-4466 | 49,300 | 35,300 | Filene's Basement |
| 475 | Aventura | 17651 Biscayne Blvd | North Miami Bea | FL | 33160 | 305-936-2497 | 42,000 | 27,700 | Filene's Basement |
| 480 | State Street Chicago | 1 North State ST | Chicago | IL | 60602 | 312-553-1055 | 63,400 | 46,400 | Filene's Basement |
| 488 | North Michigan Ave Chicag | 830 N Michigan Ave | Chicago | IL | 60611 | 312-482-8918 | 61,200 | 39,300 | Filene's Basement |
| 493 | National Press | 529 14th ST NW | Washington | DC | 20045 | 202-638-4110 | 42,700 | 31,600 | Filene's Basement |
| 495 | Baltimore Inner Harbour | 600 East Pratt ST | Baltimore | MD | 21286 | 410-685-2637 | 31,400 | 24,000 | Filene's Basement |
| 415 | Broadway 79 | 2220-2226 Broadway | New York | NY | 10024 | 212-873-8000 | 32,200 | 19,300 | Filene's Basement |

# SYMS | Filene's Basement

## Store List

## Exhibit 2

| Store No. | Store | Address | City | State | Zip Code | Telephone No. | Square Ft |
|-----------|-------|---------|------|-------|----------|---------------|-----------|
| 412 | Rockville | 11840 Rockville Pike | Rockville | MD | 20852 | 301.816.7805 | 38,257 |
| 416 | Arsenal Mall | 485 Arsenal Street | Watertown | MA | 02464 | 617.926.4474 | 33,889 |
| 419 | Northshore Mall | Rtes 114 and 128 | Peabody | MA | 01960 | 978.532.2400 | 44,434 |
| 457 | South Shore Plaza | 250 Granite St | Braintree | MA | 02184 | 781.849.0031 | 28,600 |
| 491 | Square One Mall | 1201 Broadway | Saugus | MA | 01906 | 781.231.8153 | 34,487 |

5

# Inventory Stepdown Schedule
## Exhibit 3.1 (b)

| Inventory Level | Adjustment | Guaranty |
|---|---|---|
| 69,500,000 | 0.25 | 87.40 |
| 69,250,000 | 0.25 | 87.65 |
| 69,000,000 | 0.20 | 87.90 |
| 68,750,000 | 0.20 | 88.10 |
| 68,500,000 | 0.20 | 88.30 |
| 68,250,000 | 0.20 | 88.50 |
| 68,000,000 | 0.20 | 88.70 |
| 67,750,000 | 0.20 | 88.90 |
| 67,500,000 | 0.15 | 89.10 |
| 67,250,000 | 0.15 | 89.25 |
| 67,000,000 | 0.15 | 89.40 |
| 66,750,000 | 0.15 | 89.55 |
| 66,500,000 | 0.15 | 89.70 |
| 66,250,000 | 0.15 | 89.85 |
| 66,000,000 | - | 90.00 |
| 65,000,000 | - | 90.00 |
| 64,000,000 | - | 90.00 |
| 63,750,000 | 0.15 | 89.85 |
| 63,500,000 | 0.15 | 89.70 |
| 63,250,000 | 0.15 | 89.55 |
| 63,000,000 | 0.15 | 89.40 |
| 62,750,000 | 0.15 | 89.25 |
| 62,500,000 | 0.15 | 89.10 |
| 62,250,000 | 0.15 | 88.95 |
| 62,000,000 | 0.18 | 88.77 |
| 61,750,000 | 0.18 | 88.59 |
| 61,500,000 | 0.18 | 88.41 |
| 61,250,000 | 0.18 | 88.23 |
| 61,000,000 | 0.20 | 88.03 |
| 60,750,000 | 0.20 | 87.83 |
| 60,500,000 | 0.20 | 87.63 |
| 60,250,000 | 0.20 | 87.43 |
| 60,000,000 | 0.20 | 87.23 |
| 59,750,000 | 0.30 | 86.93 |
| 59,500,000 | 0.30 | 86.63 |

*Inventory thresholds between the above increments will be handled on a prorata basis.*

*Adjustments below $59,500,000 and above $69,500,000 to be mutually agreed upon.*

