# **EXHIBIT D**

**AGENCY AGREEMENT**

This Agency Agreement ("Agreement") is made as of October 12, 2011, among Syms Corp ("Syms") and Filene's Basement, LLC ("Filene's" and, together with Syms, "Merchant"), jointly and severally, and Gordon Brothers Retail Partners, LLC ("Agent").

Section 1.  Recitals.

WHEREAS, the Merchant operates retail stores and desires that the Agent act as the Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's five (5) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") by means of a promotional "sale on everything" or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E in the Stores.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and the Merchant hereby agree as follows:

Section 2.  Appointment of Agent.

Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as the Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

Section 3.  Consideration to Merchant and Agent.

3.1  Payments to Merchant.

(a)  Subject to Merchant's compliance in all material respects with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, Agent guarantees that Filene's shall receive thirty-nine percent (39.0%) (the "Guaranty Percentage") of the aggregate Retail Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Agent shall pay to Filene's the Guaranteed Amount and the Sharing Amount due to Filene's (if any) in the manner and at the times specified in Section 3.3.  The Guaranteed Amount will be calculated based upon the aggregate Retail Value of the Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant; (B) the aggregate Retail Value of the Merchandise subject to Gross Rings; and (C) any other adjustments to Retail Value as expressly contemplated by this Agreement.

(b)  The Guaranty Percentage has been fixed based upon the aggregate Retail Value of the Merchandise included in the Sale being eleven million dollars ($11,000,000) (the "Merchandise Threshold").  To the extent that the aggregate Retail Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

3.2  Compensation to Agent, Sharing:

(a)  After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to one and one-half percent (1.5%) of the sum of: (i) the

Retail Value of the Merchandise; plus (ii) the Retail Value of the Additional Agent Merchandise ("Agent's Fee"); and THEREAFTER: thirty percent (30%) to Agent and seventy percent (70%) to Filene's ("Sharing Amounts").

(b)     To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), Agent shall use commercially reasonable efforts to dispose of all of such Remaining Merchandise by means of bulk sale/wholesale or otherwise, and the proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3     Proceeds; Time of Payments; Control of Proceeds.

(a)     For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue (e.g., jewelry and show license departments) received in the Store, in each case during the Sale Term and exclusive of Sales Taxes; and (b) the total amount (in dollars) of all sales of Additional Agent Merchandise made under this Agreement during the Sale Term and exclusive of Sales Taxes; and (c) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term; and (d) any and all proceeds received by Agent from the disposition of Remaining Merchandise.

(b)     On the first business day following the Sale Commencement Date (the "Payment Date"), Agent shall pay to Filene's an amount equal to seventy percent (70%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course) (the "Initial Guaranty Payment") by wire transfer to an account designated in writing by Filene's ("Merchant Account"). The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to the Merchant Account on the second business day following the issuance of the final report of the aggregate Retail Value of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent and Merchant (the "Final Inventory Report"); provided, however, that Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking and cause the Final Inventory Report to be issued on or before the tenth (10) day following the Sale Commencement Date (with the date of completion of such reconciliation and issuance of such Final Inventory Report to be referred to as the "Inventory Reconciliation Date"). In the event that the Initial Guaranty Payment exceeds the Guaranteed Amount, the Merchant shall pay to the Agent the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds the sum of the Initial Guaranty Payment and any other amounts paid by Agent on account of the Guaranteed Amount within two business days after the Inventory Reconciliation Date. To the extent that the Agent is owed the Adjustment Amount, and Merchant for any reason fails to timely pay to Agent the Adjustment Amount due, then to the extent that Bank of America, N.A. ("Lender") receives, or has received, any funds on account of the Guaranteed Amount from Merchant or Agent, then the Lender shall, within two business days written demand by Agent, disgorge and remit the Adjustment Amount to Agent. To the extent that Filene's is entitled to receive any funds on account of the Sharing Amount due to Filene's, Agent shall pay such Sharing Amount as part of the Final Reconciliation under Section 8.7. To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to Filene's as part of the Final Reconciliation.

(c)     All Proceeds shall be controlled by Agent in the manner provided for below.

(i)     Agent may establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts") and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the

Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and the distribution of amounts payable hereunder. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fee and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and existing bank accounts for credit card Proceeds relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

(iii)    Prior to the date Agent establishes the Agency Accounts, all Proceeds (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Store, which accounts shall be designated solely for the deposit of Proceeds (including credit card Proceeds), and the disbursement of amounts payable by Agent hereunder (the "Designated Deposit Accounts"). The Designated Deposit Accounts shall be cash collateral accounts, with all cash, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds hereunder, and Merchant hereby grants to Agent a security interest in each Designated Deposit Account and each account shall be subject to an agreement between and among the Agent, the Merchant and the subject bank, providing for, among other things, that such bank will comply with instructions originated by the secured party directing the disposition of funds in such account without further consent of the Merchant (a "Control Agreement"). Agent shall enter into an intercreditor agreement with Lender and Merchant providing for, *inter alia,* the acknowledgement of the Agent's security interest in Proceeds deposited in such account, and for turnover of any such Proceeds by Lender to Agent (the "Intercreditor Agreement"). If, notwithstanding the provisions of this Section, Merchant receives or otherwise has dominion over or control of any Proceeds, Merchant shall hold such Proceeds in trust for Agent and shall not commingle Proceeds with any of Merchant's other funds or deposit such Proceeds in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)    On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales) deposited into the Designated Deposit Accounts for the prior day; provided however that Merchant need not begin this remittance process until the fifth day following the Sale Commencement Date and may remit on a five day lag basis throughout the Sale Term (and the 5 day period following the conclusion of the Sale Term). Agent shall have ten (10) business days after the date of each such payment by Merchant to notify Merchant and Lender of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall. For the avoidance of doubt,

Merchant shall remit to Agent Proceeds from credit card sales no later than one (1) business day after actually received.

    (d) Either party may offset amounts held by them for application pursuant to the terms of this Agreement.

    (e) In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis.

    3.4 <u>Security</u>. In order to <u>secure</u> Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the Payment Date, Agent shall furnish Filene's an irrevocable standby Letter of Credit naming Lender as beneficiary (the "<u>Beneficiary</u>") in the aggregate original face amount equal to the sum of: (a) thirty percent (30%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of <u>Exhibit 3.4</u> hereof (the "<u>Letter of Credit</u>"). The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date. Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Beneficiary shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days. If the Beneficiary fails to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then Beneficiary shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Filene's. In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses the Beneficiary may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute. Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount made to the time of each such request (and Merchant shall cooperate with respect to each such request); <u>provided however</u>, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three weeks of Expenses.

  Section 4. <u>Expenses of the Sale</u>.

    4.1 <u>Expenses</u>. Agent shall <u>be</u> responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below. As used herein, "<u>Expenses</u>" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term, <u>limited</u> to the following:

    (a) all payroll for all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term (including hours worked during the Inventory Taking) as well as payroll for any of Merchant's former employees or temporary labor engaged for the Sale;

    (b) any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Benefits) for Retained Employees used in the Sale, in an amount not to exceed 15.0% of the base payroll for each Retained Employee in the Stores (the "<u>Benefits Cap</u>") during the Sale Term;

(c)     the limited occupancy-related expenses categorized on Exhibit 4.1(c), but in all cases limited on a per Store and per diem basis not to exceed the respective categories and amounts shown on Exhibit 4.1(c) (and for purposes of the avoidance of doubt, Exhibit 4.1(c) may (to the extent expressly provided on Exhibit 4.1(c)) include a percentage amount allocable for percentage rent payable with respect to sales made in the respective Store during the Sale Term);

(d)     Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)     advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)     credit card fees, bank card fees, chargebacks and discounts with respect to Merchandise sold in the Sale;

(g)     bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)     costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(i)     all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)     Store cash theft and other store cash shortfalls in the registers;

(k)     Agent's on-site supervision of the Store, including any and all fees, wages, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and incidental out-of-pocket and commercially reasonable travel expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)     postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)     fifty percent (50%) of the fees and expenses of the Inventory Taking Service.

(n)     Agent's actual cost of capital (including Letter of Credit fees) and insurance; and

(o)     Agent's reasonable out-of-pocket costs and expenses including but not limited to, reasonable legal fees and expenses incurred in connection with the review of data, preparation, negotiation and execution of this Agreement and any ancillary documents (but not to exceed $50,000 in the case of such legal fees/expenses), and in connection with the Sale.

(p)     the actual cost of goods of the Additional Agent Merchandise actually sold during the Sale Term or pursuant to Section 3.2(b) above (including without limitation Agent's actual freight costs associated with the Additional Agent Merchandise).

(q)     The actual cost to Agent of insuring the Additional Agent Merchandise pursuant to Section 8.10 below.

(r)     Third party payroll processing expenses associated with the Sale.

There will be no double payment of Expenses, and to the extent that Expenses appear or are contained in more than one Expense category, and to the extent that any cap applies to any Expense shown in more than one category above, the lowest cap shall apply.

As used herein, the following terms have the following respective meanings:

(i)     "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting.

(ii)     "Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to the Sale Commencement Date: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, termination or severance pay and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)     "Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, housekeeping and cleaning expenses, and rental for furniture, fixtures and equipment, and any and all other occupancy and occupancy-related expenses associated with the Sale and/or the Store.

(iv)     "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to Merchant.

(v)     Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or distribution centers, and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid by solely by Merchant promptly when due.

4.2     Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. Agent and/or Merchant may review or audit the Expenses at any time.

Section 5. Gross Rings; Merchandise.

5.1     Inventory Taking.

(a)     Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU and Retail Value physical inventory of the Merchandise located in the Stores (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Stores as soon as practicable (the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store).  Merchant and Agent shall jointly employ RGIS or other mutually agreed upon nation inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions").  As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service plus one hundred percent (100%) of the payroll and related benefits for Retained Employees utilized in the conduct of the Inventory Taking.  Merchant shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service.  Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant, Lender, and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking, the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store.  Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking; or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store.  Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs and Retail Value, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Retail Value of the Merchandise).  Each Store will be closed during the Inventory Taking; provided however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business.  The Inventory Taking, including, but not limited to the Final Inventory Report, shall be reconciled by Merchant and Agent as soon as practicable following the Inventory Taking.

(b)     At each Store, for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store.  Register receipts shall show for each item sold the Retail Value for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101.5% of the aggregate Retail Value of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2     Merchandise Subject to This Agreement.

(a)     For purposes of this Agreement, "Merchandise" shall mean all new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date (including Defective Merchandise and Merchandise subject to Gross Rings). "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Merchant Consignment Goods; or (5) Additional Agent Merchandise; (6) tuxedo goods, bridal gown goods, or Excess Men's Suits; or (8) furnishings, trade

fixtures, equipment and/or improvements to real property which are located in the Stores ("FF&E"); provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below.

(b)     As used in this Agreement, the following terms have the respective meanings set forth below:

"Base Retail Value" shall mean with respect to each item of Merchandise the lowest ticketed, marked, shelf, Merchandise File, or SKU/PLU file price for such item since September 15, 2011. For purposes of calculating Base Retail Value, if an item of Merchandise has more than one ticketed, marked, shelf, Merchandise File, or SKU/PLU file price, or if multiple items of the same SKU have different ticketed, marked, shelf, Merchandise File, or SKU/PLU file prices, the lowest ticketed, marked, shelf, Merchandise File, or SKU/PLU file price shall prevail for all such items of Merchandise in the same Store ("Per Store Lowest Price") unless it is reasonably determined by Merchant and Agent that the applicable Per Store Lowest Price was variantly priced because it was damaged or marked as "as is", in which case the next higher Per Store Lowest Price shall control.

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods.  Examples of Defective Merchandise include but are not limited to goods which are damaged, defective, scratched, soiled, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, parts, items typically sold as a set which are incomplete or gift with purchase items.

"Excess Men's Suits" shall mean all men's suits (if any) remaining in the Stores at such time as 12,000 men's suits have been sold in the Stores during the Sale Term.

"Excluded Defective Merchandise" means any item of Defective Merchandise for which the parties cannot mutually agree upon a Retail Value.

"Merchandise File" shall mean the files named "Accessories.xls", "IA JWLRY Home.xls", "Kids.xls", "Mens.xls", "Misc.xls", "RTW.xls", "Shoes.xls" and "Vault.xls" and sent by Merchant to Agent on October 3, 2011.

5.3     Valuation.

(a)     For purposes of this Agreement, "Retail Value" shall mean with respect to each item of Merchandise the Base Retail Value; provided however, that:

(i)     With respect to each item of Merchandise that at any time since September 15, 2011 was in any way designated as either: (i) red star Merchandise, or (ii) purple sticker or dot Merchandise, the "Retail Value" shall mean 50% of the Base Retail Value of such item.

(ii)     With respect to each item of Merchandise that at any time since September 15, 2011 was in any way designated as either: (i) red sticker or dot Merchandise, or (ii) yellow sticker or dot Merchandise, the "Retail Value" shall mean 25% of the Base Retail Value of such item.

(iii)     With respect to each item of Merchandise that at any time since September 15, 2011 was in any way designated as vault merchandise, the "Retail Value" shall mean 60% of the Base Retail Value of such item (provided however, that Merchant represents that not more than 8% of the Merchandise (by Retail Value) shall be vault merchandise).

(b)     Notwithstanding the provisions of Section 5.3(a) with respect to each item of Defective Merchandise, the parties shall mutually agree upon the "Retail Value" (and if Agent and Merchant are unable to mutually agree on the Retail Value of any one or more items of Defective Merchandise, such items shall be deemed "Excluded Defective Merchandise").

5.4     Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant Consignment Goods" at prices established by the Agent.  Agent and Merchant hereby agree that all tuxedo goods, bridal gown goods, and Excess Men's Suits shall be Merchant Consignment Goods under this Agreement. The Agent shall retain 20% of the sale price for all sales of Merchant Consignment Goods, and Merchant shall receive 80% of the receipts in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell merchandise not included as Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1     Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on October 13, 2011 (the "Sale Commencement Date").  Agent shall complete the Sale at each Store no later than December 31, 2011 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis at upon not less than five (5) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date").   In addition, the parties (in their respective sole discretions) may (at any time prior to December 1, 2011) mutually agree to extend the Sale Termination Date.

6.2     Vacating the Store.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Filene's. Agent's obligations to pay all Expenses for the Stores shall continue until the Vacate Date.

Section 7.  FF&E.

7.1     With respect to the furniture, fixtures, and equipment owned by Merchant and located at the Stores (but only to the extent designated by Merchant on or prior to the 7th day following the Sale Commencement Date for sale) (the "Owned FF&E"), Agent shall sell the Owned FF&E, and Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; provided however Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between Merchant and Agent promptly following Merchant's designation of the Owned FF&E ("FF&E Expenses").  At the conclusion of the Sale Term, Agent may abandon, in place, any unsold Owned FF&E, and any other furniture, fixtures, and equipment located at the Stores.

7.2     With respect to the furniture, fixtures, and equipment owned by Merchant and located at Merchant's Columbus store (the "Columbus Store FF&E") (which for purposes of the avoidance of doubt is not otherwise included in the Sale contemplated by this Agreement), Agent shall sell the Columbus Store FF&E, and Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds (net only of sales taxes) from the sale of any Columbus Store FF&E; provided however Merchant shall be responsible for the payment of all expenses incurred in connection with the disposition of the Columbus Store FF&E.  At the conclusion of the Sale Term, Agent may abandon, in place, any unsold Columbus Store FF&E.

Section 8.    Conduct of the Sale.

