IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re: : Chapter 11
:
FILENE'S BASEMENT, LLC, et al., : Case No. 11-13511 (KJC)
:
Debtors.[1] : Joint Administration Pending
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF STEVE LIPMAN IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 364(e), 365(a) AND 554(a), BANKRUPTCY RULES 2002, 6003, 6004, 9006(c), AND 9014 AND LOCAL RULES 2002-1 AND 9006-1 (A) SCHEDULING A HEARING AND APPROVING THE FORM AND MANNER OF NOTICE OF THE MOTION AND HEARING THEREON AND (B)(I) APPROVING THE DEBTORS' ENTRY INTO AGENCY AGREEMENT, (II) AUTHORIZING THE DEBTORS TO SELL CERTAIN ASSETS THROUGH STORE CLOSING SALES, (III) AUTHORIZING THE DEBTORS TO ABANDON UNSOLD PROPERTY, (IV) WAIVING COMPLIANCE WITH CONTRACTUAL STORE CLOSING SALE RESTRICTIONS AND EXEMPTING THE DEBTORS FROM STATE WAGE PAY REQUIREMENTS AND LAWS RESTRICTING STORE CLOSING SALES, (V) AUTHORIZING THE DEBTORS' ASSUMPTION OF OCTOBER AGENCY AGREEMENT AND (VI) GRANTING RELATED RELIEF**

I, Steve Lipman, being duly sworn, hereby depose and say:

1. I am over the age of 18 and competent to testify to the matters set forth herein. I am a Managing Director of Rothschild Inc. ("Rothschild"), located at 1251 Avenue of the Americas, New York, New York.

2. I obtained a Bachelor of Arts from Hobart College in 1984, after which I joined Bear Stearns, where during my 24 years at the firm, I held a number of positions including spending most of my time being part of their Retail Investment Banking effort and was the

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Filene's Basement, LLC (8277), Syms Corp. (5228), Syms Clothing, Inc. (3869), and Syms Advertising Inc. (5234). The Debtors' address is One Syms Way, Secaucus, New Jersey 07094.

Group Head of the Retail Group for a period of time. My other primary duties at Bear Stearns included calling on financial sponsors. Since joining Rothschild in 2009, I have concentrated my activities on advising businesses with respect to all aspects of mergers and acquisitions. I am an active member of the firm's Global Retail Group and I oversee the firm's North American Financial Sponsor Group. In my capacity as a financial advisor, I have provided investment banking and financial advisory services to companies in a number of industries; such matters have included financing and valuation advice. In particular, during my career, I have completed in excess of 25 retail investment banking transactions and over 100 investment banking transactions in general.

3. I submit this declaration ("Declaration") in support of the Debtors' Emergency Motion for Entry of Orders Pursuant to Bankruptcy Code sections 105(a), 363(b), 364(e), 365(a) and 554(a), Bankruptcy Rules 2002, 6003, 6004, 9006(c), and 9014 and Local Rules 2002-1 and 9006-1 (A) Scheduling a Hearing and Approving the Form and Manner of Notice of the Motion and Hearing Thereon and (B)(I) Approving the Debtors' Entry into Agency Agreement, (II) Authorizing the Debtors to Sell Certain Merchandise Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance with Contractual Store Closing Sale Restrictions and Exempting the Debtors from Certain State Wage Pay Requirements and Laws Restricting Store Closing Sales, (V) Authorizing the Debtors' Assumption of October Agency Agreement, and (VI) Granting Related Relief (the "Motion").

4. The facts set forth in this Declaration are based upon my personal knowledge, upon information and belief or upon the Debtors' records kept in the ordinary course of business that were reviewed by me or other senior employees of Rothschild who are working on this

matter with me. If called and sworn as a witness, I could and would competently testify to the matters set forth herein.

5. On March 9, 2011, the Debtors retained Rothschild as its investment banker to pursue strategic options with respect to the Debtors. Upon retaining Rothschild, the Debtors asked Rothschild to undertake certain tasks with respect to the Debtors' M&A efforts.

6. The Rothschild team, consisting of three other Managing Directors and other employees working under our supervision and direction, was tasked with the primary responsibility to manage the process of exploring and evaluating potential strategic alternatives on behalf of the Debtors.

### A. Overview of the Strategic Alternatives Process

7. On May 26, 2011, the Debtors issued a press release indicating that the Board of Directors had initiated a process to explore and evaluate potential strategic alternatives.

8. In connection with those efforts, the Debtors, through Rothschild and their other advisors, contacted strategic, financial, and real estate buyers, as well as liquidators, to discuss the possibility of a transaction with the Debtors. These efforts resulted in discussions with approximately (a) 20 potential strategic buyers, 5 of whom ultimately executed confidentiality agreements, (b) 38 potential financial buyers, 24 of whom ultimately executed confidentiality agreements, (c) 22 potential real estate buyers, 14 of whom executed confidentiality agreements, and (d) 5 nationally known liquidators, all of whom executed confidentiality agreements. Included within the aforementioned categories were buyers who considered a variety of strategic alternatives, including an acquisition of the entire company.

9. Throughout the process, the Debtors indicated that they were receptive to various acquisition alternatives, including but not limited to an acquisition of the Debtors in their entirety

3

(*i.e.,* retail operations and owned real estate), an acquisition of some or all of the retail operations or an acquisition of the real estate, although, it became apparent that without determining a plan for the retail operations, a real estate-only plan was not a viable option for the Debtors. To facilitate this process, Rothschild assisted the Debtors with establishing a virtual diligence room to enable those interested parties who executed confidentiality agreements the opportunity to conduct diligence and by providing additional information when requested by interested parties.

10. The results of the strategic alternatives process were disappointing, as it became apparent that no party was willing to acquire the Debtors as a going concern largely due to the uncertainty of the viability of the Debtors retail operations; the only written proposals submitted to the Debtors contemplated a liquidation of the Debtors' retail inventory and subsequent treatment of the Debtors' leases and real property assets. The Debtors, in consultation with their advisors, considered the alternatives of maintaining the status quo, pursuing a bid to acquire the Debtors' business, or commencing a chapter 11 proceeding and liquidating their retail business and subsequently marketing and selling their owned real estate through 363 sales. The factors behind the Debtors' consideration of alternatives included their self-imposed cash constraints, as depleting real estate resources to fund losses is not a long term viable strategy. Hence, the Debtors continued to experience significant losses, a decrease in trade credit being made available by certain of the Debtors' significant vendors, and a forecast of a liquidity shortfall by January 2012, if not sooner. The Debtors also recognized that if they were to pursue a liquidation of their retail business, they had to be prepared to commence that process at the outset of the holiday shopping season beginning with the upcoming Veteran's Day holiday and leading into the critical "Black Friday" shopping weekend after Thanksgiving.

**B.     The Debtors' Decision to Conduct Immediate Store Closing Sales**

11.     In short, after engaging in a comprehensive five month marketing process that invited a variety of strategic alternative proposals for the Debtors, the Debtors ultimately concluded that pursuing a liquidation of their retail operations through immediate store closing sales conducted by one or more experienced and reputable liquidators would achieve the maximum values for the assets located in the stores and would minimize administrative expenses, while enabling them to separately pursue a disposition of their owned real estate on an orderly basis.  Based on my review to date of the Debtors' business alternatives and the proposals received for a strategic alternative, together with my investment banking experience in the retail sector, I concur with this analysis.

12.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated:          November 2, 2011


                                        */s/ Steve Lipman*
                                        By:     Steve Lipman
                                        Title:  Managing Director