IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
          :
In re:           :    Chapter 11
          :
FILENE'S BASEMENT, LLC, et al.,    :    Case No. 11-13511 (KJC)
          :
       Debtors.[1]    :    Joint Administration Pending
          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF BERNARD DOUTON IN SUPPORT OF DEBTORS'
EMERGENCY MOTION FOR ENTRY OF ORDERS PURSUANT TO BANKRUPTCY
CODE SECTIONS 105(a), 363(b), 364(e), 365(a) AND 554(a), BANKRUPTCY RULES
2002, 6003, 6004, 9006(c), AND 9014 AND LOCAL RULES 2002-1 AND 9006-1 (A)
SCHEDULING A HEARING AND APPROVING THE FORM AND MANNER OF
NOTICE OF THE MOTION AND HEARING THEREON AND (B)(I) APPROVING THE
DEBTORS' ENTRY INTO AGENCY AGREEMENT, (II) AUTHORIZING THE
DEBTORS TO SELL CERTAIN ASSETS THROUGH STORE CLOSING SALES, (III)
AUTHORIZING THE DEBTORS TO ABANDON UNSOLD PROPERTY, (IV)
WAIVING COMPLIANCE WITH CONTRACTUAL STORE CLOSING SALE
RESTRICTIONS AND EXEMPTING THE DEBTORS FROM STATE WAGE PAY
REQUIREMENTS AND LAWS RESTRICTING STORE CLOSING SALES, (V)
AUTHORIZING THE DEBTORS' ASSUMPTION OF OCTOBER AGENCY
AGREEMENT AND (VI) GRANTING RELATED RELIEF**

      I, Bernard Douton, being duly sworn, hereby depose and say:

      1.      I am over the age of 18 and competent to testify to the matters set forth herein.  I

am a Managing Director of Rothschild Inc. ("Rothschild"), located at 1251 Avenue of the

Americas, New York, New York.

      2.      I obtained a Bachelor of Arts in Economics from Harvard University in 1989,

after which I joined Lazard Freres & Co. as an investment banker.  In 1996, I joined the

Restructuring/Investment Banking division of Peter J. Solomon Co., and in 2000, I joined the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Filene's Basement, LLC (8277), Syms Corp. (5228), Syms Clothing, Inc. (3869), and Syms Advertising Inc. (5234). The Debtors' address is One Syms Way, Secaucus, New Jersey 07094.

Restructuring/Investment Banking division of Rothschild. Since joining Rothschild, I have concentrated my activities on advising debtors and creditors with respect to all aspects of financial restructurings, both out of court and in the context of chapter 11 cases. In my capacity as a financial advisor, I have provided investment banking and financial advisory services to debtors and creditors in a number of industries; such matters have included financing and valuation advice. In particular, I have advised on more than a dozen retail/restaurant restructurings.

       3.      I submit this declaration ("Declaration") in support of the Debtors' Emergency Motion for Entry of Orders Pursuant to Bankruptcy Code sections 105(a), 363(b), 364(e), 365(a) and 554(a), Bankruptcy Rules 2002, 6003, 6004, 9006(c), and 9014 and Local Rules 2002-1 and 9006-1 (A) Scheduling a Hearing and Approving the Form and Manner of Notice of the Motion and Hearing Thereon and (B)(I) Approving the Debtors' Entry into Agency Agreement, (II) Authorizing the Debtors to Sell Certain Merchandise Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance with Contractual Store Closing Sale Restrictions and Exempting the Debtors from Certain State Wage Pay Requirements and Laws Restricting Store Closing Sales, (V) Authorizing the Debtors' Assumption of October Agency Agreement, and (VI) Granting Related Relief (the "Motion").

       4.      The facts set forth in this Declaration are based upon my personal knowledge, upon information and belief or upon client records kept in the ordinary course of business that were reviewed by me or other senior employees of Rothschild who are working on this matter with me. If called and sworn as a witness, I could and would competently testify to the matters set forth herein.

**A.**     **Retention of Rothschild and**
             **Assessment of Alternatives**

5.        On March 9, 2011, the Debtors retained Rothschild as investment banker to assist

the Debtors in developing and pursuing one or more strategic alternatives.  Upon retaining

Rothschild, the Debtors asked Rothschild to undertake certain tasks with respect to the Debtors'

M&A efforts.  These efforts have been led by my colleagues, Steve Lipman, Jill Goodman, and

Steven Tishman, all of whom are also managing directors, and are described in greater detail in

Mr. Lipman's declaration filed concurrently herewith (the "Lipman Declaration").  The Debtors

publicized their efforts to the market, issuing a press release in May 2011 announcing that they

were exploring strategic alternatives and that they had retained Rothschild to assist them in that

process.

