## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FILENE'S BASEMENT, *et al.*,[1] | ) | Case No. 11-13511 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | (Re: D.I. 2028, 2030, 2061) |
| | ) | |

## MEMORANDUM[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Currently before me are two separate motions for summary judgment, both concerning the proposed assumption of an unexpired lease at One Syms Way, Secaucus, New Jersey (the "Secaucus Property"), requiring a ticklish, but not insoluble, exercise in contract interpretation. One summary judgment motion was filed by U.S. Bank, National Association ("U.S. Bank"), as landlord, on its objection to the assumption, alleging both prepetition and postpetion defaults on the lease. The other summary judgment motion was filed by Syms Corp. ("Syms"), as tenant, on its objection to the allowance of an administrative, postpetition claim as a required cure to the assumption.  U.S. Bank also filed a cross-motion to strike and exclude testimony of Joshua Stein, an expert Syms procured for the purpose of this contested matter.  I will consider the motions together.  For the reasons stated below, the summary judgment motions will both be granted in part and denied in part.  The cross-motion seeking to strike and exclude the testimony of Joshua Stein will be dismissed as moot.

---

[1] The Debtors are as follows: Filene's Basement, LLC, Syms Corp., Syms Clothing, Inc., and Syms Advertising, Inc.

[2] The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(A) and  (B).

## BACKGROUND[3]

On May 8, 1986, by Assignment and Assumption of Ground Lease, dated May 16, 1986,

Syms assumed the rights as tenant from Hartz Mountain Metropolitan ("Hartz") to what is

known as Severance Lease No. 5 (the "Lease") for use of the Secaucus Property.  The Lease is

one of many "severance leases" created as part of a larger ground lease.  The Lease is for a term

of 299 years and was entered into between First Pennsylvania Bank N.A. as landlord[4] and Hartz

as tenant on April 29, 1977.  In addition to net annual rent, additional rent was fixed at five cents

per square foot.  The landlord is also entitled to percentage rent equal to 15 percent of the

tenant's "Annual Net Cash Flow" (the "Percentage Rent").  Annual Net Cash Flow is defined in

the Lease as "any net excess refinancing proceeds received during any calendar year from any

permanent mortgage refinancing of all or any part of the Demised Land and/or any building

thereon."  Lease Article 2.4(b)(2).  The term "net excess refinancing proceeds" is defined as:

> the amount by which the principal amount of any refinanced
> permanent mortgage covering a building on the Demised Land
> exceeds the unpaid principal balance of any existing mortgage
> covering such building, minus all costs and expenses incurred in
> connection with any such refinancing . . . .

*Id.*  The Percentage Rent for each year comes due on February 28 of the following year.

Syms was the borrower under a $75 million revolving credit facility with Bank of

America N.A. ("Bank of America") pursuant to a Credit Agreement dated as of August 27, 2009

(the "Credit Agreement").  On March 8, 2011, the Debtor entered into the second of three

amendments to the Credit Agreement with Bank of America (the "Second Amendment").  The

Second Amendment provided for what Syms refers to as a "short term, bridge loan" for

---

[3] The facts provided are undisputed by the parties.

[4] Pennsylvania Bank N.A. and CoreStates N.A. were predecessors in interest as landlord to U.S. Bank.

$10 million (the "$10 Million Loan").  The $10 Million Loan was to act as working capital for

Syms while it was finalizing the sale of a property located in Rockville, Maryland.  According to

the terms of the Second Amendment, the $10 Million Loan was to mature at the earlier of

"(i) April 30, 2011, (ii) the consummation of any refinancing of the Secaucus Property . . . , or

(iii) the consummation of any sale-leaseback or other disposition of the Rockville property

permitted under the Second Amendment."

   In the Second Amendment, Bank of America required additional collateral for the

$10 Million Loan, and Syms granted Bank of America a leasehold mortgage in the Lease on the

Secaucus Property (the "Mortgage").[5]  Maximum liability on the mortgage was capped at

$23.4 million.  The sale of the Rockville property closed on May 13, 2011, and the $10 Million

Loan was repaid almost immediately thereafter.

