UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re : | |
| : | Chapter 11 |
| **FILENE'S BASEMENT, LLC, *et al.*,** : | |
| : | Case No. 11-13511 (KJC) |
| Debtors : | (Jointly Administered) |
| : | (Re: D.I. 1263) |
| : | |

# MEMORANDUM[1]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On or about February 24, 2012, Ultra Stores, Inc. ("Ultra") filed a proof of claim (#2302) ("Claim") in the chapter 11 cases of Filene's Basement, LLC ("Filene's") and its affiliated debtors (collectively, the "Debtors").[2]  Ultra's claim arises from an alleged breach of contract by the Debtors as a result of the Debtors' closure of leased stores where Ultra was licensed to operate jewelry departments. Ultra's claim in the amount of $6,346,276 is comprised of its alleged lost future profits for the full term of the contract. On May 26, 2011, the Debtors filed an Objection to Ultra's Proof of Claim (the "Objection") (D.I. 1263), to which Ultra filed a Response (the "Ultra Response") (D.I. 1431).[3]  A Hearing on the Objection was held on

---

[1] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).  This contested matter involves a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(B).

[2] The following chapter 11 debtors are jointly administered in this case: Filene's Basement, LLC; Syms Corp.; Syms Clothing, Inc.; and Syms Advertising, Inc.

[3] The Official Committee of Unsecured Creditors joins in the Debtors' Objection (D.I. 1424) as does the Official Committee of Syms Corp. Equity Security Holders (D.I. 1429).

1

February 14, 2013. For the reasons set forth below, the Court will sustain the Debtors' Objection and disallow Ultra's Claim.

I.  **Undisputed Facts**

Filene's and Ultra are parties to an agreement that consists of (i) the Licensed Department Agreement dated November 13, 2007 (the "License") and (ii) the First Amendment to Licensed Department Agreement dated March 15, 2011 (the "Amendment," and, together with the License, the "Contract").[4] In the Contract, Filene's granted Ultra an exclusive license to run the jewelry departments in certain of the Debtors' leased stores (the "Licensed Departments"). In return, Ultra made periodic payments to Filene's based upon a sales formula set forth in the Contract. Pursuant to the Amendment, the Contract was set to expire in February 2016. The Contract includes the following relevant provision:

> This Agreement is subject to certain Licensor leases for leased spaces, as such leases may be modified and amended from time to time (individually a "Lease," and collectively, the "Leases"). *If a Lease is terminated, whether voluntarily or involuntarily, or Licensor loses, or is obligated to vacate, any of the said leased spaces governed by the Leases for any reason or cause, Licensor shall not be liable to Vendor for any loss, claim, injury or damage of any kind related to or arising out of the loss of such leased space* and Vendor agrees to cooperate in vacating the Licensed Department in accordance with Licensor's reasonable requirements.

(License, §2(f)) (emphasis added).[5]

On November 2, 2011, the Debtors filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code. Since the filing of the petition, the Debtors have proceeded to end all

---

[4] Copies of the License and Amendment were attached as Exhibits 1 and 2, respectively, to the Supplemental Declaration of Ann Keefe in Support of Debtors' Objection. (D.I. 1442). Filene's Basement, Inc. was the original party to the License. The Amendment recites that Filene's Basement, LLC assumed the rights and obligations of Filene's Basement, Inc. under the License.

[5] The 2007 License provided initially for the Licensed Departments to be located in 36 existing Filiene's retail stores and three other stores anticipated to be opened. (License, Ex. A). By contrast, the 2011 Amendment substituted the list of stores where Licensed Departments were located, now numbering only 18, but anticipating two of the 18 locations were to be closed. (Amendment, §4 and Ex. F thereto).

2

retail operations, by, among other things, holding going out of business sales and closing all of their retail locations.[6] Consequently, Ultra ceased operating the jewelry departments in all of the Debtors' retail locations. Ultra made its last contractual payment to the Debtors in January 2012. On February 24, 2012, Ultra filed its Claim against the Debtors in the amount of $6,346,276[7] arising from an alleged breach of contract by the Debtors as result of their store closures.

By order dated August 30, 2012, this Court confirmed the Debtors' Chapter 11 Plan (DI#1983).

## II. Discussion

It is undisputed that the Contract is governed by laws of the Commonwealth of Massachusetts. "Under Massachusetts law the interpretation of a contract is ordinarily a question of law for the court" and when the court "find[s] the contract language unambiguous, it must interpret it according to its plain terms." *Agri-Mark, Inc. v. Niro, Inc.*, 233 F.Supp.2d 200, 209 (D. Mass. 2002) (citations omitted); *see also Larabee v. Potvin Lumber Co.*, 390 Mass. 636, 641, 459 N.E.2d 93, 97 (Mass. 1983) ("[W]hen the words of a contract are plain and free from ambiguity they must be construed in their usual and ordinary sense."). Furthermore, when the terms are unambiguous "[t]here is usually, then no need to consult extrinsic evidence." *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 48 (1st Cir. 2004). Contract terms are to be "construed

