## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| FILENE'S BASEMENT, LLC, *et al.*,[1] | : | Case No. 11-13511 (KJC) |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |
| | : | (Re: D.I. 2707) |
| | : | |

## MEMORANDUM[2]

**BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

In this contested matter arising in the jointly administered chapter 11 cases of Filene's Basement, LLC and its affiliates (collectively, the "Debtors"), the Debtors objected (the "Objection" (D.I. 2707)) to the proof of claim filed by former landlord Connecticut/DeSales LLC (the "Landlord"). The Objection raises two issues concerning the proper interpretation and scope of Bankruptcy Code §502(b)(6): (1) whether the "15 percent" referred to in §502(b)(6)(A) refers to 15 percent of the remaining term of the lease or 15 percent of the remaining rent due under the lease; and (2) whether the limitation on lease termination damages in §502(b)(6) encompasses a lessor's claims for removal of abandoned furniture and fixtures and for satisfaction of a mechanic's lien.

For the reasons stated below, the Court concludes that (i) reference to "15 percent" in §502(b)(6)(A) is a measure of the remaining term of the lease, (ii) the

---

[1]The Reorganized Debtors in this bankruptcy case are: Filene's Basement, LLC, Syms Corp., Syms Clothing, Inc., and Syms Advertising Inc.

[2]This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052.

Landlord's claim for removal of abandoned furniture and fixtures falls within the §502(b)(6) cap and is not allowed as a separate claim, and (iii) the Landlord's claim for satisfaction of a mechanic's lien does not fall within the limitation of §502(b)(6) and may be asserted as a separate claim.

## I.    BACKGROUND[3]

### A.    The Debtors' Chapter 11 Case

The Debtors collectively owned and operated forty-six "off-price" retail stores under the "Syms" and "Filene's Basement" names.[4] Many of the store locations were in commercial properties leased by Filene's Basement or Syms.[5]  On November 2, 2011, the Debtors filed voluntary chapter 11 bankruptcy petitions.

On August 30, 2012 the Court entered the Order Confirming the Modified Second Amended Joint Chapter 11 Plan of Reorganization of Syms Corp. and its Subsidiaries (the "Plan") (D.I. 1983). The Plan provides that holders of Class 4 general unsecured claims of Filene's Basement, LLC will receive 100% payment in cash, and holders of Class 5 lease rejection claims of Filene's Basement, LLC will receive 75% payment in cash. (Plan, §V.D.4 and 5).

### B.    The Lease

On October 7, 1986, Connecticut/DeSales Partnership (the "Original Landlord") and Raleigh Stores Corporation (the "Original Tenant") executed a retail lease (the

---

[3] The parties agree that the facts of this matter are not in dispute.

[4] Declaration of Gary Binkoski, Interim Chief Financial Officer of Syms Corp., in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (D.I. 3), ¶7.

[5] *Id.*, ¶¶ 8-9.

"Retail Lease") for nonresidential real property located at 1133 Connecticut Avenue NW, Washington, D.C. 20013 (the "Leased Premises"). The original term of the Retail Lease was 20 years, with four options to renew for additional terms of 10 years each. The Original Landlord and the Original Tenant modified the Retail Lease three times.[6]

On February 7, 2008, the Original Landlord and Filene's Basement, Inc., as successor-in-interest to the Original Tenant, entered into the Third Amendment to the Retail Lease to expand the leased premises and to provide for certain improvements to be made by Filene's Basement, Inc.

On March 10, 2010, Connecticut/DeSales LLC ("Landlord"), as successor-in-interest to the Original Landlord, and Filene's Basement, LLC ("Filene's") entered into the Fourth Amendment (the Retail Lease, together with all amendments and modifications thereto, is referred to herein as the "Lease"). The Fourth Amendment settled state court litigation between the Landlord and Filene's concerning a disagreement over the Minimum Annual Rent provision. The Fourth Amendment notes that Filene's exercised its First Option Term under the Retail Lease, which began on February 1, 2009, and would have expired on January 31, 2019.

The Lease defines "rent" to include "minimum annual rent," "percentage rent," and "additional rent."[7] During the then current Lease term, the minimum annual rent was

---

[6] The first amendment to the Lease was made by a Memorandum of Understanding dated February 11, 1988; next, by a First Amendment dated April 25, 1988; and then, by a Second Amendment dated December 28, 1989.

[7] Article 4, §4.01 of the Lease provides, in part: "In this Lease, the term 'Rent' means collectively, the Minimum Annual Rent, Percentage Rent and Additional Rent and with respect to the payment of Rent and the performance by Tenant of all of its other covenants and obligations under this Lease, time is and shall be of the essence."