# Cost Factor Adjustment
## Exhibit 3.1 ( c )

| Cost Factor % | Adjustment | Guaranty |
|---|---|---|
| 48.20% | 0.00 | 90.00 |
| 48.30% | 0.28 | 89.72 |
| 48.40% | 0.28 | 89.44 |
| 48.50% | 0.28 | 89.16 |
| 48.60% | 0.28 | 88.88 |
| 48.70% | 0.28 | 88.60 |
| 48.80% | 0.28 | 88.32 |
| 48.90% | 0.28 | 88.04 |
| 49.00% | 0.28 | 87.76 |
| 49.10% | 0.28 | 87.48 |
| 49.20% | 0.28 | 87.20 |
| 49.30% | 0.28 | 86.92 |
| 49.40% | 0.28 | 86.64 |
| 49.50% | 0.28 | 86.36 |
| 49.60% | 0.28 | 86.08 |
| 49.70% | 0.28 | 85.80 |
| 49.80% | 0.28 | 85.52 |
| 49.90% | 0.28 | 85.24 |
| 50.00% | 0.28 | 84.96 |
| 50.10% | 0.28 | 84.68 |
| 50.20% | 0.28 | 84.40 |

*Adjustments between the above thresholds to be handled on a prorata basis.*

*Adjustments above a 50.2% cost factor to be mutually agreed upon.*

Exhibit 3.4

# LETTER OF CREDIT

Bank of America

100 Federal Street

Boston, MA 02109

Irrevocable Standby Letter of Credit Number:

Beneficiary:    Bank of America, N.A., FOR THE BENEFIT OF:
Syms Corp. and Filene's Basement, LLC and their
Affiliated debtors and debtors-in-possession

Credit Number:
Opener's Reference No:

Ladies and Gentlemen:

BY ORDER OF: Gordon Brothers Retail Partners, LLC  and Hilco Merchant Resources, LLC

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of Gordon Brothers
Retail Partners, LLC and Hilco Merchant Resources, LLC for a sum or sums not exceeding a total of
_____ _____ DOLLARS ($_____) available by your draft(s) at
SIGHT on OURSELVES, effective immediately, and expiring at OUR COUNTERS in Boston, MA or New
York, NY on _____, 2012, or such earlier date on which the Beneficiary shall notify us in writing that this
Standby Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original Letter of Credit and a signed statement in the form attached hereto
as Exhibit A, signed by Bank of America, N.A., FOR THE BENEFIT OF Syms Corp. and Filene's Basement,
LLC and their affiliated debtors and debtors-in-possession (the "Beneficiary")

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the
Beneficiary in the form attached as Exhibit B.

If a drawing is received by        at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that
such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the
account designated by Beneficiary, as directly below, in immediately available funds on the same Business Day.
If however, a drawing is received by        after 12:00 noon, Eastern Time, on a Business Day, and provided that
such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the
account designated by Beneficiary in immediately available funds on the next Business Day.

As used in the Letter of Credit "Business Day" shall mean any day other than a Saturday, Sunday, or a day on
which Banking Institutions in Massachusetts are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No._____, dated _____ of Bank of America, Scranton, PA."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 600."

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above-mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, Bank of America, 100 Federal Street, Boston, MA 02109, mentioning our reference number as it appears above. Telephone inquiries can be made to Valerie DeLaura at (800) 370-7519.

Very truly yours,

_____

Authorized Official

TO IRREVOCABLE LETTER OF CREDIT NO._____

Re: Drawing for Amounts Due to:

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____(the "Letter of Credit"). The undersigned duly authorized officer of Bank of America, N.A., FOR THE BENEFIT OF Syms Corp. and Filene's Basement, LLC and their affiliated debtors and debtors-in-possession (the "Beneficiary") in its capacity as the Beneficiary of the Letter of Credit hereby certifies to you that:

(i)   The joint venture of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (the "Agent") has not made a payment when due of or for the Guaranteed Amount and/or the Expenses due by Agent to Syms Corp. and Filene's Basement, LLC (the "Merchant"), pursuant to, and as such terms are defined in, that certain Second Agency Agreement dated as of November __, 2011 between Merchant on the one hand, and Agent, on the other ("Agency Agreement").

(ii)   Beneficiary, as Merchant's designee has given Agent five (5) business days written notice of Merchant's intention to draw on this Letter of Credit pursuant to the Notice provisions of the Agency Agreement.