8.1     Rights of Agent.  Agent shall be permitted to conduct the Sale as a "sale on everything" or similar themed sale throughout the Sale Term (provided however that Agent shall not advertise the sale as a "going out of business" or "store closing" sale unless Agent elects to do so in its sole discretion, in which case Agent shall be obligated to comply with (and indemnify Merchant in the event of its failure to comply with) applicable "going out of business" laws in connection with Agent's use of either the "going out of business" or "store closing" theme in Agent's advertising of the Sale).  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement.  In addition to any other rights granted to Agent hereunder in conducting the Sale the Agent, in the exercise of its reasonable discretion shall have the right:

(a)     to establish Sale prices and Store hours;

(b)     except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing supplies located at the Store, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Store, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(c)     (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process payroll, perform MIS, reconcile cash and inventories, process and report data, and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d)     to establish and implement advertising, signage and promotion programs consistent with the "sale on everything" or similar theme including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers (provided however that Agent shall be obligated to comply with (and indemnify Merchant in the event of its failure to comply with) applicable state and local health and safety laws in connection with Agent's use of exterior banners and signwalkers);

(e)     to transfer Merchandise between and among the Stores; provided, however, the Agent shall not transfer Merchandise between and among Stores until the Inventory Taking at the transferring and receiving Stores have been completed; and

(f)     subject to the provisions of Section 8.10 below, to include Additional Agent Merchandise in the Sale.

8.2     Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.  Except as to coupons related to Merchant's Membership Program as provided for in Section 8.6(b) below, Agent shall not accept or honor any coupons during the Sale Term. The Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

8.3     Sales Taxes.

(a)     During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor.

8.5     Returns of Merchandise.  Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect as of the date such item

was purchased.  If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its otherwise "Retail Value," multiplied by the inverse of the then prevailing Sale discount.  The aggregate Retail Value of the Merchandise shall be increased by the adjusted Retail Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5).  In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during the weekly sale reconciliation provided for in Section 8.7.  Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of Merchandise, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6    <u>Gift Certificates; Membership Program</u>.

(a)    During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar Merchandise credits issued by Merchant (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the weekly sale reconciliation provided for in Section 8.7.  Agent shall not sell any Gift Certificates.

(b)    During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons ("Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis.  To the extent the customer elects the applicable Merchant Discounts, then Merchant shall reimburse Agent for the differential between the discount received under the Membership Program and the then-prevailing Sale discounts being offered by Agent.

(c)    Merchant shall reimburse Agent in cash for the value of any discounts afforded customers in connection with the use during the Sale of Merchant's coupons and/or Merchant's other Membership program benefits ("Membership Program").   During the Sale Term, customers may elect to take advantage of Merchant's Membership Program benefits or the then-prevailing Sale discounts, but not both on a cumulative basis.

8.7    <u>Sale Reconciliation</u>.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, and Sharing Amounts, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "<u>Weekly Sale Reconciliation</u>").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "<u>Final Reconciliation</u>"), the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation, Agent shall pay to Filene's, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.

8.8    <u>Force Majeure</u>.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; <u>provided</u>, <u>however</u>, that (i) the proceeds of any insurance

attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

        8.9    <u>Right to Monitor</u>.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

        8.10    <u>Additional Agent Merchandise</u>.

        (a)    Set forth on <u>Exhibit 8.10(a)</u> is Agent's preliminary Additional Agent Merchandise purchasing plan, which Merchant has approved and which is subject to modification by Agent, in the exercise of Agent's reasonable discretion, from time to time from and after the date hereof. Subject to compliance with applicable law, Agent shall, at Agent's sole cost and expense, supplement the Merchandise in the Stores with goods of like kind and quality as is customarily sold in the Stores (the "Additional Agent Merchandise").  Sales of Additional Agent Merchandise shall be run through Merchant's cash register systems; provided however Agent shall mark the Additional Agent Merchandise using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Agent Merchandise from the sale of Merchandise.  Merchant and Agent agree that the transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  In furtherance of the foregoing, the parties shall enter into a Consignment Agreement in substantially the form attached hereto as <u>Exhibit 8.10(b)</u>.  At all times and for all purposes, the Additional Agent Merchandise and their proceeds shall be the exclusive property of Agent, and no other person or entity (including without limitation Merchant, Lender, or any third person claiming a security interest in Merchant's property) shall have any claim against any of the Additional Agent Merchandise or their proceeds.  The Additional Agent Merchandise shall at all times remain subject to the exclusive control of Agent, and Agent shall, as an Expense of the Sale, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard thereto with Agent's insurers.

        (b)    In addition to all other compensation due to Agent under this Agreement, Merchant shall pay Agent an "Agent's Supplemental Additional Merchandise Fee" equal to seven and one-half percent (7.5%) of the actual cost of goods of the Additional Agent Merchandise sold pursuant to this Agreement (including without limitation Agent's actual freight costs associated with the Additional Agent Merchandise).  Agent covenants to Merchant that Agent shall not add any "lift" to its cost of goods of the Additional Agent Merchandise.  Merchant shall pay Agent the Agent's Supplemental Additional Merchandise Fee in connection with each Weekly Sale Reconciliation with respect to purchases of Additional Agent Merchandise sold by Agent during each then prior week (or at such other mutually agreed upon time in the case of Additional Agent Merchandise sold pursuant to Section 3.2(b) above).

        8.11    <u>Collective Bargaining Agreements; Leases</u>.  Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements or leases/occupancy agreements; except to the extent identified by Merchant and set forth on <u>Exhibit 8.11</u> or <u>Exhibit 11.1(m)</u> attached hereto.

Section 9.  <u>Employee Matters</u>.

9.1      Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations, and Merchant's applicable collective bargaining agreements.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date.  Merchant shall not transfer any Retained Employee during the Sale Term without Agent's prior consent.

9.2      Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto, provided, however, that, in the event that Agent determines to cease using an employee "for cause" (which shall consist of dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided further, however, that Agent shall immediately notify Merchant of the basis for such "cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall rest solely with Merchant).

9.3      Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4      Employee Retention Bonuses.  Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion.  The amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.  Conditions Precedent and Subsequent.

(a)     The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(i)     All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)    Lender has executed this Agreement (with all Exhibits attached hereto).

(b)     The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(i)     All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)    Lender has executed this Agreement (with all Exhibits attached hereto).

Section 11.  Representations, Warranties and Covenants.

11.1    Merchant's Representations, Warranties and Covenants. Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)     Merchant (i) is a corporation (in the case of Syms) or a limited liability company (in the case of Filene's) duly organized, validly existing and in good standing under the laws of the State of its incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     The Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder.  Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

(c)     Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of

all liens, claims and encumbrances of any nature (other than the lien of the Agent hereunder and the lien of the Lender).  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds).

(d)     Merchant has maintained its pricing files (including without limitation the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale markdowns, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant has, and shall continue to, ticket or mark all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and at Merchant's other stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since September 15, 2011, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale from the Merchandise prior to the Sale Commencement Date, and has not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     Since September 15, 2011, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; and has operated the Stores in all material respects in a manner consistent with Merchant's other stores; provided however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the date hereof.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for the conduct of the Sale at the Store. Throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(i)     Merchant had paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Since September 15, 2011, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without

limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)     Since September 15, 2011, Merchant has operated, and through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business and consistent with Merchant's other stores; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business (and Merchant's other stores); (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; (v) replenishing the Stores in the ordinary course of business (and consistent with Merchant's other stores).

(l)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores.

(m)     Each of Merchant's collective bargaining agreements affecting any of its employees who will be providing services in connection with this Agreement are identified on <u>Exhibit 11.1(m)</u>.  Merchant has provided representatives of Agent with access to (and the opportunity to copy) all such agreements, and all amendments, modifications, and supplements thereto.

(n)     To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

11.2     <u>Agent's Representations,</u> Warranties <u>and Covenants</u>.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided

herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)  No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 12.  Insurance.

12.1  Merchant's Liability Insurance.  Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.

12.2  Merchant's Casualty Insurance.  Merchant will provide throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, plus any self-insurance amounts and the amount of any deductible or self-insured retention paid by Merchant shall constitute Proceeds hereunder.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured (as its interest may appear), in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3  Agent's Insurance.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as additional insureds with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as additional insureds, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).

12.4     Worker's Compensation Insurance.  Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.  Indemnification.

13.1     Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); and (vi) the gross negligence (including omissions) or willful misconduct of Merchant, or its officers, directors, employees, agents or representatives.

13.2     Agent Indemnification.  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; (iv) any consumer warranty or products liability claims relating to Additional Agent Merchandise; and (v) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.  Defaults.  The following shall constitute "Events of Default" hereunder:

(a)     The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof (or one (1) business day in the event of a failure by Merchant to perform its obligations under Section 3.3(c)(iv) above);

(b)     Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party; or

(c)     The Sale is terminated or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

Section 15. <u>Miscellaneous</u>.

15.1    <u>Notices</u>.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

|  |  |
|---|---|
| If to the Agent: | GORDON BROTHERS RETAIL PARTNERS, LLC |
|  | 101 Huntington Avenue, 10th Floor |
|  | Boston, MA  02199 |
|  | Attention: Michael Chartock |
|  | Tel: (617) 210-7116 |
|  | Fax: (617) 531-7906 |
|  | Email: mchartock@gordonbrothers.com |
|  |  |
| If to the Merchant: | SYMS CORP |
|  | FILENE'S BASEMENT, LLC |
|  | 1 Syms Way |
|  | Secaucus, NJ  07094 |
|  | Attention: Laura Brandt |
|  | Tel: (201) 902-9600 |
|  | Fax:  (201) 902-9270 |
|  | Email: laurabrandt@syms.com |
| If to the Lender: |  |
|  | Bank of America, N.A. |
|  | 100 Federal Street, 9th Floor |
|  | Boston, MA 02110 |
|  | Attention: Betsy A. Ratto |
|  | Tel: 617-434-4113 |
|  | Fax: 617-434-4339 |
|  | Email: betsy.ratto@baml.com |

15.2    <u>Governing Law/Exclusive Jurisdiction</u>.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions which would result in the application of the laws of another jurisdiction.  Should any claim or dispute arise in connection with this Agreement, then the adjudication of such claim or dispute, shall lie exclusively within the within the State of New York, and any proceeding to adjudicate such claim or dispute shall be brought before a court of competent jurisdiction within the State of New York.

15.3    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4     <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

15.5     <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6     <u>Bankruptcy Approval/Assumption</u>.  In the event that Merchant becomes subject to the jurisdiction of any United States Bankruptcy Court, at the request of Agent, Merchant shall, as part of its first day orders or as soon as practicable thereafter (but in no event later than five (5) business days after the date of the filing of the applicable petition in the applicable United States Bankruptcy Court) file a motion seeking to obtain an order from the United States Bankruptcy Court exercising jurisdiction over such Merchant approving this Agreement and authorizing the assumption thereof ("<u>Assumption Order</u>").  The Assumption Order shall be in form and substance reasonably acceptable to Agent.

15.7     <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; <u>provided</u>, <u>however</u>, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

15.8     <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

15.9     <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.10     <u>Wiring of Funds</u>.  All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; <u>provided</u>, <u>however</u>, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

15.11　　Currency.　All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

Section 16.　Agent's Security Interest.　Effective upon payment by Agent of the Initial Guaranty Payment and issuance of the Letter of Credit, Merchant hereby grants to Agent a security interest in and lien upon (i) the Merchandise (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, Credit Card Proceeds); (iv) the commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 hereof; and (vi) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount under Section 3.2(a) hereof, and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing, including, without limitation, any proceeds in the form of Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (all of which are collectively referred to herein as the "Agent Collateral") to secure the full payment and performance of all obligations of Merchant to Agent hereunder.

(a)　　The Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) subject to the acceptance for filing of an UCC-1 financing statement in the form attached with the Secretary of State for the State of New Jersey (in the case of Syms) and the Secretary of State for the State of Delaware (in the case of Filene's), perfected, and (iii) senior to all other liens and security interests, provided however, that, until the Merchant receives payment of the Guaranteed Amount, and the Letter of Credit to secure payment of Expenses due to Merchant hereunder, the security interest granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests of Lender in the Agent Collateral (other than the Additional Agent Merchandise in which Lender has no security interest or other lien) but solely to the extent and amount of the unpaid portion of the Guaranteed Amount and Expenses, and upon payment of the Guaranteed Amount and issuance of the Letter of Credit, any security interest or lien of the Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent.　Merchant shall cooperate with Agent with respect to all filings and other actions to the extent reasonably requested by Agent to ensure that Agent properly perfects the security interests and liens granted hereunder, including without limitation the execution and delivery by the Merchant, Lender and Agent of the Intercreditor Agreement.

(b)　　Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(c)　　In the event of a Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)　　As used herein, the following terms have the following respective meanings:

"Accounts" shall mean "accounts" within the meaning of Section 9-102(a)(2) of the Code and, to the extent not otherwise included therein, all Accounts, Contract Rights and accounts receivable; any other obligations or indebtedness owed to the Merchant; all rights of Merchant to receive any payments in money or kind; all guarantees of Accounts and security therefor; all cash or non-cash proceeds of all of the foregoing; all of the right, title and interest of Merchant in and with respect to the goods, services or other property which gave rise to or which secure any of the accounts and insurance policies and proceeds relating thereto, and all of the rights of the Merchant as an unpaid seller of goods or services, including, without limitation the rights of stoppage in transit, replevin, reclamation and resale and all of the foregoing, whether now existing or hereafter created or acquired.

"Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of New York.

"Contract" or "Contracts" shall mean all contracts, agreements, insurance policies, and other undertakings of any nature whatsoever pursuant to which the Merchant has entered into a sale or agreement to sell or provide goods or services now or in the future.

"Contract Rights", to the extent not included in the definition of Accounts in Section 2.1, shall mean all rights to payment or performance under a Contract not yet earned by performance and not evidenced by an instrument or chattel paper.

"Credit Card Proceeds" shall mean the Merchant's Accounts or Payment Intangibles arising from sales of Merchandise, Additional Agent Merchandise or Owned FF&E paid for by customers using credit cards.

"Deposit Accounts" shall mean "deposit accounts" within the meaning of Section 9-102(a)(29) of the Code, including, without limitation, any Designated Deposit Accounts (as defined in the Agency Agreement), the Concentration Accounts and Credit Agent Deposit Accounts (as those terms are defined in the Intercreditor Agreement) and any other deposit account holding Proceeds.

"General Intangibles" shall mean "general intangibles" within the meaning of Section 9-102(a)(42) of the Code to the extent they arise from the sale of goods or services or are used in connection with the production of the Merchandise and/or the Additional Goods, Payment Intangibles, and all choses in action, insurance proceeds, goodwill, patents, copyrights, trademarks, tradenames, customer lists, formulae, trade secrets, licenses, designs, computer software, research and literary rights now owned or hereafter acquired.

"Payment Intangible" shall have the meaning set forth in section 9-102(a)(61) of the Code.

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**Gordon Brothers Retail Partners, LLC**

By: _Richard Edwards_
Print Name and Title:
Richard Edwards
Principal 𝀡 Managing Director

**Syms Corp**

By:_____
Print Name and Title:

**Filene's Basement, LLC**

By: Syms Corp, its sole member

By:_____
Print Name and Title:

**Agreed and Accepted as to Sections
3.3, 8.3, 8.8, 8.10, and 16:
Bank of America, N.A.**

By: _____
Print Name and Title:

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**Gordon Brothers Retail Partners, LLC**

By:_____
Print Name and Title:

**Syms Corp**

By: _Marcy Syms_____
Print Name and Title: Marcy Syms, CEO

**Filene's Basement, LLC**

By: Syms Corp, its sole member

By: _Marcy Syms_____
Print Name and Title: Marcy Syms, CEO

**Agreed and Accepted as to Sections
3.3, 8.3, 8.8, 8.10, and 16:
Bank of America, N.A.**

By: _____
Print Name and Title:

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**Gordon Brothers Retail Partners, LLC**

By:_____
Print Name and Title:

**Syms Corp**

By:_____
Print Name and Title:

**Filene's Basement, LLC**

By: Syms Corp, its sole member

By:_____
Print Name and Title:

**Agreed and Accepted as to Sections
3.3, 8.3, 8.8, 8.10, and 16:
Bank of America, N.A.**

By:_____
Print Name and Title:

*Andrew Cerussi
Senior Vice President*

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 8.10(a) – Agent's Preliminary Additional Agent Merchandise Purchasing Plan.
Exhibit 8.10(b) – Form of Consignment Agreement.
Exhibit 8.11 – Identification of Leases/Occupancy Agreements.
Exhibit 11.1(m) – Identification of Collective Bargaining Agreements.