6.        Mr. Lipman and Ms. Goodman, assisted by Mr. Tishman, lead efforts on behalf of

the Debtors to explore and evaluate one or more strategic alternatives that, if consummated,

could have preserved the Debtors' businesses as going concerns.  After it became apparent that

there was little market interest in acquiring the Debtors on a going-concern basis, and in light of

expressions of interest from national liquidating firms to serve as agent in a wind-down scenario

of the Debtors' merchandise inventory and other assets, I was tasked with exploring contingency

plans for the possible liquidation of the Debtors' businesses.  Based on my experience in other

retail cases, I believe that the Debtors would not have been capable of administering a store

closing process themselves, especially given the broad geographic scope of their store base and

the need to conduct the process during the critical holiday season.  Accordingly, I recommended,

and the Debtors agreed that they required, the assistance of one or more professional liquidators.

7.        Based on my experience in other retail cases, there are very few liquidators

capable of handling a store closing process of the magnitude contemplated here.  Indeed, the

industry is small, with a limited number of well-known players.  As described further below, prior to the petition date, Rothschild contacted, on the Debtors' behalf, a total of five (5) nationally known liquidators capable of handling a company-wide store closing process, each of whom ultimately executed a confidentiality agreement.  Also as described below, this process led to multiple expressions of interest, proposals, counter-proposals, and negotiations.

8.      In determining to pursue a liquidation of their businesses, the Debtors considered the results of Rothschild's efforts to develop one or more acquisition alternatives, as described in the Lipman Declaration, on the one hand, and Rothschild's efforts to develop a liquidation alternative as described herein, on the other hand.  The latter included not only an analysis of the proposals from the liquidators and the estimated proceeds from store closing sales and sales of furniture, fixture and equipment ("FF&E"), as well as intellectual property assets ("IP"), as described below, but also estimated proceeds from liquidation of the Debtors' owned real estate portfolio and the possibility of mitigating real estate lease rejection claims.

9.      The results of the strategic alternatives process were disappointing, as it became apparent that no party was willing to acquire the Debtors as a going concern largely due to the uncertainty of the viability of the Debtors retail operations; the only written proposals submitted to the Debtors contemplated a liquidation of the Debtors' retail inventory and subsequent treatment of the Debtors' leases and real property assets.  The Debtors, in consultation with their advisors, considered the alternatives of maintaining the status quo, pursuing a bid to acquire the Debtors' business, or commencing a chapter 11 proceeding and liquidating their retail business and subsequently marketing and selling their owned real estate through 363 sales.  The factors behind the Debtors' consideration of alternatives included their self-imposed cash constraints, as depleting real estate resources to fund losses is not a long term viable strategy.  Hence, the

Debtors continued to experience significant losses, a decrease in trade credit being made available by certain of the Debtors' significant vendors, and a forecast of a liquidity shortfall by January 2012, if not sooner. The Debtors also recognized that if they were to pursue a liquidation of their retail business, they had to be prepared to commence that process at the outset of the holiday shopping season beginning with the upcoming Veteran's Day holiday and leading into the critical "Black Friday" shopping weekend after Thanksgiving.

10.     In short, after five (5) months of Rothschild's efforts pursuing one or more going-concern or other out-of-court alternatives and possible liquidation alternatives, the Debtors ultimately concluded that pursuing a liquidation of their retail operations and the mitigation of their lease liabilities through (i) immediate store closing sales, conducted by one or more experienced and reputable liquidators, and (ii) negotiations with the Debtors' landlords would maximize the value of the Debtors' estates for their creditors and shareholders. This alternative also would minimize administrative expenses, while enabling the Debtors to separately pursue a disposition of their owned real estate on an orderly basis.

## B.     The Liquidators' Bid Solicitation Process

11.     Rothschild initially contacted two (2) liquidators, Gordon Brothers Group ("GB") and The Hilco Organization ("Hilco"), in May and June 2011, at which time both parties signed confidentiality agreements and received access to confidential information about the Debtors' operations. However, after having preliminary discussions with GB in June 2011 regarding a liquidation of the Debtors' retail business and mitigation of its lease liabilities, the Debtors directed Rothschild to focus more on going-concern or other alternatives that would have contemplated a sale of the Debtors' entire business. Hilco initially partnered with a real estate investor and participated in those discussions.