   Syms filed its chapter 11 bankruptcy petition on November 2, 2011.  On February 29,

2012, the day after the Percentage Rent was due according to the Lease, U.S. Bank filed a proof

of claim asserting an administrative claim for approximately $3.5 million.  U.S. Bank asserts in

its claim that the $23.4 million Mortgage that was created between Syms and Bank of America

was a "permanent mortgage" within the meaning of Article 2.4(b)(2) of the Lease and asserted a

claim for 15 percent of $23.4 million.  Syms objected to the claim.

   On May 8, 2012, Syms moved for an order authorizing assumption of the Lease.  U.S.

Bank objected to the assumption based on Syms' failure to pay the Percentage Rent, as well as

unpaid additional rent and attorneys' fees.  To allow the bankruptcy to move forward, Syms and

U.S. Bank stipulated to the creation of a reserve that included an agreed amount for U.S. Bank's

claims.  Syms was then able to proceed with its disclosure statement and plan of reorganization,

which was confirmed by this Court on August 30, 2012.

---

[5] The tenant is permitted to encumber its leasehold interest by Article 20.1 of the Lease.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. " Fed. R. Civ. P. 56(a); Fed R. Bankr. P. 7056.  At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of establishing the absence of a genuine dispute to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").  When the nonmoving party bears the burden of persuasion at trial, the moving party "'may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden.'"  *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence," *Sarko v. Penn-Del Directory Co.,* 968 F. Supp. 1026, 1031 (E.D.Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d

Cir. 1999), or by relying on "conclusory allegations, improbable inferences and unsupported speculation." *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996). "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment." *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993).

Substantive law will determine which facts are material, and only disputes over facts that might affect the outcome of the suit will preclude summary judgment. *Anderson,* 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result."). The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 ("the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## DISCUSSION

A.    Percentage Rent

The issue central to this dispute is U.S. Bank's contention that the Mortgage created by Syms and Bank of America was a "permanent mortgage" within the meaning of the Lease that entitled U.S. Bank to a Percentage Rent claim equal to 15 percent of the principal amount of the Mortgage. Syms responds that the $10 Million Loan was only a "short-term bridge loan" and not a "permanent mortgage" under the Lease and, therefore, no Percentage Rent is due. Syms further argues that, even if the $10 Million Loan creates a Percentage Rent obligation, calculation of the Percentage Rent should be based upon only those loan proceeds actually

received by Syms -- $10 million --  rather than the maximum liability under the Mortgage - -

$23.4 million.  This would decrease the Percentage Rent claim amount from approximately

$3.5 million to $1.5 million.[6]

"[T]he construction or interpretation of a private contract is usually thought to be a

question of state law."  *Beezer East, Inc. v. Mead Corp.*, 34 F.3d 206, 212 (3d Cir. 1994).  Under

Delaware law, express choice of law provisions in contracts are generally given effect.  *Hoinis*

*Int'l Ent., Inc. v. Tandy Corp.,* 867 F.Supp. 268, 271 (D.Del. 1994).[7]  Here, I will apply New

Jersey law as provided in Article 40.1 of the Lease.

"Contract interpretation is usually a question of law in New Jersey."  *SmithKline*

*Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 159 (3d Cir. 1996) (citation omitted).  "Under

New Jersey Law, courts should interpret a contract considering 'the objective intent manifested

in the language of the contract in light of the circumstances surrounding the transaction.'"  *Id.*

(quoting *Dome Petroleum Ltd. v. Emp'rs Mut. Liab. Ins. Co.*, 767 F.2d 43, 47 (3d Cir. 1985); *see*

*also Celanese Ltd. v. Essex Cty. Improvement Auth.*, 404 N.J. Super. 514, 962 A.2d 591, 600