---

[6] The Debtors assert that they have rejected, terminated or assigned all of the leases at their retail and warehouse spaces. During argument on February 14, 2013, (there was no evidentiary presentation, except for submission of documents, including the Contract, attached to various pleadings), Ultra questioned whether *all* leases had been rejected or terminated. The Declaration of Gary Binkoski, submitted in support of the Debtors motion to reject the Contract (¶2) (D.I. 1262) (the "Rejection Motion") so states. Ultra did not dispute this in its "Limited Objection" to the Rejection Motion (D.I. 1428). No order has yet been entered on the Rejection Motion. The Debtors make the same assertion via the Declaration of Ann Keefe in support of the Objection (D.I. 1263). No additional evidence on this subject was adduced at the February 14, 2013 hearing. In any event, there is no dispute that the Debtors have ceased operations at all locations subject to the Contract and that the Filene's stores containing Licensed Departments are closed permanently. (Ultra Response at ¶5).

[7] Ultra calculated this claim amount by determining its previous 12 month profits for the period ending October 2011 and using that value to predict its future profits for the remainder of the Contract term. (Ultra Response at ¶6).

3

together to find a coherent whole." *Id.* at 49. Importantly, "[w]here knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document . . . they . . . should be held to the language they choose." *Cabot Corp. v. AVX Corp.*, 448 Mass. 629, 638, 863 N.E.2d 503, 512 (Mass. 2007) (internal quotations omitted).

Both parties agree that the language of §2(f) is unambiguous and that the resolution of their dispute over its interpretation is settled by a plain language reading as directed by Massachusetts law. The crux of the disagreement is whether the "plain language meaning" of §2(f) of the License relieves Filene's from any damage claim by Ultra when, as here, Filene's has vacated *all* of its retail locations.

The Debtors argue that the damages waiver in §2(f) applies when Filene's loses or vacates "*any* of the said leased spaces governed by the leases."[8] The Debtors contend that the use of the word "any" implies necessarily that the waiver is in effect when, as here, the Debtors have relinquished all of the leased properties as a result of their Chapter 11 filing. According to the Debtors, under the plain meaning standard, this language provides for a "clear and unambiguous damages waiver"[9] and strips Ultra of its ability to bring a claim in this Chapter 11 proceeding.[10]

Ultra focuses upon different language in §2(f), namely: "a lease," "leased space," and "leased department," stressing that all of the terms are singular. This emphasis on the singular terms is central to Ultra's argument that, according to the Contract's plain language, the damages

---

[8] Debtor's Reply to Ultra's Response to Objection, (D.I. 1441 at ¶5, citing §2(f) of the License) (emphasis in original).

[9] Debtors' Reply to Ultra's Response to Debtors' Objection (D.I. 1441 at ¶2).

[10] The Debtors argue in the alternative that (i) the Claim is invalid as the computation of the claim amount is too speculative; and (ii) Filene's terminated the Contract by cessation of retail operations and now preemptively chooses to not renew the Contract thus barring any present and future claims by Ultra. The resolution of these alternative arguments is unnecessary as I sustain the Debtors' Objection based upon their lead argument with respect to the plain language reading of §2(f).

4

waiver applies only to the termination of an individual lease of retail space, not the termination of every lease.

Ultra bolsters its argument by referencing another License provision, §4(b), which states in relevant part: "[u]pon termination of this Agreement for any reason as to one or more Licensed Departments individually, *or with respect to all Licensed Departments,* Licensor shall be entitled to recover immediately exclusive possession of the Licensed Department so affected . . . ." (License, §4(b) (emphasis added)). Ultra argues that, under Massachusetts law, contract provisions are interpreted in light of the other existing provisions.[11] Accordingly, Ultra contends that because the parties distinguished between an individual department and all jewelry departments in §4(b), the parties could have included that same distinction if §2(f) was also intended to apply to both individual departments and all departments. Ultra further argues that reading the language of §2(f) as the Debtors propose would render the language and distinction made in §4(b) superfluous.

The Debtors respond to Ultra's §4(b) argument by stressing that the two provisions can exist harmoniously as they do not address the same contingencies. While §2(f) is concerned with the bar of claims with respect to lease terminations, §4(b) addresses the procedure for the repossession of jewelry counters by Filene's upon the Contract's termination.

Lastly, in support of its interpretation of §2(f), Ultra stresses that the economic realities surrounding the Contract do not support the Debtors' reading of the disputed provision. Although it was sound business judgment for Ultra to waive any claims upon losing a single lease in anticipation of future store openings, Ultra vehemently denies that it would have entered into any arrangement in which Ultra would, in effect, be agreeing to a termination-at-will provision. As

---

[11]Ultra's Response at ¶12 citing, *Nadherny,* 390 F.3d at 49, *McMahon v. Monarch Life Inc. Co.,* 345 Mass. 261, 264, 186 N.E.2d 827 (Mass. 1962).

no such provision exists in the Contract, Ultra argues that Debtors' reading of §2(f) cannot stand. The Debtors respond by arguing that under Massachusetts law, if a contract provision is unambiguous, then the provision is interpreted in accordance with its plain language, without resort to extrinsic evidence such as parties' intent or economic conditions.