(continued on next page)

3

$1,736,961 until January 31, 2014, after which date the minimum annual rent would increase by 6.46% for a total of $1,849,168 per year. (Fourth Amendment, §4.b.)

Upon the expiration or termination of the Lease, the Debtors were required to surrender the Property "broom clean, free of debris and Tenant's personal property, in good order, condition and state of repair." (Lease Section 26.01.)  In addition, §26.01 states:

> Any property of Tenant not promptly removed shall be deemed to have been abandoned by Tenant and to have become the property of Landlord and may be retained by Landlord or disposed of at Tenant's expense (Tenant hereby agreeing to remain liable for the cost thereof even though this Lease shall have terminated) as Landlord shall so desire . . . .

In December 2011, the Court approved rejection procedures for leases that the Debtors were unable to sell (the "Rejection Procedures Order," D.I. 505).  Pursuant to the Rejection Procedures Order, leases were to be "deemed rejected as of the later of December 31, 2011 or the date the Debtors have unequivocally surrendered their leasehold interests." (D.I. 505, ¶ J).

## C.    The Claim

On January 20, 2012, the Landlord timely filed a proof of claim in the amount of $2,788,393.57 for amounts due in connection with the Lease (Claim No. 1680). The Landlord calculated its claim as follows:

---

Additional Rent is defined in Section 4.10 as "all sums of money or charges of whatsoever nature (except Minimum Annual Rent and Percentage Rent) required to be paid by Tenant to Landlord pursuant to this Lease, whether or not the same is designated as additional rent."

Further, Section 4.12 provides: TOTAL RENT. "The rent reserved under this Lease shall be the total of all Minimum Annual Rent, Percentage Rent and Additional Rent, increased and adjusted as elsewhere herein provided, payable during the entire Lease Term . . . ."

Reserved Rent
| Base Rent | $ 13,009,242.00 |
| Operating Expense Reimbursement | $ 5,053,810.00 |
| Utilities, HVAC, and Vertical Transportation | $ 279,538.00 |
| | $ 18,342,590.00 |
| | x 0.15 |
| **Total as Capped by §502(b)(6)(A)** | **$2,751,388,50** |

Unpaid Rent
| November 2011 Stub Rent Not Previously Paid | $ 6,494.07 |
| Removal of Abandoned Furniture & Fixtures | $12,000.00 |
| Mechanic's Lien Filed by Kone, Inc. | $18,511.00 |
| **Total Under §502(b)(6)(B)** | **$37,005.07** |

| **TOTAL CLAIM** | **$2,788,393.57** |

To narrow the issues relating to the Objection, the Landlord filed an amended proof of claim for "Lease Rejection" on December 10, 2013 (the "Claim," D.I. 2726), with the following revised breakdown:

Reserved Rent
| Base Rent | $ 13,009,242.00 |
| Operating Expense Reimbursement | $ 4,573,519.00 |
| Utilities, HVAC, and Vertical Transportation[8] | $ 243,513.00 |
| | $ 17,826,274.00 |
| | x 0.15 |
| **Total as Capped by §502(b)(6)(A)** | **$2,673,941.10** |

Unpaid Rent
| November 2011 Stub Rent Not Previously Paid | $6,494.07 |

| **Total §502(b)(6) Rejection Claim** | **$2,680,435.17** |

---

[8] The Attachment to the proof of claim provides that: "The operating expense reimbursements consist of tenant's 22.36% share of the building's expenses due as Additional Rent under the Lease during Remaining Term and payable at the beginning of each month. The separate listing of direct costs for electricity/HVAC are for emergency lights, electric heat for freeze protection, HVAC to prevent mold from heat and humidity and lighting to show the premises to prospective tenants. The separate listing of direct costs for vertical transportation is for quarterly grease and lubrication of the premises' internal elevator and escalators to keep them in working order."

Additional Claims
Removal of Abandoned Furniture & Fixtures                $   5,000.00
Removal of Mechanic's Lien Filed by Kone, Inc.           $ 18,511.00
                                                          $ 23,511.00

**TOTAL CLAIM**                                          **$2,703,946.17**

In the Attachment to the proof of claim, the Landlord explains that the "'Operating Expense reimbursements' are now based on 2012 actual numbers, except for actual 2013 real estate taxes, and have been divided into the following categories: real estate taxes, insurance and common-area maintenance expenses. All general and administrative costs other than insurance that were included [in the original claim] as operating expense reimbursements have been excluded from this amended proof of claim." (D.I. 2726-1, p. 2.)

The Court heard oral argument on the Objection, and the parties submitted supplemental letter briefs. The matter is ripe for decision.


## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §1409. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(B).


## III.    DISCUSSION

The Debtors' Objection to the Landlord's Claim asserts that the Claim exceeds the amount allowed by Bankruptcy Code §502(b)(6) for claims resulting from the termination of a real property lease.  Section 502(b)(6) provides, in pertinent part:

    (b)      [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that - -

. . . .