(iii)   No Event of Default on the part of the Merchant under the Agency Agreement has occurred, exists or is continuing as of this date and no event now exists which solely with the passage of time or giving of notice or both would constitute an Event of Default on the part of Merchant under the Agency Agreement.

(iv)   The amount to be drawn is $_____ (the "Amount Owing")

(v)   Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the letter of credit, less any prior drawings, as of the date hereof.

(vi)   The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(vii)   In accordance with the terms of the letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account.

IN WITNESS WHEREOF, I have executed and delivered this letter as of this __ day of _____, 201_.

Very truly yours,
Bank of America, N.A., FOR THE BENEFIT OF:
Syms Corp. and Filene's Basement, LLC and their
affiliated debtors and debtors-in-possession

By:_____
Duly Authorized Officer
Print Name:

## EXHIBIT B

### TO IRREVOCABLE STANDY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officer of Bank of America, N.A., FOR THE BENEFIT OF Syms Corp. and Filene's Basement, LLC and their affiliated debtors and debtors-in-possession (the "Beneficiary"), in its capacity as Beneficiary under this Letter of Credit, hereby confirm to you that the face amount of the Letter of Credit No. _____ hereby shall be reduced from its original face amount to a new face amount of _____ DOLLARS ($_____).

      IN WITNESS WHEREOF, I have executed and delivered this certificate as of this ___ day of _____, 201_.

                    Very truly yours,
                    Bank of America, N.A., FOR THE BENEFIT OF:
                    Syms Corp. and Filene's Basement, LLC and their
                    affiliated debtors and debtors-in-possession


                    By:_____
                    Duly Authorized Officer
                    Print Name:

## Occupancy Per Diem
### Exhibit 4.1 ( c )

| Store # | Main. Agree. | Repairs | Equip Main | Comm | Protection | Other Tax | Misc | Ins | Rent | Utilities | Cam | RE Tax/Ins | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 202 | 26 | 2 | 5 | 24 | 1 | 11 | - | 17 | 103 | - | 160 | 551 |
| 3 | 60 | 44 | 4 | 41 | 29 | 8 | - | - | - | 255 | - | 446 | 887 |
| 9 | 55 | 24 | 6 | 26 | 18 | - | 0 | - | 1,334 | 177 | - | 258 | 1,897 |
| 10 | 77 | 76 | 6 | 33 | 171 | 30 | 5 | 1 | 2,156 | 134 | 307 | 287 | 3,279 |
| 15 | 160 | 37 | 4 | 30 | 21 | 5 | 5 | 1 | - | 388 | - | 112 | 761 |
| 17 | 89 | 81 | 4 | 31 | 18 | 43 | 31 | - | - | 244 | - | 207 | 760 |
| 18 | 125 | 245 | 5 | 38 | 55 | 18 | 2 | - | - | 473 | - | 394 | 1,349 |
| 20 | 115 | 8 | 4 | 34 | 19 | 7 | 1 | - | - | 327 | - | 261 | 776 |
| 22 | 42 | 75 | 4 | 38 | 18 | 32 | 4 | - | - | 292 | 93 | 165 | 763 |
| 27 | 65 | 50 | 4 | 40 | 40 | 82 | 0 | - | - | 220 | - | 95 | 597 |
| 28 | 149 | 23 | 4 | 37 | 198 | 2 | 3 | - | - | 328 | - | 61 | 804 |
| 44 | 19 | 37 | 4 | 38 | 17 | 23 | 4 | - | - | 237 | - | - | 375 |
| 45 | 450 | 126 | 10 | 46 | 86 | 4 | 4 | - | - | 800 | - | 1,222 | 2,743 |
| 48 | 64 | 94 | 4 | 52 | 27 | 40 | 2 | - | 595 | 252 | 192 | 284 | 1,606 |
| 64 | 154 | 43 | 4 | 34 | 17 | 4 | 0 | - | - | 303 | - | 290 | 848 |
| 70 | 113 | 166 | 4 | 33 | 32 | - | 14 | - | - | 368 | - | 997 | 1,728 |
| 79 | 86 | 39 | 4 | 29 | 19 | - | 0 | - | - | 222 | - | 214 | 613 |
| 195 | 95 | 92 | 4 | 42 | 20 | 5 | 11 | - | - | 272 | - | 315 | 855 |
| 330 | 244 | 127 | 6 | 56 | 24 | - | - | - | - | 401 | - | 954 | 1,813 |
| 36 | 172 | 23 | 7 | 42 | 136 | 13 | 1 | - | 119 | 256 | - | 190 | 960 |
| 37 | 57 | 62 | 6 | 36 | 63 | 33 | - | - | - | 301 | 193 | 222 | 973 |
| 39 | 471 | 276 | 9 | 42 | 431 | 16 | 1 | - | 143 | 371 | - | 2,036 | 3,795 |
| 250 | 377 | 167 | 22 | 32 | 247 | - | - | - | - | 756 | - | 1,715 | 3,316 |
| 560 | 46 | 77 | 6 | 37 | 24 | 9 | - | - | 1,244 | 285 | 201 | 195 | 2,122 |
| 410 | 411 | 249 | 3 | - | 18 | 44 | 0 | - | 5,026 | 623 | 768 | 1,197 | 8,341 |
| 413 | 337 | 74 | 3 | - | 42 | 42 | - | - | 3,170 | - | 1,658 | 1,190 | 6,517 |
| 426 | 295 | - | 7 | 44 | 3 | 14 | 7 | - | 4,158 | 382 | 360 | 732 | 6,000 |
| 436 | 117 | 8 | 4 | 4 | 14 | 67 | 2 | - | 1,868 | 179 | 210 | - | 2,474 |
| 440 | 145 | 68 | 3 | - | 63 | 8 | 6 | - | 3,769 | 520 | 1,245 | 875 | 6,701 |
| 443 | 164 | 11 | 7 | - | 63 | 8 | 3 | - | 1,516 | 257 | - | 321 | 2,351 |
| 447 | 938 | 247 | 101 | - | 25 | 513 | 3 | - | 12,136 | 446 | 2,749 | 1,184 | 18,341 |
| 452 | 273 | 49 | - | - | 17 | 12 | 3 | - | 6,887 | 427 | 642 | 1,293 | 9,604 |
| 471 | 223 | - | 3 | - | 15 | 123 | 1 | - | 3,052 | 265 | 398 | 529 | 4,609 |
| 475 | 202 | - | 3 | 1 | 16 | 52 | 3 | - | 3,822 | 313 | - | 588 | 5,001 |
| 480 | 275 | 29 | 7 | - | 4 | 20 | 6 | - | 3,666 | 363 | 828 | 3,597 | 8,793 |
| 488 | 599 | - | - | - | 13 | 21 | 8 | - | 7,533 | 469 | 541 | 2,393 | 11,577 |
| 493 | 524 | 143 | 14 | - | 15 | 50 | - | - | 3,871 | 339 | 1,928 | 667 | 7,551 |
| 495 | 324 | 9 | 6 | 14 | 16 | 59 | 1 | - | 2,309 | 369 | 340 | 345 | 3,793 |
| 415 | 944 | 843 | 69 | - | 195 | 493 | 5 | - | 19,624 | 761 | - | 1,819 | 24,754 |
| | 9,256 | 3,744 | 370 | 938 | 2,276 | 1,900 | 134 | - | 88,016 | 13,480 | 12,652 | 27,811 | 160,577 |

Note:

Store 10 (Falls Church): Percentage rent of 4% of total gross proceeds at such store will apply only if such amount is greater than the per diem amount payable as "Rent" reflected above.

Store 415 (Broadway): Percentage rent is calculated as 2.5% of annual gross revenue over $20mm at such store.

Exhibit 5.1(a)

# INVENTORY INSTRUCTIONS
## Syms/Filene's Basement
## RGIS INVENTORY SERVICE

Type of count

The counts will be at SKU/Retail level and counted by *RGIS* Inventory Service. In this type of count, the Inventory Service personnel should scan or key in the UPC/SKU, quantity and LOWEST TICKETED PRICE for each item. As per the Agency Agreement, some specific kinds of merchandise need to be specifically identified (see Exception Categories below).

We have set up the count to accept scanned bar code (UPC), keyed bar code (UPC) or SKU. RGIS will have a SKU validation file which will increase the accuracy of the count.

For purposes of the Agreement, "Base Retail Value" shall mean with respect to each item of Merchandise the lowest ticketed, marked, shelf, Merchandise File, or SKU/PLU file price for such item since October 15, 2011.