# SYMS | Filene's Basement
## Store List
## Exhibit 1

| Store No. | Store | Address | City | State | Zip Code | Telephone No. | Square Ft |
|---|---|---|---|---|---|---|---|
| 412 | Rockville | 11840 Rockville Pike | Rockville | MD | 20852 | 301.816.7805 | 38,257 |
| 416 | Arsenal Mall | 485 Arsenal Street | Watertown | MA | 02464 | 617.926.4474 | 33,889 |
| 419 | Northshore Mall | Rtes 114 and 128 | Peabody | MA | 01960 | 978.532.2400 | 44,434 |
| 457 | South Shore Plaza | 250 Granite St | Braintree | MA | 02184 | 781.849.0031 | 28,600 |
| 491 | Square One Mall | 1201 Broadway | Saugus | MA | 01906 | 781.231.8153 | 34,487 |

**5**

**SYMS | Filene's Basement**
**Merchandise Level Adjustment Schedule**
**Exhibit 3.1 (b)**

| Level | Adjustment | Guaranty |
|---|---|---|
| 14,000,000 | 0.35 | 35.4 |
| 13,875,000 | 0.35 | 35.8 |
| 13,750,000 | 0.35 | 36.1 |
| 13,625,000 | 0.35 | 36.5 |
| 13,500,000 | 0.30 | 36.8 |
| 13,375,000 | 0.30 | 37.1 |
| 13,250,000 | 0.30 | 37.4 |
| 13,125,000 | 0.30 | 37.7 |
| 13,000,000 | 0.25 | 38.0 |
| 12,875,000 | 0.25 | 38.3 |
| 12,750,000 | 0.25 | 38.5 |
| 12,625,000 | 0.25 | 38.8 |
| 12,500,000 | - | 39.0 |
| 11,500,000 | - | 39.0 |
| 11,375,000 | 0.28 | 38.7 |
| 11,250,000 | 0.28 | 38.4 |
| 11,125,000 | 0.28 | 38.2 |
| 11,000,000 | 0.28 | 37.9 |
| 10,875,000 | 0.28 | 37.6 |
| 10,750,000 | 0.30 | 37.3 |
| 10,625,000 | 0.30 | 37.0 |
| 10,500,000 | 0.30 | 36.7 |
| 10,375,000 | 0.30 | 36.4 |
| 10,250,000 | 0.30 | 36.1 |
| 10,125,000 | 0.33 | 35.8 |
| 10,000,000 | 0.33 | 35.4 |
| 9,875,000 | 0.33 | 35.1 |
| 9,750,000 | 0.33 | 34.8 |
| 9,625,000 | 0.33 | 34.4 |
| 9,500,000 | 0.37 | 34.1 |
| 9,375,000 | 0.37 | 33.7 |
| 9,250,000 | 0.37 | 33.3 |
| 9,125,000 | 0.37 | 33.0 |
| 9,000,000 | 0.37 | 32.6 |

*Adjustments between the above increments to be handled on a prorata basis.*

*Adjustments above $14.0 M and below $9.0 M to be mutually agreed upon by Merchant and Agent*

**Exhibit 3.4**

**Form of Letter of Credit**

**LETTER OF CREDIT**


Bank of America

100 Federal Street

Boston, MA 02109


Irrevocable Standby Letter of Credit Number:

Beneficiary: Syms Corp.

                                        Credit Number:
                                        Opener's Reference No:


Ladies and Gentlemen:

BY ORDER OF: Gordon Brothers Retail Partners, LLC


We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of Gordon Brothers Retail Partners, LLC for a sum or sums not exceeding a total of _____ _____ DOLLARS ($_____) available by your draft(s) at SIGHT on OURSELVES, effective immediately, and expiring at OUR COUNTERS in Boston, MA or New York, NY on _____ __, 2012, or such earlier date on which the Beneficiary shall notify us in writing that this Standby Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original Letter of Credit and a signed statement in the form attached hereto as <u>Exhibit A</u>, signed by Syms Corp. (the "Beneficiary")

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the Beneficiary in the form attached as <u>Exhibit B</u>.

If a drawing is received by _____ at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the account designated by Beneficiary, as directly below, in immediately available funds on the same Business Day. If however, a drawing is received by _____ after 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the account designated by Beneficiary in immediately available funds on the next Business Day.

As used in the Letter of Credit "Business Day" shall mean any day other than a Saturday, Sunday, or a day on which Banking Institutions in Massachusetts are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No._____, dated _____ of Bank of America, Scranton, PA."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 600."

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above-mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, Bank of America, 100 Federal Street, Boston, MA 02109, mentioning our reference number as it appears above.  Telephone inquiries can be made to Valerie DeLaura at (800) 370-7519.

Very truly yours,

_____

Authorized Official

TO IRREVOCABLE LETTER OF CREDIT NO._____

Re: Drawing for Amounts Due to:

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____(the "Letter of Credit").  The undersigned duly authorized officer of Syms Corp. (the "Beneficiary") in its capacity as the Beneficiary of the Letter of Credit hereby certifies to you that:

(i)     Gordon Brothers Retail Partners, LLC (the "Agent") has not made a payment when due of or for the Guaranteed Amount due by Agent to Syms Corp. (the "Merchant"), pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of October __, 2011 between Merchant on the one hand, and Agent, on the other ("Agency Agreement").

(ii)    Beneficiary, as Merchant's designee has given Agent five (5) business days written notice of Merchant's intention to draw on this Letter of Credit pursuant to the Notice provisions of the Agency Agreement.

(iii)    No Event of Default on the part of the Merchant under the Agency Agreement has occurred, exists or is continuing as of this date and no event now exists which solely with the passage of time or giving of notice or both would constitute an Event of Default on the part of Merchant under the Agency Agreement.

(iv)    The amount to be drawn is $_____ (the "Amount Owing")

(v)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the letter of credit, less any prior drawings, as of the date hereof.

(vi)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(vii)    In accordance with the terms of the letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account.

IN WITNESS WHEREOF, I have executed and delivered this letter as of this __ day of _____, 201_.

Very truly yours,
Syms Corp.


By:_____
Duly Authorized Officer
Print Name:

TO IRREVOCABLE STANDY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____(the "Letter of Credit").  The undersigned, duly authorized officer of Syms Corp., in its capacity as Beneficiary under this Letter of Credit, hereby confirm to you that the face amount of the Letter of Credit No. _____hereby shall be reduced from its original face amount to a new face amount of _____ DOLLARS ($_____).

     IN WITNESS WHEREOF, I have executed and delivered this certificate as of this ___ day of _____, 201_.

                Very truly yours,
                Syms Corp.

                By:_____
                Duly Authorized Officer
                Print Name:

**Filene's Basement**
**Occupancy Per Diem**
**Exhibit 4.1 ( c )**

| Store # | Store Name | Rent | CAM | Taxes | Utilities | Other | Total |
|---------|------------|------|-----|-------|-----------|-------|-------|
| 412 | Rockville | 1,902 | 214 | - | 385 | 411 | 2,912 |
| 416 | Arsenal | 10% Sales | 489 | - | 413 | 236 | 1,138 |
| 419 | North Shore Mall | 10% Sales | 827 | - | 365 | 223 | 1,415 |
| 457 | South Shore Plaza | 1,033 | 491 | - | 420 | 253 | 2,197 |
| 491 | Saugus | 2.5% Sales | 462 | - | 234 | 265 | 961 |
| | **Total** | **2,935** | **2,483** | **-** | **1,817** | **1,388** | **8,623** |

**Notes:**

*Percentage Rent schedule for Saugus is as follows: 2.5% of Sales up to $3.3M, 2.25% of Sales from $3.3M to $4.3 M, 2.0% of Sales from $4.3M to $5.3M.*

*"Other" includes (but is not limited to) HVAC, Storage Costs, Merchant's Association Dues and Repairs & Maintenance for building, machinary and equipment.*

*"Other" does not include Payroll, Travel, Credit Card Fees and Supplies.*

**Exhibit 5.1(a)**

**Inventory Taking Instructions**

Type of count

The counts will be at SKU/Retail level and counted by *RGIS* Inventory Service. In this type of count, the Inventory Service personnel should scan or key in the UPC/SKU, quantity and LOWEST TICKETED PRICE for each item. As per the Agency Agreement, some specific kinds of merchandise need to be specifically identified (see Exception Categories below).

We have set up the count to accept scanned bar code (UPC), keyed bar code (UPC) or SKU. RGIS will have a SKU validation file which will increase the accuracy of the count.

For purposes of the Agreement, "Base Retail Value" shall mean with respect to each item of Merchandise the lowest ticketed, marked, shelf, Merchandise File, or SKU/PLU file price for such item since September 1, 2011.

Staffing

The Agent will have at least one representative present at every count, and the Merchant will also have at least a store manager or asset protection manager present.

Controls

1. A primary focus of these counts is on ensuring the accuracy of the piece count. The Service should audit each of their inventory counters during the first hour of the count. This is done by having a Service supervisor testing each crew person by having him or her bring up on their machines the last ten items they counted. The SKU/UPC and quantity entered should exactly match the items on the shelf/rack. Counters who have any errors should be tested further, i.e. for more SKU's (another 20 or 30 pieces). If you feel the counter's error rate is unreasonably high, direct the Service to not let them key any more. They can be used to do bulk pre-counts, etc., or may even have to be sent home.

Taking counters off the count is YOUR call. Counters who are inaccurate can cost the company a lot of money, and it can cost additional money to recount every section that they counted. INSIST ON ACCURACY.

2. Take care not to count empty boxes. Open all packed away goods, over stock, and new receipts to count the goods inside. NEVER key from a pack away list.

3. Authorized agents of the Merchant and Agent must jointly agree upon any adjustment made to any area.

4. The Service is to furnish representatives of the Merchant and the Agent with a hard copy of the inventory (both units and area numbers) at the completion of the count.

5. Another good test for accuracy is to have the Service print out section detail for specific sections, which you can then use to compare to the merchandise on the shelf.

Cutoffs

   Make sure all goods in the store are received, processed, and out on the floor for the physical inventory wherever possible

Exception Categories

Filene's Basement uses a colored sticker system to indicate their clearance and markdown goods. It is IMPERATIVE that these goods are segregated by color and counted in their own range of areas. You should walk the store prior to the inventory and ensure all Area Tickets are numbered as follows:

| | |
|---|---|
| Red Star Goods | 4000-4999 |
| Purple Ticket Goods | 5000-5999 |
| Red Ticket Goods | 6000-6999 |
| Yellow Ticket Goods | 7000-7999 |
| Vault Merchandise | 8000-8999 |

All other colored ticketed or vault merchandise should be counted in areas 1-3999 with the exception of the Special Damage Areas listed below.

   Specific kinds of merchandise are identified in the Agency Agreement. It is very important to identify this merchandise and to use the designated areas when counting these goods.

   At the beginning of the count, the Agents and Merchant's representatives should walk the store to identify these pieces and remove them from the displays. After this is done, the Service will assign one counter to go around the store and key the exceptions into the correct areas as shown below. Make sure to mark these pieces by removing them from the display and placing them on the floor or in a shopping cart, so that the Service knows NOT to count the merchandise again with the regular areas. Try to use a different marking method for each type of exception merchandise (on the floor, in carts, etc.) so you can tell in what exception bucket the goods are to be counted.

   Excluded merchandise                    Area 9999

"Excluded Defective Merchandise" means any item of Defective Merchandise for which the parties cannot mutually agree upon a Retail Value.
   Physically remove these goods from the present location and put them in the back stockroom in a designated area, with the damages and defectives.
   Merchandise that will require additional labor in order to be sold (for example, watch batteries, kits which must be assembled before sale) is also excluded from the count.

Damaged and Defective Merchandise                    Areas 9925, 9950, 9975

"<u>Defective Merchandise</u>" means any item of Merchandise which is not new, finished, first-quality, saleable goods.  Examples of Defective Merchandise include but are not limited to goods which are damaged, defective, scratched, soiled, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, parts, items typically sold as a set which are incomplete, gift with purchase items, or out of date.

|            |         |
|------------|---------|
| Area 9925  | 25% Off |
| Area 9950  | 50% Off |
| Area 9975  | 75% Off |

As-Is Merchandise                                        Area 9997

All Merchandise identified and sold as "As-Is" Merchandise should be segregated and counted in area 9997.

All consignment goods in Bridal and Tuxedo should be counted in Areas 9800-9899.  These are NOT Merchandise of the sale and need to be clearly segregated and identified.

## DO NOT INVENTORY

Isolate and DO NOT INVENTORY the any gift cards or gift certificates from outside vendors.

DO NOT COUNT Fixtures or displays as merchandise

## POST COUNT

At the end of the count, please fax the RGIS timesheet as well as the last page of the F1 summary report (inclusive of all above exception areas) to 208-723-1007.  **NOTE: It is IMPERATIVE that the F1 summary report include the signature of BOTH the Filene's Basement representative and the Gordon Brothers Consultant on the totals page.**

Filene's Basement
Agent's Preliminary Additional Merchandise Purchasing Plan
Exhibit 8.10 (a)

| Category | % Total |
|---|---|
| Women's Tops | 19.2% |
| Women's Bottoms | 12.8% |
| Women's Accessories/Handbags | 8.0% |
| **Total Women's** | **40.0%** |
| Men's Tops | 9.6% |
| Men's Bottoms | 6.4% |
| Men's Belts/Ties/Accessories | 4.0% |
| **Total Men's** | **20.0%** |
| Kid's Tops | 4.8% |
| Kid's Bottoms | 3.2% |
| **Total Kids** | **8.0%** |
| **Home\*** | **32.0%** |

*Home will include blankets, throws, comforters, fragrance sets, toys and luggage.*

| | |
|---|---|
| **Total Additional Merchandise Plan** | **100%** |

**Exhibit 8.10(b)**

**Form of Consignment Agreement**

# CONSIGNMENT AGREEMENT

This CONSIGNMENT AGREEMENT (this "Agreement") is made as of October 12, 2011 by and among SYMS CORP, a New Jersey corporation ("Syms") and FILENE'S BASEMENT, LLC, a Delaware limited liability company ("Filene's" and together with Syms, jointly and severally, the "Consignee") and GORDON BROTHERS RETAIL PARTNERS, LLC, a Delaware limited liability company with a principal place of business at 101 Huntington Avenue, 10th Floor, Boston, MA 02199 ("GBRP" or "Consignor"). Capitalized terms used but not defined herein have the meanings given to such terms in the Agency Agreement as defined to below.

RECITALS:

WHEREAS, Consignor and Consignee are parties to that certain Agency Agreement, dated as of October __, 2011(the "Agency Agreement"), pursuant to which the Consignee retained Consignor as the agent for the Consignee with respect to the management and disposition of Merchandise and Owned FF&E in the context of a "sale on everything" or similar sales at certain of the Consignee's retail store locations identified therein,

WHEREAS, to secure their joint and several obligations under the Agency Agreement and this Agreement, pursuant to a certain Security Agreement dated as of October 12, 2011 (the "Security Agreement"), Syms and Filene's have granted to GBRP a security interest in and to, and collaterally assigned to the Secured Party the Collateral (as defined in the Security Agreement),

WHEREAS, the Agency Agreement provides that Consignor and Consignee will enter into a consignment agreement setting forth the terms and conditions under which the Consignor may supplement the Sale with Additional Agent Merchandise, and

WHEREAS, Consignor is willing to consign the Additional Agent Merchandise to Consignee as a true consignment pursuant to Article 9 of the Uniform Commercial Code as in effect in the State of New York from time to time (the "UCC"), on the terms and conditions set forth herein,

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties (including Syms and Filene's, jointly and severally) hereto agree as follows:

1. **Consigned Merchandise.** Consignor may (but shall not be required to), from time to time, deliver to Consignee on consignment such amounts of Additional Agent Merchandise (the "Consigned Merchandise") as may be determined by Consignor in its capacity as Agent, upon the terms and conditions set forth herein and in the Agency Agreement. The Consigned Merchandise shall be shipped by or on behalf of Consignor to Consignee's Stores listed on Exhibit 1 to the Agency Agreement, to be held for sale to customers during the Sale term in such Stores.