12.     As described in the Lipman Declaration, the preliminary results of the strategic alternatives process were unsuccessful as no bids were received to acquire the Debtors' business as a going-concern.  Because of the lack of progress in finding one or more promising, "whole-company" proposals, in-mid August, the Debtors therefore directed Rothschild to begin re-pursuing liquidation proposals in the event a satisfactory sale transaction could not be identified and developed.  Accordingly, Rothschild asked both GB and Hilco to provide liquidation proposals.  GB submitted such a proposal on August 30, 2011, and Hilco submitted a proposal on September 16, 2011.  The proposals followed the same general construct typical of such proposals in the liquidation industry.

13.     In particular, each proposal provided that each liquidator would pay the Debtors a guaranteed amount of cash equal to a fixed percentage of the Debtors' cost value of their inventory, subject to certain adjustments.  After the specified recovery of the liquidated assets had been achieved and sufficient proceeds had been generated to pay the liquidator's expenses, the liquidators would receive a fee based on a fixed percentage of the Debtors' cost value of their merchandise, after which proceeds would be shared with the Debtors on a 50/50 basis.  A significant percentage of the guaranteed recovery would be paid to the Debtors upon commencement of the liquidation, with the balance secured by a letter of credit in favor of the Debtors' prepetition lender, Bank of America, N.A. ("BofA"), and the Debtors.  In addition, the proposals provided for a guaranteed payment for the sale of FF&E and the sale of IP on a "fee for services basis."  Both proposals also provided alternative structures to mitigate the Debtors'

lease liabilities in and out of a chapter 11 proceeding, ranging from an agency arrangement to structures that provided a guaranteed outcome.[2]

14.     I reviewed the initial bids and contacted both liquidators to discuss the key terms of each bid.  I also engaged in extensive negotiations regarding each proposal's terms.  In connection with these discussions, I asked both firms to submit revised proposals in late September and early October 2011.  Moreover, in late September, as the Debtors' contingency planning work intensified, Rothschild also invited the Great American Group ("Great American"), who was working with a partner on a bid for the whole company, to submit a liquidation proposal.  Thereafter, on October 24th and 26th, and at the request of BofA, Rothschild contacted Tiger Capital Group, LLC ("Tiger") and SB Capital Group ("SB"), respectively.  SB had been part of an investor group considering the acquisition of the entire company, but had not previously expressed an interest in providing a liquidation proposal.  SB and Tiger elected to work together on the transaction.

15.     In mid-October, GB, Great American and Hilco each submitted a letter of intent to serve as liquidation agent for the Debtors' inventory, FF&E, and IP.  Given that Great American was also working with an investor group on a potential bid for the entire company, Rothschild initially focused on negotiating with GB and Hilco in an effort to further refine and improve upon their proposed terms.  In addition to numerous phone calls and email exchanges, I met separately with representatives of both Hilco and GB in person to discuss various aspects of their respective proposals.  These discussions were instrumental in improving the economic terms of both liquidators' bids.  Thereafter, on October 21, 2011, GB submitted a revised offer

---

[2]     As discussed below, the Agency Agreement (defined below) which is the subject of the Motion governs the liquidation of the Debtors' merchandise in their retail stores and the disposition of their FF&E.  The Debtors will be seeking court authority to enter into separate agreements governing the treatment of their leases and IP.

through a proposed draft agency agreement. Over this time period, discussions continued with Hilco regarding potential improvements to its bid.

16.     The October 21, 2011 GB bid, which took the form of a proposed draft agency agreement, was based on the form of agency agreement entered into between the Debtors and GB on October 12, 2011 with respect to the liquidation of five (5) Filene's Basement stores. That agreement had been heavily negotiated and included the extensive involvement and explicit agreement of BofA. These forms of agency agreement were based on a standard form of agency agreement accepted in the liquidation industry and used in numerous other retail liquidations.

17.     On October 27, 2011, I supplied Hilco, Great American, Tiger and SB a template form of agency agreement that was based on the GB bid submitted on October 21, 2011, modified to reflect the Debtors' comments and the comments of BofA. I advised them and GB at that time that if the Debtors determined to file chapter 11, they likely would attempt to do so within the following week, though I emphasized that no decision had actually been made to file chapter 11 at that time.

18.     From October 27, 2011 to the petition date, representatives of the Debtor, including me, engaged in numerous discussions with the bidders regarding the terms of the bidders' various proposals. The Debtors' representatives, including me, also participated in discussions with BofA regarding the terms of the template agency agreement. I advised all the liquidators that the Debtors would be accepting final bids of their proposals by Friday, October 28, 2011. By the end of that day, the Debtors received a total of four (4) final bids from GB, Hilco, Great American, and a partnership between SB and Tiger.

19.     At a meeting of the Syms' board of directors held on October 31, 2011, I provided a presentation that summarized the terms of each of the four proposals received on October 28th.