(App.Div. 2009) ("The interpretation of a contract is ordinarily a legal question for the court and

may be decided on summary judgment . . . .").  It is the duty of the court, when interpreting a

contract, to determine whether the terms in dispute are clear or ambiguous.  *Schor v. FMS Fin.*

*Corp.*, 357 N.J. Super. 185, 814 A.2d 1108, 1112 (App.Div. 2002).  "If the language is clear, that

is the end of the inquiry."  *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231,

948 A.2d 1285, 1289 (2008).  The language of the contract is clear if a single intention of the

---

[6] Article 2.4(b)(2) permits the deduction from "net excess refinancing proceeds" of costs and expenses
incurred in connection with any such refinancing . . . ."  I use the claim amounts herein for ease of
reference, but it should be understood that the final claim amounts may change after a more precise
calculation is undertaken.
[7] A bankruptcy court should apply the choice of law rules of the state in which it resides.  *In re PHP*
*Healthcare Corp.,* 128 F.App'x 839, 843 (3d Cir. 2005).

parties can be derived when reading the "document as a whole in a fair and common sense manner." *Barr v. Barr*, 418 N.J. Super. 18, 11 A.3d 875, 882 (App.Div. 2011). Accordingly, the contract should be enforced as the parties intended. *Id.* "[T]he terms of the contract must be given their 'plain and ordinary meaning.'" *Nester v. O'Donnell*, 301 N.J. Super. 198, 693 A.2d 1214, 1220 (App.Div. 1997) (quoting *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F.Supp. 275, 283 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993)). While the parties have a disagreement about interpretation of the Lease, neither contends that the language which is the subject of their dispute is ambiguous.

1. The $10 Million Loan is part of the "Annual Net Cash Flow" under the terms of the Lease.

Under Article 2.4 of the Lease, the Debtor is required to pay 15 percent of Annual Net Cash Flow as Percentage Rent, which includes "all net excess refinancing received during any calendar year from any permanent mortgage refinancing of all or any part of the Demised Land and/or any building thereon." Lease Article 2.4(b)(2). Article 2.4(c) expressly provides that Annual Net Cash Flow **excludes**: "any construction mortgage loan or initial permanent mortgage loan." Lease Article 2.4(c). Both parties agree that the mortgage here, granted in connection with the $10 Million Loan, is not of either type listed explicitly in the exclusions ("Excluded Mortgages").

Syms was authorized to grant the Mortgage by virtue of Article 20 of the Lease, which invests the tenant with the right to grant a leasehold mortgage in the Lease. Thus, argues Syms, the original parties to the Lease recognized that, in addition to "permanent mortgages" and the Excluded Mortgages ("any construction mortgage or initial permanent mortgage loan"), the Lease recognized that the tenant could enter into *other* types of mortgages, specifically leasehold mortgages. Therefore, Syms asserts that the Court should not interpret the term "permanent

mortgage" broadly to include any mortgage other than an Excluded Mortgage.  Syms stresses that the Mortgage at issue is different from a "permanent mortgage" and cannot fall within the ambit of Article 2.4(b)(2).

U.S. Bank argues, to the contrary, that if the Mortgage cannot be characterized as an Excluded Mortgage, then it must be a "permanent mortgage."  U.S. Bank's argument is more persuasive.  The parties did not define the term "permanent mortgage" in the Lease.  However, the parties agreed explicitly which type of financing should be excluded from inclusion in Annual Net Cash Flow and articulated that agreement in Article 2.4(c) of the Lease.  If, as Syms argues, the parties intended that another type of financing should be  insulated from the landlord's reach, the parties did not say so.  In New Jersey, express contractual exclusions are to be narrowly construed.  *See Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 698 A.2d 9, 16 (1997) ("In general, insurance policy exclusions must be narrowly construed.").[8]  Article 2.4(c) should also be construed narrowly and only those exclusions "specific, plain, clear, prominent, and not contrary to public policy will be given effect."  *Doto v. Russo*, 140 N.J. 544, 659 A.2d 1371, 1378 (1995) (citations omitted).  When looking at the Lease as a whole, it is more logical to conclude that if the mortgage at issue is not an Excluded Mortgage, then it must be considered a "permanent mortgage" within the meaning of Article 2.4(b)(2) of the Lease.