Ultra's narrow focus on two or three phrases in §2(f) referring to a lease, singularly, is unconvincing when the provision is read as a whole. Although, as Ultra points out, the provision stipulates that "[i]f *a* lease is terminated," Filene's shall not be liable to Ultra, it also stipulates that liability is waived if Filene's "loses, or is obligated to vacate, *any* of said leased spaces governed by the Leases for *any* reason or cause…" (License, §2(f)). The use of the word "any" is far more indicative of the parties' intentions, specifically as "any" precedes the real concern Ultra has in this contract: the contingency of Filene's losing or vacating "*any* of said leased spaces," something that would follow from the termination or loss of "a" lease or obligation to vacate leased space. (Contract §2(f)). The plain language of the paragraph provides that the loss of Filene's retail spaces results in the loss of Ultra's jewelry departments.

"Any" as defined by Merriam-Webster's Dictionary is an all inclusive term, meaning "one, some, or all indiscriminately of whatever quantity."[12] "Any," can be used either as a pronoun or as an adjective.[13] In §2(f), where "any" modifies the noun "leased spaces" its use is as an indefinite adjective. "Any," as an indefinite adjective, can mean *all, any, none or some.*[14] Here, a plain language reading of the indefinite adjective "any" preceding the noun "leased spaces," conveys the message that the parties contemplated a waiver of liability if *all, any,* or

---

[12] Merriam-Webster Dictionary, http://www.meriam-webster.com/dictionary/any (accessed May 6, 2013).
[13] *See What is an Adjective*, The Writing Centre HyperGrammar, http://www.arts.uottawa.ca/writcent/hypergrammar/adjectve.html (last visited May 6, 2013); *What is a Pronoun,* The Writing Centre HyperGrammar, http://www.arts.uottawa.ca/writcent/hypergrammar/pronouns.html (last visited May 6, 2013).
[14] HyperGrammar, http://www.arts.uottawa.ca/writcent/hypergrammar/adjectve.html (last visited May 6, 2013).

*some* of the spaces were vacated, rather than contemplating only a specific or individual space being lost.

One Massachusetts court noted that "[t]he particle 'a' is not necessarily a singular term; it is often used in the sense of 'any' and is then applied to more than one individual object.*"* *President & Fellows of Harvard College v. PECO Energy Co.*, 57 Mass.App.Ct. 888, 892, 787 N.E.2d 595, 598 (Mass. App. Ct. 2003) (quoting *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Chatham*, 404 Mass. 365, 368, 535 N.E.2d 597 (Mass. 1989)).  The Court further noted that, had the parties truly intended to refer to a singular item, "more precise language was available. The word 'a' strikes us as too skimpy a foundation on which to place such weight." *Harvard*, 787 N.E.2d. at 599.  I am, similarly, not inclined to limit the use of the article "a" to mean "one" when its use in §2(f) can more plainly be understood to stand for more than one object, especially in light of the rest of the provision's language.

Lastly, I turn to Ultra's argument concerning the economic reality surrounding the Contract and that the Debtors' reading of §2(f) is inconsistent with this reality. Ultra argues that it would have never signed a Contract that, under the Debtors' view of §2(f), incorporates a "termination-at-will provision" in return for the exclusive operation of Filene's jewelry counters. I am unmoved by this contention. The Debtors are correct in pointing out that when a contract is unambiguous, extrinsic evidence is not permitted in the interpretation of contract terms.  It is not for the Court to consider what Ultra might or might not have done.[15] I can only consider that to which Ultra agreed, in the form of the Contract before me. The economic conditions referred to by Ultra are extrinsic to the Contract and are therefore beyond the scope of my inquiry.

---

[15] *See Rogaris v. Alberti*, 431 Mass. 833, 835, 730 N.E.2d 869, 871 (Mass. 2000) *(*"It is not the role of the court to alter the parties' agreement"); *AVX Corp v. Cabot Corp*, 23 Mass. L. Rptr. 428, 2007 WL 4711495, *6 (Mass. App. Ct. 2007) ("The Court must be careful not to . . . let matters outside the four corners of the instrument . . . overwhelm or change the document itself.").

Moreover "[w]here knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document . . . they are entitled to and should be held to the language they choose." *Cabot*, 863 N.E.2d at 512.  Ultra must be held to the terms as written.

### IV.    Conclusion

Massachusetts law requires a plain language reading when a contract provision is unambiguous. I conclude that §2(f) is unambiguous and its plain language provides that Ultra relinquished the right to any claim if any or all of the leased spaces were lost or vacated.

For the foregoing reasons, the Court will sustain the Debtors' Objection and disallow and expunge Ultra's Claim.  An appropriate Order follows.


BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

DATED:  May 8, 2013