    (6)      if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds - -

        (A)    the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of - -

            (i)     the date of the filing of the petition; and

            (ii)    the date on which such lessor repossessed, of the lessee surrendered the leased property; plus

        (B)    any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. §502(b)(6).

## A.    Time vs. Rent

The Landlord's Claim calculates the amount of the §502(b)(6)(A) cap by determining the total Base Rent and other "rent" amounts due for the remaining term of the Lease and multiplying that total by 15 percent. The Debtors argue that the reference to "15 percent" in §502(b)(6)(A) is a measure of *time* remaining under the lease term, pointing out that the context of the provision is temporal.

Both parties' views find support in the decisions by other courts, which are divided over the proper interpretation of §502(b)(6)(A). *Compare In re Connectix Corp.*, 372 B.R. 488, 491-93 (Bankr. N.D. Cal. 2007) (following the "time" approach); *In re Iron-Oak Supply Corp.*, 169 B.R. 414, 420 (Bankr. E.D. Cal. 1994) (same); *Sunbeam-Oster Co. v. Lincoln Liberty Ave., Inc. (In re Allegheny Intern., Inc.)*, 145 B.R. 823, 828 (W.D. Pa. 1992) (same); *with In re New Valley Corp.*, 2000 WL 1251858, at *11-12

7

(following the "rent" approach"); *In re Andover Togs, Inc.,* 231 B.R. 521, 540-41 (Bankr. S.D.N.Y. 1999) (same); *In re Gantos, Inc.,* 176 B.R. 793, 795-96 (Bankr. W.D. Mich. 1995) (same).[9] The Third Circuit has not ruled on this question, although in dicta the Court has explained that under the §502(b)(6)(A) cap, "a landlord-creditor is entitled to rent reserved from the greater of (1) one lease year or (2) fifteen percent, not to exceed three years, of the remaining lease term." *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 207 (3d Cir. 2003).

"The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter.'" *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "If the terms of a statute are unambiguous, the plain meaning of the statue will govern." *Estate of Palumbo v. U.S.,* 675 F.3d 234, 238-39 (3d Cir. 2012). If the Court finds that a statute is ambiguous, the Court must then turn to legislative intent and other supplementary canons of interpretation to discern Congress' intent. *U.S. v. Gilchrist,* 215 F.3d 333, 336 (3d Cir. 2000).

Is §502(b)(6)(A) ambiguous? Courts have interpreted this Code section in different ways. Yet, "just because a particular provision may be, by itself, susceptible to differing constructions does not mean that the provision is therefore ambiguous." *Price v. Delaware State Police Federal Credit Union (In re Price),* 370 F.3d 362, 369 (3d Cir. 2004). In *Price,* the Third Circuit Court of Appeals determined:

---

[9] The "rent" approach is sometimes referred to as the "majority" view, but a review of the case law reveals that courts appear to be evenly split. There is no clear majority of decisions favoring either the "rent" approach or the "time" approach. *See Connectix,* 372 B.R. at 491.

[A]mbiguity does not arise merely because a particular provision can, in isolation, be read in several ways or because a Code provision contains an obvious scrivener's error. *Lamie v. United States Trustee,* 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). Nor does it arise if the ostensible plain meaning renders another provision of the Code superfluous. *Id.* at 1031. **Rather, a provision is ambiguous when, despite a studied examination of the statutory context, the natural reading of a provision remains elusive.** In such situations of unclarity, "[w]here the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived," *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805) (Marshall, C.J.), including pre-Code practice, policy, and legislative history.

Yet policy, pre-Code practice, and such other tools of construction are to be relied upon only when, ultimately, the meaning of a provision is not plain. When, however, we can arrive at a natural reading of a Code provision, informed not only by the language of the provision itself but also by its context, the burden to persuade us to adopt a different reading is "exceptionally heavy." *Hartford Underwriters [Ins. Co. v. Union Planters Bank, N.A.],* 530 U.S. [1],at 9, 120 S.Ct. 1942 [2000] quoting *Patterson v. Shumate,* 504 U.S. 753, 760, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992)

*Price,* 370 F.3d at 369 (bold emphasis added).

The text at issue here provides that a claim for lease termination damages should be disallowed to the extent it exceeds *"the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease . . ."* A natural reading of this language supports the "time" approach:

Structurally, in comparing the greater or lesser of two things, the measurements of those things must be parallel, e.g. time versus time. The statute allows landlords to claim damages in the amount of rent reserved for the greater of one year or 15% of the remaining term. Because "one year" is inherently temporal, the phrase "remaining term" necessarily refers to time. This establishes that the statute measures "rent reserved within time periods." Therefore, the sentence structure of the statute supports the time approach.