Staffing

The Agent will have at least one representative present at every count, and the Merchant will also have at least a store manager or asset protection manager present.

Controls

1. A primary focus of these counts is on ensuring the accuracy of the piece count. The Service should audit each of their inventory counters during the first hour of the count. This is done by having a Service supervisor testing each crew person by having him or her bring up on their machines the last ten items they counted. The SKU/UPC and quantity entered should exactly match the items on the shelf/rack. Counters who have any errors should be tested further, i.e. for more SKU's (another 20 or 30 pieces). If you feel the counter's error rate is unreasonably high, direct the Service to not let them key any more. They can be used to do bulk pre-counts, etc., or may even have to be sent home.

   Taking counters off the count is YOUR call. Counters who are inaccurate can cost the company a lot of money, and it can cost additional money to recount every section that they counted. INSIST ON ACCURACY.

2. Take care not to count empty boxes. Open all packed away goods, over stock, and new receipts to count the goods inside. NEVER key from a pack away list.

3. Authorized agents of the Merchant and Agent must jointly agree upon any adjustment made to any area.

All Merchandise identified and sold as "As-Is" Merchandise should be segregated and counted in area 9997.

All consignment goods in Bridal and Tuxedo should be counted in Areas 9800-9899. These are NOT Merchandise of the sale and need to be clearly segregated and identified.

## DO NOT INVENTORY

Isolate and DO NOT INVENTORY the any gift cards or gift certificates from outside vendors.

DO NOT COUNT Fixtures or displays as merchandise

## POST COUNT

At the end of the count, please fax the RGIS timesheet as well as the last page of the F1 summary report (inclusive of all above exception areas) to 208-723-1007. **NOTE: It is IMPERATIVE that the F1 summary report include the signature of BOTH the Filene's Basement representative and the Gordon Brothers Consultant on the totals page.**



## SYMS/FILENE'S BASEMENT SALE GUIDELINES

A.    The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.    On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.    At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale.  Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any unsold owned FF&E located at a Store.

E.    Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided however that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent may advertise the Sale as a "going out of business," "store closing" "sale on everything", or similar themed sale. The Merchant and the Agent shall not use neon or day-glo display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. Nothing contained herein shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order.

F.    Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.    Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.    The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Store.

I.    The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.    Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores, Merchant's warehouse/distribution centers in Auburn, MA, Secaucus, NJ and Landover, MD, and at Merchant's home office (the "FF&E").  The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores, Merchant's warehouse/distribution centers in Auburn, MA, Secaucus, NJ and Landover, MD, and at Merchant's home office.   Additionally, the purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas or through other areas after store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any unsold FF&E.

K.    The Agent shall be entitled to include Additional Agent Merchandise in the Sale in accordance with the terms of the Approval Order and the Agency Agreement.

L.    At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

M.    Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

N.    The rights of landlords for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.    If and to the extent that the landlord of any Store affected hereby contends that the Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

If to the Merchant:
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
Attention:  Mark McDermott and Suzanne Lovett
New York, New York 10036
Tel: (212) 735-3000
Fax: (212) 735-
Email: mark.mcdermott@skadden.com
Email: Suzanne.lovett@skadden.com

If to the Agent:
Ashby & Geddes, P.A.
500 Delaware Avenue
Wilmington, DE  19899
Attention: William P. Bowden, Esq.
Tel: (302) 654-1888 extension 254
Fax:
Email: wbowden@ashby-geddes.com

SYMS | Filene's Basement
Agent's Preliminary Additional Merchandise Purchasing Plan
Exhibit 8.10 (a)

| Category | % Total |
|---|---|
| Women's Tops | 19.2% |
| Women's Bottoms | 12.8% |
| Women's Accessories/Handbags | 8.0% |
| **Total Women's** | **40.0%** |
| Men's Tops | 9.6% |
| Men's Bottoms | 6.4% |
| Men's Belts/Ties/Accessories | 4.0% |
| **Total Men's** | **20.0%** |
| Kid's Tops | 4.8% |
| Kid's Bottoms | 3.2% |
| **Total Kids** | **8.0%** |
| **Home*** | **32.0%** |

*Home will include blankets, throws, comforters, fragrance sets, toys and luggage.*

| **Total Additional Merchandise Plan** | **100%** |
|---|---|

Exhibit 11.1(m) – Identification of Collective Bargaining Agreements