2. **Title.** Title to the Consigned Merchandise delivered to the Consignee shall at all times remain with Consignor until the time of Consignee's sale to its customers and Consignee shall hold Consigned Merchandise as a bailee for the Consignor. Consignee hereby acknowledges that some of the Consigned Merchandise may constitute goods received by the Consignor on consignment from one or more suppliers (each, a "Supplier") for the purpose of consigning such Consigned Merchandise to the Consignee, and Consignee agrees that the Consignor shall be deemed to be the consignor of all Consigned Merchandise provided by Consignor or any Supplier to Consignee, and Consignor shall be entitled to all rights and remedies of a consignor under applicable law with respect to all such Consigned Merchandise (including, without limitation, those of a secured party under the UCC).

3.    Risk of Loss and Insurance.

(a)    Consignor shall be responsible for risk of loss and damage to all Consigned Merchandise from any and all causes, except to the extent any such loss or damage is due to any grossly negligent act or omission or willful misconduct of Consignee, or any of their affiliates, employees, officers, directors, agents, predecessors, successors and assigns.

(b)    Consignor shall insure (or cause to be insured) the Consigned Merchandise in accordance with the terms and conditions of the Agency Agreement, the cost of which insurance shall be borne by the Consignor as an Expense of Sale.  Consignee warrants that it shall promptly pursue on Consignor's behalf all remedies and payments in the event of a complete or partial loss and shall immediately notify Consignor of any loss and will cooperate with Consignor in obtaining, maintaining and if necessary recovering under any insurance policy.  In the event of a loss that is not covered by the insurance, or to the extent the proceeds received from the insurance carrier is less than the value of the Consigned Merchandise that was damaged or lost, Consignee shall have no obligation to Consignor for such shortfall.

4.    Inspection.    Consignee shall permit Consignor and the representatives of Consignor to inspect Consignee's books and records relating to the Consigned Merchandise and to make abstracts or reproductions of such books and records.  In addition, upon reasonable notice to Consignee and during normal business hours, Consignor shall have the right to conduct a physical inventory of the applicable Consigned Merchandise on the premises of any Store.

5.    Representations, Warranties and Covenants of Consignee.  Consignee represents and warrants to Consignor that:

(a)    no party has a security interest in Consignee's goods other than the parties listed on Exhibit A attached hereto and made a part hereof; and any time any additional creditor claims, or could claim, any interest, security interest, lien or any other encumbrance in or on any of Consignee's goods, Consignee shall promptly (but in any event not later than three (3) days after Consignee becomes aware of any such additional creditor) update Exhibit A to include any such additional creditors;

(b)    except with respect to Consignor's continuing consignment and security interests in the Consigned Merchandise, Consignee shall not hereafter permit any other security interest or other lien or encumbrance to attach to the Consigned Merchandise at any time; and

(c)    Consignee's exact legal name and jurisdiction of incorporation or formation is as set forth in the preamble hereto; and Consignee shall deliver to Consignor at least thirty (30) days' prior written notice of any change in the name, jurisdiction or corporate form of Consignee.

6.    True Consignment; UCC.

(a)    The parties hereto intend and agree that this Agreement creates a true consignment of the Consigned Merchandise and is not an arrangement intended to create security for an obligation, provided, however, the parties acknowledge and agree that the interest of the Consignor in the Consigned Merchandise is a purchase money security interest as provided under Article 9-103(d) of the UCC.

(b)    In the event that the arrangements hereunder are determined to be an arrangement for security or otherwise not to be a true consignment, to secure the prompt and punctual payment for the Consigned Merchandise and any other obligations hereunder or under the Agency Agreement, whenever

incurred, Consignee hereby grants to the Consignor a continuing security interest in all of its right, title and interest, if any, in (i) the Consigned Merchandise, whether now or hereafter existing, and (ii) and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of the foregoing, including, without limitation, any proceeds in the form of Credit Card Proceeds (as defined in the Security Agreement), Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (all of which are collectively referred to herein as the "Collateral").

(c) Consignor is hereby authorized to file and/or record UCC-1 financing statements and such other financing statements or documents as Consignor may reasonably deem necessary or appropriate to perfect its interests in the Consigned Merchandise and to take such other actions as may reasonably be deemed appropriate by Consignor to create, establish, perfect, record or give notice of Consignor's title to, and interest in, the Consigned Merchandise, and to take such other steps as may be reasonably deemed by Consignor to be appropriate to secure Consignor's rights in and to the Consigned Merchandise. Any costs associated with such filings shall be paid by Consignee. Throughout the term of this Agreement, Consignor shall have all rights and remedies afforded by law with respect to the Consigned Merchandise, including, without limitation, those of a secured party under the UCC and any rights and remedies specified herein. Consignee shall not contest the validity, perfection, priority or enforceability of the ownership by Consignor of the Consigned Merchandise or any lien or security interest of Consignor therein.

(d) Nothing contained in this section 6 is intended to conflict with the true consignment nature of this Agreement with respect to the Consigned Merchandise.

7. Payment. All payments and reconciliations between the parties in respect of the Consigned Merchandise shall be made in accordance with the terms of the Agency Agreement.

8. Indemnification. Consignor hereby agrees to indemnify Consignee and to hold Syms and its affiliates, employees, officers, directors, agents, predecessors, successors and assigns harmless from and against any and all claims, suits, liability, loss, judgments and expenses (including reasonable attorneys' fees) that any such Consignee may suffer or be or become obligated to pay to third parties arising out of (i) the infringement of any patent, trademark, copyright or other proprietary rights of third parties by Consignor or its Supplier(s) in the design, manufacture, use, promotion or sale of the Consigned Merchandise, (ii) any false or misleading labeling or other deceptive advertising practices alleged by third parties to have been employed by Consignor or its Supplier(s) in connection with the Consigned Merchandise, or (iii) the color, or quality of the materials or workmanship utilized in the manufacture of the Consigned Merchandise being other than as represented by Consignor and/or its Supplier(s). Consignor agrees further that it will carry liability insurance in such amounts as would be carried by a reasonable businessperson under like circumstances so as to fulfill its obligations hereunder, and that it will deliver to Syms promptly after execution of this Agreement, a certificate of insurance evidencing such coverage which each of the Consignees, as applicable, as additional insured thereunder. Consignor further affirms that it is in compliance, and will use its best efforts to continue to comply, with all applicable requirements of (a) the U.S.A. Patriot Act of 2001 and (b) fair labor practice laws in the country where Consignor manufactures or from which it acquires or imports its Consigned Merchandise, including, but not limited to, laws against child or forced labor and unsafe working conditions. This Section 7(a) is intended solely to allocate potential liability between the parties hereto and is not to be construed as any indication of any obligation or liability of Consignor to any parties other than Syms and its affiliates.

9. Bankruptcy Approval/Assumption. In the event that Consignee becomes subject to the jurisdiction of any United States Bankruptcy Court, at the request of Consignor, Consignee shall, as part of its first day orders or as soon as practicable thereafter (but in no event later than five (5) business

days after the date of the filing of the petition in the applicable United States Bankruptcy Court) file a motion seeking to obtain an order from the United States Bankruptcy Court exercising jurisdiction over Consignee approving this Agreement and authorizing the assumption thereof ("Assumption Order"). The Assumption Order shall be in form and substance reasonably acceptable to Consignor.

10.     Conditions Precedent.   Consignor's obligations hereunder are subject to the satisfaction or waiver by Consignor of the following conditions precedent:

(a)     Consignor shall have received evidence reasonably satisfactory to it that the creditors of Consignee listed on Exhibit A hereto have received Consignor's notice to them of the consignment of the Consigned Merchandise under this Agreement;

(b)     All financing statements reasonably required by Consignor under Section 6 shall have been filed and become effective; and

(c)     Consignee, the agent for Consignee's senior revolving credit lenders (the "Credit Agent"), and Consignor shall have entered into an agreement in form and substance reasonably satisfactory to Consignor, providing for, among other things, the Credit Agent's (i) acknowledgement of the Consignor's title and security interests in the Consigned Merchandise, (ii) agreement that any lien or security interest of the Credit Agent does not and shall not at any time extend to any Consigned Merchandise or any proceeds thereof, and (iii) consent to this Agreement and the transactions contemplated hereunder and under the Agency Agreement.

11.     Events of Default.   The following shall be Events of Default for purposes of this Agreement provided that, if an Event of Default results from noncompliance with this Agreement, such noncompliance continues for a period of five (5) days after receipt by Consignee of written notice thereof from Consignor:

(a)     The occurrence of an Event of Default under the Agency Agreement;

(b)     Consignee fails to comply in any material respect with any obligation of Consignee set forth in this Agreement (other than those referenced in subparagraph (a) above);

(c)     Consignee shall (i) apply for, consent to, or suffer the appointment of a custodian, receiver, trustee or liquidator of it or any of its property, (ii) admit in writing its inability to pay its or debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) file, or have filed against it, a petition for relief under Title 11 of the United States Code, or (v) file, or have filed against it, a petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, which event prevents the Consignor from conducting, or materially interferes with the Consignor's conducting of, the Sale under the Agency Agreement;

(d)     An order, judgment or decree shall be entered, without the application, approval or consent of Consignee, or by any court of competent jurisdiction, approving a petition seeking reorganization of Consignee or appointing a custodian, receiver, trustee or liquidator of Consignee, or of all or a substantial part of the assets of Consignee, which order, judgment or decree prevents the Consignor from conducting, or materially interferes with the Consignor's conducting of, the Sale under the Agency Agreement.

12.     Term and Termination.

(a)  Term.  Subject to the satisfaction or waiver in writing by Consignor of the conditions precedent set forth in Section 10 hereof, the term of this Agreement shall commence upon the date first written above and shall terminate upon the earlier of termination of the Agency Agreement or termination pursuant to Section 12(b) hereof.

(b)  Termination.

(i)  Termination For Cause.  In the event that any Event of Default set forth in Section 11 hereof occurs, this Agreement shall immediately terminate upon receipt by Consignee of Consignor's written notice of such termination. In the event of any such termination under this Section 12(b)(i), in addition to and not in limitation of any of Consignor's rights under the UCC:

  A.  Consignee shall not be permitted to sell to third parties or purchase for its own account any Consigned Merchandise then in its possession and Consignor shall be provided access to the Stores and shall, at Consignor's request, together with Consignee, segregate Consigned Merchandise in Consignee's possession and deliver such Consigned merchandise to a location designated by the Consignor;

  B.  All Proceeds from the Sale of Consigned Merchandise not otherwise returned as provided above shall be remitted in accordance with the terms of the Agency Agreement.

(ii)  Exception upon Written Consent.  Notwithstanding the immediately preceding Sections 11(b)(i) and (b)(ii), upon written consent of Consignor and upon such terms as may be agreed upon, Consignee may purchase such items of Consigned Merchandise in its possession as of the date of termination to which Consignor consents in writing.  Any Consigned Merchandise not timely returned as required by the terms hereof and which Consignor has not permitted to be purchased by Consignee shall remain the property of Consignor and shall be returned promptly upon request therefor.

(iii)  Additional Termination Obligations.

  A.  Termination of this Agreement shall terminate Consignor's obligation to supply Consigned Merchandise pursuant to this Agreement;

  B.  Subject to the limitations set forth in Section 4.1 of the Agency Agreement, all costs and expenses (including reasonable fees and disbursements of legal counsel and other third party experts employed or retained by Consignor) incurred by Consignor in connection with, arising out of, or in any way related to the protection, preservation, exercise or enforcement by Consignor of any of its rights or remedies under or related to this Agreement or the obligations created hereunder shall constitute an Expense under the Agency Agreement; and

  C.  Upon termination of any agreement between Consignor and a Supplier or a demand by such Supplier that the goods received by Consignor from such Supplier be returned to such Supplier, or if Consignor reasonably believes that the Consigned Merchandise or its interest therein are in

jeopardy or subject to a potential loss, Consignor shall have the right to demand immediate return of the applicable Consigned Merchandise, and Consignee shall immediately return to Consignor, all applicable Consigned Merchandise. The cost of returning such Consigned Merchandise shall constitute an Expense under the Agency Agreement, provided however, to the extent that Consignor or Supplier have been reimbursed for all or a portion of the costs of such Consigned Merchandise so returned, such amounts shall be returned to Consignee, and shall be excluded from the Expenses calculation for purposes of calculating whether any Sharing Amount is due Consignor.

13. _Independent Contractor_. Nothing contained herein shall be deemed to create any relationship between Consignor and Consignee other than that of an independent contractor. It is stipulated that the parties are not partners or joint venturers.

14. _Further Assurances_. Consignee agrees that from time to time it will, promptly upon the reasonable request of the Consignor, cooperate with and assist Consignor with respect to the transactions contemplated by this Agreement take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable law, and execute and deliver such documents and other papers, as may be reasonably requested by Consignor in order to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement and the Agency Agreement, including, without limitation, to perfect, continue the perfection of, or protect the priority of Consignor's consignment interest and security interest in the Consigned Merchandise, to protect the Consigned Merchandise against the rights, claims, or interests of third Persons (other than any such rights, claims or interests created or arising through Consignor) or to otherwise effect the purposes of this Agreement the costs of which shall be borne by Consignee as an Expense under the Agency Agreement.

15. _Miscellaneous_.

(a) _Notices_. Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

In the case of Consignor:

Gordon Brothers Retail Partners, LLC
101 Huntington Avenue,
10th Floor Boston, MA 02199
Attention: Michael Chartock
Fax: 617-531-7906
Email: mchartock@gordonbrothers.com

With a copy to:

Goulston and Storrs
400 Atlantic Avenue,
Boston, MA 02110
Attention: James F. Wallack, Esq.
Fax: 617- 574-7646
Email: jwallack@goulstonstorrs.com

In the case of Consignee:

> Syms Corp.
> Filene's Basement, LLC
> 1 Syms Way
> Secaucus, NJ 07094
> Attention: Laura Brandt
> Tel: (201) 902-9600
> Fax: (201) 902-9270
> Email: laurabrandt@syms.com

Notices shall be deemed to have been duly given on the date of service if served personally on the party (including, without limitation, service by overnight courier service) to whom notice is to be given; on the third day after mailing if mailed to the party to whom notice is to be given by prepaid registered or certified mail to the address set forth above; or on the date of transmission if sent by facsimile to the facsimile number set forth above, which facsimile is confirmed by a machine generated confirmation. Any party may change its address for purposes of this paragraph by giving the other parties written notice of the new address in the manner set forth above.

(b)     Governing Law/Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions which would result in the application of the laws of another jurisdiction. Should any claim or dispute arise in connection with this Agreement, then the adjudication of such claim or dispute, shall lie exclusively within the within the State of New York, and any proceeding to adjudicate such claim or dispute shall be brought before a court of competent jurisdiction within the State of New York.

(c)     Severability.  In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

(d)     Entire Agreement; Conflict.  This Agreement (together with the Agency Agreement and the Security Agreement) constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by Consignee and Consignor.  Consignee hereby agrees to be bound by and subject to the terms and conditions of the Agency Agreement which relate to the Additional Agent Merchandise, which terms and conditions are incorporated herein by reference.  In the event of any conflict between the terms of this Agreement and the terms of the Agency Agreement, the terms of the Agency Agreement shall control.

(e)     Assignment.  No party hereto may assign this Agreement without the express written consent of the other parties.  This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

(f)     Modification, Amendment, Supplement or Waiver.  No modification or amendment of this Agreement or any of its provisions shall be binding upon the parties hereto unless made in writing and duly signed by both parties. A failure or delay of either party to this Agreement to enforce, at any time, any of the provisions of this Agreement, to exercise any option which is herein

provided or to require at any time performance of any of the provisions hereof shall in no way be construed to be a waiver of such provision of this Agreement.