The board also heard a presentation regarding the status of Rothschild's efforts to develop other strategic alternatives. After parallel discussions with all parties in which each party improved their bids, the debtors ultimately accepted a bid from comprised of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (together, the "Agent"), which they considered to be highest and best. The Debtors' advisors worked with the Agent, in consultation with BofA, to finalize the form of agency agreement.

20. Attached to the Motion is the proposed agency agreement with Agent (the "Agency Agreement"). In my view, the process which the Debtors and Rothschild pursued in order to identify an acceptable liquidation proposal was fair, open, comprehensive, and afforded all likely interested parties ample opportunity to conduct due diligence and formulate bids if they chose to do so.

**C.      The Need for Immediate Relief to**
**         Avoid Immediate and Irreparable Harm**

21. I believe that it is critical to commence the store closing sales as soon as possible, and in any event, no later than November 11, 2011, for several important reasons. As noted above, the upcoming holiday shopping season, including the critical "Black Friday" post-Thanksgiving shopping weekend, provides a unique window of opportunity for the Debtors to maximize values from the store closings when retail customers are most likely to shop. However, the Debtors require time to get ready for the Black Friday weekend, including through the Agent's advertising and promotional blitz.

22. To the extent the Debtors delay in commencing their store closing sales, the value they anticipate receiving under the Agency Agreement will decrease. In particular, the guaranteed amount that the Agent is willing to pay to conduct store closing sales will decrease as the sales are delayed due to the inventory level adjustments outlined in the Agency Agreement

that reduces the inventory guarantee percentage as inventory drops. As the Debtors are no longer receiving regular shipments of goods, they expect inventory levels to continue to drop as sales outstrip receipts.

23.    The Agent also needs time to order inventory to augment the Debtor's existing inventory under the Agency Agreement. The Agent has advised the Debtors that if the order approving the Agency Agreement is not entered in early November, it would severely restrict the Agent's ability to obtain the augmentation goods and distribute them to the Debtors' store in a timely manner to capture the critical "Black Friday" shopping opportunity. In fact, the Agent has predicated its purchase of augment inventory on entry of a court order approving the Agency Agreement. Augment inventory is critical to the Debtors' ability to maximize the value of these estates, as the Debtors will receive a share of the net proceeds of any such inventory under the Agency Agreement, after deduction of certain customary fees and expenses.

24.    I believe that the Agency Agreement is the best, and at this point the only, viable method to maximize recoveries for all stakeholders. First, I believe that it is generally more cost-effective for the Agent, with its substantial experience, to conduct these sales, rather than the Debtors. Second, the Agent will provide the Debtors with a guaranteed return for the inventory while still allowing for potential upside through the sharing formula contained therein. I believe that this arrangement will minimize the Debtors' risk, while motivating the Agent to maximize proceeds from the liquidation sales. The Debtor also will receive a guaranteed level of proceeds for their FF&E and additional proceeds from the sale of IP. Finally, the Agency Agreement provides an incentive structure with respect to the mitigation of the Debtors' lease liabilities.

25.    In light of the Debtors' pre-filing solicitation of offers, as well as the competitive bidding process among the nation's top liquidators to enter into the Agency Agreement, I believe

that approval of the Agency Agreement with the Agent is the best alternative to any other form

of liquidation. Also, given the importance of the upcoming holiday shopping season and "Black

Friday," I further believe that scheduling an expedited hearing on shortened notice as early as

possible would allow the Agent to achieve the best results with the liquidation sales.

Accordingly, I believe it is necessary to avoid immediate and irreparable harm to the Debtors'

estates that the Debtors be granted authority to enter into the Agency Agreement and be granted

the relief requested in the Motion on or before November 10, 2011 to enable the store closing

sales to begin no earlier than November 11, 2011.

26.     In sum, based on my experience with retail bankruptcies, I believe that the

Debtors' decision to move forward with the store closing sales on the timetable described in the

Motion will not only not impair recoveries, but will significantly enhance recoveries. This is

because the most able, nationally-recognized liquidators – the only parties that can effectuate a

transaction of this magnitude – have been directly involved in the bidding process, those parties

were provided all the necessary diligence and have expertise in quickly formulating bids, the

solicitation process was routine for such situations, the form of Agency Agreement used is

customary for such transactions, and the terms and conditions in the Agency Agreement are

customary for such transactions, and there was no alternative bid to acquire the Debtors as a

going concern despite the many weeks of solicitation and negotiations with several interested

parties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:　　　　November 2, 2011

　　　　　　　　　　　　　　　　*/s/ Bernard Douton*
　　　　　　　　　　　　　　　　By:　　Bernard Douton
　　　　　　　　　　　　　　　　Title:　Managing Director

843924-New York Server 3A - MSW