2.  <u>The "Annual Net Cash Flow" is calculated based upon the amount Syms received from the $10 Million Loan.</u>

Article 2.4(b)(2) defines "net excess refinancing proceeds" in relevant part as "the amount by which the principal amount of any refinanced permanent mortgage covering a building of the Demised Land exceeds the unpaid principal balance of any existing mortgage covering such building . . . ."  Lease Article 2.4(b)(2).  U.S. Bank asserts that this definition

---

[8] Insurance policies are to be construed as any other contract.  *French v. New Jersey School Bd. Ass'n Ins. Group*, 149 N.J. 478, 694 A.2d 1008, 1015 (1997).

means that "net excess refinancing proceeds" is the amount of cash available under the Mortgage
and not the amount of cash actually received.

The Mortgage provides that "the maximum liability on this Mortgage shall not exceed"
$23.4 million.  It is apparently undisputed that only a $10 million cash advance was made to
Syms pursuant to the Second Amendment. The Lease requires payment of percentage rent equal
to 15% of the Annual Net Cash Flow of the Tenant.  Article 2.4(a).  Article 2.4(b)  provides that
Annual Net Cash Flow means "the total amount *received* by Tenant" (emphasis added) during
each calendar year of the Lease term from "all net excess refinancing proceeds *received . . .*
[from refinancing of] the Demised Land . . . ."  (emphasis added).  Here, Syms *received* only
$10 million from the $10 Million Loan secured by a mortgage of Syms' leasehold interest in the
Demised Land.  The only reasonable interpretation of the applicable Lease provisions is that the
sum to be employed in the calculation of Annual Net Cash Flow, and, consequently, Percentage
Rent, is the amount that was actually *received* by Syms.

Because the Mortgage at issue also serves as part of Bank of America's collateral
package for the entire credit facility (although apparently <u>not</u> included in the borrowing base
formula used to calculate availability for draws), U.S. Bank also argues that any advances – in
addition to the $10 million advance – received by Syms after the date of the Second Amendment
in the course of its borrowings under all revolving credit terms should be included as "Annual
Net Cash Flow" for purposes of calculating Percentage Rent.  The terms of the Lease do not
support this view.  Even if the $23.4 million Mortgage serves as part of Bank of America's
collateral package under the Credit Agreement, and assuming that the $23.4 million Mortgage
played no part in eligibility for borrowings (apart from the $10 million advance pursuant to the

Second Amendment), other draws under the $75 million revolving credit facility bear no relation to the Lease.

Therefore, the Court will grant summary judgment for U.S. Bank and allow the claim for Percentage Rent, but calculation of the Percentage Rent Claim will be limited to the loan proceeds Syms actually received ($10 million), less allowable deductions. Syms' motion for summary judgment on its request to disallow the Percentage Rent Claim will be denied, but Syms' request to limit the Percentage Rent Claim calculation (as stated above) will be granted.

B.    Additional Rent

Under the Lease, Syms is also responsible for additional rent to be paid on a per square foot basis. *See* Lease Article 2.3(a). Both parties agree that while the Lease required additional rent payments of five cents per square foot, Syms paid only three cents per square foot. This created a deficiency of $714.24 per year. The dispute that arises between the parties is the number of years that should be included in calculating a claim to cure that deficiency. U.S. Bank argues that Syms owes $14,999.04, based upon a deficiency for 21 years, dating back to 1991, when a settlement was reached between Syms and then landlord Pennsylvania Bank (the "1991 Settlement") regarding the same issue. Syms disagrees and argues that the statute of limitations on this claim is six years. *See* N.J. STAT. ANN. § 2A:14-1 (West 2012). Syms contends the deficiency for six years (plus interest at the state interest rate of six percent) entitles U.S. Bank to a cure claim of only $5,026.55.