An ordinary reading of the statute is consistent with this reasoning. The phrase "term of a lease" commonly refers to the length of a lease based on

9

time rather than rent. In addition, the statute is generally written in terms of time: the calculation of the cap begins following the earlier of two dates, the date of petition or repossession, the maximum cap is worded in terms of time, three years, and the statute requires the rent to be calculated "without acceleration."

*In re Heller Ehrman LLP*, 2011 WL 635224, at *2-3 (N.D. Cal. Feb. 11, 2011) (citations omitted); *accord In re Blatstein*, 1997 WL 560119, at *15 (E.D. Pa. Aug 26, 1997) ("Because 'not to exceed three years' immediately follows '15 percent,' the 15% figure must apply to the time remaining and not the rent remaining.); *In re Shane Co.*, 464 B.R. 32, 40 (Bankr. D. Colo. 2012) ("To read §502(b)(6)(A) as referring to 15% of the total rent due over the full remaining term of the lease is inconsistent with the natural reading of the remainder of that subsection."). A leading treatise, *Collier on Bankruptcy*, also supports the "time" approach:

> Grammatically, the "greater of" phrase contemplates two time periods, one year and 15 percent of the remaining term. But the latter period (15 percent of the remaining term) is further limited to three years, so that if the remaining lease term exceeds 20 years, the allowable damage claim will not increase. The paraphrasing of this provision in the legislative history supports this interpretation. This reading therefore appears to be the better view.

4 COLLIER ON BANKRUPTCY ¶ 502.03[7][c] (16th ed. 2015).

Furthermore, the phrase "without acceleration" in §502(b)(6)(A) lends further support to the "time" approach because the "rent" approach would render this phrase superfluous: "[t]aking 15 percent of all the rent for the remaining term, especially where escalation clauses are present, would be tantamount to effecting an acceleration." *Iron-Oak Supply*, 169 B.R. at 420. "It is a black letter rule of statutory interpretation that, if possible, a court should construe a statute to avoid rendering any element of it superfluous." *First Bank Nat. Ass'n v. F.D.I.C.*, 79 F.3d 362, 367 (3d Cir. 1996) (citing

*United Steelworkers of Am. v. North Star Steel Co., Inc.*, 5 F.3d 39, 42 (3d Cir. 1993),

*cert. denied*, 510 U.S. 1114, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994)).

Based on a reading of the plain language of §502(b)(6), there is no need to

employ other tools of statutory construction; however, other decisions note that the

legislative history and policy behind capping a landlord's claim for lease termination

damages also support the "time" approach. *Heller Ehrman*, 2011 WL 635224, *4-*6,

*Connectix Corp.*, 372 B.R. at 493-94; *In re Allegheny Int'l*, 136 B.R. 396, 402 (Bankr.

W.D.Pa. 1991) *aff'd* 145 B.R. 823 (W.D.Pa. 1992).

The detailed discussion of the legislative history of §502(b)(6)(A) found in the

*Connectix* case traces use of the "time" approach for calculating a landlord's claim.

"Prior to 1934, a landlord's claim for future rent damages due to premature lease

termination was not recognized in bankruptcy because it was considered contingent and

not capable of proof." *Connectix*, 372 B.R. at 491. A compromise was reached in the

1934 and 1938 amendments to the Bankruptcy Act to allow "landlords to assert some

amount as a claim for future rent, but with limited sacrifice on the part of general

creditors." *Id.* at 492. The Bankruptcy Act limited a landlord's claim in a liquidation

case to rent for the "year next succeeding" the date of surrender or reentry, and limited a

landlord's claim in a rehabilitation case to rent for "the three years next succeeding"

surrender or reentry. *Id.* The draft of the 1978 Bankruptcy Code continued the Act's

limitation on landlord claims for lease rejection damages, but introduced the percentage

calculation. *Id.* However, as noted by the *Connectix* Court:

> [T]he percentage calculation was intended to replace the dual time
> provisions employed in the Bankruptcy Act. There is no indication,
> however, that Congress intended to move away from calculating the cap
> based on the rent that would become due within a time period immediately

succeeding the statutory trigger date. Because there is no clear expression of an intent to change from a time approach to a "total rent" based formula, it cannot be presumed that Congress intended to make that shift. *Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 227, 77 S.Ct. 787, 791, 1 L.Ed.2d 786 (1957) ("no changes in law or policy are to be presumed from changes of language in the revision unless an intent to make such changes is clearly expressed.")

*Connectix,* 372 B.R. at 493. The *Connectix* Court also quoted the House Judiciary Report regarding an earlier version of the statute, which supports the view that the Code's computation of a landlord's future rent claim is based on time:

The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or *10% of the remaining lease term*, not to exceed three years *after* the earlier of [the petition date or the date of surrender or repossession.]