(g)     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts. Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.   This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.   At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.   No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.   In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

*[Signature pages follow]*

SYMS CORP


By: _____
Name:
Title:




FILENE'S BASEMENT, LLC
By Syms Corp., its sole member,


By: _____
Name:
Title:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name:  Richard P. Edwards
Title:    Principal and Managing Director

EXHIBIT A


List of Creditors


Bank of America, N.A.
100 Federal Street, 9th Floor
Boston, MA 02110
Attention: Betsy A. Ratto
Tel: 617-434-4113
Fax: 617-434-4339
Email: betsy.ratto@baml.com

**Exhibit 8.11**

**Store Leases**

Lease between Braintree Property Associates, LP and Filene's Basement, LLC f/k/a SYL, LLC for the Premises located at South Shore Plaza, Braintree, MA dated January 1984 and as modified from time to time.

Lease between North Shore Mall Limited Partnership and Filene's Basement, LLC f/k/a SYL, LLC for the Premises located at North Shore Mall, Peabody, MA dated May 1992 and as modified from time to time.

Lease between Mayflower Square One, LLC and Filene's Basement, LLC f/k/a SYL, LLC for the Premises located at Square One Mall, Saugus, MA dated March 1978 and as modified from time to time.

Lease between SPG Arsenal, LP and Filene's Basement, LLC f/k/a SYL, LLC for the Premises located at Arsenal Mall, Watertown, MA dated February 1993 and as modified from time to time.

Lease between Federal Realty Investment Trust and Filene's Basement, LLC f/k/a SYL, LLC for the Premises located at 11800-11858 Rockville Pike, Rockville, MD dated September 2004 and as modified from time to time.

**Exhibit 11.1(m)**

**Collective Bargaining Agreement**


Collective Bargaining Agreement between Local 1102 RWDSU UFCW and Filene's Basement, LLC dated June 2010.

**FORM OF UCC-1 FINANCING STATEMENT**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

> Stacey Mordas
> Goulston & Storrs, P.C.
> 400 Atlantic Avenue
> Boston, MA 02110-3333

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Filene's Basement, LLC | | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1 Syms Way | Secaucus | NJ | 07094 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|
| | | limited liability | Delaware | 2109715 | ☐ |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|
| | | | | | ☐ |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Gordon Brothers Retail Partners, LLC | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 101 Huntington Avenue, 10th Floor | Boston | MA | 02199 | USA |

4. This FINANCING STATEMENT covers the following collateral:

(i) all goods constituting Merchandise (ii) all goods constituting the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, Credit Card Proceeds as such term is defined in the Security Agreement); (iv) the commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 of the Agency Agreement; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 of the Agency Agreement; and (vi) any Sharing Amount and all products, proceeds, substitutions, and accessions, but only up to the amount of Secured Party's percentage of such Sharing Amount under Section 3.2(a) of the Agency Agreement, and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing, including, without limitation, any proceeds in the form of Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (as each such term is defined in the Security Agreement).

For purposes hereof:

"Agency Agreement" means that certain Agency Agreement dated as of October 12, 2011, entered into by and between the Secured Party and the Debtor hereinafter, as may be amended, modified, and/or restated from time to time. All capitalized terms not otherwise defined herein shall have the meaning set forth in the Agency Agreement.

"Security Agreement" means that certain Security Agreement dated as of October 12, 2011 entered into by and between the Secured Party and the Debtor.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

file with: Secretary of State, Delaware                    (04198.0089)

**FILING OFFICE COPY** — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

NATUCC1 - 5/4/01 C T System Online

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Stacey Mordas
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Syms Corp. | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1 Syms Way | Secaucus | NJ | 07094 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | corporation | New Jersey | 0100199752 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Gordon Brothers Retail Partners, LLC | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 101 Huntington Avenue, 10th Floor | Boston | MA | 02199 | USA |

4. This FINANCING STATEMENT covers the following collateral:

(i) all goods constituting Merchandise (ii) all goods constituting the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, Credit Card Proceeds as such term is defined in the Security Agreement); (iv) the commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 of the Agency Agreement; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 of the Agency Agreement; and (vi) any Sharing Amount and all products, proceeds, substitutions, and accessions, but only up to the amount of Secured Party's percentage share of such Sharing Amount under Section 3.2(a) of the Agency Agreement, and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing, including, without limitation, any proceeds in the form of Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (as each such term is defined in the Security Agreement).

For purposes hereof:

"Agency Agreement" means that certain Agency Agreement dated as of October 12, 2011, entered into by and between the Secured Party and the Debtor hereinafter, as may be amended, modified, and/or restated from time to time. All capitalized terms not otherwise defined herein shall have the meaning set forth in the Agency Agreement.

"Security Agreement" means that certain Security Agreement dated as of October 12, 2011 entered into by and between the Secured Party and the Debtor.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

file with: Secretary of State, Delaware                    (04198.0089)

**FILING OFFICE COPY** — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

NATUCC1 - 5/4/01 C T System Online

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Stacey Mordas
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only <u>one</u> debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Filene's Basement, LLC | | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1 Syms Way | Secaucus | NJ | 07094 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | limited liability | Delaware | 2109715 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only <u>one</u> debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only <u>one</u> secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Gordon Brothers Retail Partners, LLC | | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 101 Huntington Avenue, 10th Floor | Boston | MA | 02199 | USA |

4. This FINANCING STATEMENT covers the following collateral:

(i) all goods constituting the Additional Agent Merchandise and all goods constituting Consigned Goods (as defined in the Consignment Agreement, and with the goods constituting the Additional Agent Merchandise, collectively the "Consigned Goods") at any time consigned to the Debtor pursuant to the Agency Agreement or the Consignment Agreement; (ii) all Proceeds relating to the Consigned Goods (including, without limitation, Credit Card Proceeds as such term is defined in the Security Agreement); and (iii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing, including, without limitation, any proceeds in the form of Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (as each such term is defined in the Security Agreement).

For purposes hereof:

"Agency Agreement" means that certain Agency Agreement dated as of October 12, 2011, entered into by and between the Secured Party and the Debtor, as may be amended, modified, and/or restated from time to time. All capitalized terms not otherwise defined herein shall have the meaning set forth in the Agency Agreement.

"Consignment Agreement" means that certain Consignment Agreement dated as of October 12, 2011, entered into by and between the Secured Party and the Debtor, as may be amended, modified, and/or restated from time to time.

"Security Agreement" means that certain Security Agreement dated as of October 12, 2011 entered into by and between the Secured Party and the Debtor, as may be amended, modified, and/or restated from time to time.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☒ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

file with: Secretary of State, Delaware          (04198.0031)

**FILING OFFICE COPY** — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

NATUCC1 - 5/4/01 C T System Online

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Stacey Mordas
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only <u>one</u> debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Syms Corp. | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1 Syms Way | Secaucus | NJ | 07094 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | corporation | New Jersey | 0100199752 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only <u>one</u> debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only <u>one</u> secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Gordon Brothers Retail Partners, LLC | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 101 Huntington Avenue, 10th Floor | Boston | MA | 02199 | USA |

4. This FINANCING STATEMENT covers the following collateral:

(i) all goods constituting the Additional Agent Merchandise and all goods constituting Consigned Goods (as defined in the Consignment Agreement, and with the goods constituting the Additional Agent Merchandise, collectively the "Consigned Goods") at any time consigned to the Debtor pursuant to the Agency Agreement or the Consignment Agreement; (ii) all Proceeds relating to the Consigned Goods (including, without limitation, Credit Card Proceeds as such term is defined in the Security Agreement); and (iii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing, including, without limitation, any proceeds in the form of Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (as each such term is defined in the Security Agreement).

For purposes hereof:

"Agency Agreement" means that certain Agency Agreement dated as of October 12, 2011, entered into by and between the Secured Party and the Debtor, as may be amended, modified, and/or restated from time to time. All capitalized terms not otherwise defined herein shall have the meaning set forth in the Agency Agreement.

"Consignment Agreement" means that certain Consignment Agreement dated as of October 12, 2011, entered into by and between the Secured Party and the Debtor, as may be amended, modified, and/or restated from time to time.

"Security Agreement" means that certain Security Agreement dated as of October 12, 2011 entered into by and between the Secured Party and the Debtor, as may be amended, modified, and/or restated from time to time.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☒ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

file with: Secretary of State, New Jersey                    (04198.0031)

**FILING OFFICE COPY** — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

NATUCC1 - 5/4/01 C T System Online

# CONSIGNMENT AGREEMENT

This CONSIGNMENT AGREEMENT (this "Agreement") is made as of October 12, 2011 by and among SYMS CORP, a New Jersey corporation ("Syms") and FILENE'S BASEMENT, LLC, a Delaware limited liability company ("Filene's" and together with Syms, jointly and severally, the "Consignee") and GORDON BROTHERS RETAIL PARTNERS, LLC, a Delaware limited liability company with a principal place of business at 101 Huntington Avenue, 10th Floor, Boston, MA 02199 ("GBRP" or "Consignor").  Capitalized terms used but not defined herein have the meanings given to such terms in the Agency Agreement as defined to below.

RECITALS:

WHEREAS, Consignor and Consignee are parties to that certain Agency Agreement, dated as of October 12, 2011(the "Agency Agreement"), pursuant to which the Consignee retained Consignor as the agent for the Consignee with respect to the management and disposition of Merchandise and Owned FF&E in the context of a "sale on everything" or similar sales at certain of the Consignee's retail store locations identified therein,

WHEREAS, to secure their  joint and several obligations under the Agency Agreement and this Agreement, pursuant to a certain Security Agreement dated as of October 12, 2011 (the "Security Agreement"), Syms and Filene's have granted to GBRP a security interest in and to, and collaterally assigned to the Secured Party the Collateral (as defined in the Security Agreement),

WHEREAS, the Agency Agreement provides that Consignor and Consignee will enter into a consignment agreement setting forth the terms and conditions under which the Consignor may supplement the Sale with Additional Agent Merchandise, and

WHEREAS, Consignor is willing to consign the Additional Agent Merchandise to Consignee as a true consignment pursuant to Article 9 of the Uniform Commercial Code as in effect in the State of New York from time to time (the "UCC"), on the terms and conditions set forth herein,

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties (including Syms and Filene's, jointly and severally) hereto agree as follows:

1.     Consigned Merchandise.  Consignor may (but shall not be required to), from time to time, deliver to Consignee on consignment such amounts of Additional Agent Merchandise (the "Consigned Merchandise") as may be determined by Consignor in its capacity as Agent, upon the terms and conditions set forth herein and in the Agency Agreement.  The Consigned Merchandise shall be shipped by or on behalf of Consignor to Consignee's Stores listed on Exhibit 1 to the Agency Agreement, to be held for sale to customers during the Sale term in such Stores.

2.     Title.  Title to the Consigned Merchandise delivered to the Consignee shall at all times remain with Consignor until the time of Consignee's sale to its customers and Consignee shall hold Consigned Merchandise as a bailee for the Consignor.  Consignee hereby acknowledges that some of the Consigned Merchandise may constitute goods received by the Consignor on consignment from one or more suppliers (each, a "Supplier") for the purpose of consigning such Consigned Merchandise to the Consignee, and Consignee agrees that the Consignor shall be deemed to be the consignor of all Consigned Merchandise provided by Consignor or any Supplier to Consignee, and Consignor shall be entitled to all rights and remedies of a consignor under applicable law with respect to all such Consigned Merchandise (including, without limitation, those of a secured party under the UCC).

3.    Risk of Loss and Insurance.

(a)    Consignor shall be responsible for risk of loss and damage to all Consigned Merchandise from any and all causes, except to the extent any such loss or damage is due to any grossly negligent act or omission or willful misconduct of Consignee, or any of their affiliates, employees, officers, directors, agents, predecessors, successors and assigns.

(b)    Consignor shall insure (or cause to be insured) the Consigned Merchandise in accordance with the terms and conditions of the Agency Agreement, the cost of which insurance shall be borne by the Consignor as an Expense of Sale.  Consignee warrants that it shall promptly pursue on Consignor's behalf all remedies and payments in the event of a complete or partial loss and shall immediately notify Consignor of any loss and will cooperate with Consignor in obtaining, maintaining and if necessary recovering under any insurance policy.  In the event of a loss that is not covered by the insurance, or to the extent the proceeds received from the insurance carrier is less than the value of the Consigned Merchandise that was damaged or lost, Consignee shall have no obligation to Consignor for such shortfall.

4.    Inspection.    Consignee shall permit Consignor and the representatives of Consignor to inspect Consignee's books and records relating to the Consigned Merchandise and to make abstracts or reproductions of such books and records.  In addition, upon reasonable notice to Consignee and during normal business hours, Consignor shall have the right to conduct a physical inventory of the applicable Consigned Merchandise on the premises of any Store.

5.    Representations, Warranties and Covenants of Consignee.  Consignee represents and warrants to Consignor that:

(a)    no party has a security interest in Consignee's goods other than the parties listed on Exhibit A attached hereto and made a part hereof; and any time any additional creditor claims, or could claim, any interest, security interest, lien or any other encumbrance in or on any of Consignee's goods, Consignee shall promptly (but in any event not later than three (3) days after Consignee becomes aware of any such additional creditor) update Exhibit A to include any such additional creditors;

(b)    except with respect to Consignor's continuing consignment and security interests in the Consigned Merchandise, Consignee shall not hereafter permit any other security interest or other lien or encumbrance to attach to the Consigned Merchandise at any time; and

(c)    Consignee's exact legal name and jurisdiction of incorporation or formation is as set forth in the preamble hereto; and Consignee shall deliver to Consignor at least thirty (30) days' prior written notice of any change in the name, jurisdiction or corporate form of Consignee.

6.    True Consignment; UCC.

(a)    The parties hereto intend and agree that this Agreement creates a true consignment of the Consigned Merchandise and is not an arrangement intended to create security for an obligation, provided, however, the parties acknowledge and agree that the interest of the Consignor in the Consigned Merchandise is a purchase money security interest as provided under Article 9-103(d) of the UCC.

(b)    In the event that the arrangements hereunder are determined to be an arrangement for security or otherwise not to be a true consignment, to secure the prompt and punctual payment for the Consigned Merchandise and any other obligations hereunder or under the Agency Agreement, whenever

incurred, Consignee hereby grants to the Consignor a continuing security interest in all of its right, title and interest, if any, in (i) the Consigned Merchandise, whether now or hereafter existing, and (ii) and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of the foregoing, including, without limitation, any proceeds in the form of Credit Card Proceeds (as defined in the Security Agreement), Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (all of which are collectively referred to herein as the "Collateral").

(c)　　　Consignor is hereby authorized to file and/or record UCC-1 financing statements and such other financing statements or documents as Consignor may reasonably deem necessary or appropriate to perfect its interests in the Consigned Merchandise and to take such other actions as may reasonably be deemed appropriate by Consignor to create, establish, perfect, record or give notice of Consignor's title to, and interest in, the Consigned Merchandise, and to take such other steps as may be reasonably deemed by Consignor to be appropriate to secure Consignor's rights in and to the Consigned Merchandise. Any costs associated with such filings shall be paid by Consignee. Throughout the term of this Agreement, Consignor shall have all rights and remedies afforded by law with respect to the Consigned Merchandise, including, without limitation, those of a secured party under the UCC and any rights and remedies specified herein. Consignee shall not contest the validity, perfection, priority or enforceability of the ownership by Consignor of the Consigned Merchandise or any lien or security interest of Consignor therein.

(d)　　　Nothing contained in this section 6 is intended to conflict with the true consignment nature of this Agreement with respect to the Consigned Merchandise.

7.　　　Payment. All payments and reconciliations between the parties in respect of the Consigned Merchandise shall be made in accordance with the terms of the Agency Agreement.