In reply, U.S. Bank argues that Syms cannot rely on the statute of limitations because the equitable principle known as the "discovery rule" provides that the cause of action did not accrue until Syms informed U.S. Bank of the discrepancy *See O'Keefe v. Snyder*, 83 N.J. 478, 416 A.2d 862, 869 (1980). Typically, a cause of action involving a breach of contract accrues from the

time of the breach.  *See Sodora v. Sodora*, 338 N.J. Super. 308, 768 A.2d 840, 842 (Ch. Div.

2000).  However, under the discovery rule, "in an appropriate case, a cause of action will not

accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence

should have discovered, facts which form the basis of the cause of action."  *O'Keefe*, 83 N.J.

478, 416 A.2d at 869.  *See also Villalobos v. Fava*, 342 N.J. Super. 38, 775 A.2d 700, 704

(App.Div. 2001) (Application of the discovery rule has the effect of "postponing the accrual of a

cause of action . . . .").

      Here, it is unclear whether this is the "appropriate case" the New Jersey Supreme Court

envisioned in which to apply the discovery rule.  Syms was required to provide U.S. Bank with

an annual certified statement containing the square footage of all the buildings on the Secaucus

Property, the use of those buildings, and the amount of additional rent owed.  U.S. Bank might

have been able to discern any discrepancy from those statements.  However, U.S. Bank alleges

that it did not receive every statement regularly and, further, that Syms misrepresented the

amount of rent owed on the statements it did receive.[9]

      A party must first perform its own due diligence before relying on the discovery rule to

suspend the time for bringing a cause of action.  *See O'Keefe*, 83 N.J. 478, 416 A.2d at 870

(instructing the trial court, on remand, to determine whether plaintiff used proper due diligence

before giving the plaintiff the benefit of the discovery rule).  Here, U.S. Bank had the right to

audit the statements to assess their accuracy, but there exists a material issue of fact as to whether

U.S. Bank acted with proper due diligence, which would have revealed any additional rent

deficiencies subsequent to the 1991 Settlement.  Therefore, the Court will deny summary

judgment on the issue of additional rent.

---

[9] U.S. Bank does not allege that the misrepresentation was intentional.

C.      Attorneys' Fees

The final piece of U.S. Bank's claim asserts that Syms must reimburse U.S. Bank for all

attorneys' fees incurred as a result of Syms' default.  Bankruptcy Code Section 365(b) does not

specifically include payment of attorneys' fees as part of a cure claim.  However, a party may

recover attorneys' fees if the party is successful in its claim, the fees are reasonable, and the

agreement between the parties specifically allows for such recovery and is permissible under

state law.  *In re Crown Books Corp.*, 269 B.R. 12, 15-16 (Bankr. D. Del. 2001).  The fees sought

must be incurred on the basis of a default of the agreement and not contesting the rights of the

debtor under the Bankruptcy Code.  *Id.* at 17. New Jersey law, while strongly discouraging the

practice, permits the shifting of attorneys' fees when "controlled by a contractual provision . . . ."

*Litton Indus., Inc. v. IMO Indus., Inc.*, 200 N.J. 372, 982 A.2d 420, 427-28 (2009).

Here, the dispute as to the shifting of attorneys' fees rests on the interpretation of the

Lease.  U.S. Bank contends that Article 16 of the Lease, titled "Indemnity," permits recovery of

attorneys' fees, specifically:

> Tenant will indemnify and save harmless Landlord against and from all
> liabilities, obligations, damages, penalties, claims, costs, charges and
> expenses, including reasonable architects' and attorneys' fees, which may
> be imposed upon or incurred by or asserted against Landlord by reason of
> any of the following occurring during the term of this Lease:
> . . . .
>
> > (e) any failure of the part of the Tenant to perform or
> > comply with any of the covenants, agreements, terms or
> > conditions contained in this Lease . . . .