*Connectix,* 372 B.R. at 493-94 (emphasis in *Connectix*) quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 353 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5849 *reprinted in* Collier on Bankruptcy (15th Rev. Ed.), vol. C, App. Pt. 4(d)(i).

Other courts have reasoned that the "rents" approach is more equitable because it allows landlords to recover damages based upon rent increases the parties bargained for when they entered into the lease. *In re Gantos, Inc.,* 176 B.R. 793, 795-96 (Bankr. W.D. Mich. 1995). *See also New Valley,* 2000 WL 1251858 at *11-12 (agreeing with *Gantos*). However, the *Connectix* Court points out that the "time" approach "better serves the economic forces that Congress was trying to address when it enacted the landlord damage cap" in the Bankruptcy Code:

Although Congress wanted to continue the Bankruptcy Act's decision to give landlords some claim for future rent in bankruptcy, it also recognized the historical belief that it was equitable to limit the claims of landlords. The legislative history indicates that Congress started from the premise that, historically, landlords had no claim at all. It was also influenced by the fact that landlords, unlike other general unsecured creditors, have

added protection at the termination of a lease arrangement. Landlords get the property back. As one court concluded, § 502(b)(6) provides landlords with a certain period of time to relet their property. If successful, the landlord suffers no real economic detriment, because reletting the premises restores the landlord to the position it was in prior to lease termination. *See In re Allegheny International, Inc.* 136 B.R. at 402, *aff'd,* 145 B.R. 823 (W.D.Pa.1992).

*Connectix,* 372 B.R. at 494.

I conclude that the text of §502(b)(6)(A) requires application of the 15 percent cap based on the "time" approach.[10] Legislative history and policy offer further support for this conclusion.

## B.    Additional Claims

The Landlord's Claim asserts two claims separately from the §502(b)(6) lease termination damages: (i) the cost ($5,000) to remove abandoned furniture and fixtures left on the Leased Premises, pursuant to Section 26.01 of the Lease (the "Abandonment Claim"),[11] and (ii) the cost ($18,000) to remove a mechanic's lien resulting from the

---

[10] The American Bankruptcy Institute Commission to Study the Reform of Chapter 11 suggested in its Final Report and Recommendations that the calculation of rejection damages for real property leases under §502(b)(6) should be clarified consistent with the "time" approach, as follows:

> The claim of a lessor for damages resulting from the termination of a lease of real property shall not exceed: (i) The greater of (A) the rent reserved for one year under the lease following the termination date and (B) the alternative rent calculation plus (ii) Any unpaid rent due under the lease on the termination date. For purposes of this section: The **"alternative rent calculation"** is the rent reserved for the shorter of the following two periods: (a) 15 percent of the remaining term of the lease following the termination date and (b) three years under the lease following the termination date.

AMERICAN BANKRUPTCY INSTITUTE COMMISSION TO STUDY THE REFORM OF CHAPTER 11, ISBN: 978-1-937651-84-8, Section V.A.6, pp. 129-30 (2014).

[11] Lease Section 26.01, entitled "Delivery At End Of Lease Term," provides, in part:

> Tenant shall deliver up and surrender to Landlord possession of the demised premises upon the expiration or earlier termination of the Lease Term, broom clean, free of debris
> (continued on next page)

Debtors' nonpayment of a contractor who serviced the elevators and escalators in the Leased Premises, in violation of Section 11.04 of the Lease[12] (the "Mechanic's Lien Claim" and, together with the Abandonment Claim, the "Additional Claims"). While the Debtors do not dispute that a landlord may assert separate claims that do not arise from termination of a lease, the Debtors argue that the Additional Claims do indeed arise from termination of the Lease and are subject to the §502(b)(6) cap.

---

> and Tenant's personal property, in good order, condition and state of repair (except as may be Landlord's obligation under this Lease and ordinary wear and tear and damage by casualty) and shall deliver the keys to the office of Landlord in the Building or to Landlord at the address to which notices to Landlord are to be sent pursuant to Section 28.01. Any property of Tenant not promptly removed shall be deemed to have been abandoned by Tenant and to have become the property of Landlord and may be retained by Landlord or disposed of at Tenant's expense (Tenant hereby agreeing to remain liable for the cost thereof even though this Lease shall have terminated) as Landlord shall so desire....