8.　　　Indemnification. Consignor hereby agrees to indemnify Consignee and to hold Syms and its affiliates, employees, officers, directors, agents, predecessors, successors and assigns harmless from and against any and all claims, suits, liability, loss, judgments and expenses (including reasonable attorneys' fees) that any such Consignee may suffer or be or become obligated to pay to third parties arising out of (i) the infringement of any patent, trademark, copyright or other proprietary rights of third parties by Consignor or its Supplier(s) in the design, manufacture, use, promotion or sale of the Consigned Merchandise, (ii) any false or misleading labeling or other deceptive advertising practices alleged by third parties to have been employed by Consignor or its Supplier(s) in connection with the Consigned Merchandise, or (iii) the color, or quality of the materials or workmanship utilized in the manufacture of the Consigned Merchandise being other than as represented by Consignor and/or its Supplier(s). Consignor agrees further that it will carry liability insurance in such amounts as would be carried by a reasonable businessperson under like circumstances so as to fulfill its obligations hereunder, and that it will deliver to Syms promptly after execution of this Agreement, a certificate of insurance evidencing such coverage which each of the Consignees, as applicable, as additional insured thereunder. Consignor further affirms that it is in compliance, and will use its best efforts to continue to comply, with all applicable requirements of (a) the U.S.A. Patriot Act of 2001 and (b) fair labor practice laws in the country where Consignor manufactures or from which it acquires or imports its Consigned Merchandise, including, but not limited to, laws against child or forced labor and unsafe working conditions. This Section 7(a) is intended solely to allocate potential liability between the parties hereto and is not to be construed as any indication of any obligation or liability of Consignor to any parties other than Syms and its affiliates.

9.　　　Bankruptcy Approval/Assumption. In the event that Consignee becomes subject to the jurisdiction of any United States Bankruptcy Court, at the request of Consignor, Consignee shall, as part of its first day orders or as soon as practicable thereafter (but in no event later than five (5) business

days after the date of the filing of the petition in the applicable United States Bankruptcy Court) file a motion seeking to obtain an order from the United States Bankruptcy Court exercising jurisdiction over Consignee approving this Agreement and authorizing the assumption thereof ("Assumption Order"). The Assumption Order shall be in form and substance reasonably acceptable to Consignor.

10.     Conditions Precedent.    Consignor's obligations hereunder are subject to the satisfaction or waiver by Consignor of the following conditions precedent:

(a)     Consignor shall have received evidence reasonably satisfactory to it that the creditors of Consignee listed on Exhibit A hereto have received Consignor's notice to them of the consignment of the Consigned Merchandise under this Agreement;

(b)     All financing statements reasonably required by Consignor under Section 6 shall have been filed and become effective; and

(c)     Consignee, the agent for Consignee's senior revolving credit lenders (the "Credit Agent"), and Consignor shall have entered into an agreement in form and substance reasonably satisfactory to Consignor, providing for, among other things, the Credit Agent's (i) acknowledgement of the Consignor's title and security interests in the Consigned Merchandise, (ii) agreement that any lien or security interest of the Credit Agent does not and shall not at any time extend to any Consigned Merchandise or any proceeds thereof, and (iii) consent to this Agreement and the transactions contemplated hereunder and under the Agency Agreement.

11.     Events of Default.    The following shall be Events of Default for purposes of this Agreement provided that, if an Event of Default results from noncompliance with this Agreement, such noncompliance continues for a period of five (5) days after receipt by Consignee of written notice thereof from Consignor:

(a)     The occurrence of an Event of Default under the Agency Agreement;

(b)     Consignee fails to comply in any material respect with any obligation of Consignee set forth in this Agreement (other than those referenced in subparagraph (a) above);

(c)     Consignee shall (i) apply for, consent to, or suffer the appointment of a custodian, receiver, trustee or liquidator of it or any of its property, (ii) admit in writing its inability to pay its or debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) file, or have filed against it, a petition for relief under Title 11 of the United States Code, or (v) file, or have filed against it, a petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, which event prevents the Consignor from conducting, or materially interferes with the Consignor's conducting of, the Sale under the Agency Agreement;

(d)     An order, judgment or decree shall be entered, without the application, approval or consent of Consignee, or by any court of competent jurisdiction, approving a petition seeking reorganization of Consignee or appointing a custodian, receiver, trustee or liquidator of Consignee, or of all or a substantial part of the assets of Consignee, which order, judgment or decree prevents the Consignor from conducting, or materially interferes with the Consignor's conducting of, the Sale under the Agency Agreement.

12.     Term and Termination.

(a)     <u>Term</u>.  Subject to the satisfaction or waiver in writing by Consignor of the conditions precedent set forth in Section 10 hereof, the term of this Agreement shall commence upon the date first written above and shall terminate upon the earlier of termination of the Agency Agreement or termination pursuant to Section 12(b) hereof.

(b)     <u>Termination</u>.

(i)     <u>Termination For Cause</u>.  In the event that any Event of Default set forth in Section 11 hereof occurs, this Agreement shall immediately terminate upon receipt by Consignee of Consignor's written notice of such termination. In the event of any such termination under this Section 12(b)(i), in addition to and not in limitation of any of Consignor's rights under the UCC:

    A.  Consignee shall not be permitted to sell to third parties or purchase for its own account any Consigned Merchandise then in its possession and Consignor shall be provided access to the Stores and shall, at Consignor's request, together with Consignee, segregate Consigned Merchandise in Consignee's possession and deliver such Consigned merchandise to a location designated by the Consignor;

    B.  All Proceeds from the Sale of Consigned Merchandise not otherwise returned as provided above shall be remitted in accordance with the terms of the Agency Agreement.

(ii)     <u>Exception upon Written Consent</u>.  Notwithstanding the immediately preceding Sections 11(b)(i) and (b)(ii), upon written consent of Consignor and upon such terms as may be agreed upon, Consignee may purchase such items of Consigned Merchandise in its possession as of the date of termination to which Consignor consents in writing.  Any Consigned Merchandise not timely returned as required by the terms hereof and which Consignor has not permitted to be purchased by Consignee shall remain the property of Consignor and shall be returned promptly upon request therefor.

(iii)     <u>Additional Termination Obligations</u>.

    A.  Termination of this Agreement shall terminate Consignor's obligation to supply Consigned Merchandise pursuant to this Agreement;

    B.  Subject to the limitations set forth in Section 4.1 of the Agency Agreement, all costs and expenses (including reasonable fees and disbursements of legal counsel and other third party experts employed or retained by Consignor) incurred by Consignor in connection with, arising out of, or in any way related to the protection, preservation, exercise or enforcement by Consignor of any of its rights or remedies under or related to this Agreement or the obligations created hereunder shall constitute an Expense under the Agency Agreement; and

    C.  Upon termination of any agreement between Consignor and a Supplier or a demand by such Supplier that the goods received by Consignor from such Supplier be returned to such Supplier, or if Consignor reasonably believes that the Consigned Merchandise or its interest therein are in

jeopardy or subject to a potential loss, Consignor shall have the right to demand immediate return of the applicable Consigned Merchandise, and Consignee shall immediately return to Consignor, all applicable Consigned Merchandise. The cost of returning such Consigned Merchandise shall constitute an Expense under the Agency Agreement, provided however, to the extent that Consignor or Supplier have been reimbursed for all or a portion of the costs of such Consigned Merchandise so returned, such amounts shall be returned to Consignee, and shall be excluded from the Expenses calculation for purposes of calculating whether any Sharing Amount is due Consignor.

13. <u>Independent Contractor</u>. Nothing contained herein shall be deemed to create any relationship between Consignor and Consignee other than that of an independent contractor. It is stipulated that the parties are not partners or joint venturers.

14. <u>Further Assurances</u>. Consignee agrees that from time to time it will, promptly upon the reasonable request of the Consignor, cooperate with and assist Consignor with respect to the transactions contemplated by this Agreement take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable law, and execute and deliver such documents and other papers, as may be reasonably requested by Consignor in order to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement and the Agency Agreement, including, without limitation, to perfect, continue the perfection of, or protect the priority of Consignor's consignment interest and security interest in the Consigned Merchandise, to protect the Consigned Merchandise against the rights, claims, or interests of third Persons (other than any such rights, claims or interests created or arising through Consignor) or to otherwise effect the purposes of this Agreement the costs of which shall be borne by Consignee as an Expense under the Agency Agreement.

15. <u>Miscellaneous</u>.

(a) <u>Notices</u>. Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

In the case of Consignor:

    Gordon Brothers Retail Partners, LLC
    101 Huntington Avenue,
    10th Floor Boston, MA 02199
    Attention: Michael Chartock
    Fax: 617-531-7906
    Email: <u>mchartock@gordonbrothers.com</u>

With a copy to:

    Goulston and Storrs
    400 Atlantic Avenue,
    Boston, MA 02110
    Attention: James F. Wallack, Esq.
    Fax: 617- 574-7646
    Email: jwallack@goulstonstorrs.com

In the case of Consignee:

> Syms Corp.
> Filene's Basement, LLC
> 1 Syms Way
> Secaucus, NJ  07094
> Attention: Laura Brandt
> Tel: (201) 902-9600
> Fax: (201) 902-9270
> Email: laurabrandt@syms.com

Notices shall be deemed to have been duly given on the date of service if served personally on the party (including, without limitation, service by overnight courier service) to whom notice is to be given; on the third day after mailing if mailed to the party to whom notice is to be given by prepaid registered or certified mail to the address set forth above; or on the date of transmission if sent by facsimile to the facsimile number set forth above, which facsimile is confirmed by a machine generated confirmation. Any party may change its address for purposes of this paragraph by giving the other parties written notice of the new address in the manner set forth above.

(b)     Governing Law/Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions which would result in the application of the laws of another jurisdiction. Should any claim or dispute arise in connection with this Agreement, then the adjudication of such claim or dispute, shall lie exclusively within the within the State of New York, and any proceeding to adjudicate such claim or dispute shall be brought before a court of competent jurisdiction within the State of New York.

(c)     Severability.  In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

(d)     Entire Agreement; Conflict.   This Agreement (together with the Agency Agreement and the Security Agreement) constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by Consignee and Consignor.  Consignee hereby agrees to be bound by and subject to the terms and conditions of the Agency Agreement which relate to the Additional Agent Merchandise, which terms and conditions are incorporated herein by reference.  In the event of any conflict between the terms of this Agreement and the terms of the Agency Agreement, the terms of the Agency Agreement shall control.

(e)     Assignment.  No party hereto may assign this Agreement without the express written consent of the other parties.  This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

(f)     Modification, Amendment, Supplement or Waiver.   No modification or amendment of this Agreement or any of its provisions shall be binding upon the parties hereto unless made in writing and duly signed by both parties. A failure or delay of either party to this Agreement to enforce, at any time, any of the provisions of this Agreement, to exercise any option which is herein

provided or to require at any time performance of any of the provisions hereof shall in no way be construed to be a waiver of such provision of this Agreement.

(g) <u>Counterparts</u>. This Agreement may be executed in one or more counterparts. Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement. This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

*[Signature pages follow]*

SYMS CORP

By: _Marcy Syms_
Name:  Marcy Syms
Title:  CEO


FILENE'S BASEMENT, LLC
By Syms Corp., its sole member,

By: _Marcy Syms_
Name:  Marcy Syms
Title:  CEO

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____

Name:   Richard P. Edwards
Title:    Principal and Managing Director

EXHIBIT A


List of Creditors


Bank of America, N.A.
100 Federal Street, 9th Floor
Boston, MA 02110
Attention: Betsy A. Ratto
Tel: 617-434-4113
Fax: 617-434-4339
Email: betsy.ratto@baml.com

# SECURITY AGREEMENT

This Security Agreement (hereinafter, this "Agreement") is entered into as of October 12, 2011 by and between **SYMS CORP**, a New Jersey corporation ("Syms") and **FILENE'S BASEMENT, LLC**, a Delaware limited liability company ("Filenes" and, together with Syms, "Merchant") having its principal place of business at 1 Syms Way Secaucus, NJ 07094, jointly and severally, and **GORDON BROTHERS RETAIL PARTNERS, LLC** (hereinafter, the "Secured Party"), a Delaware limited liability company having its principal place of business at 101 Huntington Avenue, Boston, Massachusetts 02199.

Reference is made to (i) that certain Agency Agreement entered into by and between the Secured Party and the Merchant of even date herewith (hereinafter, as may be amended, modified, and/or restated from time to time, the "Agency Agreement") pursuant to which the Secured Party shall provide certain services to the Merchant including selling all of the Merchant's Merchandise from Merchant's five (5) retail store locations identified in the Agency Agreement (the "Stores") by means of a promotional "sale on everything" or similar sale (the "Project"), and (ii) that certain Consignment Agreement of even date herewith (hereinafter, as may be amended, modified, and/or restated from time to time, the "Consignment Agreement") pursuant to which the Merchant agreed to hold certain of the Secured Party's assets on consignment in connection with the Project. *Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Agency Agreement.*

It is a condition of the Secured Party entering into, and/or performing under, the Agency Agreement and the Consignment Agreement that the Merchant execute and deliver this Agreement in order to grant the Secured Party a security interest in certain personal property which the Merchant now owns or hereafter acquires in order to secure all obligations and liabilities of the Merchant to the Secured Party.

FOR VALUE RECEIVED, and in consideration of the mutual covenants contained herein and benefits to be derived herefrom, and intending to be legally bound hereby, the parties hereto (including, Syms and Filene's, jointly and severally) agree as follows:

## ARTICLE 1.  GRANT OF SECURITY INTEREST

In order to supplement the security interests and liens in and to the Merchandise, Additional Agent Merchandise, and Proceeds, granted to the Secured Party pursuant to the Agency Agreement and the Consignment Agreement, and to further secure the Merchant's obligation for the prompt, punctual, and faithful performance of all and each of the Merchant's Liabilities (as that term is defined herein), the Merchant hereby grants to the Secured Party a security interest in and to, and collaterally assigns to the Secured Party, (i) the Merchandise (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, Credit Card Proceeds); (iv) the commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 of the Agency Agreement; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 of the Agency Agreement; and (vi) any Sharing Amount, but only up to the amount of Secured Party's percentage share of such Sharing Amount under Section 3.2(a) of the Agency Agreement, and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing, including, without limitation, any proceeds in the form of Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles (all of which are collectively referred to herein as the "Collateral").

.

# ARTICLE 2. CERTAIN DEFINITIONS

As herein used, the following terms have the following meanings:

2.1     "Accounts" shall mean "accounts" within the meaning of Section 9-102(a)(2) of the Code and, to the extent not otherwise included therein, all Accounts, Contract Rights and accounts receivable; any other obligations or indebtedness owed to the Merchant; all rights of Merchant to receive any payments in money or kind; all guarantees of Accounts and security therefor; all cash or non-cash proceeds of all of the foregoing; all of the right, title and interest of Merchant in and with respect to the goods, services or other property which gave rise to or which secure any of the accounts and insurance policies and proceeds relating thereto, and all of the rights of the Merchant as an unpaid seller of goods or services, including, without limitation the rights of stoppage in transit, replevin, reclamation and resale and all of the foregoing, whether now existing or hereafter created or acquired.

2.2     "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of New York.

2.3     "Collateral" shall have the meaning assigned to it in Article 1 of this Agreement.

2.4     "Contract Rights", to the extent not included in the definition of Accounts in Section 2.1, shall mean all rights to payment or performance under a Contract not yet earned by performance and not evidenced by an instrument or chattel paper.

2.5     "Contract" or "Contracts" shall mean all contracts, agreements, insurance policies, and other undertakings of any nature whatsoever pursuant to which the Merchant has entered into a sale or agreement to sell or provide goods or services now or in the future.

2.6     "Credit Card Proceeds" shall mean the Merchant's Accounts or Payment Intangibles arising from sales of Merchandise, Additional Agent Merchandise or Owned FF&E paid for by customers using credit cards.

2.7     "Deposit Accounts" shall mean "deposit accounts" within the meaning of Section 9-102(a)(29) of the Code, including, without limitation, any Designated Deposit Accounts (as defined in the Agency Agreement), the Concentration Accounts and Credit Agent Deposit Accounts (as those terms are defined in the Intercreditor Agreement) and any other deposit account holding Proceeds.

2.8     "General Intangibles" shall mean "general intangibles" within the meaning of Section 9-102(a)(42) of the Code to the extent they arise from the sale of goods or services or are used in connection with the production of the Merchandise and/or the Additional Goods, Payment Intangibles, and all choses in action, insurance proceeds, goodwill, patents, copyrights, trademarks, tradenames, customer lists, formulae, trade secrets, licenses, designs, computer software, research and literary rights now owned or hereafter acquired.