In response, Syms cites to a Third Circuit decision concluding that indemnification "presumes an

obligation to a third party that triggers the indemnitor's obligation to the indemnitee." *Longport*

*Ocean Plaza Condo., Inc. v. Robert Cato*, 137 F. App'x 464, 467 (3d Cir. 2005).  Here, no third

party is involved.  U.S. Bank argues that *Longport* is an unpublished, non-precedential opinion

of the Third Circuit and proceeds to cite to three, also unpublished, district court opinions from within the Third Circuit that contradict *Longport* by concluding that an indemnity clause does not require a third-party obligation to protect the indemnitee. *See Waynesborough Country Club of Chester Cty. v. Diedrich Niles Bolton Architects, Inc.*, Civ. No. 07-155, 2008 WL 4916029 (E.D. Pa. Nov. 12, 2008); *Metex Mfg. Corp. v. Manson and Manson Envtl. Corp.*, Civ. 2008 WL 877870 (D.N.J. Mar. 28, 2008); *STS Holdings, Inc. v. CDI Corp.*, No. 99-3480, 2004 WL 739869 (E.D. Pa. Mar. 19, 2004). *See also SBA Network Servs., Inc. v. Telecom Procurement Servs., Inc.*, 250 F. App'x 487, 492 (3d Cir. 2007) (no third party obligation required under Florida law).

In New Jersey, an indemnity clause should be interpreted using the same rules of construction as any other provision in a contract. *Mantilla v. NC Mall Assoc.*, 167 N.J. 262, 770 A.2d 1144, 1151 (2001). Here, the parties were unable to provide, and the Court was unable to discover, any binding precedent within New Jersey as to whether a duty to indemnify requires the existence of an obligation to a third party. Jurisdictions around the country appear to be split on the issue. It appears that resolution of this issue may require the Court to predict how the New Jersey Supreme Court might decide this issue; however, in light of the Court's ruling on the issue with the most economic consequence to the parties – Percentage Rent – I will reserve ruling on this issue and direct the parties to meet in an attempt to resolve this and any remaining issues.

D.    Cross-Motion to Strike

U.S. Bank filed a separate cross-motion to strike and exclude testimony of Joshua Stein, an attorney and commercial real estate expert retained by Syms to interpret the terms "permanent mortgage" and "net excess refinancing proceeds" as used in the Lease. Because I did not and

13

need not consider parol evidence in rendering my opinion, I need not consider this motion and

dismiss it as moot.  *See Mickens v. Lowe's Cos., Inc.*, Civ. No. 07-CV-6148 (DMC),

2009 WL 4911952, at *2 n. 7 (D.N.J. Dec. 14, 2009).[10]

## CONCLUSION

For the reasons set forth above, U.S. Bank's motion for summary judgment will be

granted, in part, to allow a claim for Percentage Rent, although calculation of the Percentage

Rent claim will be limited to the amount actually received by Syms for the $10 Million Loan

(with allowable deductions) and denied, in part, as to any remaining claims.  Syms motion for

summary judgment will be granted, in part, to limit the amount of the Percentage Rent claim to

the amount actually received, and denied, in part, to all remaining claims. The parties are ordered

to meet and confer about possible resolution of the remaining issues on additional rent and

attorney fees.  U.S. Bank's cross-motion to strike and exclude the testimony of Joshua Stein is

dismissed as moot.

An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY, JUDGE
UNITED STATES BANKRUPTCY COURT

Dated:   February 19, 2013

---

[10] Consideration of common or usual industry terms is not appropriate under these circumstances, since
the intention of the parties to the Lease is capable of determination without resort to extrinsic evidence.  I
am doubtful that, under the circumstances, expert testimony is an adequate substitute for testimony by a
percipient witness or witnesses.