[12] Lease Section 11.04, entitled "No Liens Permitted; Discharged," provides, in part:

> Tenant will not permit to be created or to remain undischarged any lien, encumbrance or charge (arising out of any work done or materials or supplies furnished, or claimed to have been done or furnished, by any contractor, mechanic, laborer or materialman or otherwise by or for Tenant) or any mortgage, conditional sale, security agreement or chattel mortgage, which might be or become a lien or encumbrance or charge upon the Building or any part thereof or the income therefrom. Tenant will not suffer any other matter or thing whereby the estate, rights and interests of Landlord in the Building or any part thereof might be impaired. If any lien or notice of lien on account of an alleged debt of Tenant or by a party engaged by Tenant or Tenant's contractor to work on the demised premises shall be filed against the Building or any part thereof, Tenant, within ten (10) days after notice of the filing thereof, will cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. If Tenant shall fail to cause such lien or notice of lien to be discharged within the period aforesaid, then, in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge the same either by paying the amounts claimed to be due or by procuring the discharge of such lien by deposit or by by [sic] bonding proceedings and in any such event Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and expenses, including reasonable attorneys' fees, incurred by Landlord in connection therewith, shall constitute additional rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand....

Section 502(b)(6) provides that the claim of a lessor *"for damages resulting from the termination of a lease of real property"* should be disallowed to the extent that it exceeds the limits imposed by §502(b)(6)(A) and (B). If the Additional Claims resulted from the termination of the Lease, they are subject to the statutory cap. If the claims do not arise as a result of the Lease termination, then the claims may be asserted separately against the Debtors.

Courts are divided on how to determine which claims "result from termination" of a lease. The Debtors urge the Court to follow cases such as *Foamex* and *McSheridan* that interpret the phrase broadly. *McSheridan* decided that "rejection of the lease results in the breach of each and every provision of the lease, including covenants, and §502(b)(6) is intended to limit the lessor's damages resulting from the rejection." *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91, 102 (9th Cir. B.A.P. 1995) *overruled in part by In re El Toro Materials Co., Inc.,* 504 F.3d 978 (9th Cir. 2007). *See also In re Foamex Int'l, Inc.*, 368 B.R. 383, 393-94 (Bankr. D.Del. 2007) (relying on *McSheridan* and deciding that lessors are entitled to one claim, capped by §502(b)(6), for all prepetition and postpetition breaches of the lease and any resulting damages)

The Landlord argues that this Court should rely on the Ninth Circuit's *El Toro* decision, which overruled, in part, the Bankruptcy Appellate Panel's decision in *McSheridan*, holding "[t]o the extent that *McSheridan* holds section 502(b)(6) to be a limit on tort claims other than those based on lost rent, rent-like payments or other damages directly arising from a tenant's failure to complete a lease term, it is overruled."

*El Toro*, 504 F.3d at 981-82.[13]   In *El Toro*, a debtor left one million tons of its wet clay

"goo," mining equipment and other materials on the leased property after rejecting the

lease. When the landlord brought an adversary proceeding seeking damages of

$23 million for the cost of removing the mess under theories of waste, nuisance, trespass

and breach of contract, the bankruptcy court determined that the claims were not limited

by the §502(b)(6). The Bankruptcy Appellate Panel reversed the bankruptcy court and the

landlord appealed.   The Ninth Circuit determined that the landlord's claims for waste,

nuisance and trespass did not result from the rejection of the lease - - instead, those

claims resulted from the "pile of dirt" allegedly left on the property:

> Rejection of the lease may or may not have triggered [the landlord's] ability to sue for the alleged damages.  But the harm to [the landlord's] property existed whether or not the lease was rejected.  **A simple test reveals whether the damages result from the rejection of the lease:  Assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?**  Here [the landlord] would still have the same claim it brings today had El Toro accepted the lease and committed to finish the term:  The pile of dirt would still be allegedly trespassing on [the landlord's] land and [the landlord] still would have the same basis for its theories of nuisance, waste and breach of contract.  The million-ton heap of dirt was not put there by the rejection of the lease - - it was put there by the action and inactions of El Toro in preparing to turn over the site.

*El Toro*, 504 F.3d at 980-81 (emphasis added).  The *El Toro* Court reasoned that allowing

separate claims was consistent with the purpose of the statute:

---

[13]The Landlord also relies upon *In re Best Prod. Co., Inc.*, 229 B.R. 673, 679 (Bankr. E.D. Va. 1998) (holding that a claim for prepetition deferred maintenance damages was not subject to the cap of §502(b)(6)); *In re Bob's Sea Ray Boats, Inc.*, 143 B.R. 229, 231-32 (Bankr. D.N.D. 1992) (holding that a claim for repairing damages caused by the tenant pre-termination was not a lease termination claim under §502(b)(6)); *In re Atlantic Container Corp.*, 133 B.R. 980, 988 (Bankr. N.D. Ill. 1991) (holding that claims for physical damage to the leased premises and for repair and maintenance expenses are not subject to the §502(b)(6) cap).