2.9     [Intentionally deleted].

2.10    "Intercreditor Agreement" shall mean that certain letter agreement dated as of the date hereof by and among Merchant, Secured Party and Bank of America, N.A. as Credit Agent.

2.11    "Liability" and "Liabilities" shall mean any and all liabilities, debts, indemnifications, and obligations of the Merchant to the Secured Party of every kind, nature, and description, now existing or hereafter arising under, or arising in connection with, the Agency Agreement or the Consignment

Agreement (specifically including all rights of the Secured Party to conduct the Sale from the Stores and to use the assets of the Merchant in connection therewith, all as more fully set forth in the Agency Agreement), whether or not any of such are liquidated, unliquidated, primary, secondary, direct, indirect, absolute, contingent, or of any other type, nature, or description.

2.12    "Payment Intangible" shall have the meaning set forth in section 9-102(a)(61) of the Code

## ARTICLE 3.  COLLECTION OF COLLATERAL

3.1    All Proceeds of the Collateral shall be handled in accordance with the Agency Agreement.

3.2    The Merchant hereby irrevocably constitutes and appoints the Secured Party, effective immediately from and after the occurrence of an Event of Default, as the Merchant's true and lawful attorney, with full power of substitution, to convert the Collateral into cash at the sole risk, cost, and expense of the Merchant, subject to the terms of the Agency Agreement (including, without limitation, the Agent's obligation thereunder to pay Expenses).    Furthermore, subject to the terms of the Agency Agreement and the Intercreditor Agreement and to the extent directly related to the Collateral, the Secured Party shall have the right and power to:

(a)    prosecute, defend, compromise, or release any action relating to the Collateral;

(b)    endorse the name of the Merchant in favor of the Secured Party upon any and all checks, drafts, notes, acceptances, or other items or instruments constituting Collateral; sign and endorse the name of the Merchant on, and receive as secured party, any of the Collateral, any invoices, schedules of Collateral, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of a same or different nature relating to the Collateral;

(c)    sign the name of the Merchant on any notice to the Merchant's account debtors or verification of the Collateral; sign the Merchant's name on any proof of claim in bankruptcy against account debtors, notice of lien, claims of mechanics liens, or assignments or releases of mechanics lien securing accounts; and

(d)    use or license any or all General Intangibles of the Merchant, but only to the extent necessary in order to realize upon the Collateral.

3.3    All powers conferred upon the Secured Party by this Agreement, being coupled with an interest, shall be irrevocable until the Merchant shall have satisfied the Liabilities in full.

3.4    This Agreement constitutes an authenticated record, and the Merchant hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral, in such filing offices as the Secured Party shall deem appropriate, and the Merchant shall execute and deliver to the Secured Party such financing or continuation statements, and amendments thereto, promptly upon the reasonable request of the Secured Party.    Such financing statements or continuation statements, and amendments thereto, may be filed without the signature of the Merchant, and the Merchant agrees that a carbon, photographic, or other reproduction of this Agreement or of a financing statement signed by the Merchant shall be sufficient as a financing statement and may be filed as a financing statement in any and all jurisdictions.    The Merchant further authorizes the Secured Party to file any financing statement, or continuation statement, and

amendments thereto, that (a) indicate the Collateral (i) falls within the scope of Article 9 of the Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by Part 5 of Article 9 of the Code for the sufficiency or filing office acceptance of any financing statement or amendment, including whether Merchant is an organization, the type of organization and any organization identification number issued to Merchant.

## ARTICLE 4.  DEFAULT

Upon the occurrence of any one or more of the following events (hereinafter, "Events of Default"), any and all Liabilities of the Merchant to the Secured Party shall, at the option of the Secured Party, become immediately due and payable without notice or demand, provided, that upon the occurrence of an Event of Default of the nature specified in Section 4.4, below, all Liabilities shall automatically become immediately due and payable without notice or demand.  The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under the Agency Agreement and the Consignment Agreement.

4.1     The failure by the Merchant to pay, perform or comply with any of the Liabilities, subject to any applicable grace or cure periods granted in the applicable governing document;

4.2     Any breach of any representation or warranty heretofore, now, or hereafter made by the Merchant to the Secured Party in the Agency Agreement or the Consignment Agreement;

4.3     The occurrence of any breach of, or event of default under, the Agency Agreement or the Consignment Agreement, subject to any applicable grace or cure periods granted therein;

4.4     The appointment of a receiver, trustee, or other person, pursuant to court action or otherwise, over all, or any part of the Merchant's property; the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of the Merchant, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for the Merchant; adjudication of bankruptcy or insolvency relative to the Merchant; the entry of an order for relief or similar order with respect to the Merchant in any proceeding pursuant to the Bankruptcy Code (Title 11, United States Code, as amended) or any other federal bankruptcy law; the filing of any complaint, application, or petition by or against the Merchant initiating any matter in which the Merchant is or may be granted any relief from the debts of the Merchant pursuant to the Bankruptcy Code or any other insolvency statute or procedure;

4.5     The imposition of any lien upon any of the Collateral or the entry of any judgment against the Merchant which materially impacts Secured Party's ability to perform under the Agency Agreement;

4.6     The entry of any court order which enjoins, restrains, or in any way prevents the Merchant from conducting all or any part of its business affairs in the ordinary course;

4.7     Any act by or against, or relating to the Collateral pursuant to which any creditor of the Merchant seeks to reclaim or repossess, or reclaims or repossesses all or any portion of the Collateral; or

4.8     The entry of any court order, or occurrence of any other event (not caused by any acts of the Secured Party) which enjoins, restrains, materially interferes with, or in any way prevents or terminates, the conduct of the Project.

## ARTICLE 5.  RIGHTS AND REMEDIES UPON DEFAULT

In addition to all of the rights, remedies, powers, privileges, and discretions which the Secured Party is provided prior to the occurrence of an Event of Default by the Merchant, the Secured Party shall have the following rights and remedies upon the occurrence of any Event of Default by the Merchant:

5.1     Upon the occurrence of any Event of Default by the Merchant, as described above, and during the continuance of such Event of Default, the Secured Party shall have all of the rights and remedies of a secured party upon default under the Code and other applicable law, in addition to which the Secured Party shall have all of the following rights and remedies:

(a)     To collect the Collateral with or without the taking of possession of any of the Collateral;

(b)     To take possession of all or any portion of the Collateral;

(c)     To sell, lease, or otherwise dispose of any or all of the Collateral, in its then condition or following such preparation or processing as the Secured Party deems advisable and with or without the taking of possession of any of the Collateral; and/or

(d)     To apply the Collateral or the proceeds of the Collateral towards (but not necessarily in complete satisfaction of) the Liabilities.

5.2     Notwithstanding any other provision of this Agreement, the Secured Party agrees that it will, to the extent permitted by applicable law, use best efforts, applied in a commercially reasonable manner, to conduct the sale or other disposition of the Collateral in the manner contemplated by the Agency Agreement.  Any such sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Secured Party deems advisable and are commercially reasonable, having due regard to compliance with any lease (if disposed of at the Stores), contract, statute or regulation which might affect, limit, or apply to the Secured Party's disposition of the Collateral.  In connection with any such sale or disposition, the Secured Party shall have all of the rights set forth in the Agency Agreement (whether or not the Agency Agreement is then in force, or has been rejected or otherwise terminated, as if all of the rights and benefits were set forth herein in full).  So long as Secured Party disposes of the Collateral in the manner contemplated by the Agency Agreement, Merchant waives notice of any such sale or disposition and agrees that sale of some or all of the Collateral substantially as contemplated in the Agency Agreement shall constitute a commercially reasonable disposition.  Otherwise, unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Secured Party shall provide the Merchant with such notice as may be practicable under the circumstances), the Secured Party shall give the Merchant reasonable prior written notice of the date, time, and place of any proposed public sale, and of the date after which any private sale or other disposition of the Collateral may be made.  The Merchant agrees that ten (10) days notice shall be deemed reasonable prior notice.  The Secured Party may purchase the Collateral, or any portion of it at any sale held under this Article.  After satisfaction of the Liabilities out of the proceeds of any such sale held in accordance with the terms and provisions of this Article, including, without limitation, the payment of any reasonable legal fees and expenses incurred in connection therewith, the remaining balance of such proceeds (if any) shall be delivered to the Merchant.

5.3     In connection with the Secured Party's exercise of the Secured Party's rights under this Article, the Merchant agrees that the Secured Party may enter upon, occupy, and use any Store, warehouse, and/or other location where the Collateral is located.  The Secured Party shall not be required to remove any of the Collateral from any such premises upon the Secured Party's taking possession thereof, and may render any Collateral unusable to the Merchant and may, at its option conduct a

liquidation of the Collateral.  The Secured Party shall have all of the rights to use the above locations and the assets of the Merchant to conduct a sale or sales, as further set forth in the Agency Agreement

5.4     The rights, remedies, powers, privileges, and discretions of the Secured Party hereunder (hereinafter, the "Secured Party's Rights and Remedies") shall be cumulative and not exclusive of any rights or remedies which it would otherwise have.  No delay or omission by the Secured Party in exercising or enforcing any of the Secured Party's Rights and Remedies shall operate as, or constitute a waiver thereof.  No waiver by the Secured Party of any Event of Default by the Merchant or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement.  No single or partial exercise of any of the Secured Party's Rights and Remedies, and no other agreement or transaction, of whatever nature entered into between the Secured Party and the Merchant at any time, either express or implied, shall preclude any other exercise of the Secured Party's Rights and Remedies.  No waiver by the Secured Party of any of the Secured Party's rights and remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver.  All of the Secured Party's Rights and Remedies and all of the Secured Party's rights, remedies, powers, privileges, and discretions under any other agreement or transaction are cumulative, and not alternative or exclusive, and may be exercised by the Secured Party at such time or times and in such order of preference as the Secured Party in its sole discretion may determine.  The Secured Party's Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Liabilities.

# ARTICLE 6.  GENERAL

6.1     Collateral in the possession of the Secured Party, whether for safe keeping, or otherwise, or in the possession of any third party acting on the Secured Party's behalf (regardless of the reason the Secured Party had received same or whether the Secured Party has conditionally released the same) shall at all times constitute security for any and all Liabilities, and may be applied or set off against any Liabilities by the Secured Party upon the exercise of its rights and remedies in accordance with Article 6 hereof, whether or not other collateral is available to the Secured Party.

6.2     The Merchant makes the following waiver knowingly, voluntarily, and intentionally, and understands that the Secured Party, in the establishment and maintenance of the Secured Party's relationship with the Merchant, is relying thereon.  Except as expressly provided herein:

THE MERCHANT, AND THE SECURED PARTY RESPECTIVELY TO THE EXTENT ENTITLED THERETO, WAIVE ANY PRESENT OR FUTURE RIGHT OF THE MERCHANT OR THE SECURED PARTY, TO A TRIAL BY JURY IN ANY CASE OR CONTROVERSY IN WHICH THE SECURED PARTY IS OR BECOMES A PARTY (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST THE SECURED PARTY OR IN WHICH THE SECURED PARTY IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF, OR IS IN RESPECT TO, ANY RELATIONSHIP AMONGST OR BETWEEN THE MERCHANT, ANY SUCH PERSON, AND THE SECURED PARTY.

6.3     The Secured Party shall have no duty as to the collection or protection of the Collateral beyond the safe custody of such of the Collateral as may come into the possession of the Secured Party and shall have no duty as to the preservation of rights against prior parties or of any other rights pertaining thereto, except as set forth in and subject to the Agency Agreement.

6.4     All notices and other correspondences in connection with this Agreement shall be made in accordance with the terms and provisions of the Agency Agreement.

6.5     This Agreement shall be binding upon the Merchant and the Merchant's heirs, executors, administrators, representatives, successors, and assigns and shall inure to the benefit of the Secured Party and the Secured Party's successors and assigns.

6.6     Any determination that any provision of this Agreement or any application thereof is invalid, illegal, or unenforceable in any respect in any instance shall not affect the validity, legality, and enforceability of such provision in any other instance, nor the validity, legality, or enforceability of any other provision of this Agreement.

6.7     This Agreement, the Agency Agreement, the Consignment Agreement and the Intercreditor Agreement and all other instruments executed in connection herewith, incorporate all discussions and negotiations between the Merchant and the Secured Party, either express or implied, concerning the matters included herein and in such other instruments, any statute, custom, or usage to the contrary notwithstanding.  No such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof.  No modification, amendment, or waiver of any provision of this Agreement or of any provision of any other agreement between the Merchant and the Secured Party is effective unless executed in writing by a duly authorized officer of the party to be charged with such modification, amendment, or waiver.

6.8     The proceeds of any collection, sale, or disposition of the Collateral, or of any other payments received hereunder, shall be applied as provided in the Agency Agreement.  The Merchant shall remain liable to the Secured Party for any deficiency remaining following such application.

6.9     From and after the occurrence of an Event of Default, the Merchant shall pay all costs of collection and all expenses of the Secured Party in connection with the enforcement of this Agreement between the Merchant and the Secured Party.

6.10    This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions which would result in the application of the laws of another jurisdiction.  Should any claim or dispute arise in connection with this Agreement, then the adjudication of such claim or dispute, shall lie exclusively within the within the State of New York, and any proceeding to adjudicate such claim or dispute shall be brought before a court of competent jurisdiction within the State of New York.

6.11    This Agreement shall remain in full force and effect until all Liabilities are satisfied in full.

6.12    It is intended that the security interests created by this Agreement attach to all of the Collateral now owned or hereafter acquired which are capable of being subject to a security interest, and the security interests created by this Agreement secure all Liabilities of the Merchant to the Secured Party, whether now existing or hereafter arising.

6.13    This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that

any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

6.14     FOR THE AVOIDANCE OF DOUBT, THE PARTIES HERETO ACKNOWLEDGE AND AGREE THAT THE PURPOSE OF THIS AGREEMENT IS TO SUPPLEMENT THE GRANTS OF SECURITY INTERESTS IN THE COLLATERAL SET FORTH IN THE AGENCY AGREEMENT, THE CONSIGNMENT AGREEMENT, AND THE INTERCREDITOR AGREEMENT AND TO SET FORTH IN GREATER DETAIL THE RIGHTS AND REMEDIES OF THE SECURED PARTY WITH RESPECT TO THE COLLATERAL, PARTICULARLY FROM AND AFTER THE OCCURRENCE OF AN EVENT OF DEFAULT. NOTHING CONTAINED HEREIN IS INTENDED TO, NOR SHALL BE CONSTRUED TO, ALTER, AMEND, OR MODIFY THE TERMS AND CONDITIONS OF THE AGENCY AGREEMENT, THE CONSIGNMENT AGREEMENT OR THE INTERCREDITOR AGREEMENT WITH RESPECT TO THE TERMS AND CONDITIONS OF THE SALE, THE TREATMENT OF PROCEEDS AND EXPENSES, OR OTHER SIMILAR TERMS, OR TO ALTER OR EXPAND THE OBLIGATIONS OR LIABILITIES OF THE MERCHANT THEREUNDER. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND THOSE OF THE AGENCY AGREEMENT AND/OR THE CONSIGNMENT AGREEMENT AND/OR THE INTERCREDITOR AGREEMENT, THE TERMS AND CONDITIONS OF THE AGENCY AGREEMENT OR CONSIGNMENT AGREEMENT, OR INTERCREDITOR AGREEMENT AS APPLICABLE, WILL PREVAIL.

**[Remainder of Page Intentionally Left Blank - Signature Page To Follow]**

IN WITNESS WHEREOF, each of the undersigned represent and warrant that he/she has been duly authorized to execute this Security Agreement on behalf of the applicable party set forth below as of the date first set forth above.