The structure of the cap - - measured as a fraction of the remaining term - - suggests that damages other than those based on a loss of future rental income are not subject to the cap. It makes sense to cap damages for lost rental income based on the amount of expected rent: Landlords may have the ability to mitigate their damages by re-leasing or selling the premises, but will suffer injury in proportion to the value of their lost rent in the meantime. In contrast, collateral damages are likely to bear only a weak correlation to the amount of rent: A tenant may cause a lot of damage to a premises leased cheaply, or cause little damage to premises underlying an expensive leasehold.

One major purpose of bankruptcy law is to allow creditors to receive an aliquot share of the estate to settle their debts. Metering these collateral damages by the amount of the rent would be inconsistent with the goal of providing compensation to each creditor in proportion with what it is owed. Landlords in future cases may have significant claims for both lost rental income and for breach of other provisions of the lease. To limit their recovery for collateral damages only to a portion of their lost rent would leave landlords in a materially worse position than other creditors. In contrast, capping rent claims but allowing uncapped claims for collateral damage to the rented premises will follow congressional intent by preventing a potentially overwhelming claim for lost rent from draining the estate, while putting landlords on equal footing with other creditors for their collateral claims.

*El Toro,* 504 F.3d at 980 (footnotes omitted). *See also Kupfer v. Salma (In re Kupfer),* 526 B.R. 812 (N.D.Ca. 2014) (following *El Toro,* and deciding that the landlord's attorney fees and costs from a pre-petition arbitration regarding lease default were collateral damages).

I find the reasoning of the Court of Appeals in *El Toro* persuasive and agree with the more narrow interpretation of §502(b)(6).[14]  The statute does not prevent a landlord

---

[14] The Debtor argues that I should follow *McSheridan*'s broader reading of §502(b)(6), because that decision was adopted by the Third Circuit in *First Bank Nat. Ass'n v. F.D.I.C.,* 79 F.3d 362, 369 n. 7 (3d Cir. 1996).  *First Bank* involved a question about under what circumstances, if any, the Federal Deposit Insurance Agency ("FDIC") is required to pay the cost of lease mandated structural repairs to a building when, as receiver for a failed savings bank, it disaffirms its lease under FIRREA.  In its analysis, the *First Bank* Court looked, in part, to Bankruptcy Code §502(b)(6) and the Ninth Circuit Bankruptcy Appellate Panel's decision in *McSheridan* to inform

(continued on next page)

from asserting a separate claim for damages that do not directly arise from termination of the lease.  Accordingly, I will review each of the Additional Claims before me.

(1)    The Abandonment Claim

The Abandonment Claim covers the cost to remove abandoned furniture and fixtures from the Leased Premises, which (the Landlord argues) is a breach of the Debtors' obligation to surrender the premises in a broom-clean condition.  The Landlord, relying on a narrower reading of §502(b)(6), asserts that the Abandonment Claim is not subject to the statutory cap because it is not a claim for rent for the balance of the lease term. The Landlord's argument conflates the concepts of determining whether a claim results from termination of a lease and determining whether a claim falls within the "reserved rent" language of subsection 502(b)(6)(A).

"Non-rent damages potentially fall within the scope of section 502(b)(6)." *Kupfer*, 2014 WL 4244019, *3.  The *El Toro* Court's narrower reading of the statutory cap did not change this:

> [T]he Ninth Circuit's holding in *El Toro* did not purport to eliminate the possibility that non-rent damages can result from lease termination, nor did it remove non-rent lease termination damages from the section 502(b)(6) cap.  The Court merely effected a correction of controlling precedent by giving meaning to the plain language of the statute, which speaks of a relationship between lease termination and lease damages.

*Id.* at *4 citing *El Toro,* 504 F.3d at 980.

---

its interpretation of 12 U.S.C. §1821(e) (4) concerning the FDIC's obligations when it disaffirms a lease. Since the *First Bank* Court was considering interpretation of FIRREA, any discussion of §502(b)(6) is dictum.  And, after *First Bank* was decided, the Ninth Circuit Court of Appeals decided *El Toro*, which overruled *McSheridan*, in part. Therefore, *First Bank* is not controlling.

Therefore, the initial question is not whether the Abandonment Claim is rent, but whether the Abandonment Claim results from the termination of the Lease.  In the decision *In re Energy Conversion Devices, Inc.,* 483 B.R. 119 (Bankr. E.D. Mich. 2012), the court denied a trustee's request to disallow a landlord's entire claim for "Additional Damages" under §502(b)(6), recognizing that the landlord could assert separate damage claims.  *Energy Conversion,* 483 B.R. at 125 citing *El Toro,* 504 F.3d at 979-81.  However, the Additional Damages claim was based upon claims for:

> [r]emoval of equipment and other personal property in violation of the Lease, . . . damage to the roof, damage to the parking lot, damage to HVAC and exhaust units and fire extinguishers, damage to the landscaping, environmental damage and liabilities, cleaning fees, plumbing damages and other costs to be incurred in restoring the property to the condition set forth in the Lease.