SYMS CORP

By: _Marcy Syms_

Name: Marcy Syms

Title: CEO


FILENE'S BASEMENT, LLC
By Syms Corp, its sole member,

By: _Marcy Syms_

Name: Marcy Syms

Title: CEO


GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____

Name: Richard P. Edwards

Title: Principal and Managing Director

IN WITNESS WHEREOF, each of the undersigned represent and warrant that he/she has been duly authorized to execute this Security Agreement on behalf of the applicable party set forth below as of the date first set forth above.

SYMS CORP

By: _____
Name:
Title:

FILENE'S BASEMENT, LLC
By Syms Corp, its sole member,

By: _____
Name:
Title:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name:   Richard P. Edwards
Title:    Principal and Managing Director

October 12, 2011

Syms Corp
Filene's Basement, LLC
One Syms Way
Secaucus, NJ 07094

Gordon Brothers Retail Partners, LLC
101 Huntington Avenue
10th Floor
Boston, Massachusetts 02199

RE:  Intercreditor Agreement

Ladies and Gentlemen;

Reference is hereby made to (a) that certain Credit Agreement, dated as of August 27, 2009 by and among Syms Corp ("Syms"), as Lead Borrower, the other Borrowers named therein, including without limitation Filene's Basement, LLC ("Filene's" and collectively and jointly and severally with Syms, the "Merchant"), the guarantors named therein, the lenders party thereto (the "Lenders") and Bank of America, N.A., as Administrative Agent and Collateral Agent (the "Credit Agent") as such Credit Agreement may be amended and in effect from time to time (the "Credit Agreement"), and (b) that certain Agency Agreement pertaining to the conduct of sales of Merchandise and other goods at certain of the Merchant's retail store locations (the "Agency Agreement") dated as of October 12, 2011 by and between the Merchant and Gordon Brothers Retail Partners, LLC (the "Sale Agent").  All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the Agency Agreement.

Pursuant to the Agency Agreement, the Sale Agent has agreed to conduct the sale (the "Sale") of certain Merchandise and furniture, fixtures and equipment (the "Owned FF&E") located at various retail store locations (the "Stores"), all as more particularly described in the Agency Agreement.  The Merchandise and Owned FF&E are subject to a perfected first priority security interest in favor of the Credit Agent and the Merchant and the Sale Agent have requested that the Credit Agent: (a) consent to the conduct of the Sale in accordance with Agency Agreement, (b) consent to the granting by the Merchant to the Sale Agent of a security interest in, and lien upon: (i) the Merchandise (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, Credit Card Proceeds); (iv) the commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 of the Agency Agreement; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 of the Agency Agreement; and (vi) any Sharing Amount, but only up to the amount of Secured Party's percentage share of such Sharing Amount under Section 3.2(a) of the Agency Agreement, and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing, including, without limitation, any proceeds in the form of Accounts, Contract Rights, Contracts, Deposit Accounts and General Intangibles, as each such term is defined in that certain  Security Agreement dated as of October 12, 2011 (the "Security Agreement") between and among the Sale Agent and the Merchant (all of which are collectively referred to herein as the "Agent Collateral") in accordance with the Agency Agreement and the Security Agreement (c) upon payment of the Initial Guaranty Payment and the issuance of the Letter of Credit, agree to subordinate any

security interest of the Credit Agent in the Agent Collateral <u>provided</u> <u>however</u>, until Sale Agent has tendered payment of the Guaranteed Amount in full and Expenses, if any, due to Merchant (collectively, the "<u>Agent Payment Obligations</u>"), the security interest of the Credit Agent remains senior to the security interest granted under the Agency Agreement to the Sale Agent to the extent of such unpaid Agent Payment Obligations, (d) subject to the provision of Section 3 and 3.3(e) of the Agency Agreement, to the extent Credit Agent receives any Proceeds, turnover such proceeds to the Sale Agent, (e) acknowledge and agree (i) to the Sale Agent's provision of Additional Agent Merchandise to the Merchant under a separate consignment agreement and (ii) to disclaim any security interest or other lien, claim or interest in any Additional Agent Merchandise and the proceeds thereof provided however, for the avoidance of doubt, the parties agree that the Credit Agent has a lien on any Proceeds of Additional Agent Merchandise to the extent owing to the Merchant under the Agency Agreement.

Accordingly, for good and valuable consideration, the receipt and sufficient of which are hereby acknowledged, the parties agree as follows:

1.      The Credit Agent hereby acknowledges and agrees that:

   a.      Notwithstanding the provisions of the Credit Agreement to the contrary, including, without limitation, the restrictions contained in clause (b) of the definition of "Permitted Disposition", the Credit Agent and the Required Lenders (as defined in the Credit Agreement) have consented to the proposed Sale and all other transactions contemplated under the Agency Agreement, and the Credit Agent hereby consents to the grant by Merchant to the Sale Agent of a security interest in, and lien upon, the Agent Collateral, subject to the terms of the Agency Agreement, the Security Agreement and this Agreement, and waives any Default or Event of Default (as each such term is defined in the Credit Agreement) which may arise under the Credit Agreement as a result thereof;

   b.      the sale by Sale Agent of Merchandise and Owned FF&E in accordance with the Agency Agreement shall transfer ownership to purchasers of such Merchandise and Owned FF&E free and clear of any security, lien, encumbrance, claim or interest of the Credit Agent or any Lender; and any such security interest shall attach solely to any Proceeds thereof, in the order of priority set forth herein and in the Agency Agreement;

   c.      any Additional Agent Merchandise are consigned goods under a "consignment" as defined under Section 9-102 (20) of the Uniform Commercial Code as in effect in the State of New York (the "<u>UCC</u>"), title to which Additional Agent Merchandise is and shall remain with the Sale Agent (or its affiliate);

   d.      Credit Agent shall not distrain or otherwise exercise any rights against any of the Additional Agent Merchandise, and shall not assert any security interest, lien, encumbrance or claim against the Additional Agent Merchandise or any proceeds thereof, for any reason, (x) notwithstanding anything to the contrary in the Credit Agreement or related loan documents or in any provision of the UCC, or any other applicable law, and (y) without regard to the order or time of attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting any lien or security interest in favor of the Credit Agent in any goods of the same type as the Additional Agent Merchandise, or any lien or security interest in favor of the Sale Agent in the Additional Agent Merchandise; <u>provided</u>, <u>however</u>, for the avoidance of doubt, the parties acknowledge and agree that the Credit

Agent has a lien on any Proceeds of Additional Agent Merchandise to the extent owing to the Merchant under the Agency Agreement; and

e.    Sale Agent has sent and the Credit Agent has received an authenticated notification of the Sale Agent's consignment interest prior to the Merchant's receipt of any Additional Agent Merchandise that is sufficient for purposes of UCC Section 9-324(b).

2.    The Credit Agent hereby agrees that any liens and security interests of the Credit Agent in any Agent Collateral, after payment to the Merchant of the Initial Guaranteed Payment and the issuance of the Letter of Credit, shall be subject and subordinate to the Sale Agent's senior security interest in such property irrespective of the time of the execution, delivery, or issuance of the Agency Agreement or the time, order or method of attachment and perfection of the Sale Agent's liens and security interest, except to the extent of any unpaid Agent Payment Obligations in such property, provided, however, that Credit Agent shall have no lien or security interest in the Additional Agent Merchandise, provided, further, that, for the avoidance of doubt, the parties acknowledge and agree that the Credit Agent has a lien on any Proceeds of Additional Agent Merchandise to the extent owing to the Merchant under the Agency Agreement.

3.    The Merchant maintains bank accounts with the Credit Agent including accounts with numbers ending in 8549 and 9920 (collectively, the "Concentration Accounts") which are Designated Deposit Account into which Proceeds, including without limitation Credit Card Proceeds, are anticipated to deposited on a daily basis.  To the extent that the Credit Agent receives any Proceeds into the Concentration Account or any other deposit accounts of Merchant maintained with the Credit Agent, including without limitation accounts, ending in 1570 and 9933 ("Credit Agent Deposit Accounts") or any other deposit account over which the Credit Agent has control under UCC 9-104,(together with the Credit Agent Deposit Accounts, collectively, the "Control Accounts") the Credit Agent shall deliver such Proceeds to the Sale Agent as provided under the Agency Agreement in accordance with the wire instructions attached hereto as Exhibit A and the Credit Agent is hereby appointed and shall act as the Sale Agent's agent for the sole and limited purpose of perfecting by control the Sale Agent's security interest in the Proceeds and the Control Accounts (to the extent of any Proceeds on deposit therein).  With respect to Proceeds that are deposited in any Credit Agent Deposit Account, the Credit Agent agrees to comply with instructions originated by the Sale Agent directing disposition of funds in any such Credit Agent Deposit Account which are Proceeds in accordance with Agency Agreement without the further consent of the Merchant.  For avoidance of doubt nothing in this Section 3 amends the Sale Agent's rights to Proceeds as set forth in the Agency Agreement.

4.    The Credit Agent hereby agrees Merchant's receivables consisting of amounts owed by credit card processors to Merchant representing payments for any Merchandise, Additional Agent Merchandise or Owned FF&E purchased in the Sale are Proceeds ("Credit Card Proceeds") and in the event that the Credit Agent has any assignment of or shall otherwise assume control over or receive direct payment of Credit Card Proceeds, the Credit Agent will deliver such Credit Card Proceeds to the Sale Agent as provided under the Agency Agreement and in accordance with instructions set forth on Exhibit A; and with respect to Credit Card Proceeds that are subject to any assignment to the Credit Agent or other agreement between Credit Agent and any credit card processor, the Credit Agent is hereby appointed and shall act as the Sale Agent's agent for the sole and limited purpose of perfecting the Sale Agent's security interest in the Credit Card Proceeds. With respect to Credit Card Proceeds that are received directly by the Credit Agent, the Credit Agent agrees to comply with instructions originated by the Sale Agent directing disposition of

such Credit Card Proceeds in accordance with Agency Agreement without the further consent of the Merchant.  For avoidance of doubt nothing in this Section 4 amends the Sale Agent's rights to Proceeds as set forth in the Agency Agreement.

5.      As long as the Sale Agent is in compliance with its obligations under the Agency Agreement, the Credit Agent shall not take any action under the provisions of any state or federal law, including, without limitation, the UCC, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any Agent Collateral.

6.      Except as expressly provided herein, nothing in this Agreement shall constitute a modification or waiver of any of the Credit Agent's and the Lenders' other rights or obligations under the Credit Agreement or any other Loan Documents and any further sales not contemplated under the Agency Agreement must strictly comply with the terms of the Credit Agreement.  The consent and waiver furnished herein relates solely to the Agency Agreement and is not a continuing waiver.

7.      The Sale Agent hereby:

   a.      acknowledges that the Sale Agent has no interest in any receivables (the "Existing Receivables") arising from sales made at the Stores prior to the commencement of the Sale under the Agency Agreement and agrees in the event the Sale Agent receives any payment or any other distribution of any property on account of any of the Existing Receivables or any property other than the Agent's Collateral, the Sale Agent will direct that the full amount of such payment be made or delivered directly to the Merchant (or to the Credit Agent if the Credit Agent has exercised dominion over the Merchants' cash and deposit accounts) and, until so delivered, will be held by the Sale Agent in trust; and

   b.      agrees not to amend or otherwise modify the Agency Agreement Documents without the prior written consent of the Credit Agent, which consent shall not be unreasonably withheld, conditioned or delayed.

8.      The Credit Agent represents and warrants:

   a.      that it is duly authorized to execute, deliver and perform its obligations under this Agreement, by the Lenders and otherwise;

   b.      the execution, delivery and performance by  the Credit Agent and the Lenders do not and will not (a) require any consent or approval of any governmental agency or authority (other than any consent or approval that has been obtained and is in full force and effect) or (b) conflict (i) with any provision of applicable law, (ii) with the organizational documents of the Credit Agent, (iii) in any material respect with any agreement, indenture, instrument or other document, including, without limitation, the Credit Agreement, or (iv) with any judgment, order or decree that is binding upon the Credit Agent, any Lender or any of their respective properties.

9.      The Sale Agent represents and warrants:

   a.      that it is duly authorized to execute, deliver and perform its obligations under this Agreement;

b.      the execution, delivery and performance of this Agreement by the Sale Agent do not and will not (a) require any consent or approval of any governmental agency or authority (other than any consent or approval that has been obtained and is in full force and effect) or (b) conflict (i) with any provision of applicable law, (ii) with the organizational documents of the Sale Agent, (iii) in any material respect with any agreement, indenture, instrument or other document, or (iv) with any judgment, order or decree that is binding upon the Sale Agent or any of its properties.

10.     This Agreement is binding upon the parties hereto and shall inure to the benefit of their respective successors and assigns.

11.     The provisions of this Agreement may be amended or waived only by an instrument in writing signed by the parties hereto.

12.     All notices and other communications provided for in this Agreement shall be given or made in writing and mail by certified mail, return receipt requested or delivered to the intended addressee at the address for notices specified in the Agency Agreement, or as to any party, to such other address as shall be designated by such party in a notice to the other party given in accordance with this paragraph.  All such communication shall be deemed to have been duly given when personally delivered or, in the case of mail notice, when duly deposited in the mails.

13.     This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions which would result in the application of the laws of another jurisdiction.  Should any claim or dispute arise in connection with this Agreement, then the adjudication of such claim or dispute, shall lie exclusively within the within the State of New York, and any proceeding to adjudicate such claim or dispute shall be brought before a court of competent jurisdiction within the State of New York.

14.     Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement and the effect thereof shall be confined to the provisions held to be invalid or illegal.

15.     This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

Very truly yours,

BANK OF AMERICA, N.A.

By: _____

*Andrew Cerussi*
*Senior Vice President*

[Signatures of Merchant and Sale Agent to follow]

AGREED:


SYMS CORP

By: _Marcy Syms_

Name: Marcy Syms

Title: CEO

FILENE'S BASEMENT, LLC
By Syms Corp., its sole member,


By: _Marcy Syms_

Name: Marcy Syms

Title: CEO


GORDON BROTHERS RETAIL PARTNERS, LLC


By:_____

Name: Richard P. Edwards

Title: Principal and Managing Director

AGREED:

SYMS CORP

By:_____
Name:
Title:

FILENE'S BASEMENT, LLC
By Syms Corp., its sole member,

By: _____
Name:
Title:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name: Richard P. Edwards
Title: Principal and Managing Director

<u>EXHIBIT A</u>

<u>Wire Instructions</u>

Gordon Brothers Retail Partners, LLC
Bank of America
100 Federal Street
Boston, Mass 02109

Acct:  54608746
ABA:  026-009-593

GORDON BROTHERS RETAIL PARTNERS, LLC
101 Huntington Avenue, 10th Floor
Boston, MA 02199

BY EMAIL and OVERNIGHT COURIER

Bank of America, N.A.
100 Federal Street, 9th Floor
Boston, MA 02110
Attention: Betsy A. Ratto
Fax: 617-434-4339
Email: betsy.ratto@baml.com

      Re:    Notice of Consignment to FB LLC and Syms Corp.

Dear Ms Ratto:

      Reference is hereby made to that certain Consignment Agreement entered into as of October 12, 2011 by and between the undersigned, Gordon Brothers Retail Partners, LLC ("Consignor") and Filene's Basement, LLC ("FB, LLC") and Syms Corp. ("Syms" and collectively with FB LLC, "Consignees" and each a "Consignee"). A search of relevant Uniform Commercial Code ("UCC") filing jurisdictions indicates that you have filed one or more financing statements asserting security interests in certain of Consignees' personal property.

      Pursuant to Article 9 of the Uniform Commercial Code, Part 3, section 9-324(b), you are hereby notified that Consignor expects to deliver to Consignees the following goods in consignment:

      Any and all goods, whether now existing or hereafter acquired, that are the property of Consignor or any of its affiliates and are delivered for consignment from time to time to any of the Consignee's retail stores, any of the Consignee's or any of any Consignee's agents, distribution centers and/or warehouses, or otherwise to any Consignee, and any and all proceeds and products of the foregoing, including without limitation, all documents, instruments, general intangibles, chattel paper, accounts and contract rights arising out of the consigned goods.

      Very truly yours,

      GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name: Richard Edwards
Title: Principal ? Managing Director

cc:    James Wallack, Esq.