*Energy Conversion*, 483 B.R. at 121.  The *Energy Conversion* Court decided that further development of the record was necessary before it could determine whether particular items in the Additional Damages claim fell within the §502(b)(6) cap.  *Id.* at 125-26.  In *In re Brown,* 398 B.R. 215 (Bankr. N.D. Ohio 2008), the lease provided that the tenant was responsible for "refitting costs" (*i.e.*, costs necessary to make the leased property suitable for the needs of a replacement tenant) only when the debtor was in breach of its covenants under the lease.  *Id.* at 219.  The *Brown* Court determined that the debtor's liability for refitting costs was a consequence directly resulting from the termination of the lease.

The *El Toro* Court determined that the landlord's tort claims for removal of tons of dirt and mining equipment left by the debtor were outside the scope of §502(b)(6). *El Toro,* 504 F.3d at 980-81.  The *El Toro* Court suggests a "simple test" to determine

whether the claim results from rejection of a lease: assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than reject it? In this case, the Landlord would have the same claim for removal of abandoned property, whether the lease terminated upon rejection or, if the lease was assumed, at the end of the lease term. For that matter, the Landlord would also have the same claim due to the natural expiration of the Lease.

Although *El Toro* focuses on whether the damages arose from *rejection* of the lease, §502(b)(6) caps any claims resulting from *termination* of the lease. I find it significant that Congress chose to use the word "termination," not "rejection," in the introductory phrase of §502(b)(6), and conclude that such choice was intentional. In the case before me, the Landlord would remove the Debtors' furniture and fixtures only upon *termination* of the lease. After review of the facts provided in support of the Abandonment Claim, I conclude that the claim is for damages resulting from termination of the Lease and, therefore, the Abandonment Claim is subject to the limitation imposed by §502(b)(6).

Once a court determines that a claim is for lease termination damages, it must decide whether the claim may be included as part of what is "rent reserved" under §502(b)(6)(A). The *McSheridan* Court used the following test to determine whether a claim falls within the "rent reserved":

(1)    the charge must: (a) be designated as "rent" or "additional rent" in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;

(2)    the charge must be related to the value of the property or the lease thereon; and

(3)    the charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.

*McSheridan*, 184 B.R. at 99-100. *See In re Crown Books Corp.*, 291 B.R. 623, 627 (Bankr. D. Del. 2003) (relying on the *McSheridan* test to determine that base rent, CAM charges, insurance premiums and property taxes are subject to the §502(b)(6)(A) cap); *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 348-49 (Bankr. D. Del. 1998) (determining that attorney fees and late payments were designated as "additional rent" under the lease and, therefore, came within the §502(b)(6) limitation, but neither attorney fees nor late charges were "rent reserved" under the *McSheridan* test because neither were related to the value of the property or were fixed, regular or periodic charges).

The Lease designated all payments due from the Debtors as "Additional Rent." However, the Abandonment Claim damages are not fixed, regular or periodic charges and do not qualify as "rent reserved."[15]

Based on the foregoing, I conclude that the Abandonment Claim is a claim that falls within the scope of §502(b)(6), but is not part of the "rent reserved" under §502(b)(6)(A) and, therefore, cannot be included the calculation of the claim under §502(b)(6).

(2)    The Mechanic's Lien Claim

The Mechanic's Lien Claim is based on the Landlord's cost to remove a mechanic's lien on the Leased Premises resulting from the Debtors' nonpayment of a

---

[15] To be clear, I do not find it necessary here to apply the three-part *McSheridan* test, *in toto*, but I do agree that to be properly classifiable as "rent reserved," a charge must be fixed, regular, or periodic.

contractor who serviced the elevators and escalators in the Leased Premises. As discussed above, the Court must first determine whether the Mechanic's Lien Claim results from termination of the Lease. Based on the record before me, I conclude that the Mechanic's Lien Claim exists independent of whether the Lease is terminated. Accordingly, the Mechanic's Lien Claim is not subject to the limitations of §502(b)(6), and the Landlord may assert a separate claim for recovery of those costs.

## IV.    CONCLUSION

Based on the foregoing, I conclude that the text of §502(b)(6)(A) requires application of the 15 percent cap based on the "time" approach. The Landlord's claim must be recalculated accordingly. Further, I conclude that the Landlord's Abandonment Claim falls within the §502(b)(6) cap and cannot be asserted as a separate claim; however, the Landlord's Mechanic's Lien Claim does not fall within the §502(b)(6) cap and may be asserted as a separate claim.

An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: April 16, 2015